# Declaration under Penalty of Perjury

I, Stuart W. Bowen, Jr., in accordance with 28 U.S.C. Section 1746, make the following statement:

*EFFECTS OF NONDISCLOSURE: Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

**Complainant's Name: Denise N. Burgess**

**Agency Number: ARHQOSA07AUG03041**

**Claims being Investigated: Was the Complainant discriminated against based on her race (Black), sex (female), national origin (African-American), and retaliation (opposing unlawful discrimination) when:**

**1. On March 2, 2007, Kristine Belisle, the Complainant's former Special Inspector General for Iraq Reconstruction (SIGIR) Deputy, at the direction of Ginger Cruz, challenged the Complainant's authority?**

**2. On or about May 2007, Ms. Cruz, without consultation with the Complainant, took over an assignment that the Inspector General had given to the Complainant?**

**3. In July 2007, Ms. Cruz targeted the Complainant and her staff for termination when an equivalent unit had four full-time staff members and was slated for no reductions?**

**4. From June 2007 through July 2007, Ms. Cruz delayed hiring staff into the Complainant's section, forcing the Complainant to accomplish work previously done by two full-time individuals?**

GOVERNMENT
EXHIBIT
3

397

Declarant's Initials SB

**5. From June 2007 through July 2007, Ms. Cruz exclusively reviewed the Complainant's time and attendance records in hope of finding irregularities?**

**6. In July 2007, Ms. Cruz isolated the Complainant from the consultative process regarding media activities?**

**7. In July 2007, Ms. Cruz insisted on addressing one of the Complainant's staff members with an improper name?**

**8. On July 23, 2007, the Complainant received a memorandum from R.G. "Nick" Arntson, Chief of Staff for the SIGIR, informing her that effective September 1, 2007, her employment with the SIGIR agency would be terminated?**

**9. On July 23, 2007, Ms. Cruz retaliated against the Complainant for opposing employment practices that were racially discriminatory, by terminating her employment?**

Q: State your full name.

R: *Stuart Waddington Bowen, Jr.*

Q: Identify your race, national origin, and sex.

R: *Caucasian, American, Male*

Q: What were your position title, grade, and series as of June 2007?

R: *Special Inspector General for Iraq Reconstruction; ES IV equivalent*

Q: Briefly describe your duties in that position.

R: *SIGIR is responsible for the oversight of the use, and potential misuse, of the all obligation, expenditure, and revenue associated with reconstruction and rehabilitation activities in Iraq. SIGIR provides independent and objective reviews of programs in Iraq reconstruction and provides audit and inspection reports to Congress. SIGIR produces comprehensive Quarterly Reports to Congress summarizing its audits, inspections, and investigations.*

*I manage a staff of approximately 130 personnel in Arlington, Virginia, and Baghdad, Iraq (and several other locations in the continental United States). I meet regularly with members of Congress to brief them on the progress of Iraq's reconstruction.*

Q: When were you assigned to the position you held as of June 2007? Are you in that same position now? If not, when did you leave that position?

R: *As provided in the Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005 (__P.L. 108-375__), I became and now serve as the Special Inspector General for Iraq Reconstruction. Previously, I was the Inspector General for the Coalition Provisional Authority (CPA), and that position was re-designated as the SIGIR by P.L. 108-375.*

Q: What is the name of the organization to which you were assigned when the claims at issue occurred?

R: *The Special Inspector General for Iraq Reconstruction*

Q: Provide the names and position titles of your first and second level supervisors (the persons to whom you reported) as of June 2007.

R: *As Inspector General, I serve under the general supervision of the Secretaries of State and Defense.*

Q: What was your organizational relationship to the Complainant during her employment within SIGIR?

R: *Complainant served as an Assistant Inspector General. I was her second line supervisor.*

Q: Who hired the Complainant for her position within SIGIR? Did you provide your approval so that the Complainant could be hired?

R: *I identified her for employment and provided approval for her to be hired.*

Q: The Complainant believes that you and Ginger Cruz are responsible for the alleged discrimination against her. Please respond.

R: *I deny that any SIGIR employee, including Ginger Cruz and myself, engaged in any acts of discrimination toward Ms. Burgess.*

Q: Respond to the Complainant's allegation that on March 2, 2007, Ms. Belisle, the Complainant's former SIGIR Deputy, at the direction of Ms. Cruz, challenged the Complainant's authority by performing media-related activity without first advising the Complainant.

R: *I have no direct knowledge of this. However, Ms. Belisle sent me an e-mail dated March 2, 2007, with regard to a media contact she had received in which she copied Ms. Burgess and Ms. Cruz. I believe that Ms. Belisle acted professionally and did not, by this action, challenge Ms. Burgess' authority.*

Q: Respond to the Complainant's allegation that on or about May 2007, Ms. Cruz, without consultation with the Complainant, and because of the Complainant's race, national origin, and sex, took over an assignment that you had given to the Complainant. Include in your response a description of that particular assignment.

R: *I have no knowledge of this.*

Q: Respond to the Complainant's allegation that in July 2007, Ms. Cruz targeted the Complainant and her staff for termination, because of the Complainant's race, national origin, sex, and in retaliation, when an equivalent unit had four full-time staff members and was slated for no reductions.

R: *In the spring and summer of 2007, SIGIR was under financial pressure, particularly from the Office of Management and Budget (OMB), due to potential budget shortfalls and thus reductions in staffing levels became necessary. It was also understood at that point in time that SIGIR could be closing its doors within a year to 18 months. Nick Arntson, then Chief of Staff, informed me that SIGIR could suffer an Anti-Deficiency Act violation if it did not reduce staffing numbers and costs. I tasked Ms. Cruz with the duty to realign our staffing, with particular emphasis on reducing the number of positions in non-core functions and in cutting contractor costs. During this time frame, we reduced staff in Media and Congressional Affairs. We also reduced our footprint in Iraq. The termination of Complainant was in conjunction with this reorganization and was not related to the Complainant's race, national origin, sex, nor was it in retaliation for any complaint.*

Q: Respond to the Complainant's allegation that from June 2007, through July 2007, Ms. Cruz delayed hiring staff into the Complainant's section, forcing the Complainant to accomplish work previously done by two full-time individuals, and I do not believe that this was done because of the Complainant's race, national origin, sex, and in retaliation.

R: *I have no direct knowledge of this. Given that SIGIR was under budget constraints and engaging in a reorganization, it seems appropriate to refrain from hiring staff for this time period. I do not believe that the work-load for public affairs was unreasonable for one person to accomplish, and one person has succeeded in accomplishing this workload for over a year now. Ms. Cruz's action was not taken because of the Complainant's race, national origin, sex, or in retaliation.*

Q: Respond to the Complainant's allegation that because of her race, national origin, sex, and in retaliation, from June 2007, through July 2007, Ms. Cruz exclusively reviewed the Complainant's time and attendance records in hope of finding irregularities.

R: *I have no direct knowledge of this. However, as the Complainant's supervisor, Ms. Cruz was required to approve her time and attendance. I do not believe that such time and attendance review was related to the Complainant's race, national origin, sex, or in retaliation.*

Q: Did the Complainant inform you that Ms. Cruz had reviewed her records for that purpose? If so, when did she inform you, how did she inform you, and what action did you take in response?

R: *I have no recollection of any such conversations.*

Q: Respond to the Complainant's allegation that in July 2007, Ms. Cruz isolated the Complainant from the consultative process regarding media activities, because of her race, national origin, sex, and in retaliation.

R: *I have no knowledge of this.*

Q: Respond to the Complainant's allegation that in July 2007, Ms. Cruz insisted on addressing one of the Complainant's staff members with an improper name by referring to Patricia Redmon as "Pat." Include in your response whether you knew of that incident.

R: *I have no knowledge of this.*

Q: Why did Ms. Cruz use that name? Had Ms. Cruz or anyone else used that name before when addressing Ms. Redmon?

R: *I have no knowledge of this.*

Q: Did Ms. Redmon, or anyone else, object to being addressed as "Pat?" If so, who, when, and in what manner did she or he object? Describe what action management took when it became aware of the objection to the use of the name at issue.

R: *I have no knowledge of this.*

Q: Respond to the Complainant's allegation that on July 23, 2007, she received a memorandum from R.G. "Nick" Arntson, Chief of Staff for the SIGIR, informing her that effective September 1, 2007, her employment with the SIGIR agency would be terminated, and that this was done to her because of her race, national origin, sex, and in retaliation for having complained of Ms. Redmon's termination.

R: *The letter speaks for itself. The termination was based on a necessary reorganization and not because of Complainant's race, national origin, sex, nor in retaliation for having complained of Ms. Redmon's contract being terminated.*

Q: Respond to the Complainant's allegation that on July 23, 2007, Ms. Cruz retaliated against the Complainant, for complaining of Ms. Redmon's termination, by terminating the Complainant's employment.

R: *As discussed above, the termination of the Complainant was part of a reorganization of non-core function positions at SIGIR. The termination was not in retaliation for anything.*

Q: Were you aware of the Complainant having complained about Ms. Redmon's termination? If so, when did she complain, and when and how did you learn of it?

R: *I do not recall. To the best of my recollection, I became aware of her complaint regarding Ms. Redmon during the pendency of this proceeding.*

Q: What was the reason(s) for the Complainant's termination?

R: *As discussed above, in the spring and summer of 2007, SIGIR was under financial pressure, particularly from OMB, to reduce staffing levels. I tasked Ms. Cruz to realign our staffing with a particular eye toward reducing the number of positions in non-core functions and in cutting contractor costs. During this time frame, we reduced staff in Media Affairs and Congressional Affairs. The termination of Complainant was in no way because of the Complainant's race, national origin, sex, or in retaliation.*

Q: Was Kristine Belisle's previous complaint against the Complainant a factor in the Complainant's termination?

R: *No.*

Q: Why did Ms. Belisle quit her employment with SIGIR in the early portion of calendar year 2007?

R: *I am aware that, at the Complainant's direction, Ms. Belisle received a letter from the SIGIR human resource officer informing her that her employment with SIGIR was terminated due to a reorganization.*

Q: Why did Ms. Belisle return to employment with SIGIR after she had previously quit?

R: *I do not know why Ms. Belisle chose to return to SIGIR. However, I do know that she is one of about ten SIGIR employees that have returned to work at SIGIR after a hiatus.*

Q: Was the Complainant's termination a factor in Ms. Belisle's return to employment with SIGIR?

R: *I do not know why Ms. Belisle chose to return to work for SIGIR. I do know that the new position of Director, Public Affairs, was created as part of the reorganization, that Ms Cruz offered her a position and that Ms. Belisle chose to accept that position.*

Q: What was the reason(s) for the termination of Barbara Lewis and Patricia Redmon?

R: *They both were contractors and not government employees. Given budget constraints, SIGIR reduced the number of contractor employees. Generally, contractor employees were considerably more costly for the agency than direct hire employees*

402

Q: Why was it that after the Complainant had been hired for only about seven months, it was determined that her section and position were no longer needed? What changed within that seven-month period to make her termination necessary?

R: *The budget situation changed within that time period. As discussed, above, in the spring and summer of 2007, SIGIR was under tremendous pressure, particularly from OMB, to reduce staffing levels. The then Principal Deputy Inspector General Robin Raphel, whom I had tasked to develop a budget and work with OMB, had submitted a budget to OMB of over $50 million. This was rejected by OMB and caused increased scrutiny of SIGIR's spending, particularly in areas of non-core functions, like Public and Congressional Affairs. I tasked Ms. Cruz with realigning our staffing overall with particular eye toward reducing the number of positions in non-core functions and in cutting contractor costs. During this time frame, we reduced staff in Media Affairs and Congressional Affairs. We also reduced our footprint in Iraq. Once it was determined that Public Affairs would not have a staff, there was no longer a need for Complainant's skill sets. The termination of Complainant was in no way because of the Complainant's race, national origin, sex, or in retaliation.*

Q: Did the Complainant ever report to you or to any other of her supervisors that she believed she was being harassed on her job? If so, to whom did the Complainant report, when did the Complainant tell that person, how did she tell that person, what did the Complainant say, and what was management's response?

R: *No. I have no knowledge as to whether she reported harassment to anyone else.*

Q: Was anyone else involved in the harassment that the Complainant alleges? If so, who and in what manner?

R: *I have no knowledge of this.*

Q: Did you treat the Complainant differently in any manner during her employment with SIGIR because of her race, national origin, sex, or any previous protected EEO activity in which she participated?

R: *No.*

Q: Are you aware of anyone having treated the Complainant differently because of her race, national origin, sex, or previous EEO participation?

R: *No.*

Q: Describe your role in any restructuring of the Agency that occurred prior to the termination of Ms. Redmon and the Complainant?

R: *I tasked Ms. Cruz with realigning SIGIR's staffing to respond to our budgetary pressures. We had several conversations during the course of this realignment. However, Ms. Cruz was completely responsible for managing this task. She had, and continues to have, my full authority and support for her actions in this regard.*

Q: Identify with whom you discussed reorganization of the Agency, when any such discussions occurred, and what was the substance of those discussions? To be clear, "discussions" include any in-person discussions, telephone calls, emails, and/or any other communications.

R: *Ms. Cruz and I had several discussions over this time period. I also had discussions with Nick Arntson, my Chief of Staff. I do not recall the specific dates and times of these discussions. To the best of my recollection, the substance of the discussions with Ms. Cruz involved the nature of the budget problems facing SIGIR and my authorization for her to take necessary actions to address these budgetary problems through a reorganization of non-core functions that would reduce costs, including contractor costs. To the best of my recollection, my discussions with Mr. Arntson involved the budgetary problems facing SIGIR as well as certain administrative matters like the notification of termination to Complainant and the hiring of Ms. Belisle.*

Q: Describe by category and location all documents, electronically stored information, and tangible things that the Agency has in its possession, custody, or control that relates to a reorganization of the Agency in any way, created before the agency terminated the Complainant.

R: *I am aware of no personal records or e-mails addressing the reorganization. Documents that support the reorganization were provided to counsel to provide to the EEO Investigator. It is my understanding that such documents were provided to the Investigator. In addition, Ms. Cruz's notes about the reorganization have also been provided to the Investigator. There are no other files specifically discussing the reorganization. Possible documents include organizational charts, table 30, notes and emails between SIGIR and OMB, memoranda, and e-mails.*

Q: Do you have anything to add?

R: *No.*

END OF STATEMENT

I, Stuart W. Bowen, Jr., declare (*certify, verify or state*) under penalty of perjury, that the foregoing is true and correct.

[signature] (Declarant)s Signature

9.12.08 (Date)

404

## Declaration under Penalty of Perjury

I, R.G. Arntson, in accordance with 28 U.S.C. Section 1746, make the following statement:

*EFFECTS OF NONDISCLOSURE: Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

**Complainant's Name: Denise N. Burgess**

**Agency Number: ARHQOSA07AUG03041**

**Claims being Investigated: Was the Complainant discriminated against based on her race (Black), sex (female), national origin (African-American), and retaliation (opposing unlawful discrimination) when:**

**1. On March 2, 2007, Kristine Belisle, the Complainant's former Special Inspector General for Iraq Reconstruction (SIGIR) Deputy, at the direction of Ginger Cruz, challenged the Complainant's authority?**

**2. On or about May 2007, Ms. Cruz, without consultation with the Complainant, took over an assignment that the Inspector General had given to the Complainant?**

**3. In July 2007, Ms. Cruz targeted the Complainant and her staff for termination when an equivalent unit had four full-time staff members and was slated for no reductions?**

**4. From June 2007 through July 2007, Ms. Cruz delayed hiring staff into the Complainant's section, forcing the Complainant to accomplish work previously done by two full-time individuals?**

**5. From June 2007 through July 2007, Ms. Cruz exclusively reviewed the Complainant's time and attendance records in hope of finding irregularities?**

GOVERNMENT EXHIBIT 4

406

**6. In July 2007, Ms. Cruz isolated the Complainant from the consultative process regarding media activities?**

**7. In July 2007, Ms. Cruz insisted on addressing one of the Complainant's staff members with an improper name?**

**8. On July 23, 2007, the Complainant received a memorandum from R.G. "Nick" Arntson, Chief of Staff for the SIGIR, informing her that effective September 1, 2007, her employment with the SIGIR agency would be terminated?**

**9. On July 23, 2007, Ms. Cruz retaliated against the Complainant for opposing employment practices that were racially discriminatory, by terminating her employment?**

Q: State your full name.

R: Richard Gordon Arntson; also known as Nick.

Q: Identify your race, national origin, and sex.

R: Caucasian, American, Male

Q: What were your position title, grade, and series as of June 2007?

R: Chief of Staff, SES (Administratively Determined), 343

Q: Briefly describe your duties in that position.

R: Responsible for the execution of support staff functions (human resources, budget, etc.); also the staff coordination, communications, and integration of tasks and functions between all the various staff directorates to ensure all the agency tasks were being completed.

Q: When were you assigned to the position you held as of June 2007? Are you in that same position now? If not, when did you leave that position?

R: October 2005. No. I left that position on 4 September 2007 and departed the Special Inspector General for Iraq Reconstruction on 30 September 2007 for the Department of State Inspector General Office.

Q: What is the name of the organization to which you were assigned when the claims at issue occurred?

R: I was the Chief of Staff for the Special Inspector General for Iraq Reconstruction during the time the alleged incidents occurred.

Q: Provide the names and position titles of your first and second level supervisors (the persons to whom you reported) as of June 2007.

R: Ambassador Robin Raphel, Deputy Inspector General; later Ms. Ginger Cruz, Deputy Inspector General, and Stuart Bowen, Special Inspector General for Iraq Reconstruction.

Q: What was your organizational relationship to the Complainant during her employment within SIGIR?

R: We were peers on the senior staff.

Q: Who hired the Complainant for her position within SIGIR?  Did you provide your approval so that the Complainant could be hired?

R: Mr. Stuart Bowen hired the complainant after conferring with Ambassador Robin Raphel. Both had met the complainant during a meeting at the Department of Defense in December 2006. I did review the complainant's resume provided to me by Ambassador Robin Raphel but did not participate in any interviews with the complainant. I ensured the complainant's hiring packet was processed and met her for the first time when she reported to work in January 2007.

Q: The Complainant believes that Ginger Cruz and Stuart Bowen are responsible for the alleged discrimination against her.  Please respond.

R: The complainant stated to me on several occasions from mid - July through August 2007 that she believed both her and Ms. Redmon were terminated because they were African-American and they conducted themselves differently than what Mr. Bowen and Ms. Cruz desired. The complainant stated to me that she believed Ms. Cruz felt threatened by the complainant's extensive resume of experience in the Foreign Service and communications management. Further the complainant believed because of both her strong objection to Ms. Cruz's decision concerning the termination of Ms. Redmon and Ms. Cruz's perception of the complainant's treatment of her friend Ms. Belisle, while serving as the complainant's deputy, that she was targeted for termination. The complainant stated to me she believed these were acts of discrimination and retaliation against her which she intended to file a formal complaint with the appropriate agencies.

Q: Respond to the Complainant's allegation that on March 2, 2007, Ms. Belisle, the Complainant's former SIGIR Deputy, at the direction of Ms. Cruz, challenged the Complainant's authority by performing media-related activity without first advising the Complainant.

R: Ms. Belisle made contact with one of her media sources without consulting the complainant concerning a story about our organization. Ms. Belisle informed me she had taken the action on the advice of Ms. Cruz because she felt the complainant was stifling her initiative and hurting her professional reputation with Belisle's media sources. My response to Ms. Belisle was Ms. Burgess, the complainant, was her supervisor and Ms. Burgess was held responsible and accountable for the actions of the complainant's subordinates by Mr. Bowen. I told Ms. Belisle it was inappropriate for Ms. Cruz to instruct Ms. Belisle to take such an action and also inappropriate for Ms. Belisle to follow Ms. Cruz's instructions.

Q: Respond to the Complainant's allegation that on or about May 2007, Ms. Cruz, without consultation with the Complainant, and because of the Complainant's race, national origin, and

sex, took over an assignment that you had given to the Complainant. Include in your response a description of that particular assignment.

R: The complainant had been given the responsibility based on her position and duties as the Assistant Inspector General for Public Affairs to maintain and keep current the organization's website. Ms. Cruz while reviewing the website noticed several out of date items which included Congressional testimony provided by Mr. Bowen early in the year. Ms. Cruz took it upon herself to inform Mr. Bowen of the missing items and volunteered to get the testimony and other items on the website current. Ms. Cruz then proceeded to contact Ms. Marthena Cowart, Assistant Inspector General for Congressional Affairs, concerning the missing testimony and the organization's Informational Technology (IT) staff about posting the missing testimony and other items without informing the complainant of her actions. The complainant was very upset with Ms. Cruz's actions and met with Mr. Bowen which then led to a subsequent meeting with Mr. Bowen, concerning a review of what went wrong with the website posting process. It was determined there were several staff failures in the posting of the testimonies to the website mostly outside the control of the complainant's staff section.

Q: Respond to the Complainant's allegation that in July 2007, Ms. Cruz targeted the Complainant and her staff for termination, because of the Complainant's race, national origin, sex, and in retaliation, when an equivalent unit had four full-time staff members and was slated for no reductions.

R: Shortly after Ms. Cruz was re-instated as the Deputy Inspector General, Ms. Cruz announced there would be a re-organization within the Congressional Affairs and Public Affairs staff sections due to budget issues. However, the only re-organization occurred within Public Affairs. The complainant's position was re-designated from Assistant Inspector General for Public Affairs to Director, Public Affairs. One staff assistant position (Ms. Patricia Redmon) was eliminated, the other staff assistant position was to be a shared asset with the Congressional Affairs office, and the Deputy Public Affairs position was to remain but stay unfilled. The Congressional Affairs office only changed two of its staff titles but did not reduce its staff level. I do not know if the Ms. Cruz did these things because of the complainant's race, national origin, sex, and/or in retaliation to the complainant.

Q: Respond to the Complainant's allegation that from June 2007, through July 2007, Ms. Cruz delayed hiring staff into the Complainant's section, forcing the Complainant to accomplish work previously done by two full-time individuals, and this was done because of the Complainant's race, national origin, sex, and in retaliation.

R: See response above. Ms. Cruz did delay hiring into certain staff sections pending her review and decisions concerning a re-organization.

Q: Respond to the Complainant's allegation that because of her race, national origin, sex, and in retaliation, from June 2007, through July 2007, Ms. Cruz exclusively reviewed the Complainant's time and attendance records in hope of finding irregularities.

R: Ms. Cruz requested that I provide her the complainant's time and attendance records because she believed the complainant was taking excessive time off for personal and medical

appointments during critical periods when she was needed at the office in preparation for and during our July 2007 quarterly report cycle.

Q: Did the Complainant inform you that Ms. Cruz had reviewed her records for that purpose? If so, when did she inform you, how did she inform you, and what action did you take in response?

R: I informed the complainant concerning Ms. Cruz's inquiry into the complainant's time and attendance records, which as a supervisor Ms. Cruz had the authority to do. I informed the complainant of Ms Cruz's inquiry and told the complainant she should be prepared to respond.

Q: Respond to the Complainant's allegation that in July 2007, Ms. Cruz isolated the Complainant from the consultative process regarding media activities, because of her race, national origin, sex, and in retaliation.

R: The complainant reported to me in July 2007 she was being excluded from discussions with Mr. Bowen concerning media strategy and decisions reference media activities by Ms. Cruz. I do not have any first hand knowledge of this action being taken by Ms. Cruz but from my previous experiences with Ms. Cruz and given Ms. Cruz's previous experience in communications and public affairs and Mr. Bowen's reliance on Ms. Cruz's opinion on such matters it is possible that the complainant was isolated from consultative process regarding media.

Q: Respond to the Complainant's allegation that in July 2007, Ms. Cruz insisted on addressing one of the Complainant's staff members with an improper name by referring to Patricia Redmon as "Pat." Include in your response whether you knew of that incident.

R: I was not a witness to the incident but both the complainant and Ms. Redmon made me aware of the incident. Both the complainant and Ms. Redmon considered this deliberate because it was well known since Ms. Redmon joined the organization in February 2007 that she did not like to be called Pat but Patricia. It was now July 2007 and both the complainant and Ms. Redmon believed it was a deliberate act on Ms. Cruz's part to demean Ms. Redmon personally.

Q: Why did Ms. Cruz use that name? Had Ms. Cruz or anyone else used that name before when addressing Ms. Redmon?

R: I do not know why Ms. Cruz used that name in addressing Ms. Redmon. Ms. Cruz and all other members of the staff who interacted with the Public Affairs office routinely had been informed and knew that Ms. Redmon did not like being called Pat but Patricia. Both the complainant and Ms. Redmon believed it was a deliberate act on Ms. Cruz's part to demonstrate her power over the complainant's staff.

Q: Did Ms. Redmon, or anyone else, object to being addressed as "Pat?" If so, who, when, and in what manner did she or he object? Describe what action management took when it became aware of the objection to the use of the name at issue.

R: When Ms. Redmon first arrived in February 2007 the complainant told every one who she was and that she preferred to be called Patricia not Pat. This included Ms. Cruz. Mr. Bowen called Ms. Redmon, Patricia as did all the senior staff. If an error occurred with a new staff



member it was usually handled directly either by Patricia or the complainant. I do not recall any flagrant or repetitive occurrences concerning calling Ms. Redmon, Patricia, until the reporting of the incident with Ms. Cruz by the complainant and Ms. Redmon in July 2007.

Q: Respond to the Complainant's allegation that on July 23, 2007, she received a memorandum from you informing her that effective September 1, 2007, her employment with the SIGIR agency would be terminated, and that this was done to her because of her race, national origin, sex, and in retaliation for having complained of Ms. Redmon's termination.

R: I was not part of the decision to terminate the complainant's employment. The decision was made by Ms. Cruz and Mr. Bowen along with advice of legal counsel. Ms. Cruz told me of the decision a few hours prior to the meeting the complainant had with Ms. Cruz and Mr. Patrick Bowers, Deputy General Counsel. Following the meeting the complainant asked for a written notification of her termination which as the Chief of Staff, I believed I had the responsibility to provide her. I drafted the notification and had the draft letter reviewed and approved by Ms. Cruz and Mr. Patrick Bowers, who met with the complainant about her termination before I signed it and provided it to the complainant.

Q: Respond to the Complainant's allegation that on July 23, 2007, Ms. Cruz retaliated against the Complainant, for complaining of Ms. Redmon's termination, by terminating the Complainant's employment.

R: Ms. Cruz received an email from the complainant stating she, Ms. Burgess, would be unable to attend a previously scheduled meeting because she had an appointment with the Office of Special Counsel that morning. Ms. Cruz informed me and forwarded me the email. She then asked to see both Deputy General Counsels Mr. Patrick Bowers and Mr. Justin Martell. I was informed later that morning by Ms. Cruz to arrange a meeting for that afternoon with the complainant, Ms. Cruz, and Mr. Bowers. Ms. Cruz and Mr. Bowers informed me separately that the complainant would be informed of her termination that afternoon.

Q: Were you aware of the Complainant having complained about Ms. Redmon's termination? If so, when did she complain, and when and how did you learn of it?

R: Yes. I do not recall the exact date but it was late June 2007 because we had intended to give all affected employees 30 day notice prior to the effective date of their termination which was around August 1, 2007. The complainant believed Ms. Redmon's termination was targeted at the complainant and her public affairs section to make them less effective and enable Ms. Cruz to terminate the complainant.

Q: What was the reason(s) for the Complainant's termination?

R: The official reason was staff re-organization but Ms. Cruz did state on several occasions she did not like the complainant personally, she did not believe the complainant was properly advising and assisting Mr. Bowen with media issues and activities, and it was reported to me from other staff members that Ms. Cruz was upset over the treatment and removal of Ms. Cruz's friend Ms. Belisle by the complainant.

Q: Did the Agency give you any indication of a restructuring prior to the termination of Ms. Redmon and the Complainant? If so, who told you, when were you told, and what specifically were you told?

R: As previously stated, shortly after Ms. Cruz was re-instated as the Deputy Inspector General, Ms. Cruz announced there would be a re-organization within the Congressional Affairs and Public Affairs staff sections due to budget issues. However, the only re-organization occurred within Public Affairs. The complainant's position was re-designated from Assistant Inspector General for Public Affairs to Director, Public Affairs. One staff assistant position (Ms. Patricia Redmon) was eliminated, the other staff assistant position was to be a shared asset with the Congressional Affairs office, and the Deputy Public Affairs position was to remain but stay unfilled. The Congressional Affairs office only changed two of its staff titles but did not reduce its staff level. Additional staff positions within the organization held by contractors would be converted to government and other contractor positions would be eliminated. Only the re-organization of the Congressional Affairs office and Public Affairs office was completed prior to my departure in Sept 2007. The remainder of the re-organization decisions was left for the new Chief of Staff to review and decide.

Q: What documents are created/used when terminating someone in a position such as the Complainant's? Were those documents used when terminating the Complainant?

R: The complainant was the first person at this level who was terminated. Previously persons in these senior staff positions had resigned. But based on the advice of counsel provided to Ms. Cruz the only document I was made aware of or involved with was the notification letter previously addressed above.

Q: Was Kristine Belisle's previous complaint against the Complainant a factor in the Complainant's termination?

R: I believe yes.

Q: Why did Ms. Belisle leave her employment with SIGIR in the early portion of calendar year 2007?

R: Ms. Belisle and the complainant were not able to work well together and it was causing frustration by both parties and undue stress to Ms. Belisle. Ms. Belisle believed she would be better off professionally in turning her attention full time to her own business and not arguing with the complainant her professional capabilities.

Q: Why did Ms. Belisle return to employment with SIGIR?

R: Ms. Belisle was contacted by Ms. Cruz in early August and told that the complainant had been terminated and Ms. Cruz asked Ms. Belisle to return to SIGIR.

Q: Was the Complainant's termination a factor in Ms. Belisle's return to employment with SIGIR?

R: Absolutely yes.

Q: What was the reason(s) for the termination of Barbara Lewis and Patricia Redmon?

R: Ms. Cruz believed that Barbara Lewis' cost (salary) and contribution to the quarterly report and our Lesson Learned projects were not warranted. Ms. Cruz believed and requested Ms. Lewis to reduce her hours from 40 to 20 per week which Ms. Cruz believed was more representative of the actual hours needed by Ms. Lewis' skills and analysis. Ms. Lewis disagreed and insisted she was needed 40 hours per week on these projects. After a few weeks of awkward disagreement and discussion Barbara Lewis was released.

Ms. Cruz did not believe Ms. Redmon was qualified or possessed the skills necessary to perform all the functions and duties which the complainant had hired Ms. Redmon to perform. Additionally, Ms. Cruz also believed the organization was paying too much for the position which Ms. Redmon occupied and for the performance of those duties; therefore both the position and Ms. Redmon were targeted for elimination over the objection of the complainant. Ms. Cruz saw Ms. Redmon's position as an overage and unnecessary position; however that same position had existed within that staff directorate for over 3 years while Ms. Cruz previously served as Chief of Staff and the Deputy Inspector General.

Q: Why was it that after the Complainant had been hired for only about seven months, it was determined that her section and position were no longer needed? What changed within that seven-month period to make her termination necessary?

R: The section was not eliminated but significantly reduced in staffing. The position of Assistant Inspector General for Public Affairs was re-designated as Director, Public Affairs. The Deputy Public Affairs position also still remained as of 4 Sept 2007 when I left my position as Chief of Staff. Ms. Cruz believed due to her experience in communications and public affairs she could direct and manage a smaller public affairs section while still performing her duties as Deputy Inspector General. The job description for the Assistant Inspector General for Public Affairs was re-written in August 2007 as the Director, Public Affairs. Most of the public affairs policy and planning was placed under the responsibility of the Deputy Inspector General. Also, some of the website responsibilities were divided out to other staff sections reducing the requirements within the Public Affairs section and other responsibilities were eliminated. All of these actions lead to the outcome of a smaller public affairs section then the organization had in January 2007.

Q: Did the Complainant ever report to you or to any of her supervisors that she believed she was being harassed on her job? If so, to whom did the Complainant report, when did the Complainant tell that person, how did she tell that person, what did the Complainant say, and what was management's response?

R: Yes. But the complainant's description of the harassment to me would be more accurately described as "being hassled" by Ms. Cruz with frequent verbal questioning and continual follow-up concerning tasks and projects assigned to the complainant. The complainant stated that Ms. Cruz had knowingly established unrealistic timelines, based on Ms Cruz's stated experience in the communications and public relations workplace; to accomplish the assigned tasks. The complainant also stated Ms. Cruz further denied her the authority to hire additional staff resources to accomplish these tasks in a timely manner. The complainant believed these were all

deliberate actions to discredit her. There was no requirement at that time for a management response or action.

Q: Was anyone else involved in the harassment that the Complainant alleges? If so, who and in what manner?

R: No; to the best of my knowledge.

Q: Did you treat the Complainant differently in any manner during her employment with SIGIR because of her race, national origin, sex, or any previous protected EEO activity in which she participated?

R: NO.

Q: Are you aware of anyone having treated the Complainant differently because of her race, national origin, sex, or previous EEO participation?

R: NO.

Q: Do you have anything to add?

R: Yes. I had reminded both Mr. Patrick Bowers and Mr. Justin Martell, Deputy General Counsels advising Ms. Cruz concerning the re-organization of the Office of Public Affairs and the termination of Ms. Burgess, that the Office of General Counsel had previously informed me and other members of the senior staff on several occasions that during a re-organization the members of the organization whose positions were being eliminated must be offered other open staff positions for which they are qualified. I do not know if they reminded Ms. Cruz of this opinion but the complainant stated to me in August 2007 she was not offered another comparable position for which she was qualified by Ms. Cruz.

END OF STATEMENT

I, R.G. Arntson, declare (*certify, verify or state)* under penalty of perjury, that the foregoing is true and correct.

Richard G. Arntson (Declarant's Signature)

9-15-2008 (Date)

414



**SPECIAL INSPECTOR GENERAL FOR IRAQ RECONSTRUCTION**

August 27, 2008

Martin J. Welker
Department of Defense
Civilian Personnel Management Service
2656 San Antonio Avenue
Wright-Patterson AFB, OH 45433-5650

Dear Mr. Welker:

Attached are 20 pages of notes taken by Ginger Cruz that were maintained in a bound book and referred to at the fact finding conference you conducted on August 26, 2008, relating to claims by Denise Burgess. I have redacted the information not relevant to the fact finding conference. If you have any additional questions for Deputy Inspector General Cruz based on the documents attached, she would be willing to participate in an additional conference or interview, or answer interrogatories relating to them.

As I indicated at the fact finding conference, we will review once again Ms. Cruz' notebook for the May-July 2007 time period (consisting of 146 pages) and ensure you get copies of anything that is responsive to the request for documents as soon as possible.

Do not hesitate to contact me if you have any questions.

Sincerely,

Lynne M. Halbrooks
Lynne M. Halbrooks
General Counsel

Enclosures
cc: Michael J. Baratz

GOVERNMENT EXHIBIT 5

375

178

DOJ has supported Greyson's cases. 2 recently.

comparison of remuneration < military / contractors

062007

376

1'14

Robin/John ← set one quickly

6/26/2007 11a. · meeting Dave/ Mike / Ginger

July 6 Retreat: 10 top goals

June 29. Robin's last Day

Rick · move toward commit (deputy - choice)

Linda → Ric. Mgmt DIR

Barry Pullman - GAO SES/Deputy - sp projects

185

DIG-O
DIG-B   "digby"
BIG-P

Dave
Mike
Ginger

 187

contract pay

(8B issues) Barry Sp. Asst to DIG-O.
Matthew - Principal Deputy. SES ~~Sr. Advisor~~
Deputies only GS-15.

• Rick - OK, update / 7-15 July Here.
• Dave not here on the 6th - postpone
when is start date. 30 July or 6 Aug.

Denise on vacation on 6 ~~July~~ August

PD's ready Thu.

Robin's last Day 8/3. After.

Office Space ... ? - no need to decide now.

201

70307 -5

(1) (OT) Preapproval. / Submitted / Effective Sunday.
GC signature authority for AGs. Pub/CA/PA.

Joshua making 31K yr. w/ [illegible]
15% GS9 step 1 46K.
Pub Affairs Specialist.
[illegible] the only one we could get.

funding position \ Redistribution of work.
3 FTEs. / Restructuring [illegible]
just started in June

Jason instead. ?

/ Reevaluate all Staff.

Chuck
[illegible] Sylvia Back Nov 13 she's done.

(Paul Janiczek.)

Olson - COS: Sp Programs

reappointments
Anders [illegible], Berefeld, [illegible], [illegible], Sue Fields
Ron Nadia [illegible] Klein. Josh Eklund.

Bray [illegible] - Auditors. [illegible] for Tammy. [illegible] Warren.

* / Hillel — 2 options for Maitreya > Sr Advisor.
Dir of Programs

☆ New Org Chart

380

COPY

DEPARTMENT OF DEFENSE

OFFICE OF COMPLAINT INVESTIGATIONS

INVESTIGATION IN THE COMPLAINT OF

DENISE N. BURGESS

AGENCY DOCKET NUMBER:

ARHQOSA07AUG03041

FACT-FINDING CONFERENCE

Tuesday, August 26, 2008

Arlington, Virginia

INVESTIGATOR: MARTIN J. WELKER

REPORTED BY: VIRGINIA JOHNSON
FREE STATE REPORTING

SEP
HQDA - EEO
SAAA - EO
Received

GOVERNMENT EXHIBIT 6

## A P P E A R A N C E S

On Behalf of the Complainant:

MICHAEL J. BARATZ
SUSAN HUHRA
HARRY LEE

On Behalf of the Agency:

ANDREA BERNARDO
LYNNE HALBROOKS

## I N D E X

| Witness: | Page: |
|---|---|
| Denise Burgess | 11 |
| Ginger Cruz | 80 |
| Patricia Redmon | 174 |
| Janice Nisbet | 186 |
| Kris Belisle | 211 |

KRISTINE BELISLE

was called for questioning, and after having been first duly sworn, was examined and testified as follows:)

EXAMINATION

BY THE INVESTIGATOR: Please be seated. And please state your full name.

THE WITNESS: Kristine Rose Belisle.

THE INVESTIGATOR: And identify your race.

THE WITNESS: White, Caucasian.

THE INVESTIGATOR: And identify your national origin.

THE WITNESS: American.

THE INVESTIGATOR: Okay. And your sex is female, is that correct?

THE WITNESS: Correct.

THE INVESTIGATOR: As of calendar year 2007, describe your employment status with SIGIR and by that, I mean whether you were a federal government employee or a contractor employee, and granted, it might have varied during that year of 2007. If you could kind of explain what it was, when.

THE WITNESS: Certainly. I started the year 2007 as a federal government employee and departed, and then in July of 2007 came back as a contract employee, and then in August of 2007 I was converted to a federal

government employee.

THE INVESTIGATOR: Okay. And why, for that short stint in July, why were you a contract employee?

THE WITNESS: Because I had departed SIGIR in March and was contacted in July and asked to return to help them out for a short period of time and then I -- so I came back as a contractor; however, then I stayed, so I reverted to a government employee.

THE INVESTIGATOR: When you returned in July, was it the intent was for you to become a government employee?

THE WITNESS: That was not my intent and the conversation was very quick that I had with them in preparation to come back and so we didn't really discuss the long term. I was simply asked to come back and to facilitate the process, to speed it up. It was to return as a contract employee.

THE INVESTIGATOR: Okay. Early in your -- the first part of the year, 2007 --

THE WITNESS: Um-hum.

THE INVESTIGATOR: -- what was your position title?

THE WITNESS: I was a Deputy Assistant Inspector General for Public Affairs.

THE INVESTIGATOR: And what was your grade and

series or what other identifier used for that position?

THE WITNESS: Yeah, I have to be honest with you. I don't know. I know that we do administrative determined zero-zero and that there is a grade determined for pay scale, but I don't -- I've never paid close attention to it. This is the only government job I've held, so I didn't come in in a ranking. I think it was 12 or 13, but I really don't know.

THE INVESTIGATOR: When you again entered employment as a government employee with SIGIR in August, what was your duty title then?

THE WITNESS: Director of Public Affairs.

THE INVESTIGATOR: And do you recall -- grade, series, position, anything like that?

THE WITNESS: We didn't discuss grade.

THE INVESTIGATOR: And are you in that current -- in that position now?

THE WITNESS: I am.

THE INVESTIGATOR: And briefly describe your duties back in the January 2007 timeframe.

THE WITNESS: Well, for the month of January, there was change at the end of January, but for the month of January I was asked -- my previous boss quit and gave 24 hours notice. I was asked by the Chief of Staff to manage all of the duties of both Public Affairs and

Congressional Affairs because up until that moment they actually were combined. When my boss quit, they were split into two different departments.

Two individuals were hired, Denise Burgess and Marthena Cowart, and came onboard -- we were in the process of releasing our quarterly report. So I was asked to assume all duties of both sections until the report was released at the end of January and then to transition the responsibilities to Denise and Marthena and then act as Denise's deputy.

THE INVESTIGATOR: Okay. And what were your duties when you came back onboard, July of 2007?

THE WITNESS: As Director of Public Affairs, I managed the media relations, liaison with the press, act as spokesperson, manage speaking engagements, do talking points for any appearances the Inspector General or the Deputy Inspector General may make and field public inquiries.

THE INVESTIGATOR: What was the reason that you left your employment with SIGIR early in the year of 2007?

THE WITNESS: I was Deputy Assistant Inspector General for Public Affairs and had a number of run-ins with Denise and the Chief of Staff came back to me and told me that she had made the decision she didn't like

me, that my personality was not one that she wished to work with and so I -- and that she was reducing my duties and I was allowed to be her secretary if I wanted to stay, which I declined.

I was overqualified for that and wouldn't have found it challenging. And so at that point, I -- they offered -- well, there was a back-and-forth and in the end, I said I disagree with the way that I was being treated, that she was allowed to make that decision over a matter of days based on two run-ins.

THE INVESTIGATOR: I need to ask for clarification.

THE WITNESS: Sure.

THE INVESTIGATOR: Who made this -- you're saying she and I'm wondering if we're talking the Deputy of SIGIR or --

THE WITNESS: I was told that Denise was allowed to make the decision that she no longer wished for me to work with her in her department. And also I was to be her secretary.

THE INVESTIGATOR: You would've been Ms. Burgess's secretary?

THE WITNESS: Correct.

THE INVESTIGATOR: Okay.

THE WITNESS: I declined that position, but

then there was further back-and-forth about what was taking place and the way that I was treated and so I did, at that point, tell the Chief of Staff -- I was told I could either resign or be let go and I just told him I refuse to resign because I disagreed with the process and how I was being treated. And so then I was given a letter stating that there is a reorganization and my position was reorg'd out.

THE INVESTIGATOR: You refused to resign and the reason that you left was your position was reorganized?

THE WITNESS: The letter that I received, that's what it stated, but I was told by the Chief of Staff I was essentially being let go because Denise did not like me.

THE INVESTIGATOR: Who wrote this or created this letter of reorganization?

THE WITNESS: I think it was signed by the Chief of Staff. I haven't looked at it recently.

THE INVESTIGATOR: That would be Mr. Arnston?

THE WITNESS: Yes.

MS. BERNARDO: I don't know if it's in the record, but I have a copy of it here.

THE INVESTIGATOR: Um-hum.

MS. BERNARDO: Right here.

MR. BARATZ: Mr. Welker, can we get copies of that --

MS. BERNARDO: Yeah.

MR. BARATZ: -- to put in the record?

THE INVESTIGATOR: Okay. Just one second, here. Quickly looking just to make sure I don't already have -- no, I don't think I do. Yeah.

MR. BARATZ: I'm virtually positive that you don't have the document.

THE INVESTIGATOR: Okay. And for the record, this is a letter dated March 26, 2007, assigned to Kristine Belisle, signed by Janice Nisbet. It deals with -- mentions reorganization of her position.

MS. HALBROOKS: Want -- to make copies?

MR. BARATZ: No, that's okay. I'll wait for the copy. Thank you.

THE INVESTIGATOR: What was the reason that you returned to employment with SIGIR?

THE WITNESS: At the time, I was consulting. I had a couple of clients for which I was doing communications consulting for and when Ginger asked me to come back and help them and return as a contractor, I was happy to do so. I had positive relations with everyone at SIGIR with the exception of Denise and so it was my understanding she was not going to be there. I said I

thought I was just going back to help out for a short period of time. I was happy to do so. I had all of the media contacts, I knew everyone. I knew that they were in a pinch in terms of the report was about to come out at the end of July and I knew that I'd be able to easily facilitate the process of releasing it.

THE INVESTIGATOR: Do you have any information regarding the Complainant's termination?

THE WITNESS: No.

THE INVESTIGATOR: When you were invited to come back for employment, did -- who did you speak with?

THE WITNESS: I spoke with Ginger Cruz.

THE INVESTIGATOR: Did she tell you anything about the Complainant's termination.

THE WITNESS: She did not. I asked if she would be there because I would not have worked with her again and so I know that she wasn't going to be there, but that's all that I knew.

THE INVESTIGATOR: Did you treat the Complainant differently in any manner during her employment with SIGIR because of her race, national origin, sex or because of any EEO complaints she might have made?

THE WITNESS: No.

THE INVESTIGATOR: Are you aware of anyone else

having treated the Complainant differently for those same reasons?

THE WITNESS: No, absolutely not.

THE INVESTIGATOR: My last question for you before I invite others to ask you questions, do you have anything to add, anything you care to state?

THE WITNESS: Only that I had reviewed some of the information for today and I understand that it's being stated that there is concern about this March 2nd event where I passed an e-mail to the Inspector General and that I was being insubordinate to Denise and I'd only like to state that I did everything in my power to make her transition into SIGIR as easy as possible.

I was running around crazy trying to do everything for her to make it a smooth transition, for everything to go successfully. I, in no way, shape or form was ever insubordinate to her and on the event of March 2nd, I got a call from a reporter who wanted a very quick interview with the Inspector General. He was leaving the country, Denise was not available. I called, she did not answer. I waited two hours, it was not -- my call was not returned and so I sent an e-mail to the Inspector General that cc'd Denise simply so that they would know that this request had come in.

THE INVESTIGATOR: Okay. Mr. Baratz, questions

you may have?

MR. BARATZ: Have you heard anything from anyone about the hearing today?

THE WITNESS: No. I mean, I was here this morning, so just -- was told that it would continue to proceed and I could not sit in until now. That was it.

MR. BARATZ: When did Ginger first, Ms. Cruz, first contact you about returning to SIGIR?

THE WITNESS: I think it was the second week of July. I was in Minnesota, which is where I'm from, so I was with family. She called me and I told her that I was in Minnesota and not available to have a longer conversation, but she asked about my schedule and my availability, what I was doing in my career, and I told her I'd be back to D.C. that following week.

I think that's correct, return to the third week, if I'm correct, somewhere around the 15th. When I returned, we went to lunch. It was a Friday and I don't know the exact date off the top of my head. I think it might've been the 20th, perhaps, which -- because I had a wedding shower the next day and I think it was on the 21st, but it was a Friday and she asked me at that time to come back.

MR. BARATZ: What did she say to you?

THE WITNESS: That they -- there was going to

be a change in the Public Affairs staffing and they needed help releasing the report.

MR. BARATZ: So when you came onboard, you had to jump in right away on this huge report?

THE WITNESS: Correct.

MR. BARATZ: And when is that report released?

THE WITNESS: It depends on if it's an annual or a semi-annual, but that one was released on July 30th.

MR. BARATZ: Did she -- did Ms. Cruz explain to you at all why you were jumping in a week, two weeks before that major report had to be released?

THE WITNESS: No. I mean, I knew that -- I assumed then that Denise would be leaving and not releasing the report and so that's why I was needed because I had released the reports in the past.

MR. BARATZ: And what was your understanding as to why Ms. Burgess would be leaving?

THE WITNESS: I didn't have an understanding. I didn't ask.

MR. BARATZ: Did you find out afterwards? Did you discuss it with anyone after --

THE WITNESS: I was -- yeah, the department was downsized.

MR. BARATZ: The department was downsized how?

THE WITNESS: In that the contract staff was

let go, some people were shuffled around. I knew Marthena Cowart was -- that there was a reorganization, that Marthena Cowart moved on, Denise moved on.

MR. BARATZ: And who told you about the reorganization?

THE WITNESS: You know, to be honest with you, I don't know. I mean, it was -- I mean, multiple people were leaving, so it was talked about in the office by multiple people.

MR. BARATZ: And that reorganization occurs, are you -- come in that week before that major report, how hard did you have to work when you got back here?

THE WITNESS: I think I worked a good 10 or 12 day each day to make sure that I was up to being on the content of the material and could answer the questions quickly. That's usually the most taxing part of it.

MR. BARATZ: That phone call in Minnesota, when did you think that was?

THE WITNESS: The second week of July.

MR. BARATZ: And Ms. Cruz called you?

THE WITNESS: Correct.

MR. BARATZ: And what did she say?

THE WITNESS: She asked about my schedule and my availability. She understood that I was in Minnesota working and she wanted to know how long I would be in

Minnesota and just was asking what I was up to. She knew I was consulting.

MR. BARATZ: Did she mention, at that time, the possibility of rejoining SIGIR or was this just sort of a find out how you were doing, where you are and what your schedule is?

THE WITNESS: I think it was find out how I was doing and catch up and she mentioned that there may be opportunity, but she didn't say with SIGIR, even. She just said there may be opportunity for me to do some more work.

MR. BARATZ: Did you understand that to be as part of your consulting practice? What did you understand that to mean?

THE WITNESS: I assumed that it was because I had no intention of not consulting at that time. I had been working to build up consulting clients, so I had no intention I was changing that.

MR. BARATZ: And the reason you were in the D.C. area on that Friday was because of the wedding shower?

THE WITNESS: Well, I live here, so I was finished with my time in Minnesota. I was scheduled to come back at that time, anyways. But I did specifically schedule my time in Minnesota to end because it was one

of my closest friends. I needed to be here for that occasion.

MR. BARATZ: Where did you have lunch?

THE WITNESS: Ted's.

MR. BARATZ: Where -- is that --

THE WITNESS: Ted's is Ted's Montana Grill, I think it's called, in Crystal City. It's across the street from the SIGIR office.

MR. BARATZ: And how long did that lunch last?

THE WITNESS: It wasn't a long lunch. I think it was probably about an hour, maybe it was an hour and a half. I mean, it was an average lunch time.

MR. BARATZ: Did you bring your resume with you?

THE WITNESS: No.

MR. BARATZ: Did you understand that the lunch was going to be discussing a new position with SIGIR?

THE WITNESS: No, I did not have that much detail going into the lunch.

MR. BARATZ: And what was exactly said at the lunch?

THE WITNESS: That she needed somebody to come in and help release the report and was I available and would I be interested.

MR. BARATZ: And you responded --

THE WITNESS: That I would be interested. I sent her my resume the next day.

MR. BARATZ: So you sent it to her on the weekend?

THE WITNESS: Yes, I sent it Saturday.

MR. BARATZ: Via e-mail?

THE WITNESS: Correct.

MR. BARATZ: Was that your personal e-mail?

THE WITNESS: It was.

MR. BARATZ: Do you keep your e-mail? Do you still have that?

THE WITNESS: I do. I do have it.

MR. BARATZ: The responsibilities for your job now --

THE WITNESS: Um-hum.

MR. BARATZ: Well, let me strike that. You were familiar, because you were here, of what Ms. Burgess's responsibilities were when she was the Assistant Inspector General for Public Affairs, right?

THE WITNESS: If those responsibilities would have changed once I was not working directly with her or after my departure, then I would not be -- I mean, I can tell you as I knew them from my previous boss and I assumed Denise assumed the same responsibilities. If they changed, I would not have been familiar with them.

MR. BARATZ: And how do those responsibilities compare with your responsibilities now?

THE WITNESS: I don't know that I can say. I mean, I know that it would've been expected of her to manage the press; I manage the press. I know that -- I assume it would've been expected of her, as it was of my previous boss, to give comment to the press and act as a spokesperson, which I do. And also to cover speaking engagements and general communications for the agency.

MR. BARATZ: At your lunch on the 20th with Ms. Cruz, did you know when Ms. Cruz wanted you to start back at SIGIR?

THE WITNESS: I did not. I mean, I ended up starting that Tuesday, I believe, which I did not expect.

MR. BARATZ: And how did that occur? You sent your resume on Saturday. What happens next?

THE WITNESS: They called me Monday and said can you come in tomorrow.

MR. BARATZ: When -- what time did they call you on Monday?

THE WITNESS: I don't know. It was sometime in the afternoon.

MR. BARATZ: When you had -- you said that there was tension in your professional relationship with Ms. Burgess.

 THE WITNESS: Correct.

MR. BARATZ: Who did you discuss those issues with at SIGIR?

THE WITNESS: Nick Arnston.

MR. BARATZ: Anyone else?

THE WITNESS: No. I mean, not specifically that I can recall. I mean, I had -- multiple conversations with Nick Arnston. Oh, actually I discussed it briefly with Jim Burn, who is no longer with the organization, and I most likely discussed it with Dina Nevarez although I don't recall specifically, but I would imagine that she's someone I would've discussed it with.

MR. BARATZ: Any conversations with Ms. Cruz?

THE WITNESS: No.

MR. BARATZ: How long have you known Ms. Cruz?

THE WITNESS: Since I joined the organization, September of 2005.

MR. BARATZ: And no interactions with her before that?

THE WITNESS: Before 2005 in September, no.

MR. BARATZ: How did you get a position with SIGIR?

THE WITNESS: I knew Jim Burn, who had been the General Counsel at the time. He knew that I worked in

C E R T I F I C A T E

This is to certify that the attached proceedings before Martin J. Welker in the matter of:

Complaint of Denise Burgess

Agency Docket Number: ARHQOSA07AUG03041

Arlington, Virginia

August 26, 2008

were held as herein appears, and that this is the original transcription thereof for the file of the Office of Complaint Investigations.

/S/

Virginia Johnson, Reporter
Notary Public
FREE STATE REPORTING, INC.

**EEO COUNSELOR'S REPORT**
For use of this form see AR 690-600, the proponent agency is OSA.

1. DA DOCKET NUMBER
ARHQOSA07A060304

**PRIVACY ACT STATEMENT (5 U.S.C. §552a)**

**AUTHORITY:** Public Law 92-261

**PRINCIPAL PURPOSE:** Used for processing of complaints of discrimination because of race, color, national origin, religion, sex, age, physical and/or mental disability, or reprisal by Department of the Army civilian employees, former employees, applicants for employment and some contract employees.

**ROUTINE USES:** Information will be used *(a)* as a data source for complaint information for production of summary descriptive statistics and analytical studies of complaints processing and resolution efforts; *(b)* to respond to general requests for information under the Freedom of Information Act; *(c)* to respond to requests from legitimate outside individuals or agencies *(White House, Congress, Equal Employment Opportunity Commission)* regarding the status of a complaint or appeal; or *(d)* to adjudicate complaint or appeal.

**DISCLOSURE:** Voluntary, however, failure to complete all appropriate portions of this form may lead to delay in processing and/or rejection of complaint on the basis of inadequate data on which to continue processing.

**SECTION I - PRE-COMPLAINT INTAKE INTERVIEW**

2. NAME OF AGGRIEVED *(Print-Last, First, Middle Initial)*: BURGESS, DENISE N.
3. SSN: [redacted]
4. JOB TITLE: FORMER: ASSISTANT INSPECTOR GENERAL FOR PUBLIC AFFAIRS
5. PAY PLAN/SERIES/GRADE: SES/4 AD/0301/00
6. DUTY ORGANIZATION *(Complete address including office symbol)*: FORMER: SPECIAL INSPECTOR GENERAL FOR IRAQ RECONSTRUCTION 2011 CRYSTAL DRIVE CRYSTAL CITY, VA 22202
7. WORK TELEPHONE: N-A
8. HOME TELEPHONE: [redacted]
9. HOME ADDRESS: [redacted]
10. DATE OF ALLEGED DISCRIMINATORY ACTION *(YYYYMMDD)*: 4/07 - 7/07
11. 45TH CALENDAR DAY AFTER EVENT *(YYYYMMDD)*:
12. REASON FOR DELAYED CONTACT BEYOND 45 DAYS, IF APPLICABLE:
13. DATE OF INITIAL CONTACT WITH EEO OFFICIAL *(YYYYMMDD)*:
14. 30TH CALENDAR DAY AFTER INITIAL CONTACT WITH EEO OFFICIAL *(YYYYMMDD)*:
15. 90TH CALENDAR DAY AFTER INITIAL CONTACT WITH EEO OFFICIAL *(YYYYMMDD)*:
16. DATE COUNSELING EXTENSION GRANTED, IF APPLICABLE *(YYYYMMDD)*:
17. DATE PRE-COMPLAINT INTAKE INTERVIEW CONDUCTED *(YYYYMMDD)*: 8/13/07
18. PRE-COMPLAINT INTAKE INTERVIEW CONDUCTED: ☐ Telephonically ☑ In-Person ☐ Other *(facsimile/e-mail)*

**SECTION II - ORGANIZATION WHERE ALLEGED DISCRIMINATION OCCURRED** *(Complete address including office symbol)*

SPECIAL INSPECTOR GENERAL FOR IRAQ RECONSTRUCTION (SIGIR)

**SECTION III - RESPONDING MANAGEMENT OFFICIAL(s) INFORMATION** *(Include name, complete work address and phone number if known.)*

STUART BOWEN - SPECIAL INSPECTOR GENERAL
SPECIAL INSPECTOR GENERAL FOR IRAQ RECONSTRUCTION
2011 CRYSTAL ~~[illegible]~~ DRIVE
CRYSTAL CITY, VA 22202
GINGER CRUZ - DEPUTY INSPECTOR GENERAL
(703) 428-1044

13 AUG 2007 HQDA - EEO SAAA - EO Received

DA FORM 7510, FEB 2004

20

GOVERNMENT EXHIBIT 7

**SECTION IV - BASIS OF COMPLAINT** *(Identify specific race, color, religion, national origin, disability, age, sex, or reprisal if alleged.)*

☑ RACE AFRICAN AMERICAN ☐ COLOR ______ SEX ☐ Male ☑ Female

☐ AGE ______ DATE OF BIRTH ______ ☐ NATIONAL ORIGIN ______

☐ RELIGION ______ DISABILITY ☐ Mental ______ ☐ Physical ______

☐ REPRISAL ______
*(Date(s) of prior EEO activity)*

**SECTION V - MATTER(s) GIVING RISE TO COMPLAINT** *(Specify who, what, where, and when.) (Use additional sheet of paper if necessary.)*

SEE ATTACHMENT.

**SECTION VI - RELIEF SOUGHT**

COMPENSATORY DAMAGES
EMPLOYMENT AND SALARY (PRIOR EMPLOYMENT)

**SECTION VII - RIGHTS AND RESPONSIBILITIES**

THE AGGRIEVED WAS PROVIDED WITH THE AGGRIEVED PERSON'S RIGHTS AND RESPONSIBILITIES NOTICE AND WAS SPECIFICALLY ADVISED OF THE FOLLOWING:

- [ ] The basis*(es)* for filing pre-complaint, formal complaint, and/or class complaint, and of right to file a formal complaint of discrimination.
- [ ] The pre-complaint, formal and/or class complaint process.
- [ ] The 45-day calendar requirement from effective date of personnel action or of the date of the matter alleged to be discriminatory.
- [ ] The role of the EEO counselor, including that the counselor is not an advocate for either the aggrieved person or the agency and acts strictly as a neutral.
- [ ] The activity's Alternate Dispute Resolution *(ADR)* Program and right to elect either ADR *(if offered)* or traditional EEO counseling.
- [ ] The right to remain anonymous during the pre-complaint process.
- [ ] The right to representation throughout the complaint process.
- [ ] Responsibility of the aggrieved to notify the EEO office in writing of any change in address and/or phone number.
- [ ] Responsibility of the aggrieved to notify the EEO office in writing of non-attorney or attorney representation, including address and phone number.
- [ ] The possible election requirement between a negotiated grievance procedure, MSPB procedure and the EEO complaint process.
- [ ] The election options in age and wage-based discrimination complaints.

**SECTION VIII - ELECTION OF REPRESENTATION**

☐ ATTORNEY ☐ NON-ATTORNEY ☐ NON-REPRESENTATIVE

| NAME OF REPRESENTATIVE | | ADDRESS |
|---|---|---|
| TELEPHONE NUMBER | FAX | E-MAIL |

**SECTION IX - ALTERNATE DISPUTE RESOLUTION *(ADR)***

☐ Matter determined not appropriate for ADR ________________ *(Aggrieved must sign and date)*

☐ Matter determined appropriate for ADR ________________ *(EEO Officer must initial and date)*

☐ Wishes to participate in ADR, if offered ________________ *(EEO Officer must initial and date)*

Date of written offer of ADR ________________

Date of Agreement to Participate in ADR ________________

Name of assigned ADR facilitator/mediator ________________

Date ADR facilitator/mediator assigned ________________

**Result of ADR:**

☐ ADR was successful. Negotiated settlement agreement, signed on ________ *(YYYYMMDD)*, is

☐ ADR was not successful. The aggrieved was issued a Notice of Right to File a Formal Complaint of Discrimination on ________ *(YYYYMMDD)* and notified of requirement to file a formal complaint within 15 calendar days after receipt of Notice of Right to File. The aggrieved was provided a DA Form 2590, Formal Complaint of Discrimination.

**SECTION X - TRADITIONAL EEO COUNSELING** *(EEO official to complete only those which apply.)*

☐ Election of traditional counseling.

Name of assigned EEO counselor ________________

Date EEO counselor assigned ________________

☐ Election to remain anonymous.

☐ Election to waive right to remain anonymous.

☐ Declined to pursue matter under Title VII.

**SECTION XI - WITNESS INQUIRY**

a. Witness Information *(List all witness data here. Number sequentially and include name, title, organization, phone number, and relevant basis(es) information.)*

b. Witness Statements

# DENISE N. BURGESS

**To:** Directorate of Equal Employment Opportunity
U.S. Army Resources and Programs Agency
Office of the Administrative Assistant to the Secretary
2530 Jefferson Davis Highway, Taylor Building
Arlington, VA 22202-3905
Attn: Ms. Stephanie Dawkins
Intake Specialist

**From:** Denise N. Burgess

**Subject:** EEO Complaint

**Date:** August 13, 2007

This memo is a formal Equal Employment Opportunity complaint. I and at least one of my colleagues – Patricia Redmon – have been discriminated against by our employer, The Special Inspector General for Iraq Reconstruction (SIGIR). It appears we were both targeted for termination as a result of our race. Moreover, I have suffered retaliation for complaining about this discrimination to SIGIR's current Deputy Inspector General, the individual responsible for the discriminatory personnel decision. I was dismissed within 72 hours of a verbal complaint and 24 hours of a written complaint.

Moreover, I and at least three other professional staff have been discriminated against based on our gender. We have been subjected to a targeted campaign of harassment and intimidation aimed at ensuring our departure. In the past two months SIGIR's entire contingent of female senior staff, with the exception of the current Deputy Inspector General, have resigned or been terminated.

The dates of the alleged violations are April 2007 through July 27, 2007.

Complaining Party: Denise N. Burgess

Respondent: Mr. Stuart Bowen, Special Inspector General
Ms. Ginger Cruz, Deputy Inspector General
Special Inspector General for Iraq Reconstruction
2011 Crystal Drive, 11th Floor
Crystal City, VA 22202
703-428-1100
Number of Employees: Approximately 130

24

**EEO COMPLAINTS**
SIGIR's abrupt decision to eliminate my position appears to be in retaliation for complaining about the fairness of the decision to terminate my staff assistant. The subsequent elimination of my position can be clearly traced to my verbal EEO complaint on July 19th and my e-mail complaint on the morning of July 23rd (see Tab A). I was informed of my termination within hours of sending the complaining e-mail.

In a July 19th meeting with the Deputy Inspector General, I was informed that my assistant Ms. Patricia Redmon would be terminated in two weeks. At that time I specifically raised my concern that the decision was unfair. I questioned the equality of the decision to terminate Ms. Redmon since the Public Affairs sister section, Congressional Affairs, was overstaffed. I asked if anyone from the Congressional Affairs unit would also be released. Ms. Cruz said no. The Congressional Affairs section had four full-time employees – two at the SES level who are White, one at the Deputy level who is also White, and one staff assistant who is African-American. The Public Affairs section had two full-time employees – one at the SES level and one staff assistant, both of whom are African-American. Both sections have equal workloads. (In fact, a credible argument can be made that the Public Affairs workload exceeds that of Congressional Affairs.) However, the decision was made to terminate only Ms. Redmon despite her excellent work record.

I told Ms. Cruz that I it would be extremely difficult for me to manage the workload with out an assistant. She said I could expect help from her, the Inspector General and other AIGs. At no time did she indicate that my position was in danger of elimination due to budget cuts. In fact, her comments clearly indicated an expectation I would continue in my position well beyond Ms. Redmon's release date.

On Monday, July 23rd I raised again my EEO complaint, this time in an e-mail copied to appropriate SIGIR senior staff. In it, I stated my position that the decision to terminate Ms. Redmon was unfair and unequal. I requested a management meeting including the outgoing Deputy Inspector General, SIGIR's Chief of Staff, SIGIR's General Counsel, and SIGIR's HR Director to reconsider the decision to terminate Ms. Redmon. In clear retaliation for my complaints, I was terminated that afternoon.

The following data-points leave little room for speculation as to motive:

- My performance during my tenure at SIGIR was excellent (see Tab B);
- the workload and the nature of the work in Public Affairs had not changed;
- the organization's public affairs needs had not changed. Senior-level communications counsel was still required to prevent public affairs missteps and bad press advice (see Tab C);

**Data Points toward motive (con't)**

- no objective criteria could be produced to justify the decision to eliminate my position and Ms. Redmon's; both were ad hoc and based on personal prejudice;
- the Deputy Inspector General admitted the decisions were based on a need for the "right mix of people." Neither I nor Ms. Redmon fit the unknown requirements for "the right mix of people," however, the sole common denominator between us is race.

Moreover, I was informed that a "new" position had been created in the allegedly defunct Public Affairs section. However, I was not offered the new Director of Public Affairs position, although I am professionally qualified to fill it. It was offered to a former employee, who presumably met the "right mix of people" criteria. Ms. Kristine Belisle, my former deputy, was hired to fill the position, the requirements of which remain substantively unchanged (see Tab D). I am told Ms. Belisle's salary is within the same range as mine even though Ms. Belisle's experience, credentials, professional accomplishments, and education are not commensurate with mine (See Tab E). She is, however, White.

**HARASSMENT AND INTIMIDATION**

Since being rehired by SIGIR and subsequently appointed as Deputy Inspector General, Ms. Cruz has undertaken a subtle but targeted campaign to prevent me from carrying out my duties to the best of my abilities. Her actions were aimed at harassing and intimidating me, and caused me to suffer illness, insomnia, humiliation, and untold stress. Following are examples of harassment and intimidation I endured:

- Ms. Cruz exclusively reviewed my time and attendance records in hopes of finding irregularities, according to SIGIR administrative officials;
- SIGIR leadership attempted to monitor my e-mail traffic without the proper authority from the Department of Defense, according to SIGIR administrative officials;
- Ms. Cruz encouraged my former Deputy, Ms. Kristine Belisle, to challenge my authority as the Public Affairs director. She clearly encouraged Ms. Belisle to defy normal professional standards and SIGIR established policy by suggesting Ms. Belisle approach the Special Inspector General with an interview request, despite repeated guidance from me that all requests of this nature should come to me first (see Tab F);
- When Ms. Belisle's contract was not renewed as the result of documented poor performance, Ms. Cruz encouraged Ms. Belisle to file a complaint against me accusing me of creating a hostile work environment. My response to Ms. Belisle's accusations are submitted for the record (see Tab G). I was advised by the then Deputy Inspector General, Ambassador Robin Raphel who spearheaded an inquiry into the matter, that the investigation concluded that Ms. Belisle's complaints failed to meet the government's definition of a hostile work environment and thus her accusations were found to be without merit;

**HARASSMENT AND INTIMIDATION (CON'T)**

- undercutting my authority by hijacking an assignment given to me by the Special Inspector General. Ms. Cruz issued guidance to the wider staff in contradiction to a request from me for comments on a proposed guidance change (see Tab H);
- isolating me from the consultative process regarding media activity (see Tab I);
- delaying hiring staff into my section, forcing me to accomplish the work previously done by two full-time individuals;
- targeting my sole staff member, (who is also African-American) for termination when an equivalent unit (in workload and importance to the mission – Congressional Affairs) had four full-time staff and was slated for no reductions;
- refusing to address my staff assistant by her proper name (Patricia vice Pat), despite repeated requests by me and Ms. Redmon to do so. Ms. Redmon was warned by her colleague that she would "lose her job" if she continued to challenge Ms. Cruz by insisting on being address by her proper name.

**ATTITUDES REVEALED**

The current Deputy Inspector General's views regarding issues of race and discrimination were made clear to me in a comment she made at the start of a staff meeting in April, shortly after her arrival. Her comments caused me immediate concern. She said "These people who file complaints are looking for an excuse for their own incompetence – they're always the weak ones." I was completely taken aback and immediately concerned since EEO is so strongly associated with African-Americans. I did not openly challenge her, but instead engaged her in conversation on the topic to ensure I'd heard her right. She indeed reconfirmed my understanding of her comments.

Moreover, Ms. Cruz sent an e-mail in late April thanking me for my help with managing negative press coverage regarding an on-going U.S. government investigation of Ms. Cruz and Mr. Bowen. The investigation is the result of complaints filed with the President's Council on Integrity and Efficiency by former SIGIR employees. In that e-mail, Ms. Cruz reveals her own negative assessment of our working relationship despite the fact that no negative incident had taken place between. It appears she had developed a negative assessment of me independent of any substantive interaction with me (see Tab J).

Moreover, several colleagues (who will not be named due to legitimate fears of retaliation) warned me prior to her arrival and thereafter, that Ms. Cruz had no tolerance for highly-competent women; that she considered them a threat to her position; and that she had a reputation for targeting women for harassment and termination. I was further warned that the Inspector General would take no action to curb excessive or unethical behavior by Ms. Cruz. I was told that before she was rehired to SIGIR (after resigning her employment at the U.S. Embassy in Baghdad where she could not work successfully with the Foreign Service staff – see Tab K), she boasted "I'm back and people are just going to have to move over." Many of my colleagues believed her threat was directed at me.

**BACKGROUND**

I was targeted for dismissal by SIGIR for reasons completely unrelated to my professional performance – which was documented as excellent up to my last day at SIGIR (See Tab L). The Special Inspector General approved the decision to illegally terminate me, and took no action to control the activities of his new Deputy despite numerous warnings by members of his senior staff that she was managing poorly and acting unethically, if not illegally. Since I refused to resign under pressure and intimidation, and I had the temerity to challenge discriminatory personnel practices, I was terminated. SIGIR has relied on the pretext of a shadowy office reorganization – that allegedly was driven by an unsubstantiated demand by OMB that SIGIR cut its budget – to attempt to justify these illegal personnel actions.

Based on warnings from my colleagues, comments, and actions, I am convinced I was singled-out for harassment, intimidation and ultimately termination as a result of my race and gender. I was the sole African-American senior manager at SIGIR. I also note that every female senior manager at SIGIR has been subjected to a relentless campaign of intimidation and harassment since the arrival of the new Deputy Inspector General. The former Deputy Inspector General, Ambassador Robin Raphel and former AIG Marthena Cowart resigned under attacks launched against their professionalism and credibility.

**ABUSE OF 3161 HIRING AUTHORITY**

SIGIR has been granted 3161 hiring authority, which means the organization's employees do not enjoy civil service rights and protections. This is as it should be, given the temporary nature of the organization. However, 3161 hiring authority does not absolve the organization of its ethical responsibility to conform to established US government rules and regulations. More importantly, it is not a license to ignore the law. SIGIR's leadership has abused the freedom from personnel protections that 3161 hiring authority offers. Far more egregious, SIGIR may have used that authority to break the law.

In general, dismissal should be based on documented poor performance – whether under civil service rules or 3161 hiring authority. The liberty afforded by this unique authority is not mandated to allow capricious hiring and firing of employees. It is mandated to assist a temporary USG organization to hire qualified individuals without the lengthy process required for regular civil service appointments. The absence of civil service protections under 3161 hiring authority has left SIGIR employees victim to the whims and personal prejudices of SIGIR's leadership.

**BUDGET CUTS LEADING TO REORGANIZATION**

Many U.S. government agencies have been forced to reorganize in response to budgetary constraints. Under normal federal agency standards and regulations, established practices for fairly and equitably managing staff reductions during a cost-cutting exercise are followed. They include: a hiring freeze, capturing reductions from attrition, canceling non-essential travel, curtailing overtime, downsizing discretionary projects, and other cost-saving measures. If a reduction in force is necessary, it must be accomplished through a transparent and fair process, with clear mission-based criteria as the means for determining those to be dismissed.

Should positions be downgraded, employees slated for termination are entitled to the right of first refusal for those positions remaining for which they qualify. I was afforded no such consideration under the current reorganization. However, when the SIGIR Congressional Affairs section underwent a reorganization in June to accommodate a new AIG for Congressional Affairs, the sitting AIG was removed from her position and was offered another position, created for her. This narrative demonstrates a clear double standard at SIGIR.

All employees should understand the means by which they were selected for termination. Well-established practices such as those noted above serve as a bulwark against discriminatory decision-making. They are widely practiced throughout both the public and private sectors and SIGIR is not an exception in this matter. Few, if any of the actions described above were taken in response to the alleged budget deficit of 2 million dollars (out of a total budget of 35 million dollars). In fact, new employees continue to be hired and new positions created, bringing into question the credibility of the contention that Ms. Redmon and I were terminated to save money. Moreover, I understand the individual hired to replace me is earning only 10,000 dollars less than my previous salary – hardly a substantive cost savings. Even when an employee is terminated due to legitimate budget cuts, selection based on race and/or gender is still illegal. The new Deputy Inspector General's responses to my questions regarding the basis for my termination clearly indicate no objective, mission-based criteria were used in selecting me and Ms. Redmon for termination. (See Tab M).

I note that the claim of required budget cuts is itself questionable. At SIGIR's July 12th staff meeting – where the neither the current Deputy Inspector General nor the Special Inspector General were present – the AIG for Congressional Affairs reported that, in a meeting the previous day with OMB, the officials there assured the SIGIR delegation that any budget shortfall would be covered through a supplemental request this year. The AIG for Congressional Affairs said he was not concerned about SIGIR's budget and was completely confident any budget issues would be adequately addressed by Congress. He noted that several pieces of pending legislation, when passed, would actually increase SIGIR's responsibilities and budget.

**CONCLUSION**

Since my arrival at SIGIR I have received only positive feedback regarding my work from the Special Inspector General, Mr. Stuart Bowen, and also from Ambassador Robin Raphel, the previous Deputy Inspector General, as well as from my colleagues within SIGIR and from SIGIR's outside media contacts. In a meeting to discuss Ms. Cruz's appointment as the new Deputy Inspector General in June, Mr. Bowen told me I was doing an excellent job and assured me that I would be with the organization "for the duration." There was no mention of potential budget constraints nor of any possibility of a major reorganization – this, less then three months before my position was "eliminated." In addition, I received a monetary award from Mr. Bowen in early June for outstanding performance.

Given these facts, it is clear my professional performance is not in question.

As regards the required budget cuts, there was no hard evidence presented to SIGIR senior staff of a 2 million dollar deficit, nor any focused discussion among the senior staff regarding cost control. There have been no Congressional budget cuts. There was no plan developed, nor implemented with consistent, transparent cost-control measures. In fact, the SIGIR recently hired new senior staff while at the same time claiming budget constraints. Moreover, the Special Inspector General offered to expand staffing of the LLCR team during a board meeting in July. Finally it was reported by a reliable source that OMB would resolve any budget deficit through a supplement funding request to Congress.

Given these facts, it is clear SIGIR's alleged budget deficit had not reached a sufficiently critical stage to warrant immediate and summary terminations.

The "shadowy reorganization," driven by an alleged, immediate requirement for budget cuts, suffers from an alarming lack of transparency. SIGIR's senior staff was not consulted regarding the timing, manner, or even the need for a reorganization. Even if extreme cost-cutting measures were required, they were taken in an ad hoc manner reflecting the personal wishes of one individual with the support of the Special Inspector General. As a result they are unfair and unequal. Moreover, it appears African-Americans are bearing a disproportionate burden of the decision to eliminate positions. There was no organized, communicated plan for a drawdown of SIGIR staff. Instead, there was one individual making decisions based on her own prejudices and attitudes, in the context of a well-known, inexplicable and long-standing alliance at the senior most level of SIGIR.

Given these facts, it is clear the claim that both positions in the Public Affairs Section had to be eliminated for cost-savings and for mission-based reasons is not credible.

**Burgess, Denise Ms SIGIR**

**om:** Denise Burgess [burgess.denise@gmail.com]
**nt:** Monday, July 23, 2007 9:47 AM
**o:** Burgess, Denise Ms SIGIR; burgess.denise@gmail.com
**Subject:** Fwd: Stuart.Bowen@sigir.mil;Robin.Raphel@sigir.mil;John.Acken@sigir.mil;Justin.Martell@sigir.mil ;James.Bowers@sigir.mil;Nick.Arntson@sigir.mil;Janice.Nisbet@sigir.mil

---------- Forwarded message ----------
From: Denise Burgess <burgess.denise@gmail.com>
Date: Jul 23, 2007 9:04 AM
Subject:
Stuart.Bowen@sigir.mil;Robin.Raphel@sigir.mil;John.Acken@sigir.mil;Justin.Martell@sigir.mil <http://sigir.mil>
;James.Bowers@sigir.mil;Nick.Arntson@sigir.mil;Janice.Nisbet@sigir.mil
To: Ginger.Cruz@sigir.mil <mailto:Ginger.Cruz@sigir.mil>

Ginger,

I have an appointment at the PCIE this morning and so I will not be in the office. I'm not sure how long they will keep me so I don't know what time I'll be in.

However, I believe we need to revisit the decision to terminate Patricia. As I told you on Thursday when you informed me of this decision, I have serious concerns about the fairness and equality of this action. I believe we need to have a robust discussion that includes the appropriate management staff, whom I have copied on this message. If we are able to do so today, we should plan to do so in a conference call as soon as you are available given your travel schedule.

Many thanks,
Denise

301

GOVERNMENT EXHIBIT 8

**Bernardo, Andrea Q Ms SIGIR**

**From:** Nisbet, Janice E Ms SIGIR
**Sent:** Thursday, May 08, 2008 4:20 PM
**To:** Bernardo, Andrea Q Ms SIGIR
**Subject:** FW: David Mays (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Budget issues

-----Original Message-----
From: Burgess, Denise Ms SIGIR
Sent: Friday, July 13, 2007 11:06 AM
To: Nisbet, Janice E Ms SIGIR
Subject: David Mays (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

It's a budget issue. They are holding new hires until they have some assurance we will have sufficient funds, in time, to make offers. They anticipate news next week sometime.

Denise

Denise N. Burgess
Assistant Inspector General for Public Affairs Office of the Special Inspector General for Iraq Reconstruction
703-428-1217
...se.Burgess@sigi...

Classification: UNCLASSIFIED
Caveats: NONE
Classification: UNCLASSIFIED
Caveats: NONE

366

GOVERNMENT EXHIBIT 9

**Bernardo, Andrea Q Ms SIGIR**

| | |
|---|---|
| **From:** | Nisbet, Janice E Ms SIGIR |
| **Sent:** | Thursday, May 08, 2008 4:20 PM |
| **To:** | Bernardo, Andrea Q Ms SIGIR |
| **Subject:** | FW: David Mays (UNCLASSIFIED) |

Classification: UNCLASSIFIED
Caveats: NONE

Fyi. J.

-----Original Message-----
From: Burgess, Denise Ms SIGIR
Sent: Wednesday, July 11, 2007 9:03 AM
To: Nisbet, Janice E Ms SIGIR
Subject: David Mays (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Hi Janice,

I selected David Mays, but didn't move forward due to the reorganization. I spoke with Ginger and she's onboard with offering David the position.

Thanks,
Denise

Denise Burgess
Assistant Inspector General for Public Affairs Office of the Special Inspector General
for Iraq Reconstruction
703-428-1217
Denise.Burgess@sigir.mil

Classification: UNCLASSIFIED
Caveats: NONE
Classification: UNCLASSIFIED
Caveats: NONE

365

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| DENISE BURGESS,<br><br>Plaintiff,<br>v.<br><br>PETE GEREN, Secretary of the Army<br><br>Defendant. | Civil No. 1:09-cv-763<br>JCC/JFA |

**DECLARATION of JANICE NISBET**

My name is JANICE NISBET. I am the Director, Management and Administration for the office of the Special Inspector General for Iraq Reconstruction (SIGIR). I was appointed to this position in July 2009. From March 2005 to July 2009, I served as the Chief, Staffing and Operations Support with the SIGIR. From November 2004 to March 2005, I was a contractor providing human resource services to the Office of the SIGIR.

1. As the Chief, Staffing and Operations Support, I reported to the Chief of Staff through the Deputy Chief of Staff. I oversaw the execution of human resource activities on behalf of SIGIR. I also supervised travel, deployment and, upon request, supported the budget process by providing personnel-related information.

2. I understand that Ms. Denise Burgess alleges that the reorganization of the SIGIR in July 2007, which resulted in her removal from the organization, was motivated by her race and retaliation for protected activity.

3. SIGIR, the Special Inspector General for Iraq Reconstruction, has a highly specialized mission providing independent and objective oversight of Iraq reconstruction. SIGIR is a temporary organization. SIGIR's statue provides it with special personnel appointment authority pursuant to 5 U.S.C. 3161. As provided by 5 U.S.C. 3161, SIGIR employees may be appointed to temporary employment for periods not to exceed three years and their positions are in Schedule A of the Excepted Service. In practice, all SIGIR employees are appointed to terms of less than two years, normally 13 months; however, these appointments may be terminated early.

4. In January 2007 Ms. Burgess was offered a 3161 appointment as Assistant Inspector General for Public Affairs (AIG for Public Affairs). This was a supervisory, managerial job equivalent to a Senior Executive Service position. She was advised in a January 25, 2007 offer letter (Attachment 1) that her 3161 appointment may be

GOVERNMENT
EXHIBIT
10

terminated early. She accepted the offer that same day (Attachment 2). Her appointment was effective as of February 4, 2007, with a not to exceed date of March 4, 2008. Ms. Burgess' SF 50, Notification of Personnel Action dated February 4, 2007, is attached as Attachment 3. (For a few weeks in January 2007, prior to her official February appointment, Ms. Burgess had informally performed the functions of SIGIR's AIG for Public Affairs while she was still formally employed and paid by another federal agency.)

5. The Department of the Army serves as SIGIR's Support Agent. During in-processing, Army provides all new SIGIR employees a memorandum that outlines some of the restrictions of a time limited 3161 appointment to include that (a) employment may be terminated earlier than the established "not to exceed date," (b) the employee does not have the protection of reduction-in-force procedures, and (c) the employee is not eligible for assignment to any other position by promotion, change to lower grade or reassignment. Ms. Burgess signed the memorandum provided to her by Army on February 4, 2007 (Attachment 4) acknowledging that she read and understood the restrictions of a 3161 appointment. These same restrictions apply to all 3161 appointments at SIGIR.

6. At the beginning of July 2007, there were four positions within the Public Affairs Office: one senior level position (AIG for Public Affairs), held by Ms. Burgess, and three staff level positions (Media Relations Chief, a contracted support person, and one vacant position for a Public Affairs Specialist). The AIG for Public Affairs and the contracted support position were eliminated in July 2007. In August 2007, the vacant position for a Public Affairs Specialist was filled by a GS-15-equivalent employee, Ms. Kristine Belisle, a Caucasian Female, under the title of Director of Public Affairs. (Ms. Belisle actually started work on July 24, 2007, as a contracted consultant pending the processing of her paperwork for employment as Director of Public Affairs.) From that time to the present, as explained below, the public affairs duties have been essentially performed by one person, the Director of Public Affairs -- a staff level position with no supervisory or managerial responsibilities.

7. The Media Relations Chief position was eliminated in November 2007 at the conclusion of the incumbent's term. Even before the position was eliminated, the Media Relations Chief had been on intermittent and extended leave in connection with military service and a worker's compensation claim. Since November 2007, there has been only one public affairs position at SIGIR, the Director of Public Affairs. When the Caucasian Female originally appointed to that position resigned from SIGIR to work at another federal agency, the Director of Public Affairs position was filled by a Caucasian Male with Arabic language skills.

8. In July 2007, there were three positions within the Congressional Affairs Office: two senior level positions (AIG for Congressional Affairs and a Senior Advisor for Congressional Affairs), and one staff level position (Deputy AIG for Congressional Affairs). At that time, the AIG for Congressional Affairs and the Deputy AIG for Congressional Affairs were Caucasian Males and the Senior Advisor for Congressional Affairs was a Caucasian Female. The Senior Advisor resigned effective September 8, 2007, accepting a position with a non-profit agency, and the

Senior Advisor position was eliminated. The Deputy AIG resigned on September 29, 2007, accepting a private sector position. The Deputy AIG position was filled by a Caucasian Male, who left that position in March 2009. The Deputy AIG for Congressional Affairs position has been vacant since that time.

9. During July 2007, SIGIR also reduced the number of full-time funded positions in Iraq from 55 to 42 and later further reduced its staffing complement to35 full-time funded positions in Iraq. A further example of efforts to restructure staffing included the conversion of seven contractor positions to less costly government staff level positions during the period from July through November 2007. These positions were filled by 4 African American Females, 1 African American Male, 1 Caucasian Male, and 1Asian Female. Five contractor positions were eliminated. One of these five was the contracted staff person assigned to Public Affairs (African American Female); one was a contracted staff person assigned to the Quarterly Report (Caucasian Female); one was a contracted staff person assigned to the Information Services Office (African American Male); one was a contracted staff person assigned to Personnel Security duties (African American Male); and the fifth was a contracted person (Caucasian Female) assigned to policy drafting for the Chief of Staff.

10. Immediately prior to Ms. Burgess being notified that her position was eliminated, she notified me that due to a reorganization and budget considerations SIGIR would refrain from hiring within her office. (Attachment 5)

11. I have not been present at and am not aware of any conversation, consideration, or deliberation that the decision to eliminate Ms. Burgess' position was made based on race or in retaliation for protected activity.

12. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. (28 U.S.C. § 1746).

Executed on: September 18, 2009

**JANICE NISBET**

Attachment 1

SPECIAL INSPECTOR GENERAL FOR IRAQ RECONSTRUCTION

January 25, 2007

Ms. Denise Burgess
[redacted]
Arlington, VA 22202

Dear Ms. Burgess:

This is to formalize an offer of appointment to the Department of Defense, Special Inspector General for Iraq Reconstruction (SIGIR). You will be appointed to the Excepted Service position of Assistant Inspector General for Public Affairs that is located with the Washington, DC Office of the SIGIR. Overseas travel, to include travel to Iraq, is required. Your appointment, initially, is for a period of thirteen months; however, the appointment could be terminated prior to that date.

Your base salary has been set at the Administratively Determined (AD) rate of $144,400 per annum While in Iraq, you would be entitled to receive a danger pay allowance of up to 35 percent of your salary, prorated for the number of days you serve in a foreign country where danger pay is authorized. In addition, if you serve forty-three or more consecutive days in Iraq, you will receive 35 percent of your salary as foreign post differential pay, computed retroactive to your first day in country.

The effective date of your appointment is February 4, 2007. I look forward to receiving your written confirmed acceptance of this offer. You will be contacted by Rebecca Baumann with details regarding the required in-processing activities that will occur on Monday, February 5. If you have any questions regarding your appointment, please contact me at (703) 428-1095. Congratulations!

Sincerely,

Janice Nisbet
Chief, Staffing & Operations Support

Attachment Z

**Nisbet, Janice E Ms SIGIR**

From: Burgess, Denise Ms SIGIR
Sent: Thursday, January 25, 2007 5:49 PM
To: Nisbet, Janice E Ms SIGIR
Cc: Arntson, Richard G Mr SIGIR
Subject: SIGIR offer (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

[illegible]

[illegible] so much for your quick work Janice. I accept the offer and look forward to [illegible] with the SIGIR family.

[illegible]

Denise N. Burgess
Assistant Inspector General for Public Affairs Office of the Special Inspector General for Iraq Reconstruction

[illegible] 703-428-1100

[illegible].burgess@sigir.mil

Classification: UNCLASSIFIED
Caveats: NONE

Standard Form 50-B
Rev 7/91
U.S. Office of Personnel Management
FPM Supp 296-33, Subch. 4

Attachment 3

# [illegible]FICATION OF PERSONNEL ACT[illegible]

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| BURGESS, DENISE NMN | [redacted] | [redacted] | 02-04-2007 |

## FIRST ACTION

| 5-A. Code | 5-B. Nature of Action |
|---|---|
| 171 | Exc Appt NTE 04-MAR-2008 |
| 5-C. Code | 5-D. Legal Authority |
| [illegible] | Sch A, 213.3199 5 USC 3161 |
| 5-E. Code | 5-F. Legal Authority |
| | |

## SECOND ACTION

| 6-A. Code | 6-B. Nature of Action |
|---|---|
| | |
| 6-C. Code | 6-D. Legal Authority |
| | |
| 6-E. Code | 6-F. Legal Authority |
| | |

7. FROM: Position Title and Number

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis |
|---|---|---|---|---|---|
| | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|
| | | | |

14. Name and Location of Position's Organization

15. TO: Position Title and Number
ASSISTANT INSPECTOR GENERAL-PUBLIC AFFAIRS
IQ2731 - 1138221

| 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|
| AD | 0301 | 00 | 00 | $144,400.00 | PA |

| 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|
| $144,400.00 | $0 | $144,400.00 | $0 |

22. Name and Location of Position's Organization
DEPARTMENT OF THE ARMY
SPECIAL INSPECTOR GENERAL
FOR IRAQ RECONSTRUCTION (SIGIR)
400 ARMY NAVY DRIVE
ARLINGTON, VA 22202

## EMPLOYEE DATA

23. Veterans Preference: 1 (1 - None; 2 - 5-Point; 3 - 10-Point/Disability; 4 - 10-Point/Compensable; 5 - 10-Point/Other; 6 - 10-Point/Compensable/30%)

24. Tenure: 3 (0 - None; 1 - Permanent; 2 - Conditional; 3 - Indefinite)

25. Agency Use:

26. Veterans Preference for RIF: YES [ ] NO [X]

27. FEGLI: X3 Basic + Option B (2x)

28. Annuitant Indicator: 9 Not Applicable

29. Pay Rate Determinant: 0

30. Retirement Plan: K FERS and FICA

31. Service Comp. Date (Leave): 03-03-1986

32. Work Schedule: F Full-Time

33. Part-Time Hours Per Biweekly Pay Period:

## POSITION DATA

34. Position Occupied: 2 (1 - Competitive Service; 2 - Excepted Service; 3 - SES General; 4 - SES Career Reserved)

35. FLSA Category: E (E - Exempt; N - Nonexempt)

36. Appropriation Code: 1100000VED

37. Bargaining Unit Status: 8888

38. Duty Station Code: 51[illegible]013

39. Duty Station (City - County - State or Overseas Location): ARLINGTON / ARLINGTON / VIRGINIA

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| [illegible] | POS# OA | | | TDA DATA SJ/W4XEAA/0001/84T |

45. Remarks

OPF maintained by North Central Civilian Personnel Operations Center, Rock Island, IL 61299-7650.

Reason for temporary appointment: to support the war efforts in IRAQ.

Appointment affidavit executed 05-FEB-2007.

Health benefits coverage continues.

Creditable Military Service: None

Frozen Service: None

Previous retirement coverage: Previously covered.

Employee is automatically covered under FERS.

46. Employing Department or Agency
[illegible] Svcs & Activities Spt'd by Ofc, Sec of the Army (ARSJ)

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date |
|---|---|---|
| ARSJ | 2241 | 02-08-2007 |

50. Signature/Authentication and Title of Approving Official
Joan F. Gardner
AUTHORIZING OFFICIAL

  Attachment 4

**MEMO FOR TIME LIMITED 3161 APPOINTEES**

A time limited appointment cannot exceed the date stated in block 5B of the Standard Form 50, Notification of Personnel Action, issued for such appointment unless the time limited appointment can be and is extended, or a conversion to permanent appointment is effected.

A time limited appointment does not afford an employee career or career conditional status, nor does it afford the employee eligibility for permanent appointment.

An employee on a time limited appointment is not eligible for assignment to any other position by promotion, change to lower grade, or reassignment.

A time limited employee with personal reinstatement eligibility may apply for vacancies that are not just open to current permanent employees and that are specifically open to reinstatement eligibles.

A time limited employee earns sick and annual leave.

A time limited employee does not have the protection of reduction-in-force procedures. Upon advance notice from appointing officer, you may be terminated earlier than the established "not to exceed date" for reasons such as lack of funds, lack of work, etc.

I have read and understand the above information

[signature]
Signature of Employee

02/4/07
Date

**Nisbet, Janice E Ms CIV DOD SIGIR** Attachment 5 - 1

**From:** Burgess, Denise Ms SIGIR
**Sent:** Wednesday, July 11, 2007 9.03 AM
**To:** Nisbet, Janice E Ms SIGIR
**Subject:** David Mays (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Hi Janice,

I selected David Mays, but didn't move forward due to the reorganization. I spoke with Ginger and she's onboard with offering David the position.

Thanks,
Denise

Denise N. Burgess
Assistant Inspector General for Public Affairs Office of the Special Inspector General for Iraq Reconstruction
o: 703-428-1217
Denise.Burgess@sigir.mil

Classification: UNCLASSIFIED
Caveats: NONE

**Nisbet, Janice E Ms CIV DOD SIGIR** Attachment 5 -2

**From:** Burgess, Denise Ms SIGIR
**Sent:** Friday, July 13, 2007 11:06 AM
**To:** Nisbet, Janice E Ms SIGIR
**Subject:** David Mays (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

It's a budget issue. They are holding new hires until they have some assurance we will have sufficient funds, in time, to make offers. They anticipate news next week sometime.

Denise

Denise N. Burgess
Assistant Inspector General for Public Affairs Office of the Special Inspector General for Iraq Reconstruction
o: 703-428-1217
Denise.Burgess@sigir.mil

Classification: UNCLASSIFIED
Caveats: NONE

# Termination Meeting Notes

Where: SIGIR: Office of Deputy Inspector General

When: Monday, July 23, 2007 at 3pm

Attending: Ms. Ginger Cruz – Deputy Inspector General
Mr. James Bowers – SIGIR General Counsel
Ms. Denise Burgess – Assistant Inspector General for Public Affairs

Ms. Ginger Cruz called me into a meeting in which she informed me my employment at SIGIR would be terminated. I took extensive notes regarding the conversation and transcribe them below. Following the meeting I sent an e-mail to all appropriate staff, including the Special Inspector General, Mr. Stuart Bowen, requesting written notification of my termination with the reasons this decision was taken.

Ms. Cruz opened the meeting saying SIGIR was undergoing a reorganization because the senior staff at SIGIR was "too heavy along non-operational lines" and also claimed SIGIR was being forced by OMB to trim two million dollars from its current budget. She determined that there needed to be reductions in the Congressional and Public Affairs staffs. Since SIGIR does not issue press releases, she said other AIGs, herself and Mr. Bowen could handle all press inquiries, and thus the AIG for Public Affairs "was going away." She offered a one month transition period and positive recommendations.

I pointed out to Ms. Cruz that the Public Affairs sister section, Congressional Affairs had four full-time employees and the Public Affairs section had two and that both sections had equivalent workloads. I inquired as to how many people were being terminated from the Congressional Affairs section and Ms. Cruz replied "Congressional is in progress." I pressed further about cuts to that section and she replied "no one is being let go from that section at the moment." I asked why not, and she said because of the section's workload, specifically citing preparing testimony for hearings on the Hill and responding to Congressional inquiries. (I note none of these tasks represent new assignments nor has the testimony schedule increased in the past 3 months). She did not respond to my characterization that the two sections had comparable workloads.

I told Ms. Cruz the Public Affairs workload has not changed, so I was unsure why the Congressional Affairs section would remain untouched with four employees and the Public Affairs Section with only two employees would be completely eliminated. She then informed me they were creating a new position titled Director of Public Affairs, which would be paid at a lower level. She also informed me SIGIR had just hired an individual to fill that position.

GOVERNMENT EXHIBIT 11

I again expressed my concern at the lack of transparent, measurable criteria for determination of who would be terminated. Ms. Cruz said SIGIR was an organization with a special mission and as such, "must have the right mix of people." When I asked what exactly was the criteria for determining the "right mix of people" she replied that the criteria was "determined internally." I pressed her on this point and demanded specific criteria. She repeated that it was an "internal decision" and she was not "obligated to discuss those details with me." She said, "I don't need an AIG for Public Affairs." I challenged this statement by asking why SIGIR had needed an AIG for Public Affairs for its entire history and suddenly now, did not; I asked her what had changed in the portfolio. She asserted that SIGIR's Public Affairs work had changed over time. I again asked "in what way?" She responded that Public Affairs was "constantly evolving" but again could offer no specific examples. When I continued to press, she admitted there had been no change in the Public Affairs work, but there was now a change in "how we'll address Public Affairs work." I asked exactly what that meant and she replied "I don't need and SES doing this job."

I then said "so you're not contending there has been a great reduction in the Public Affairs workload either, correct?" She replied, "yes, that's correct." I then said "Ok, I still don't understand what has changed to require a change in the type of staffing needed in the section." I pointed out that it stands to reason that if the organization needed a different type of individual to do the Public Affairs work, there must be some change in the work driving the decision. At that point the lawyer entered into the conversation and said "*What* don't you understand?" I then made a statement that I presumed that neither Ms. Cruz nor Mr. Bowers had objections to my asking questions and that I was entitled to understand fully why I was targeted for termination and that I was taking very detailed and specific notes to ensure I had a full understanding of what they were saying. I reread my notes regarding workload and nature of work to both. Neither challenged the accuracy of my notes.

As it was clear to me that there was no objective criteria (measurable workload reduction, a change in the nature or type of work, etc) I decided to wrap up the conversation. I asked Ms. Cruz where we would go from here. I was instructed to forward all press inquiries to Mr. Bowen's staff assistant. I agreed that I would send out the remaining reports to the media. I asked about when exactly my administrative leave began and was told by Ms. Cruz on August 1st and that I would remain on the payroll until August 31st.

I concluded the meeting by saying I wanted to go on record to express my disappointment that my termination was for other than performance reasons, and I asked if I was correct in this statement. Both Mr. Bowers and Ms. Cruz said – at exactly the same time – "it's just reorganization." I said "ok" and left the room.

Neither the need for reorganization, nor an alleged budget deficit so severe it required immediate terminations, remain credible under scrutiny. Therefore, other reasons for the decision to "eliminate" the Public Affairs Section must be garnered from the statements, historical record of fact, and the testimony of individuals familiar with SIGIR's management practices. Those data-points lead to an unavoidable conclusion: that the termination decisions unjustly targeted minorities and were discriminatory; and that an environment of harassment and intimidation festered at SIGIR in order to eliminate SIGIR's senior female staff.

**REQUESTED ACTION**

The Office of the Special Inspector General for Iraq Reconstruction has failed to live up to standard best practices and its ethical responsibilities as a U.S. government agency. Worse, the Special Inspector General and his Deputy may have broken the law as regards the fair and equitable treatment of employees regardless of race or gender.

It is my hope that the EEO Commission will thoroughly investigate this complaint and determine the facts of the case. I also ask that a finding be rendered in the most expeditious manner possible.

I seek redress in the form of compensatory and punitive damages to be assessed against the Office of the Special Inspector General for Iraq Reconstruction. It is only through public accountability and substantive sanction, where fault is found, that ethical standards and the law will be respected.

I thank you for your attention to this matter.

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| ...GESS, DENISE N. | [redacted] | [redacted] | 09-01-2007 |

**FIRST ACTION** / **SECOND ACTION**

| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 357 | Termination | | |
| **5-C. Code** | **5-D. Legal Authority** | **6-C. Code** | **6-D. Legal Authority** |
| UYM | Agency Reg Schedule A, 213.3199 5 USC 3161 | | |
| **5-E. Code** | **5-F. Legal Authority** | **6-E. Code** | **6-F. Legal Authority** |
| | | | |

7. FROM: Position Title and Number
ASSISTANT INSPECTOR GENERAL-PUBLIC AFFAIRS
IQ2731 - 1138221

15. TO: Position Title and Number

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis |
|---|---|---|---|---|---|
| AD | 0301 | 00 | 00 | $144,400.00 | PA |

| 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|
| | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|
| $144,400.00 | $0.00 | $144,400.00 | |

| 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|
| | | | |

14. Name and Location of Position's Organization
DEPARTMENT OF THE ARMY
SPECIAL INSPECTOR GENERAL
FOR IRAQ RECONSTRUCTION (SIGIR)
400 ARMY NAVY DRIVE
ARLINGTON, VA 22202

22. Name and Location of Position's Organization

**EMPLOYEE DATA**

23. Veterans Preference: 1 (1 - None; 2 - 5-Point; 3 - 10-Point/Disability; 4 - 10-Point/Compensable; 5 - 10-Point/Other; 6 - 10-Point/Compensable/30%)

24. Tenure: 3 (0 - None; 1 - Permanent; 2 - Conditional; 3 - Indefinite)

25. Agency Use

26. Veterans Preference for RIF: YES [ ] NO [X]

27. FEGLI: Basic + Option B (2x)

28. Annuitant Indicator: 9 Not Applicable

29. Pay Rate Determinant: 0

30. Retirement Plan: FERS and FICA

31. Service Comp. Date (Leave): 03-03-1936

32. Work Schedule: F Full-Time

33. Part-Time Hours Per Biweekly Pay Period

**POSITION DATA**

34. Position Occupied: 2 (1 - Competitive Service; 2 - Excepted Service; 3 - SES General; 4 - SES Career Reserved)

35. FLSA Category: E (E - Exempt; N - Nonexempt)

36. Appropriation Code: 11000000VED

37. Bargaining Unit Status: 8888

38. Duty Station Code: 510100013

39. Duty Station (City - County - State or Overseas Location): ARLINGTON / ARLINGTON / VIRGINIA

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| NM | PON# OA | | | TDA DATA SJ/W4XEAA/0001/84T |

45. Remarks

Forwarding address: 2000 S Eads St Apt 911 Arlington, VA 22202-3112.

Not entitled to severance pay.

Lump-sum payment to be made for any unused annual leave.

SF 2819 was provided. Life insurance coverage is extended for 31 days during which you are eligible to convert to an individual policy (nongroup contract).

Health benefits coverage is extended for 31 days during which you are eligible to convert to an individual policy (nongroup contract).You are also eligible for temporary continuation of your FEHB coverage for up to 18 months.

You appear to be eligible for early deferred retirement benefits at age 56. If you have questions, contact your agency retirement counselor.

314

GOVERNMENT EXHIBIT 12

46. Employing Department or Agency: J... & Activities Sptd by Ofc, Sec of the Army (ARSJ)

50. Signature/Authentication and Title of Approving Official: Nicole M. Mcwade, AUTHORIZING OFFICIAL

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date |
|---|---|---|
| ARSJ | 2241 | 08-27-2007 |

5-Part 50-316

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6238

TURN OVER FOR IMPORTANT INFORMATION

# INVESTIGATIVE FILE

ARHQOSA07AUG03041
AGENCY NUMBER

DENISE N. BURGESS
COMPLAINANT

OFFICE OF THE SPECIAL INSPECTOR GENERAL
FOR IRAQ RECONSTRUCTION,
ARLINGTON, VIRGINIA
ORGANIZATION FILED AGAINST

UNITED STATES ARMY
COMPONENT FILED AGAINST

**WARNING:** All information contained in this Investigative File is protected by the Privacy Act of 1974 and must be dealt with accordingly.

# DEPARTMENT OF DEFENSE

CIVILIAN PERSONNEL MANAGEMENT SERVICE
INVESTIGATIONS AND RESOLUTIONS DIVISION

GOVERNMENT EXHIBIT 13



**DEPARTMENT OF DEFENSE**
CIVILIAN PERSONNEL MANAGEMENT SERVICE
INVESTIGATIONS AND RESOLUTIONS DIVISION

OCT 14 2008

Received SAAA-EO HQDA-EEO 17 OCT 2008

MEMORANDUM FOR Stephanie Dawkins, EEO Specialist
Office of the Administrative Assistant
Directorate of EEO (JDRP-EE)
2530 Jefferson Davis Hwy
Arlington, VA 22202-3905

SUBJECT: Complaint of Denise N. Burgess
Agency Number #ARHQOSA07AUG03041

The Investigative File, including the Report of Investigation, for the subject discrimination complaint is provided for appropriate action.

All investigative files are covered by the Privacy Act of 1974, 5 U.S.C. Section 552a. An investigative file does not constitute a public record because of its coverage under the Privacy Act. Access to or release of complaint files is controlled in accordance with the law to protect the privacy interests of the subjects and the integrity of the files. Therefore, if you release copies of this file or any part of it, you must ensure the information released does not violate the Privacy Act. However, the original file must not be sanitized, so that deciding officials and adjudicators can completely review and properly adjudicate the case.

As a reminder, the Equal Employment Opportunity Commission's Management Directive 110, Chapter 6, Section IV.B prohibits investigators from making or recommending a finding of discrimination.

Questions may be directed to (770) 859-0511.

For J. HAYWARD KIGHT
Director, DoD Agencies Component

Attachments:
Investigative File
One (1) CD-ROM copy

# REPORT OF INVESTIGATION

OCT 14 2008

**Agency Number:** ARHQOSA07AUG03041

**Activity Filed Against:** Office of the Special Inspector General for Iraq Reconstruction
Arlington, Virginia (VA)

**Complainant's Name and Address:** Denise N. Burgess
2000 South Eads Street #911
Arlington, VA 22202

**Representatives' Names and Addresses:** Michael J. Baratz, Attorney at Law
Harry Lee, Attorney at Law
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036-3902

Susan E. Huhta, Director, Equal Employment Opportunity Project
Washington Lawyers' Committee for Civil Rights & Urban Affairs
11 Dupont Circle, NW
Washington, D.C. 20036

**Date of Initial Contact with EEO Counselor:** August 13, 2007

**Date Complaint Filed:** October 28, 2007

**Date Investigation Requested:** January 25, 2008

**Date Received by IRD:** February 11, 2008

**Dates of Investigation:** August 26 – September 12, 2008

**Claims:**

Was Denise N. Burgess (hereafter referred to as the Complainant) discriminated against based on her race (Black), national origin (African American), sex (female), and retaliation (opposing unlawful discrimination) when:

1. On March 2, 2007, Ms. Kristine R. Belisle, the Complainant's former Special Inspector General for Iraq Reconstruction (SIGIR) Deputy, at the direction of Ms. Ginger M. Cruz, challenged the Complainant's authority.

2. On or about May 2007, Ms. Cruz, without consultation with the Complainant, took over an assignment that the Inspector General (IG) had given to the Complainant.

3. In July 2007, Ms. Cruz targeted the Complainant and her staff for termination when an equivalent unit had four full-time staff members and was slated for no reductions.

4. From June 2007, through July 2007, Ms. Cruz delayed hiring staff into the Complainant's section, forcing the Complainant to accomplish work previously done by two full-time individuals.

5. From June 2007, through July 2007, Ms. Cruz exclusively reviewed the Complainant's time and attendance records in hope of finding irregularities.

6. In July 2007, Ms. Cruz isolated the Complainant from the consultative process regarding media activities.

7. In July 2007, Ms. Cruz insisted on addressing one of the Complainant's staff members with an improper name.

8. On July 23, 2007, the Complainant received a memorandum from Mr. R.G. "Nick" Arntson, Chief of Staff for the SIGIR, informing her that effective September 1, 2007, her employment with the SIGIR agency would be terminated.

9. On July 23, 2007, Ms. Cruz retaliated against the Complainant for opposing employment practices that were racially discriminatory, by terminating her employment (Investigative File [IF] pages [pp] 77B-77C).

**Relief Requested:**

Compensatory and punitive damages (IF page [p] 4).

## PART I - BACKGROUND

When the Complainant was employed with SIGIR, she was assigned as the Assistant IG for Public Affairs, SES-4/AD/301/00, in Crystal City, VA. She began working in the position in January 2007, but her official date of assignment was February 4, 2007. Ms. Belisle performed the Complainant's duties prior to the Complainant's hire. Ms. Belisle's employment with the Agency officially ended on April 27, 2007. At the time of the Complainant's hire, Ms. Cruz was a Senior Advisor within SIGIR. In June 2007, Ms. Cruz became the Deputy IG, SIGIR, and as such was the Complainant's immediate supervisor. As of May 2007, the Complainant's Public Affairs section consisted of two employees, the Complainant and her assistant, Ms. Patricia N. Redmon, who was a contract employee. The Agency informed Ms. Redmon on or about July 19, 2007, that her employment with the Agency would end. On July 23, 2007, the Complainant expressed her dissatisfaction with the termination of her assistant by sending an email message to the Agency's senior managers. Later that day, the Agency advised the Complainant of her

termination. The Complainant's termination became effective on September 1, 2007 (IF pp 132, 168, 314, 364; Transcript [TR] pp 13-15, 82).

Table I-1 below provides the name, whether a Responsible Management Official (RMO), position held at the time of the alleged discrimination, relationship to the Complainant, self-identified race, national origin, sex, and knowledge of the Complainant's prior protected Equal Employment Opportunity (EEO) activity for each of the interviewed witnesses.

| NAME/RMO | POSITION/RELATIONSHIP | RACE/NATIONAL ORIGIN/SEX/EEO | SOURCE |
|---|---|---|---|
| Denise N. Burgess | Assistant IG for Public Affairs; Senior Executive Service (SES) Complainant | Black/Black American/female/NA | TR pp11, 13 |
| Ginger M. Cruz RMO | Deputy IG for Policy; SES First line supervisor | Asian American/Filipino American/female/no | TR pp 81, 83, 113 |
| *Stuart W. Bowen, Jr. RMO | SIGIR; Executive Service IV equivalent Second line supervisor | Caucasian/American/ male/no | IF pp 398, 401 |
| *Richard G. "Nick" Arntson RMO | Chief of Staff; SES Peers on the senior staff | Caucasian/American/ male/yes | IF pp 407-408, 411 |
| Janice E. Nisbet | Chief of Staffing and Operations Support, no assigned grade or pay band Servicing HR Representative | Caucasian/United States/female/no | TR pp 186-187, 196 |
| Patricia N. Redmon | Contractor, Administrative Special Assistant Supervised by Complainant | Black/African American/female/NA | TR pp 174-176 |
| Kristine R. Belisle | Contractor, Deputy Assistant IG for Public Affairs Formerly supervised by Complainant | Caucasian/American/ female/NA | TR pp 211-212 |

**TABLE I-1.** Witnesses who provided testimony.
*Testimony provided by responding to interrogatories.

Data provided by the Agency shows that as of June 1, 2007, SIGIR consisted of 109 federal civil service employees. The race and national origin (RNO) composition of SIGIR consisted of 92 White, ten Black or African American, four Asian, two Hispanic or Latino, and one American Indian or Alaska Native employee. Ms. Cruz, who described herself as Asian American when providing her testimony, is recorded as being White on the SIGIR personnel roster. The data reveals that 81 employees are male, and 28 are female. The Agency did not provide data to disclose how many of its employees had filed EEO complaints (IF pp 152-154).

There was considerable delay in scheduling the fact-finding conference (FFC). The Investigator distributed a scheduling letter dated April 25, 2008, scheduling the FFC to occur on May 13,

2008. On May 9, 2008, the Agency postponed the FFC because Ms. Cruz respectfully declined to appear as a witness. Ms. Cruz's counsel advised her to take that action because she was also appearing before a grand jury investigation of the Complainant's termination from SIGIR. Upon the conclusion of the grand jury investigation, Ms. Cruz was willing to appear before the FFC, and the FFC was re-scheduled for August 26, 2008 (IF pp 439-448, 456-460, 468-472).

The Complainant requested that the Investigation include the testimony of 12 witnesses that she identified. The Investigator approved of four of these witnesses and added three others that he believed had information of relevance to the claims. The Investigator decided not to interview eight of the requested witnesses because their testimony would have duplicated that of more knowledgeable witnesses, or was not expected to be relevant. During the preliminary conference, the Investigator explained to the Complainant and her Representatives that if they were to obtain written statements from any of the discounted witnesses, the Investigator would include those statements in the IF. Neither the Complainant nor her Representatives submitted statements from these witnesses (IF p 4; TR pp 6-7)

Three of the scheduled witnesses were not able to be present at the FFC. Mr. Bowen and Mr. Arntson were working overseas on August 26, 2008, and the Agency stated that it was unable to contact Ms. Barbara Lewis (Caucasian, Arab American, female, unknown EEO), who was working as a contractor. Mr. Bowen and Mr. Arntson provided their declarations in response to the Investigator's interrogatories. Those declarations are included within the IF (IF pp 397-414, 473-479).

The Investigator instructed the Complainant and her Representatives during the preliminary meeting that he would give the Complainant the opportunity to rebut the testimony of the witnesses both during the FFC and afterward in response to the declarations of Mr. Bowen and Mr. Arntson. The Complainant declined to provide rebuttal comments throughout the FFC, and her Representatives later advised that they decided not to provide a rebuttal to either Mr. Bowen or Mr. Arntson's declarations. This report of investigation is written based upon the evidence available. The Investigator's Declaration at Exhibit F-21 addresses specifics of the investigative process (IF pp 416, 485-486; TR pp 173, 186, 210, 236).

## PART II – DISCUSSION AND ANALYSIS

**Complainant's allegations:**

The Complainant testifies that her previous protected EEO activity consisted of two actions that related to the termination of contract employee assistant, Ms. Redmon. First, the Complainant verbally commented to Ms. Cruz on the Thursday, July 19, 2007, that she was dissatisfied upon learning of Ms. Redmon's termination. Secondly, the Complainant sent an email message the following Monday, July 23, 2007, in which she clearly and explicitly expressed that she believed the Agency's termination of Ms. Redmon was racially motivated and discriminatory. She also states that she believes that termination was racially discriminatory toward her (the Complainant). The Complainant states that she addressed that email message to those who

would be involved in any discussion regarding discrimination; this includes Mr. Bowen, Mr. Arntson, and Ms. Nisbet (IF p 301; TR pp 12-13, 34-35).

The Complainant testifies that Ms. Cruz made derogatory comments in a staff meeting regarding people who file EEO complaints. Ms. Cruz made the comments in the spring of 2007, not long after she (Ms. Cruz) arrived in her position. The Complainant states that since she is a Black woman, and EEO discrimination cases are often associated with Black Americans, she thought that Ms. Cruz was directing the remark toward her (TR pp 19-20).

The Complainant testifies that another instance of Ms. Cruz's discrimination toward Black employees was her continuing to refer to Ms. Redmon as "Pat." Ms. Cruz called Ms. Redmon Pat on four occasions, even though Ms. Redmon and the Complainant had told Ms. Cruz that she preferred to be called Patricia. When Ms. Redmond corrected Ms. Cruz on this matter, Ms. Cruz appeared to be very annoyed. The Complainant asserts that this act of disrespect had racial overtones, and is particularly derogatory when directed at Black Americans (TR pp 20-22, 48-49).

The Complainant accounts that Ms. Cruz undercut her authority on one occasion when, even though she (the Complainant) had been communicating with a Washington Post reporter, Ms. Cruz later spoke with that reporter and never informed her (the Complainant) that she had done so. This incident occurred in June or July of 2007 (TR pp 22-24, 47).

The Complainant relates that there was another instance where Ms. Cruz undercut her authority with her colleagues. Mr. Bowen asked the Complainant to compile recommendations for how to better release a quarterly report. The Complainant held meetings with other Assistant IGs, created a draft set of recommendations, and asked her colleagues to review them and respond to her the following Monday. The Complainant was off work the previous Thursday and Friday, and when she returned to work she discovered that Ms. Cruz had taken an old set of recommendations and issued them as the new rules. The Complainant's colleagues came to her and asked what had happened since Mr. Bowen had given that assignment to her (the Complainant) (TR pp 24-25, 39, 68-69).

The Complainant testifies that she and Ms. Belisle had often discussed that information relating media requests for interviews of Mr. Bowen had to first go through the Complainant so she could do the necessary research before advising him whether to conduct the interview. However, the Complainant received an email message from Mr. Bowen, dated March 2, 2007, that revealed Ms. Belisle had, at Ms. Cruz's direction, contacted Mr. Bowen regarding an interview without first informing the Complainant. The Complainant testifies that she did not immediately consider that action to have been discriminatory with regard to her race and national origin. However, when viewed in the context of all the other derogatory actions, she realized the Agency did them in order to diminish her because she was Black and "did not know her place" (IF pp 254-256; TR pp 26-29, 39, 64).

The Complainant asserts that the Agency's termination of Ms. Redmon was the "final straw" for her. The Complainant believes that Ms. Redmon's termination was racially motivated because

Ms. Redmon is a well-spoken, well-educated Black woman, who by demanding to be addressed by her correct name revealed that she "did not know her place." The Complainant states that she felt that Ms. Redmon's termination was intended to target both her and Ms. Redmon since their section consisted of only them, two African American women. The Complainant asserts that she told Ms. Cruz that without her assistant, it was going to be difficult for her (the Complainant) to perform her required duties. The Complainant states that the Agency terminated her (the Complainant) on the Monday, July 23, 2007, following Ms. Redmon's termination, and only hours after she sent an email message in which she disputed Ms. Redmon's termination. The Complainant contends her termination was in retaliation for sending that email message because during her conversation with Ms. Cruz the previous Thursday regarding Ms. Redmon's termination, Ms. Cruz told the Complainant that other employees would assist her with the duties that Ms. Redmon had performed, thus indicating at that time that the Agency was not intending to terminate the Complainant (IF p 301; TR pp 29-30, 35-37).

The Complainant states that her section, Public Affairs, and another section within SIGIR, Congressional Affairs, were meant to be staffed equally since their workloads were somewhat equal. When Ms. Cruz told her she was losing her assistant, the Complainant expected Congressional Affairs to also lose someone. However, even though Congressional Affairs had four people, to include two SES level employees, that section lost no one. The Complainant states that Public Affairs had three employees, one of whom was absent due to being hospitalized. The Complainant contends that if the Agency's reason for terminating her and Ms. Redmon was to save money, then its actions were illogical since much more money could have been saved by terminating an SES employee than a staff level employee. The Complainant states that the Agency's illogical actions caused her to realize that discrimination was the true reason for what was occurring (TR pp 40-42).

The Complainant states that the Agency had selected Mr. David Mays (race – not asked, national origin – not asked, male, EEO – NA) to be her deputy, but Ms. Cruz told her that his hire was placed on hold until she (Ms. Cruz) familiarized herself with the Agency. The Agency never hired Mr. Mays (TR pp 43-44).

The Complainant testifies that in her termination meeting, Ms. Cruz told her that part of the reason the Agency was terminating her was because SIGIR required the "right mix of people." The Complainant states that she asked for the criteria that determined who was included within the right mix. The Complainant testifies that Ms. Cruz's inability to answer the question also indicated that race was a factor (TR pp 30-31).

Although most of the incidents she relates pertain to actions by Ms. Cruz, the Complainant contends that Mr. Bowen is also culpable because as head of the organization, he approved of the Agency's discriminatory actions. The Complainant states that Mr. Bowen was one of the persons who interviewed and hired her for the position, and he also told her, only a few weeks before her termination, that she was doing a great job and would be with the Agency for the duration. The Complainant states that given those events, she does not understand why Mr. Bowen allowed her termination (TR pp 32-33).

The Complainant asserts that the Agency acknowledged her outstanding performance by giving her a certification of appreciation on her last day of employment. Only a few weeks before her dismissal, she received an $8,500.00 bonus, and Mr. Bowen gave her a letter of commendation (TR pp 33-34).

The Complainant testifies that the Agency had no official reorganization. There were no management meetings, discussions, plans, or any evidence of reorganization. The Complainant states that when the Agency terminated her, she was told that her section was being abolished. However, the Agency had already hired someone else, Ms. Belisle, to take her position (TR pp 44-45, 47, 56).

The Complainant testifies that three people in the Agency, one of whom was Mr. Arntson, told her in about June or July 2007, that Ms. Cruz was reviewing her time and attendance records to discover any irregularities, such as claimed overtime that she had not worked. The Complainant states that no one informed her of any irregularities being discovered (TR pp 45-47).

The Complainant testifies that the Agency treated her differently than it did the SES level Assistant IG for Congressional Affairs, Ms. Marthena Cowart (Caucasian, American, female, EEO – unknown), and Ms. Belisle. The Complainant states that both Ms. Cowart and Ms. Belisle had performance issues, whereas she (the Complainant) did not; however the Agency allowed Ms. Belisle to work until her contract ended during her first period of employment, and it moved Ms. Cowart to another position and did not terminate Ms. Cowart as it did her (TR pp 52-55, 79).

The Complainant testifies that, prior to her termination, she did not speak or report to any member of management regarding the harassment she alleges because she had hoped to tolerate the situation and maintain her employment. She states that on the day of her termination, she attempted to speak with the EEO Representative, but no one knew who that was. She states that she may have spoken with Ms. Nisbet about the alleged discrimination (TR pp 55-56, 66).

**Management's response:**

**Testimony of Ginger M. Cruz:**

Ms. Cruz testifies that she advised Ms. Belisle on March 2, 2007, to send an email message directly to Mr. Bowen regarding the request for an interview. Ms. Cruz contends that she directed that action because the request was time-sensitive and Ms. Belisle had not been able to locate Ms. Burgess. She also states that she told Ms. Belisle to ensure that she (Ms. Cruz) and the Complainant received a copy of the message (TR p 84).

With regard to her taking over an assignment relating to release procedures for quarterly reports, Ms. Cruz testifies that Mr. Bowen had asked the Complainant to prepare policy on that matter. The Complainant coordinated with the senior staff and gave a draft to Mr. Bowen. Mr. Bowen was not satisfied with the draft, and asked that Ms. Cruz discuss it with the Complainant. Ms. Cruz states that she spoke once with the Complainant on her progress with the changes, and then

Mr. Bowen directed her (Ms. Cruz) to provide him the final policy with the specific views on timing that he had mentioned to her (TR pp 85-86).

Ms. Cruz testifies that at the time she reduced the Public Affairs section, she reduced the Congressional Affairs section as well. She states that she eliminated the positions that were not mission critical. Ms. Cruz asserts that Public Affairs was downgraded to a single position, that of director. At the same time, she notified a White male, a White female, and a Black female in Congressional Affairs that they needed to find other positions due to their positions being eliminated. Among the contractors who the Agency terminated were a Black female (Ms. Redmon), a White female, and a Black male. Ms. Cruz states that at that time she also converted seven contractor personnel to mission critical government positions. These seven consisted of four Black females, one Black male, one White female, and one White male. Ms. Cruz responds that two of the Congressional Affairs employees whose positions were eliminated, the White male and White female, were able to reassign into other SIGIR positions. Ms. Cruz also states that there was no position at a level to which the Complainant could have been reassigned, but that she did offer to provide whatever assistance she could to help the Complainant during her transition to other employment (TR pp 86-90).

Ms. Cruz testifies that the Agency is temporary and undergoes a strategic planning process every three months to evaluate how well it meets the mission with the number of employees assigned. She states that 250 employees have left since the Agency was created four years ago. The Agency is unlike the normal long-term bureaucratic federal organizations in that it constantly evaluates itself to determine how to accomplish its mission with the leanest staff possible. In December 2006, four employees were completing the duties in both Congressional and Public Affairs, but by early 2007, the number of employees in those sections had increased to eight (TR pp 90-91).

In the spring of 2007, the Office of Management and Budget (OMB) expressed concern that SIGIR's budget was increasing dramatically. OMB told SIGIR that there was no Congressional mandate for SIGIR to have a press function, and it was unacceptable that the in-house staff and the budget were growing. Ms. Cruz also testifies that contractor employees were proving to be expensive for SIGIR (TR pp 92-97).

Ms. Cruz testifies that she was sorry that the Complainant lost her position. The Agency tried to assist the Complainant by giving her 30 days of administrative leave as she searched for another job, and the certificate of appreciation that the Complainant received prior to her termination was another attempt to assist her (TR p 99).

Ms. Cruz asserts that when the Agency hires employees, it is for a temporary appointment of 13 months, an appointment that the Agency may terminate anytime during that 13-month period (TR p 100).

Ms. Cruz testifies that she did not offer the Director, Public Affairs position that Ms. Belisle would fill to the Complainant because the Complainant had expressed during the two months prior to her termination that she would be unable to accomplish the duties of Public Affairs

without there being four people in the section. Ms. Cruz states that she approached Ms. Belisle for the position because her skills were not managerial; Ms. Belisle was not above doing anything such as making telephone calls, or doing the "heavy lifting" herself. Ms. Belisle also was conversant regarding audits, inspections, and the quarterly report, whereas the Complainant was not. Ms. Cruz asserts that the hiring of Ms. Belisle would enable SIGIR to realize a large financial savings in that Ms. Belisle was able to perform all of the activities that the Complainant stated she needed a four-person section to accomplish (IF p 7; TR pp 100-103).

Ms. Cruz testifies that when she used the phrase, "right mix of people," when speaking with the Complainant and other employees, she meant that SIGIR needed the substantive mix of individuals that included auditors, inspectors, and investigators, and less nonessential and support positions, such as those in Public Affairs and Congressional Affairs (TR pp 106-107).

Ms. Cruz asserts that when she became the Deputy for Policy, she sent an email message to all the employees who reported directly to her, the Complainant, Ralph S. Michaud (White, male, EEO – unknown), and Ms. Cowart, that requested that they all send their timesheets to her. Ms. Cruz states that as their supervisor, she made sure that she reviewed their timesheets for accuracy. She contends that it was good management to do so, and was not directed at any one individual. Ms. Cruz states that she never had any issues with the Complainant's timesheets (IF p 140; TR pp 109-110).

With regard to the Complainant's claim that she was isolating the Complainant from the consultative process of media activities, Ms. Cruz testifies that she did not isolate the Complainant. Ms. Cruz states that whenever a person brought media issues to her attention and excluded the Complainant, she made certain that she directed that person to the Complainant, or that she herself included the Complainant in the issue (TR p 110-111).

Ms. Cruz testifies that because she has known and currently speaks with several persons named Pat, she made the mistake of referring to Ms. Redmon as Pat also. Ms. Cruz states that she apologized when Ms. Redmon brought the error to her attention. Ms. Cruz contends that she meant no offense by calling Ms. Redmon Pat. When the Complainant corrected her on the same issue, Ms. Cruz states that she was embarrassed, and believes that embarrassment was the reaction that the Complainant observed (TR pp 111-112).

Ms. Cruz testifies that the termination of the Complainant was not related to any sort of retaliation. Ms. Cruz states that when she told the Complainant on July 19, 2007, of her intent to remove Ms. Redmon from employment, she (Ms. Cruz) already had decided that she would also soon release the Complainant. She contends that the plans for reorganization had been ongoing since June 20, 2007. Mr. Bowen told her to conduct reorganization in the most expedient manner possible. Ms. Cruz states that she informed Mr. Bowen of her decision to terminate the Complainant about two weeks prior to the Complainant being so notified. She asserts that the termination had nothing to do with the email message the Complainant sent complaining of Ms. Redmon's termination. Ms. Cruz testifies that she is a minority female who has been an activist for minority issues. She asserts that the Complainant's email message did not state that the Complainant believed the Agency was terminating Ms. Redmon because she is African

American. Ms. Cruz testifies that the Complainant had often related that she and Ms. Redmon were good friends who had worked together for over ten years, so she (Ms. Cruz) believed the Complainant's email message was intended to try to save Ms. Redmon's employment because of their friendship. Ms. Cruz states that her termination of the Complainant did not occur on the same day she released Ms. Redmon because she had not yet discussed the Complainant's termination with the General Counsel, James P. Bowers (White, male, EEO – unknown). Ms. Cruz states that she included the Agency's General Counsel, Ms. Nisbet of HR, and Mr. Arntson in on the Complainant's termination, and none of them believed there were any negative issues with the action (IF p 140; TR pp 113-116, 121, 128, 143-145, 150, 152, 157, 160, 163-164).

Ms. Cruz testifies that her comments to the Complainant about persons who had filed complaints were in specific reference to people who had filed anonymous complaints. Ms. Cruz asserts that she has been the target of a full-blown anonymous attack against her character by disgruntled former employees who used anonymous media contacts to slander and libel her in public. She mentioned this to the Complainant because it was the Complainant who was receiving calls from the media about those attacks. Ms. Cruz asserts that the persons who filed those complaints against her were not minorities, but were almost exclusively White males (TR pp 118-119).

Ms. Cruz testifies that the General Counsel was present at the Complainant's termination, but was not present at the termination of Ms. Cowart. Ms. Cruz states that because she noticed the Complainant was sending copies of much of her email correspondence to the General Counsel, she thought it was prudent to maintain transparency by having the General Counsel present. Ms. Cruz explains that by the nature of the Complainant's association with media, the Agency could not allow the person who performed all external relations for the Agency to continue to speak for the organization because of the obvious bad feelings that person (the Complainant) would develop. For that reason, the Agency gave the Complainant paid administrative leave while she sought other employment (TR pp 153-154, 156).

Ms. Cruz testifies that the reorganization she implemented attained the targeted amount for savings of $2 million (TR p 165).

Ms. Cruz contends that she offered Ms. Belisle the Director of Public Affairs position prior to receiving the email message from the Complainant on July 23, 2007, in which the Complainant complained about Ms. Redmon's termination (IF p 301; TR pp 171-172).

**Declaration of Stuart W. Bowen, Jr.:**

Mr. Bowen declares that he identified the Complainant for employment with the Agency, and approved her hire (IF p 399).

Mr. Bowen denies that he, Ms. Cruz, or any Agency employee discriminated against the Complainant (IF p 399).

Mr. Bowen states that Ms. Belisle sent him an email message on March 2, 2007, regarding a media contact, in which she copied the Complainant and Ms. Cruz. He believes that Ms. Belisle acted professionally and did not challenge the Complainant's authority (IF p 399).

Mr. Bowen asserts that Ms. Belisle's complaint against the Complainant was not a factor in the Agency's termination of the Complainant (IF p 402).

Mr. Bowen declares that in the spring and summer of 2007, the budget situation changed and SIGIR came under financial pressure from OMB, which made reductions in staffing necessary. He tasked Ms. Cruz to reduce the number of positions in non-core functions and to cut contractor costs. As a result, the Agency reduced staff in Public Affairs and in Congressional Affairs, and reduced Agency presence in Iraq. Mr. Bowen contends that the Complainant's termination was in conjunction with this reorganization and was not related to her race, national origin, sex, or retaliation for any complaint (IF pp 400, 402-403).

Mr. Bowen contends that he had several discussions during the time period at issue with both Ms. Cruz and Mr. Arntson regarding the reorganization. He states that he does not recall the specific dates and times of those discussions (IF p 404).

Mr. Bowen contends given that SIGIR was under budget constraints, it was appropriate to refrain from hiring additional staff during the June 2007, through July 2007, time period. He believes that the workload in Public Affairs was sufficient for one person to manage. With there no longer being a staff in Public Affairs, the Agency no longer needed the Complainant's skill sets. One person has succeeded in accomplishing the workload in Public Affairs for over the past year (IF pp 400, 403).

Mr. Bowen states that as the Complainant's supervisor, Ms. Cruz was required to approve her time and attendance records (IF p 400).

Mr. Bowen declares that the memorandum, dated July 23, 2007, that terminated the Complainant's employment effective September 1, 2007, was based on a necessary reorganization within the Agency, and was not produced because of the Complainant's race, national origin, sex, or retaliation for complaining of Ms. Redmon's termination (IF p 401).

Mr. Bowen declares that he does not recall knowing of the Complainant having complained of Ms. Redmon's termination, until being advised of it within the instant EEO complaint (IF p 401).

Mr. Bowen declares that the Agency created the position of Director, Public Affairs as part of the reorganization, and that Ms. Belisle accepted that position which Ms. Cruz offered to her (IF p 402).

Mr. Bowen states that contractor employees were considerably more expensive than direct hire employees. The Agency terminated contractor employees Ms. Redmon and Ms. Lewis as part of the budget constraints that it addressed by reducing the number of contractor employees (IF p 402).

Mr. Bowen declares that he has no knowledge of the Complainant having reported harassment to him or anyone else (IF p 403).

**Declaration of Richard G. Arntson:**

Mr. Arntson declares that on several occasions from mid July through August 2007, the Complainant stated to him that she believed she and Ms. Redmon were terminated because they were African American and conducted themselves differently than how Mr. Bowen or Ms. Cruz desired. The Complainant also stated to Mr. Arntson that she believed Ms. Cruz felt threatened by the Complainant's extensive experience in the Foreign Service and communications management. Mr. Arntson states that the Complainant felt that she was targeted for termination because of her treatment of Ms. Cruz's friend, Ms. Belisle (IF p 408).

Mr. Arntson declares that Ms. Belisle informed him that on the advice of Ms. Cruz, she contacted one of her media sources without first consulting with the Complainant on March 2, 2007, because Ms. Belisle felt the Complainant was stifling her initiative and hurting her professional reputation with media sources (IF p 408).

Mr. Arntson declares that Ms. Belisle left her employment with SIGIR because she and the Complainant were not able to work well together, and it was causing them frustration and was stressful to Ms. Belisle. He contends that Ms. Belisle believed that she would be better off professionally to turn her attention full time to her own business and to not argue with the Complainant over her professional capabilities. Mr. Arntson asserts that the Complainant's termination was a factor in Ms. Belisle's decision to return to SIGIR (IF p 412).

Mr. Arntson states that the Complainant had the responsibility to maintain the Agency's website. Ms. Cruz noticed that several items on the website were out of date. Ms. Cruz informed Mr. Bowen and volunteered to update the website. Mr. Arntson states that Ms. Cruz then directed Ms. Cowart and the Informational Technology staff to provide missing Congressional testimony for the website, without informing the Complainant of her actions. The Complainant was very upset when she learned of Ms. Cruz's actions and met with Mr. Bowen. A subsequent review of the website posting process determined that most of the staff failures were outside of the Complainant's staff section (IF p 409).

Mr. Arntson declares that shortly after Ms. Cruz was reinstated as the Deputy IG, she announced that there would be reorganization within the Public Affairs and Congressional Affairs staff sections because of budget issues. Mr. Arntson contends that only the Public Affairs staff was reorganized, while the Congressional Affairs office only changed two staff titles without reducing its staff level. Mr. Arntson states that he does not know if Ms. Cruz's manner of reorganization was because of the Complainant's race, national origin, sex, or retaliation (IF pp 409, 412).

Mr. Arntson declares that Ms. Cruz asked him to provide her the Complainant's time and attendance records because she believed that the Complainant was taking excessive time off for personal and medical appointments during critical times when she was needed to prepare for the

July 2007, quarterly report cycle. Mr. Arntson states that he informed the Complainant of Ms. Cruz's inquiry into her time and attendance records, and told her to be prepared to respond (IF pp 409-410).

Mr. Arntson contends that in July 2007, the Complainant reported to him that Ms. Cruz was excluding her from discussions with Mr. Bowen regarding media strategy and activities. He states that he has no first hand knowledge of Ms. Cruz excluding the Complainant in this manner, but his previous experience with Ms. Cruz and Mr. Bowen's reliance on Ms. Cruz leads him to believe that it was possible that Ms. Cruz did indeed isolate the Complainant from the consultative process regarding media (IF p 410).

Mr. Arntson declares that both the Complainant and Ms. Redmon informed him that Ms. Cruz referred to Ms. Redmon as Pat. Both women considered Ms. Cruz's action to be deliberate because it was well known ever since Ms. Redmon joined the Agency in February 2007, that she preferred to be called Patricia. Mr. Arntson states that the Complainant and Ms. Redmon thought the action was meant to demean Ms. Redmon because as of July 2007, Ms. Cruz continued to make this error (IF pp 410-411).

Mr. Arntson declares that he was not part of the decision to terminate the Complainant's employment; Ms. Cruz, Mr. Bowen, and the General Counsel (Mr. Bowers) made that decision. Mr. Arntson states that Ms. Cruz informed him of the decision a few hours prior to when Ms. Cruz and the General Counsel informed the Complainant of her termination. Following the notification of her termination, the Complainant asked him (Mr. Arntson) for a written notification of her termination. He states that he drafted the letter and obtained a review from Ms. Cruz and the General Counsel before he (Mr. Arntson) signed and then gave it to the Complainant (IF p 411).

Mr. Arntson declares that on the day that the Complainant was to be informed of her termination, Ms. Cruz received an email message from the Complainant, which Ms. Cruz forwarded to Mr. Arntson, stating that the Complainant could not attend a previously scheduled meeting because she had an appointment with the Office of Special Counsel. Ms. Cruz asked him to arrange for a meeting later that afternoon between the Complainant, Ms. Cruz, and Mr. Bowers, in which the Complainant would receive notice of her termination (IF p 411).

Mr. Arntson declares that Ms. Cruz did not believe that Ms. Redmon was qualified to perform all the functions and duties the Complainant had hired her to perform. Ms. Cruz also believed that the Agency was paying too much for the position that Ms. Redmon occupied for the performance of those duties. Therefore, Ms. Cruz targeted Ms. Redmon and the position she filled for elimination (IF p 413).

Mr. Arntson declares that he was aware of the Complainant having complained of Ms. Redmon's termination, but cannot recall the exact date. He states that the Complainant believed Ms. Redmon's termination was targeted at her (the Complainant) and her Public Affairs section to make them less effective and enable Ms. Cruz to terminate her (IF p 411).

Mr. Arntson declares that although the official reason for the Complainant's termination was the staff reorganization, Ms. Cruz had stated on several occasions that she did not like the Complainant personally, and that she did not believe the Complainant properly advised and assisted Mr. Bowen. Mr. Arntson also states that other staff members told him that Ms. Cruz was upset over the Complainant's treatment and removal of Ms. Cruz's friend, Ms. Belisle. Mr. Arntson believes that Ms. Belisle's complaint against the Complainant was a factor in the Complainant's termination (IF pp 411-412).

Mr. Arntson declares that Ms. Cruz believed that due to her experience in communications and public affairs, she could direct and manage a smaller Public Affairs section while still performing her duties as the Deputy IG. Many of the duties of the Public Affairs section were divided among the Deputy IG and other staff sections (IF p 413).

Mr. Arntson declares that the Complainant complained to him of Ms. Cruz harassing her. He states that the Complainant's description of the harassment consisted of "being hassled" by Ms. Cruz's frequent questioning and continual follow-up concerning tasks and projects assigned to the Complainant. The Complainant reported that Ms. Cruz knowingly established unrealistic timelines, and denied her the opportunity to hire additional staff to accomplish the assigned tasks. The Complainant told Mr. Arntson that she believed these actions were intended to discredit her (IF pp 413-414).

Mr. Arntson declares that he is aware of no one having treated the Complainant differently than other employees because of her race, national origin, sex, or previous EEO participation. He also states that during reorganization, employees who lose their positions must be offered other open staff positions for which they qualify. Mr. Arntson states that the Complainant told him in August 2007, that Ms. Cruz did not offer her another comparable position for which she was qualified (IF p 414).

**Testimony of Janice E. Nisbet:**

Ms. Nisbet testifies that she has no knowledge of Ms. Cruz or Mr. Bowen discriminating against the Complainant. Ms. Nisbet states that she was out of the country on vacation when the Agency terminated the Complainant. Upon her return, she received an email message from the Complainant, and a letter drafted by Mr. Arntson stating that the Public Affairs section had been reorganized and the Complainant had been terminated. Ms. Nisbet contends that her only role in what occurred was to process the termination by placing information into the personnel system (TR pp 189-191, 193).

Ms. Nisbet states she noticed that reorganization actions, in addition to that which caused the Complainant's termination, occurred within the Agency. In July 2007, the Agency reduced its slots in Iraq from 55, down to 30 (TR pp 193, 195).

Ms. Nisbet testifies that she does not believe that the Complainant's race, national origin, sex, or previous EEO activity were factors in her termination, and she is not aware of anyone having treated the Complainant differently because of those protected factors (TR p 196).

Ms. Nisbet states that in July 2007, the Complainant told her that the Agency would not hire a previously selected candidate for a position in Public Affairs because of budget concerns and uncertainties about funding. She states that there was also a halt in recruitment at that time (TR pp197-199).

Ms. Nisbet contends that it was within the last week of July 2007, or the first week in August 2007, when she first heard that Ms. Belisle was returning to work for SIGIR (TR pp 202-203).

Ms. Nisbet states that it is her understanding that the Chief of Staff is responsible for ensuring that reorganizations and/or terminations resulting from reorganizations are accomplished in a nondiscriminatory manner (TR p 207).

**Complainant's rebuttal:**

The Complainant and her Representatives did not rebut the testimony of the primary management witnesses during the FFC. They also declined to submit a written rebuttal to the declarations of Mr. Bowen and Mr. Arntson (IF pp 485-486; TR pp 173, 186, 210, 236).

**Testimony of other witnesses:**

**Testimony of Patricia N. Redmon:**

Ms. Redmon testifies that when she first began working for SIGIR, Mr. Bowen frequently stopped at her office to speak with her about work matters. However, about two months prior to her termination, Mr. Bowen abruptly stopped talking to her. Ms. Redmon states that she noticed the same behavior from Mr. Bowen with regard to the Complainant (TR pp 177-178, 183).

Ms. Redmon states that she recalls that she and the Complainant were alienated by the other employees prior to their terminations (TR p 179).

Ms. Redmon testifies that she and the Complainant noticed that Ms. Cruz began performing their duties, and letting them know what she had done afterward (TR p 184).

Ms. Redmon states that her contractor supervisor informed her that she was terminated for financial reasons, but she does not believe that is the true reason because since before Ms. Cruz's arrival at SIGIR, rumors were circulating about how easily Ms. Cruz would fire employees. Ms. Redmon relates that after the Complainant had corrected Ms. Cruz on more than one occasion not to refer to her (Ms. Redmon) as Pat, Ms. Cruz continued to call her Pat. Ms. Redmon states that when she told Ms. Cruz that she preferred to be called Patricia, Ms. Cruz's response was to say, "Oh, Pat. I don't know why I can't remember that." Ms. Redmon states that she did not consider being called Pat as being racist, but that it was a sign of disrespect for her. Ms. Redmon testifies that it was within the same week of her exchange with Ms. Cruz that she (Ms. Redmon) was informed of her termination (TR pp 181-182, 185).

**Testimony of Kristine R. Belisle:**

Ms. Belisle testifies that she had previously worked for SIGIR, during the first part of 2007, as the Deputy Assistant IG for Public Affairs. Ms. Belisle states that in January 2007, she managed the duties of both Public Affairs and Congressional Affairs because her supervisor had quit. The Chief of Staff asked her to assume the supervisory duties of both sections until the Agency's quarterly report was released at the end of January. Ms. Belisle asserts that she was then to transition the responsibilities to the two newly hired Assistant IGs for both sections, the Complainant and Ms. Cowart, and was to become the Complainant's deputy (TR pp 212-214).

Ms. Belisle asserts that she was not insubordinate to the Complainant and did all that she could to make the Complainant's transition into SIGIR as easy as possible. With regard to the incident of March 2, 2007, Ms. Belisle states that she received a call from a reporter who wanted to quickly interview Mr. Bowen before he left the country. She called the Complainant, but did not get an answer. After her call was not returned after two hours, Ms. Belisle states that she sent an email message to Mr. Bowen, and copied the Complainant, so they were aware of this request for an interview (TR p 219).

Ms. Belisle testifies that she left her first period of employment with SIGIR in early 2007, because the Complainant did not like working with her. The Complainant decided that she (Ms. Belisle) could continue working in Public Affairs, but only as her secretary. Ms. Belisle states that she declined the secretary position and that she arranged with the Chief of Staff, Mr. Arntson, to be released for the reason that her position was eliminated due to reorganization (IF p 364; TR pp 215-216).

Ms. Belisle contends that Ms. Cruz contacted her on about July 15, 2007, and asked about the status of her employment. They met for lunch on Friday, July 20, 2007, and she sent her resume to Ms. Cruz the following day. On Monday, July 23, 2007, Ms. Cruz asked her to return to SIGIR as the Director of Public Affairs, and she began work on Tuesday as a contractor with BCPI earning $70,000 or $80,000 a year. Ms. Belisle states that she accepted the position once Ms. Cruz assured that the Complainant would not be working at the Agency. Ms. Belisle asserts she learned afterward that the Complainant was no longer at SIGIR because the Public Affairs section had downsized (TR pp 212, 218, 220-222, 226).

Ms. Belisle testifies that she first met Ms. Cruz in September 2005, when she (Ms. Belisle) began her employment with the Agency. Ms. Belisle states that she and Ms. Cruz have a good relationship with each other, and on rare occasions they have met for social events outside of the office (TR pp 227, 229).

Ms. Belisle testifies that she was converted from her contractor position to her current federal civil service position in August 2007, where she earns a salary of $125,000 a year. She states that she has no administrative support and is the only person performing public affairs activities (TR pp 211-212, 230).

**Investigator's analysis:**

**Issue of harassment (hostile work environment):**

The Complainant has membership in the protected groups of race (Black), national origin (African American), and sex (female) (IF p 143; TR p 11).

The Complainant was subjected to unwelcome conduct that a reasonable person would find offensive. Not all of the Complainant's claims describe actions that a reasonable person would find offensive; however, those that would be considered offensive include:

- Ms. Cruz taking over the Complainant's assignment to compile quarterly report recommendations from the staff in or about May 2007 (TR pp 24-25, 39, 68-69).
- Ms. Cruz reviewing the Complainant's time and attendance cards from June 2007, through July 2007, in order to determine if she was taking too much time off for personal reasons and medical appointments (IF pp 409-410).
- Ms. Cruz isolating the Complainant from the consultative process regarding media activities by excluding her from meetings with Mr. Bowen (IF p 410).
- Advising the Complainant on July 23, 2007, that her employment would be terminated (IF p 314).

The actions noted above are sufficiently severe as to create an intimidating work environment. The actions that led to the Complainant's termination caused the Complainant to suspect that Ms. Cruz's actions were part of a process of working against her toward the goal of creating a case for the Complainant's termination (TR pp 29-30, 35-37).

The Complainant testified that the fact that the Agency eliminated the only two people in her section, both of whom are Black/African American, and replaced them with a White person, Ms. Belisle, is an indication that race and national origin were involved in the reorganization and Ms. Cruz's subsequent termination of the Complainant and Ms. Redmon. Additionally, a similar section, Congressional Affairs, was also reorganized but the effected White employees were able to transfer to other positions within the Agency. No witness testified as to sex being a factor in the alleged claims. All witnesses other than the Complainant, to include Ms. Redmon, testified that they did not believe race or national origin were the reasons for the Agency's actions. Mr. Arntson testified that the Complainant's termination may have been associated with the Complainant's treatment of Ms. Cruz's friend, Ms. Belisle (IF pp 409, 411-412; TR pp 40-42, 44-45, 47, 52-56, 79, 181-182, 185).

The alleged harasser is Ms. Cruz, whom the Complainant testified as initiating nearly all of the alleged acts of harassment. The Complainant asserted that Mr. Bowen was also involved, because as the senior person in the Agency, he would have approved the actions that Ms. Cruz executed. Both Mr. Bowen and Ms. Cruz are within the Complainant's chain of command (IF p 126; TR pp 32-33).

Management contends that it did not harass the Complainant, so it did not believe that there was harassing behavior that it needed to address. The Agency submitted copies of its policies on EEO and harassment from the Department of the Army. The Agency provided a copy of its own policy statement on EEO, which also addresses harassment. That document is signed by Mr. Bowen but is not dated (IF pp 324-331, 399, 403).

When asked if she reported the harassment she alleges to anyone prior to her termination, the Complainant stated that she did not because she had hoped that she could tolerate the harassment. The Complainant also stated that she wanted to retain her job, thus indicating that she believed that by reporting the harassment her continued employment would be jeopardized (TR pp 55-56).

**Issue of retaliation:**

The Complainant testified that she expressed to Ms. Cruz on July 20, 2007, that she believed Ms. Cruz's decision to terminate Ms. Redmon's employment was racially motivated and discriminatory. The Complainant also sent an email message on the morning of July 23, 2007, in which she expressed that she had concerns about the fairness and equality of the termination of Ms. Redmon (IF p 301; TR pp 12-13, 34-35).

Ms. Cruz testified that the Complainant complained to her of Ms. Redmon's termination both verbally and by email message, but she did not consider either complaint to be an allegation of discrimination based on race or national origin. Management was aware of the Complainant's protected EEO complaint, namely the email message in which she expressed concern over the fairness and equality of Ms. Redmon's termination, because the Complainant sent it to senior members of management, to include Mr. Bowen, Ms. Cruz, Mr. Arntson, and Ms. Nisbet, on the morning of July 23, 2007, at 9:04 a.m. (IF pp 140, 301; TR pp 12-13, 34-35, 113-116, 121, 128, 143-145, 150, 152, 157, 160, 163-164).

Management's action of terminating the Complainant would be considered as materially adverse to a reasonable employee. Such termination would likely deter a reasonable employee from filing or supporting a complaint of discrimination.

The Complainant's notification of her termination occurred at about 3:00 p.m. on July 23, 2007. The Complainant had distributed the email message of her concern for fairness and equality earlier that morning. The Complainant had also verbally complained to Ms. Cruz about Ms. Redmon's termination about four days earlier. Ms. Cowart was similarly situated to the Complainant in that Ms. Cowart was also the Assistant IG for a section within the Agency (Congressional Affairs). There is no evidence supporting that Ms. Cowart had any previous protected EEO activity. The Agency removed both the Complainant and Ms. Cowart from their Assistant IG positions; however, the Agency allowed Ms. Cowart to transfer to another position. The Agency did not allow the Complainant to transfer to another position within the Agency. According to Ms. Cruz, the Complainant could not so transfer because there was no other position for which she was qualified (IF pp 125, 134, 311-313; TR pp 29-30, 35-37, 89-90).

Management has articulated legitimate, non-retaliatory reasons for its treatment of the Complainant and Ms. Cowart. Management witnesses testified that OMB had placed pressure on SIGIR to reduce costs. Since the Public Affairs section had in the past operated with only one person, Ms. Cruz believed that section was one area in which the Agency could reduce the number of positions. Management testimony and Ms. Cruz's notes reveal that the Agency began planning reorganization as early as June 2007, which was prior to Ms. Redmon's termination, and prior to the Complainant subsequently complaining about Ms. Redmon's termination verbally on July 19, 2007, and via email message on July 23, 2007. Mr. Cruz states that Ms. Cowart was able to transfer to another position because she was qualified for that position. However, the Complainant was not offered the opportunity to transfer because she was not qualified for another position within the Agency (IF pp 376, 400, 402-403; TR pp 89-97, 193-195).

The reasons that the Agency has given for its actions are credible in that several management witnesses, Ms. Cruz, Mr. Bowen, and Ms. Nisbet, testified that reorganization was indeed occurring in June and July 2007. Also, copies of meeting notes from Ms. Cruz's notebook disclose that as early as June 2007, she was discussing reorganization of the Agency with Mr. Bowen. Mr. Arntson declared that on July 23, 2007, Ms. Cruz informed him that the Complainant had sent her an email message in which the Complainant stated that she could not attend a meeting that she and Ms. Cruz had previously scheduled for that day. This indicates that Ms. Cruz had already scheduled a meeting to terminate the Complainant prior to July 23, 2007. In other words, Ms. Cruz had decided to terminate the Complainant before she received the Complainant's email message on the morning of July 23, 2007, in which she complained of fairness and equality. Mr. Arntson's testimony dissents from that of the majority of witnesses regarding the Complainant's termination. He declared that the Complainant's treatment of Ms. Belisle was a factor in the Complainant's termination because Ms. Cruz and Ms. Belisle were friends (IF pp 301, 376, 400, 402-404, 411-412; TR pp 92-97, 121, 193, 195).

**Issue of disparate treatment:**

The Complainant's memberships in the protected groups of race, national origin, sex, and having prior EEO activity were previously addressed (IF pp 140, 143, 301; TR pp 11-13, 34-35, 113-116, 121, 128, 143-145, 150, 152, 157, 160, 163-164).

Ms. Cowart was similarly situated to the Complainant in that both were Assistant IGs who supervised their respective sections; Ms. Cowart over Congressional Affairs, and the Complainant over Public Affairs (IF p 125).

The Agency treated the Complainant differently than it did Ms. Cowart who is outside of the Complainant's protected group of race, national origin, and EEO activity in that Ms. Cowart is White, American, and has no known prior EEO activity. Even though both lost their assigned positions in the reorganization that occurred in July 2007, the Agency offered Ms. Cowart the opportunity to transfer to another position, that of Senior Advisor for Congressional Affairs. Ms. Cowart remained in that position until she left the Agency on September 8, 2007. Ms. Cruz's meeting notes reveal that she and Mr. Bowen considered reassigning Ms. Cowart to the position

of Senior Advisor for Congressional Affairs on about July 3, 2007, as they planned the Agency's reorganization. The Agency did not give the Complainant the opportunity to transfer within SIGIR (IF pp 133, 140, 379; TR pp 52-55, 79).

The Complainant and Mr. Arntson testified that Ms. Cruz terminated the Complainant and Ms. Redmon, both Black and African American, who were the only members of the Public Affairs section, yet Ms. Cruz offered other positions to the members of the Congressional Affairs section who were predominantly White (IF pp 409, 412; TR pp 29-30, 35-37, 40-42).

The fact that management has articulated legitimate, nondiscriminatory reasons for its treatment of the Complainant and Ms. Cowart was previously addressed (IF pp 376, 400, 402-403; TR pp 89-97, 193-195).

The fact that management's reasons for its actions are credible were previously discussed (IF pp 301, 376, 400, 402-404, 411-412; TR pp 92-97, 121, 193, 195).

Ms. Cruz testified that the Agency reassigned Ms. Cowart to another position, but did not do the same for the Complainant because she did not qualify for an available position. Review of the Agency's SIGIR Staffing Table 30 documents shows that after the reorganization, the Agency reassigned Ms. Cowart to the position of Senior Advisor for Congressional Affairs, which was in the Congressional Affairs section. Review of the Table 30 documents from January 2007, through November 2007, reveals that the position of Senior Advisor for Congressional Affairs did not exist prior to the reorganization, and no longer existed as a vacant position after Ms. Cowart departed the Agency on September 8, 2007. This analysis of the documentation indicates that the Agency created the Senior Advisor for Congressional Affairs position for Ms. Cowart to fill following the reorganization. No information indicates that the Agency created a position for the Complainant following the reorganization. Ms. Cruz testified that after the Complainant's termination, the Agency could not allow her to temporarily remain working in Public Affairs since the Agency could not have an understandably unhappy, terminated employee represent SIGIR and speak with the media. The Agency filled the newly created position of Director of Public Affairs with the recently hired Ms. Belisle who is Caucasian, American, and has no known previous EEO activity (IF pp 129-136; TR pp 153-154, 156, 211).

Martin J. Welker
Investigator

# INDEX

Investigative File
Complaint of Denise N. Burgess
Activity Docket Numbers: ARHQOSA07AUG03041

**PAGE**

**EXHIBIT A – Formal Complaint Documents**
Formal Complaint of Discrimination..........1

**EXHIBIT B – EEO Counseling Documents**
1. EEO Counselor's Report and related correspondence..........14
2. Notice of Aggrieved Person's Rights and Responsibilities..........59
3. Notice of Right to File a Formal Complaint of Discrimination..........71

**EXHIBIT C – Claims to be Investigated**
1. Notice of Receipt of Discrimination Complaint..........75
2. Notice of Acceptance of Discrimination Complaint..........77

**EXHIBIT D – Attempts at Resolution**
Documents Relating to Mediation Attempt..........83

**EXHIBIT E – Appellate Activity**
Reserved..........102

**EXHIBIT F – Evidence**
1. Agency response to request for information and documentation..........103
2. Agency follow-up response to request for information and documentation..........110
3. Organization charts, Special Inspector General for Iraq Reconstruction (SIGIR)..........124
4. SIGIR staffing tables..........128
5. SIGIR personnel rosters..........137
6. Resume of Complainant..........161
   a. Notification of Personnel Action, Selection..........168
7. Duty description, Director, Public Affairs, AD-0301-00..........174
8. Duty description, Assistant Inspector General (IG), Public Affairs, AD-0301-00..........179
9. Documents relating to Kristine R. Belisle's complaint against Complainant..........184
10. Complainant's award nomination documents..........262
11. Email message communications..........270
12. Complainant's notice of termination letter..........309
   a. *Complainant's termination meeting notes..........311
   b. Notification of Personnel Action, Termination..........314
13. Roster of personnel losses within SIGIR..........320

***Regulations and Policies***
14. Agency EEO policy memorandums and training rosters..........323
15. US Code, Title 5, Employment and compensation of employees..........354

# INDEX

Investigative File
Complaint of Denise N. Burgess
Activity Docket Numbers: ARHQOSA07AUG03041

PAGE

**EXHIBIT A – Formal Complaint Documents**
Formal Complaint of Discrimination ........ 1

**EXHIBIT B – EEO Counseling Documents**
1. EEO Counselor's Report and related correspondence ........ 14
2. Notice of Aggrieved Person's Rights and Responsibilities ........ 59
3. Notice of Right to File a Formal Complaint of Discrimination ........ 71

**EXHIBIT C – Claims to be Investigated**
1. Notice of Receipt of Discrimination Complaint ........ 75
2. Notice of Acceptance of Discrimination Complaint ........ 77

**EXHIBIT D – Attempts at Resolution**
Documents Relating to Mediation Attempt ........ 83

**EXHIBIT E – Appellate Activity**
Reserved ........ 102

**EXHIBIT F – Evidence**
1. Agency response to request for information and documentation ........ 103
2. Agency follow-up response to request for information and documentation ........ 110
3. Organization charts, Special Inspector General for Iraq Reconstruction (SIGIR) ........ 124
4. SIGIR staffing tables ........ 128
5. SIGIR personnel rosters ........ 137
6. Resume of Complainant ........ 161
   a. Notification of Personnel Action, Selection ........ 168
7. Duty description, Director, Public Affairs, AD-0301-00 ........ 174
8. Duty description, Assistant Inspector General (IG), Public Affairs, AD-0301-00 ........ 179
9. Documents relating to Kristine R. Belisle's complaint against Complainant ........ 184
10. Complainant's award nomination documents ........ 262
11. Email message communications ........ 270
12. Complainant's notice of termination letter ........ 309
   a. *Complainant's termination meeting notes ........ 311
   b. Notification of Personnel Action, Termination ........ 314
13. Roster of personnel losses within SIGIR ........ 320

***Regulations and Policies***
14. Agency EEO policy memorandums and training rosters ........ 323
15. US Code, Title 5, Employment and compensation of employees ........ 354

# INDEX

Investigative File
Complaint of Denise N. Burgess
Activity Docket Numbers: ARHQOSA07AUG03041

***Data Collected During the Investigation and Afterward***

16. Hiring Authority, Section 3161, Employment and compensation of employees ................359
17. Correspondence provided by the Agency ................363
18. Notes copied from the personal notebook of Ginger Cruz ................372
19. Declaration – Stuart W. Bowen, Jr. ................396
20. Declaration – Richard G. "Nick" Arntson ................405
21. Investigator's Declaration, October 3, 2008 ................415

**EXHIBIT G – Documents Relating to Processing of Investigation**
General correspondence and related documents ................417

**EXHIBIT H – Documents Relating to Compensatory Damages**
Reserved................487

**ENCLOSURE – Fact-Finding Conference Transcript**

**** Denotes document(s) relocated from EEO Counselor's Report***

The documents in this file were provided by the Complainant and/or Agency sources and have not been altered. Duplicate documents have been removed from the file and any reorganization of documents is noted in the record.



**DEPARTMENT OF THE ARMY**
EQUAL EMPLOYMENT OPPORTUNITY
COMPLIANCE AND COMPLAINTS REVIEW
1901 SOUTH BELL STREET, SUITE 109B
ARLINGTON, VA 22202-4508

REPLY TO
ATTENTION OF

13 APR 2009

Equal Employment Opportunity
Compliance and Complaints Review

Michael J. Baratz, Attorney at Law
Harry Lee, Attorney at Law
Steptoe & Johnson L.L.P.
1330 Connecticut Avenue, NW
Washington, D.C. 20036-3902

Complaint of Denise N. Burgess v.
Pete Geren, Secretary of the Army
DA Docket Number: ARHQOSA07AUG03041

Dear Mr. Baratz:

This is the Department of the Army's final decision in your client's equal employment opportunity (EEO) complaint, dated October 28, 2007, which was filed with the EEO Office, Office of the Administrative Assistant to the Secretary.

**Procedural and Factual Background**

In the instant complaint, Ms. Denise Burgess (hereinafter "the Complainant" or "your client") claimed that she was the victim of discrimination and harassment based upon race/national origin (African American), sex (female), and retaliation (opposing unlawful discrimination) when:

1. On March 2, 2007, Ms. Kristine R. Belisle (Caucasian American female, unknown EEO activity), Deputy to the Assistant Special Inspector General for Iraq Reconstruction (SIGIR) for Public Affairs, at the direction of Ms. Ginger M. Cruz (Asian American, Filipino, female, no prior EEO activity) Deputy Inspector General (IG), SIGIR, challenged the Complainant's authority;

2. On or about May 2007 Ms. Cruz, without consultation with the Complainant, took over an assignment that the IG had given to the Complainant;

3. In July 2007 Ms. Cruz targeted the Complainant and her staff for termination when an equivalent unit with 4 full-time staff members had no reductions;

4. From June 2007 through July 2007 Ms. Cruz delayed hiring staff into the Complainant's section, forcing the Complainant to accomplish work previously done by 2 full time employees;[1]

[1] Claims 3 and 4 will be analyzed together since they both involve staffing of the Complainant's section.

GOVERNMENT EXHIBIT 14

5. From June 2007 through July 2007 Ms. Cruz exclusively reviewed the Complainant's time and attendance records in hope of finding irregularities;

6. In July 2007 Ms. Cruz isolated the Complainant from the consultative process regarding media activities;

7. In July 2007 Ms. Cruz insisted on addressing the Complainant's assistant, Ms. Patricia Redmond as "Pat" rather than "Patricia;"

8. On July 23, 2007, the Complainant received a memorandum from Mr. Nick Arntson (Caucasian American, male, prior EEO activity), Chief of Staff for the SIGIR, informing her that effective September 1, 2007, her employment would be terminated; and,

9. On July 23, 2007, Ms. Cruz retaliated against the Complainant for opposing employment practices that were racially discriminatory by terminating her employment[2] (Investigative File [IF] pages [pp] 77B-77C).

I note that an investigation was conducted by the Department of Defense Civilian Personnel Management Service, Investigations and Resolutions Division. The Complainant was notified of the option to request either a hearing before an Equal Employment Opportunity Commission (EEOC) administrative judge or a final Army decision based upon the evidence in the case file. This decision is issued pursuant to your client's request for a final Army decision based upon the evidence of record or your client's failure to respond to the notice of post-investigative options within the allotted time.

The Complainant was employed as an SES-4, Assistant IG (AIG) for Public Affairs, SIGIR, in Arlington, Virginia. She began working in the position in January 2007, but her official date of assignment was February 4, 2007. Ms. Belisle performed the Complainant's duties prior to her (the Complainant's) hire. Ms. Belisle's employment with the Agency ended April 27, 2007. At the time of the Complainant's hire, Ms. Cruz was a Senior Advisor within SIGIR; however, in June 2007, Ms. Cruz became the Deputy IG, SIGIR, and as such was the Complainant's immediate supervisor. As of May 2007, the Complainant's Public Affairs section consisted of herself and her assistant, Ms. Redmon, who was a contract employee. On or about July 19, 2007, the Agency informed Ms. Redmon that her employment with the Agency would end. On July 23, 2007, the Complainant expressed her dissatisfaction with the termination of her assistant by sending an email message to the Agency's senior managers. Later that day, the Agency advised the Complainant of her termination effective on September 1, 2007 (IF pp 132, 168, 314, 364; Transcript [TR] pp 13-15, 82).

---

[2] Claims 8 and 9 will be analyzed together because the proposed termination is considered to have merged with the termination.

The Complainant identifies her previous protected EEO activity as 2 actions that related to the termination of her assistant, Ms. Redmon (contract employee). First, the Complainant verbally commented to Ms. Cruz on July 19, 2007, that she was dissatisfied upon learning of Ms. Redmon's termination. Second, the Complainant sent an email message on July 23, 2007, in which she allegedly expressed that she believed the Agency's termination of Ms. Redmon was racially motivated and discriminatory (IF page [p] 301; TR pp 12-13, 34-35).

**Legal Framework**

In any proceeding, either judicial or administrative, involving a charge of discrimination, it is the complainant's burden to prove that prohibited discrimination was the motivating factor in the actions or policies challenged. To satisfy this burden by circumstantial evidence, the complainant must first establish a *prima facie* case of discrimination. *See McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973); *Furnco Construction Company v. Waters*, 438 U.S. 567 (1978). This means that the complainant must present a body of evidence such that, were it not rebutted, the finder of fact could conclude that unlawful discrimination did occur.

The analysis in *McDonnell Douglas* prescribes that if the complainant meets his/her burden of presenting a *prima facie* case, then the employer or Agency must articulate some legitimate, nondiscriminatory reason(s) for its actions. That is, the employer must ". . . introduce evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993). Once the employer or Agency carries this burden of production, the presumption of discrimination created by the *prima facie* "finding drops from the case."

The complainant then must demonstrate that the proffered reason was not the true reason for the employment decision and that unlawful discrimination was the true discrimination. The complainant retains the ultimate burden of persuading the finder of fact that the Agency intentionally discriminated against the complainant.

Disparate Treatment. To establish a *prima facie* case of discrimination based upon race or national origin, your client, must show: (1) that she is a member of a group(s) protected by Title VII, as amended; (2) that she was adversely affected by an agency personnel decision, action or change; and (3) that she was treated less favorably than similarly situated individuals outside of her protected group(s) or, in the alternative, that there is some other evidence raising an inference of prohibited discrimination.

To establish a *prima facie* case of reprisal, your client must show: (1) that she engaged in activity protected by Title VII of the Civil Rights Act of 1964, as amended; (2) that management was aware of the protected activity; (3) that subsequent to the protected activity, her employment situation was adversely changed or affected; and (4) that there is a causal nexus between the protected activity and the adverse action or

the adverse action occurred within such a period of time that a retaliatory motivation may be inferred or that other evidence exists so as to cause one to reasonably conclude there was a nexus between the two actions. See *Mack v. Department of the Army*, EEOC Appeal No. 01921446 (May 6, 1993).

Hostile Work Environment. Harassment is defined as ongoing and continuous, rather than isolated or sporadic conduct, which creates a hostile work environment, so pervasive that a reasonable person would find it hostile and abusive. See *Harris v. Forklift Systems, Inc.*, 510 U.S. 17; 114 S.Ct. 367 (1993). The severity of the alleged harassing acts must be determined from the totality of the circumstances. See *Gilbert v. City of Little Rock*, 722 F.2d 1390, 1394 (8th Cir. 1983). The U.S. Supreme Court has held that a violation of Title VII may be predicated on either of two (2) types of harassment: (1) that which results in a tangible personnel action, and (2) that which, while not resulting in a tangible personnel action, creates a hostile and offensive work environment because of one's protected group status. See *Meritor Savings Bank F.S.B. v. Vinson*, 477 U.S. 57, 62-67 (1986).

To establish a *prima facie* case your client must show: (1) that she is a member of a group protected under Title VII; (2) that she was subjected to unwelcome verbal or physical conduct; (3) that the harassment complained of was based on your protected group status; (4) that the harassment complained of affected a "term, condition or privilege of employment," i.e., the conduct must be sufficiently severe as to alter the conditions of employment and create an abusive work environment; and (5) that the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

**Analysis and Findings**

As stated above, to establish a *prima facie* case you must show: (1) that your client is a member of a group protected under Title VII; (2) that she was subjected to unwelcome verbal or physical conduct; (3) that the harassment complained of was based on a protected group status; (4) that the harassment complained of affected a "term, condition or privilege of employment," i.e., the conduct must be sufficiently severe or pervasive as to alter the conditions of employment and create an abusive work environment; and (5) that the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

**Protected Group Status**. In your client's complaint, she established the first element by virtue of her race/national origin (African American), and, sex (female).

However, your client has not proven that she opposed practices that she believed to be a violation of civil rights laws. Specifically, your client asserts that her previous protected EEO activity consisted of 2 actions relating to the termination of her Assistant, Ms. Redmon. Ms. Burgess alleges that she verbally commented to Ms. Cruz on July 19, 2007, that she was dissatisfied upon learning of Ms. Redmon's termination, and sent an email message on July 23, 2007, stating that the Agency's termination of

Ms. Redmon was racially motivated and discriminatory (IF p 301; TR pp 12-13, 34-35). However, Ms. Cruz denies that your client ever mentioned illegal discrimination to her (TR pp 113-114). A review of the July 23, 2007, email message reveals no assertion of discrimination; rather, the email asserts concerns about the "fairness and equality" of the termination. This statement is not sufficiently specific to put a reasonable person on notice of a belief that your client was raising a complaint of race or sex discrimination. The words "fairness and equality" do not in and of themselves implicate Title VII. Matters may be unfair and unequal without an illegally discriminatory motive.

Ms. Burgess also asserted that in the spring of 2007, Ms. Cruz made derogatory comments in a staff meeting regarding people who file EEO complaints (TR pp 19-20). However, Ms. Cruz testifies that her comments about persons who had filed complaints were in specific reference to people who had filed anonymous complaints about her. Ms. Cruz asserts that she had been the target of a full-blown anonymous attack against her character by disgruntled former employees who used anonymous media contacts to slander and libel her in public. She mentioned this to the Complainant because it was the Complainant who was receiving calls from the media about those attacks. Ms. Cruz asserts that the people who filed those complaints against her were not minorities (TR pp 118-119). Ms. Burgess' characterization of these comments as relating to EEO complaints appears to be unfounded in light of Ms. Cruz' denial and the absence of any corroborating witness testimony that the discussion of "complaints" alluded to EEO complaints. Accordingly, no *prima facie* inference of reprisal can be inferred. Even so, I note that management articulated legitimate nondiscriminatory reasons for its actions.

**Unwelcome Verbal or Physical Conduct**. While most of the incidents identified by your client were not verbal or physical actions; we will assume, for argument's sake, that the element has been satisfied.

**Based on a Protected Group Status**. Since the matters at issue do not involve any direct evidence of verbal or physical acts that specifically implicate race, national origin, or sex discrimination, proof of this element is accomplished via circumstantial evidence in the same manner as that of a disparate treatment claim (i.e., proof that a similarly situated person of a different protected group received more favorable treatment in similar circumstances and that management's nondiscriminatory reasons were a pretext for illegal discrimination).

At the outset, I note that the Complainant asserted that Mr. Bowen was also responsible for the alleged discrimination. The record reveals that Mr. Bowen was the same management official that hired the Complainant 6 months earlier (TR pp 15, 32-33). In such situations, the EEOC has found no inference of discriminatory animus because it is unreasonable to believe that Mr. Bowen did not hold discriminatory animus against the Complainant when she was hired in January 2007, but did when she was terminated in July 2007.

**Incident Nos. 1, 2, and 6.** Undercutting the Complainant's Authority. The Complainant expressed her opinion that undercutting one's authority was "classically

racist" and that she was the only African American on staff who was treated in that manner; however, there is no evidence to support these assertions (TR pp 22, 38, 39). The Complainant did not identify a similar situation in which another staff member was treated differently. A bare assertion of dissimilar treatment is not sufficient to infer a causal link to one's protected bases. Management denied that these incidents were attempts to undercut the Complainant's authority. Specifically, management's witnesses asserted the following:

- Incident No. 1: March 2007 Reporter Interview Matter. Ms. Belisle received a call from a reporter who wanted to quickly interview Mr. Bowen before he left the country. She called the Complainant, but did not get an answer. After her call was not returned after 2 hours, Ms. Belisle sent an email message to Mr. Bowen, and copied the Complainant, so they were aware of the request for an interview (TR p 219). Ms. Cruz admits telling Ms. Belisle to contact Mr. Bowen directly regarding the interview request because the matter was time sensitive and the Complainant could not be reached. Ms. Cruz told Ms. Belisle to notify the Complainant about the matter. Mr. Bowen concurred in the handling of this matter (IF p 399; TR p 84).

- Incident No. 2: May 2007, Assumption of an IG Assignment. Mr. Bowen had asked the Complainant to prepare policy regarding procedures for the release of quarterly reports. Mr. Bowen was not satisfied with the Complainant's draft. Ms. Cruz spoke once with the Complainant on her progress with the changes. While the Complainant was absent from the office, Mr. Bowen directed her (Ms. Cruz) to provide him the final policy with the specific views on timing that he had mentioned to her. Having previously discussed the matter with the Complainant, Ms. Cruz felt that it was appropriate to issue the procedures (TR pp 85-86).

- Incident No. 6: July 2007, Isolated from Media Activities' Consultative Process. Ms. Cruz denies isolating the Complainant from media activities consultative process. Whenever a person brought media issues to her attention and excluded the Complainant, she made certain that she directed that person to the Complainant, or that she included the Complainant in the discussion about the issue (TR p 110-111).

**Incident Nos. 3 & 4.** Interference with Hiring Staff and Targeting the Complainant's Section for Staff Reductions. The Complainant identified the AIG for Congressional Affairs section, managed by Ms. Marthena Cowart (Caucasian, American, female, unknown EEO activity), as having been similar to her section but was not subjected to similar staff reductions and hiring interference. The comparative section had 4 employees (3 White and 1 Black; 2 females and 2 males; all U.S. citizens); while the Complainant's section had 3 employees (2 Black females, 1 unspecified[3]) and an additional position which the complainant was not allowed to fill

[3] The Complainant stated that the employee was absent due to being hospitalized, but she did not otherwise identify the employee (TR pp 40-42).

(White male had been selected but was not allowed to be hired) (TR pp 40, 42-43, 53-55).

Management denied that these incidents were discriminatory and asserted that the organization's budget had undergone scrutiny by the Office of Management and Budget (OMB). As such, the office had to reduce its budget expenditures. In December 2006, 4 employees were completing the duties in both Congressional and Public Affairs, but by early 2007, the number of employees in those sections had increased to 8 (TR pp 90-91). In the spring of 2007, OMB expressed concern that SIGIR's budget was increasing dramatically. OMB told SIGIR that there was no Congressional mandate for SIGIR to have a press function, and it was unacceptable that the in-house staff and the budget were growing. Both the Public Affairs and Congressional Affairs sections lost positions that were not mission critical. Specifically, Public Affairs lost one position, Ms. Redmon, and Congressional Affairs lost 3 positions (2 of these employees were placed in vacant positions elsewhere in the organization) (TR pp 86-90, 92-97). The record reflects that by November 2007 both organizations combined had only 3 positions, as opposed to 6 positions in July and August 2007; thus, substantiating management's assertions (IF pp 134, 136).

**Incident No. 5**. Time and Attendance Record Review. There is no identification of a comparator for this incident; however, it is presumed that the Complainant was comparing herself to Ms. Cruz' other subordinate managers. Management denied that this incident was the result of discrimination. Specifically, Ms. Cruz stated that when she became the Deputy for Policy, she sent an email message to all the employees who reported directly to her, the Complainant, Ralph S. Michaud (White, male, unknown EEO activity), and Ms. Cowart requesting that they all send their timesheets to her. As their supervisor, she made sure that she reviewed their timesheets for accuracy, and she never had any issues with the Complainant's timesheets (IF pp 139, 400; TR pp 109-110).

**Incident No. 7.** Calling Ms. Redmon "Pat" instead of Patricia. No comparator was identified as to this allegation. Further, Ms. Redmon stated that she did not perceive Ms. Cruz' calling her "Pat" instead of "Patricia" as being discriminatory based upon a protected group status (TR pp 181-182, 185). As such, there is no evidence that this incident was based upon a protected group status. In any event, Ms. Cruz stated that this was simply an oversight on her part and was neither intentional nor discriminatory.

**Incident Nos. 8 & 9.**[4] Complainant's Termination. Ms. Cruz allegedly said that the organization was trying to get the "right mix of people," which the Complainant interpreted as an allusion to race (TR p 30). The Complainant was replaced by a White female (Ms. Belisle). The Complainant also identified another SES level employee, Marthena Cowart, as an underperforming employee who was moved to another position

[4] Incident nos. 8 and 9 are addressed together since the notice of proposed termination merges with the actual termination.

rather than being terminated (TR pp 52-55, 79). However, since Ms. Belisle's and Ms. Cowart's national origin and sex were also American female, there is no evidence from which to infer national origin or sex discrimination as to the termination claim. A *prima facie* inference of race discrimination is extant.

Management denied that this incident was motivated by discrimination. Specifically, the Complainant was terminated due to the same budget issues as those that necessitated the reduction in other staff. The work formerly performed by the Complainant's section was transferred to a new Director, Public Affairs position into which Ms. Belisle was hired after the Complainant's termination. Ms. Cruz did not offer the Director, Public Affairs position that Ms. Belisle would fill to the Complainant because the Complainant had expressed during the 2 months prior to her termination that she would be unable to accomplish the Public Affairs duties without there being 4 people in the section (TR pp 36). Ms. Cruz states that she approached Ms. Belisle for the position because her skills were "not managerial." Ms. Belisle was "not above doing anything such as making telephone calls, or doing the heavy lifting" herself. Ms. Belisle also was conversant regarding audits, inspections, and the quarterly report, whereas the Complainant was not. Ms. Cruz asserts that the hiring of Ms. Belisle would enable SIGIR to realize a large financial savings in that Ms. Belisle was able to perform all of the activities that the Complainant stated she needed a 4 person section to accomplish (IF p 7; TR pp 100-103). Ms. Cruz states that there was no other position at the Complainant's level to which she could have been reassigned (TR pp 86-90).

The Complainant contends that there was no reorganization; thus, it was simply a pretext to terminate her employment. However, contrary to the Complainant's assertions, the record contained copies of emails, dated July 11 and 13, 2007, from the Complainant to Janice Nisbet (Caucasian American female, no prior EEO activity), Servicing Human Resources Representative, in which she states that she did not move forward filling the vacant position in her section "due to the reorganization" and because of "budget issues" (IF pp 365-366). These email messages were dated prior to Ms. Redmon's termination on July 19, 2007, and prior to the Complainant complaining about Ms. Redmon's termination verbally on July 19, 2007, and via email message on July 23, 2007. Further, several management witnesses confirmed that a reorganization was ongoing in June and July 2007 (IF pp 125, 134, 311-313; TR pp 29-30, 35-37, 89-90). Also, the record reflects that by November 2007 the combined Congressional and Public Affairs sections had only 3 positions, as opposed to 6 positions in July and August 2007, thus supporting management's assertion that the Complainant's position was abolished (IF pp 134, 136). It is notable that when Ms. Belisle left SIGIR in April 2007, her termination letter gave "reorganization" as the reason that her Term position was not being renewed (IF p 364). This evidence supports management's nondiscriminatory reasons for the decision not to hire more staff into the Complainant's section and for the Complainant's and Ms. Redmon's terminations.

**Pretext**. Other than the initial assertions presented during the Complainant's testimony, no rebuttal evidence was provided by the Complainant and she declined to submit a written rebuttal to the declarations of Mr. Bowen and Mr. Arntson (IF pp 485-

486; TR pp 173, 186, 210, 236).[5] Even if the record supported a finding of pretext, the burden remains with the Complainant to prove that the real motive for the actions at issue was discrimination based on a protected group status. In this instance, no such evidence exists.[6] Thus, the record does not support a finding that the Complainant was subjected to disparate treatment due to prohibited discriminatory animus.

**Severity and Pervasiveness**. In light of the absence of evidence to prove that management's reasons were a pretext for illegal discrimination, it is not necessary to determine whether the incidents at issue were sufficiently severe and/or pervasive to alter the terms and conditions of the Complainant's employment.

In the absence of proof of the third *prima facie* element of a harassment claim (i.e., that the matters at issue were motivated by the Complainant's race, national origin, sex, or alleged opposition to discriminatory practices), the Complainant's hostile work environment claim must fail.

## Conclusion

Pursuant to my authority to decide these matters on behalf of the Secretary of the Army, I find that your client was not the victim of discrimination based upon the evidence in the case file and for the reasons cited above.

Since your client is not a prevailing party, although represented by an attorney, she is not entitled to any relief, including attorney's fees or costs.

If your client is not satisfied with this decision, her appeal rights follow:

## APPEAL RIGHTS FOR NONMIXED COMPLAINTS

An appeal may be filed with the Equal Employment Opportunity Commission [Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 77960, Washington, DC 20013] within 30 calendar days of the date of receipt of this decision. The 30-day period for filing an appeal begins on the date of receipt of this decision. An appeal shall be deemed timely if it is delivered in person, transmitted by facsimile or postmarked before the expiration of the filing period or, in the absence of a legible postmark, the appeal is received by the Commission by mail within 5 days after the expiration of the filing period. The complainant will serve a copy of the Notice of Appeal/Petition, EEOC Form 573, to the agency [Director, Equal Employment

---

[5] The Complainant asserted that a positive letter of recommendation and a bonus were indicators that her termination was wrongful; however, this evidence is irrelevant since the Complainant's termination was not related to her job performance.

[6] It is possible that management's decision to rehire Ms. Belisle, after the Complainant was terminated was influenced by Ms. Cruz' friendship with Ms. Belisle (IF pp 411-412). However, in the absence of evidence which implicates a basis protected by anti-discrimination law and regulation, such cronyism cannot be redressed by the EEO process. See *Kay v. Department of the Army*, EEOC Appeal No. 01A04243 (January 30, 2001).

Opportunity Compliance and Complaints Review, Department of the Army, ATTN: SAMR-EO-CCR, 1901 South Bell Street, Suite 109B, Arlington, Virginia 22202-4508] [and furnish a copy to the agency representative at the address on the enclosed Certificate of Service (Enclosure 1)] at the same time it is filed with the Commission. In or attached to the appeal to the Commission, the complainant must certify the date and method by which service was made to the agency [Director, Equal Employment Opportunity Compliance and Complaints Review].

The complainant may file a brief or statement in support of his/her appeal with the Office of Federal Operations. The brief or statement **must** be filed within 30 calendar days from the date the appeal is filed. The complainant will serve a copy of the brief or statement in support of his/her appeal to the agency [Director, Equal Employment Opportunity Compliance and Complaints Review and to the agency representative at the address shown above] at the same time the brief or statement is filed with the Commission. The regulation providing for appeal rights is contained in Title 29 of the Code of Federal Regulations, a section of which is reproduced below:

***Section 1614.401 Appeals to the Commission.***

*(a) A complainant may appeal an agency's final action or dismissal of a complaint.*

*(b) An agency may appeal as provided in Section 1614.110(a).*

*(c) A class agent or an agency may appeal an administrative judge's decision accepting or dismissing all or part of a class complaint; a class agent may appeal a final decision on a class complaint; a class member may appeal a final decision on a claim for individual relief under a class complaint; and a class member, a class agent or an agency may appeal a final decision on a petition pursuant to Section 1614.204(g)(4).*

*(d) A grievant may appeal the final decision of the agency, the arbitrator or the Federal Labor Relations Authority (FLRA) on the grievance when an issue of employment discrimination was raised in a negotiated grievance procedure that permits such issues to be raised. A grievant may not appeal under this part, however, when the matter initially raised in the negotiated grievance procedure is still ongoing in that process, is in arbitration, is before the FLRA, is appealable to the MSPB [Merit Systems Protection Board] or if 5 U.S.C. 7121(d) is inapplicable to the involved agency.*

*(e) A complainant, agent or individual class claimant may appeal to the Commission an agency's alleged noncompliance with a settlement agreement or final decision in accordance with Section 1614.504.*

***Section 1614.402 Time for appeals to the Commission.***

*(a) Appeals described in Section 1614.401(a) and (c) must be filed within 30 days of receipt of the dismissal, final action or decision. Appeals described in Section*

*1614.401(b) must be filed within 40 days of receipt of the hearing file and decision. Where a complainant has notified the EEO Director [Director, Equal Employment Opportunity Compliance and Complaints Review] of alleged noncompliance with a settlement agreement in accordance with Section 1614.504, the complainant may file an appeal 35 days after service of the allegations of noncompliance, but no later than 30 days after receipt of the agency's determination.*

*(b) If the complainant is represented by an attorney of record, then the 30-day time period provided in paragraph (a) of this section within which to appeal shall be calculated from the receipt of the required document by the attorney. In all other instances, the time within which to appeal shall be calculated from the receipt of the required document by the complainant.*

***Section 1614.403 How to appeal.***

*(a) The complainant, agency, agent, grievant or individual class claimant (hereinafter appellant) must file an appeal with the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 77960, Washington, DC 20013, or by personal delivery or facsimile. The complainant should use EEOC Form 573, Notice of Appeal/Petition [copy enclosed], and should indicate what is being appealed.*

*(b) The appellant shall furnish a copy of the appeal to the opposing party [Director, Equal Employment Opportunity Compliance and Complaints Review and to the agency representative – addresses shown above] at the same time that it is filed with the Commission. In or attached to the appeal to the Commission, the appellant must certify the date and method by which service was made on the opposing party [Director, Equal Employment Opportunity Compliance and Complaints Review].*

*(c) If an appellant does not file an appeal within the time limits of this subpart, the appeal shall be dismissed by the Commission as untimely.*

*(d) Any statement or brief on behalf of a complainant in support of the appeal must be submitted to the Office of Federal Operations within 30 days of filing the notice of appeal. Any statement or brief on behalf of the agency in support of its appeal must be submitted to the Office of Federal Operations within 20 days of filing the notice of appeal. The Office of Federal Operations will accept statements or briefs in support of an appeal by facsimile transmittal, provided they are no more than 10 pages long.*

*(e) The agency must submit the complaint file to the Office of Federal Operations within 30 days of initial notification that the complainant has filed an appeal or within 30 days of submission of an appeal by the agency.*

*(f) Any statement or brief in opposition to an appeal must be submitted to the Commission and served on the opposing party within 30 days of receipt of the statement or brief supporting the appeal, or, if no statement or brief supporting the*

*appeal is filed, within 60 days of receipt of the appeal. The Office of Federal Operations will accept statements or briefs in opposition to an appeal by facsimile provided they are no more than 10 pages long.*

***Section 1614.407 Civil action: Title VII, Age Discrimination in Employment Act and Rehabilitation Act.***

*A complainant who has filed an individual complaint, an agent who has filed a class complaint or a claimant who has filed a claim for individual relief pursuant to a class complaint is authorized under Title VII, the ADEA [Age Discrimination in Employment Act] and the Rehabilitation Act to file a civil action in an appropriate United States District Court:*

*(a) Within 90 calendar days of receipt of the final action on an individual or class complaint if no appeal has been filed;*

*(b) After 180 days from the date of filing an individual or class complaint if an appeal has not been filed and final action has not been taken;*

*(c) Within 90 days of receipt of the Commission's final decision on an appeal; or*

*(d) After 180 days from the date of filing an appeal with the Commission if there has been no final decision by the Commission.*

***Section 1614.409 Effect of filing a civil action.***

*Filing a civil action under § 1614.408 or § 1614.409 shall terminate Commission processing of the appeal. If private suit is filed subsequent to the filing of an appeal, the parties are requested to notify the Commission in writing.*

If a civil action is filed and complainant does not have or is unable to obtain the services of a lawyer, the complainant may request the court to appoint a lawyer. In such circumstances as the court may deem just, the court may appoint a lawyer to represent the complainant and may authorize the commencement of the action without the payment of fees, costs, or security. Any such request must be made within the above referenced 90-day time limit for filing suit and in such form and manner as the court may require.

You are further notified that if a civil action is filed, the appropriate Department or Agency head must be named as the defendant and his or her official title provided. **DO NOT NAME JUST THE AGENCY OR DEPARTMENT**. Failure to name the head of the Department or Agency or to state her or her official title may result in the dismissal of the case. The appropriate agency is the Department of the Army. The head of the Department of the Army is the Honorable Pete Geren, who is the Secretary of the Army.

**DOCKET NUMBER**

The docket number identified on page one of this letter should be used on all correspondence.

Sincerely,

Spurgeon A. Moore
Director, Equal Employment Opportunity
Compliance and Complaints Review

Enclosure

COPY

DEPARTMENT OF DEFENSE

OFFICE OF COMPLAINT INVESTIGATIONS

INVESTIGATION IN THE COMPLAINT OF

DENISE N. BURGESS

AGENCY DOCKET NUMBER:

ARHQOSA07AUG03041

FACT-FINDING CONFERENCE

Tuesday, August 26, 2008

Arlington, Virginia

INVESTIGATOR: MARTIN J. WELKER

REPORTED BY: VIRGINIA JOHNSON
FREE STATE REPORTING

SEP

HQDA - EEO
SAAA - EO
Received

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902



GOVERNMENT
EXHIBIT
15

# A P P E A R A N C E S

On Behalf of the Complainant:

MICHAEL J. BARATZ
SUSAN HUHRA
HARRY LEE

On Behalf of the Agency:

ANDREA BERNARDO
LYNNE HALBROOKS

# I N D E X

| Witness: | Page: |
|---|---|
| Denise Burgess | 11 |
| Ginger Cruz | 80 |
| Patricia Redmon | 174 |
| Janice Nisbet | 186 |
| Kris Belisle | 211 |

Patricia Redmon. And at this time, Ms. Redmon, please stand with me and raise your right hand.

(Whereupon,

PATRICIA REDMON

was called for questioning, and after having been first duly sworn, was examined and testified as follows:)

EXAMINATION

BY THE INVESTIGATOR: Please be seated. Please state your full name.

THE WITNESS: Patricia Nicholson Redmon.

THE INVESTIGATOR: How's Nicholson spelled?

THE WITNESS: Nicholson.

THE INVESTIGATOR: And identify your race.

THE WITNESS: African American.

THE INVESTIGATOR: Identify your national origin.

THE WITNESS: Black.

THE INVESTIGATOR: And you're a female, is that correct?

THE WITNESS: Correct.

THE INVESTIGATOR: As of June of 2007, what was your employment status? Were you a government employee or a contract --

THE WITNESS: Contractor.

THE INVESTIGATOR: And what was your position

title?

THE WITNESS: Administrative -- Special Assistant.

THE INVESTIGATOR: Okay. Briefly describe your duties in that position.

THE WITNESS: Well, I worked in the Public Affairs office and also assisted in the Congressional Affairs office, but primarily my responsibility was working in the Public Affairs office assisting the Inspector General for Public Affairs, handling a lot of the media interviews and administrative support.

THE INVESTIGATOR: Okay. When were you assigned to that position?

THE WITNESS: I believe I came in to SIGIR -- I don't know the exact date.

THE INVESTIGATOR: Perhaps a month and year?

THE WITNESS: In February, I believe.

THE INVESTIGATOR: Two thousand --

THE WITNESS: Of '07.

THE INVESTIGATOR: And when did you leave that position?

THE WITNESS: August of '07.

THE INVESTIGATOR: Okay. And what's the name of the organization to which you were assigned?

THE WITNESS: The name -- Special Inspector

General for Iraq Reconstruction.

THE INVESTIGATOR: Okay.

THE WITNESS: SIGIR.

THE INVESTIGATOR: And --

THE WITNESS: I was with the Public Affairs office.

THE INVESTIGATOR: Okay. Who was your first-level supervisor when -- as of June 2007, to whom you reported?

THE WITNESS: Well, as a contractor, I was under Benjamin Campbell and my direct supervisor at SIGIR, Denise Burgess.

THE INVESTIGATOR: And who was your second-level supervisor for both organizations as a contractor and --

THE WITNESS: I didn't have a second-level supervisor.

THE INVESTIGATOR: Okay. The Complainant believes that she was discriminated against, Ms. Burgess, because of her race, her national origin and her sex. And in the individual she alleges discriminated against her was Ms. Cruz and also Mr. Bowen. And what comments -- what's your response to that? Do you have any knowledge of discrimination going on within the workplace either against the Complainant or anyone else?

THE WITNESS: Now, when you say do I have any knowledge of discrimination --

THE INVESTIGATOR: I'm interested in maybe your observations, what you've seen, what you're heard.

THE WITNESS: Not with anyone within the organization. I witnessed, myself, working with SIGIR, when I came onboard it was a very congenial environment for me. Stuart Bowen, who I would speak to and he would speak to me, we would discuss media tapes that I may have been transcribing for him and he would ask me, you know, what I thought about the tapes, how did I enjoy listening to them, what did he sound like.

Well, I would say within a matter of, I think, probably three months, two months, maybe, two months before I was let go, he just stopped speaking to me. He would walk by. And every morning he would walk by the office that I shared with another employee and he would speak and come in and then he just stopped.

THE INVESTIGATOR: Do you know what might have caused the change in his behavior?

THE WITNESS: Well, there were a lot of rumors going around. I didn't know a lot of the employees there. I mainly stayed in my office and Denise and I worked together. The rumors were something was happening with Denise. I was -- there were rumors I may be let go.

And so, you know, I really didn't hear exactly what was going on, didn't know what was going on, but it became uncomfortable. It became uncomfortable for me because I was in an environment that I wasn't quite sure what was going on and to have someone who for months would speak to you, come in and talk with you, to just stop, was something that I questioned and I just didn't know why.

THE INVESTIGATOR: What was the date that you were let go?

THE WITNESS: I don't know the exact date. I was given a month. I believe -- Ben Campbell came in to speak with me. Trying to think -- and sometime in June, July, I believe, I'm not quite sure. And he called me up. It was on, I believe, on a Wednesday morning, called me at the office and said I need to come in and talk with you and I need to talk with you as soon as possible. They came in, I believe, the same day and I --

THE INVESTIGATOR: You said they came in?

THE WITNESS: It was two. It was himself and another young lady. I don't recall her name. I had never met her. They came in, we met in a conference room. When I sat down, he says well, I just wanted you to know that because of budget reasons, we're going to have to let you -- they're going -- SIGIR will have to let you go and we will give you a month. You can stay at

SIGIR; we'll give you a month to try to find other employment. Unfortunately, we cannot offer you -- we don't have any positions available. And then he also said, you know, unfortunately -- he said I've been with SIGIR for some time and the dynamics at SIGIR is such -- he said I couldn't tell you that when you came onboard. And I just said no, I understand what you're saying because I witnessed -- even though he didn't say what the dynamics were, I witnessed first-hand what I felt and what I saw that was happening between myself and with Ms. Burgess.

THE INVESTIGATOR: And what did you witness?

THE WITNESS: Being alienated. For what, you know, I don't know. We were -- I was an extremely good worker. There was no hint of a budget cut. I remember the time Denise and I were meeting and Denise said -- I think it was Ginger who requested position descriptions on everyone and so I gave Denise my position description and I believe within that week or -- well, from that week that's when I was -- I received a call from the contracting office, Ben Campbell, and he said because of the reasons, we're going to have to let you go.

THE INVESTIGATOR: The female that came with Mr. Campbell that you don't her know her name --

THE WITNESS: That's correct.

THE INVESTIGATOR: -- was she a contractor employee?

THE WITNESS: I'm assuming she worked with BCP, but I don't know what her title was.

THE INVESTIGATOR: Do you what BCP stands for, if anything?

THE WITNESS: BCP International, I don't know. I think it's just their acronym. I don't know.

THE INVESTIGATOR: Do you believe -- you said you were told the reason was, I think, financial reasons, budgetary reasons --

THE WITNESS: Um-hum.

THE INVESTIGATOR: -- for SIGIR that you were let go. Do you agree? Does that seem reasonable to you?

THE WITNESS: I don't believe that.

THE INVESTIGATOR: Why not?

THE WITNESS: I didn't believe that.

THE INVESTIGATOR: And why not?

THE WITNESS: Well, because there were other dynamics going on within SIGIR and the dynamics that I saw between Ginger. When Ginger came onboard there was this atmosphere that -- and again, I was only there for a couple of months, so I didn't know half the players within SIGIR. I kept to myself. But you would hear the rumors that, you know, this woman -- and I never knew who

Ginger Cruz was. This person was coming onboard and there was this big joke that don't -- you know, no one would put anything on their walls because you never knew when she would come in and say you're fired. And I thought that's ridiculous. How can one person wield that much power? So I would hear all of these things. Didn't -- there were just things that I heard.

THE INVESTIGATOR: Um-hum.

THE WITNESS: But then I witnessed, even with myself, there were little things that -- and I only had -- I believe with Ginger, we only spoke two or three times, but she always had a problem calling me by my name, which is Patricia. How hard is that? She would always say Pat. And so one day I had mentioned to one of my -- one of the people that I shared an office with, well, the next time she says Pat I'll correct her and they went don't do that.

It's my name. I don't want to -- I would prefer being called Patricia. So I remember giving her something and she said thanks, Pat. I said Ginger -- now, Denise had already said to her, more than once, please, Patricia prefers being called Patricia, not Pat. She always said it. And that day it was my opportunity to say to her I prefer being called Patricia. She said oh, Pat. I don't know why I can't remember that. All

right, thank you.

THE INVESTIGATOR: Was that a response, oh, Pat, I don't --

THE WITNESS: That was her response to me and I just -- I said okay. I said well, I will prefer Patricia and it was all in this same week with the naming, my name, doing the job description and then I get the phone call from Ben.

THE INVESTIGATOR: All within a week's time?

THE WITNESS: Pretty much, yeah.

THE INVESTIGATOR: Are you -- anyone having treated the Complainant differently because of her race, national origin, sex or any other reason that you observed again in the workplace?

THE WITNESS: Would you repeat that?

THE INVESTIGATOR: Are you aware of anyone having treated the Complainant, Ms. Burgess --

THE WITNESS: Um-hum.

THE INVESTIGATOR: -- differently because of her race, national origin, sex?

THE WITNESS: No.

THE INVESTIGATOR: Okay.

THE WITNESS: And are you speaking of the employees or Ginger and Stuart?

THE INVESTIGATOR: Both employees and members

of management.

THE WITNESS: Well, Stuart also stopped speaking to her, it seemed.

THE INVESTIGATOR: So you said that Mr. Bowen --

THE WITNESS: Um-hum.

THE INVESTIGATOR: -- stopped speaking with you and --

THE WITNESS: Apparently -- yeah. He -- every day he was in Ms. Burgess's office, when I first arrived. They were meeting. Denise would abreast him of what was going on, his calendar. Her phone was always -- Stuart was always calling. She was always keeping him up to date on everything. She couldn't make a move without Stuart and Stuart was always there, talking to Denise, seeking her advice. Within -- as I said, just before I was let go there was this month of him -- he just stopped talking with me, really not conversing with Denise. And it was uncomfortable. I mean, everyone could see something was going on. No one quite understood what was going on.

THE INVESTIGATOR: Did you notice Ms. Cruz taking some of the duties away from Ms. Burgess?

THE WITNESS: In her own little way, yes, I did.

THE INVESTIGATOR: Can you explain, in her own way, what that means?

THE WITNESS: Well, we could be working on something. Denise may have said, you know, Patricia contact so-and-so, whatever, and for whatever reason, Ms. Cruz would jump the gun and would've done it. Now, it did -- at one point, I believe -- we did say Denise said, you know, she was in training or something and she said if you need help, let Ms. Cruz know and if she can assist you -- so we always tried to be cooperative with Ginger, but Ginger would also just start taking our responsibilities and then letting us know, putting us in the loop in the end or we would find out that she had done something or contacted a reporter or something that we normally would do in the press office.

THE INVESTIGATOR: At the time of your termination were there other terminations going on at the same time?

THE WITNESS: Not that I know of, no.

THE INVESTIGATOR: Had you been told that the Public Affairs section, there was actually going to be more hiring, another person hired, say like a month before you were terminated? Did you hear conversations to that effect?

THE WITNESS: I don't recall.

THE INVESTIGATOR: Are you aware of Ms. Cruz reviewing anyone's time and attendance records of employees --

THE WITNESS: Well, I knew that the time and attendance records were reviewed by Ms. Cruz at some point because I would hear people say we would have to -- they would have to pass it on to Ms. Cruz.

THE INVESTIGATOR: Do you know why that came about?

THE WITNESS: No. It didn't concern me as to why.

THE INVESTIGATOR: I think that's all the questions I have. Ms. Bernardo, if you have any questions?

MS. BERNARDO: Did you think Ms. Cruz calling you Pat was racist?

THE WITNESS: I wouldn't say it was racist. I think it was very inappropriate. I wouldn't call her anything but what she wanted to be called and I just thought that she didn't have respect for me.

MS. BERNARDO: Okay, thank you. I don't have any other questions.

THE INVESTIGATOR: Okay. Mr. Baratz, do you have any questions?

MR. BARATZ: No questions, thank you.