# Exhibit 1

80

1    reconcile with the fact that you didn't know you were

2    going to be terminated on the day that you were, in fact

3    -- you maintain you were terminated?

4            THE WITNESS:  Because I was asked to attend a

5    meeting that Friday.  After I'd been terminated, I was

6    asked to attend a meeting that Friday with the new person

7    to brief him.

8            MS. BERNARDO:  Okay.  I don't have any other

9    questions.

10           THE INVESTIGATOR:  Mr. Baratz, any questions?

11           MR. WELKER:  I have no questions.  Thank you.

12           THE INVESTIGATOR:  I have noted --

13           (Off the record.)

14           (On the record.)

15           THE INVESTIGATOR:  It is nine minutes after one

16   o'clock.  We took a 50 minute break for lunch there and

17   we returned and we will now begin with questioning of

18   another witness, Ginger Cruz.

19   (Whereupon,

20                       GINGER CRUZ

21   was called for questioning, and after having been first

22   duly sworn, was examined and testified as follows:)

23                       EXAMINATION

24           BY THE INVESTIGATOR:  Ms. Cruz, please state

25   your full name.

1          THE WITNESS:  Ginger M. Cruz.

2          THE INVESTIGATOR:  And identify your race.

3          THE WITNESS:  I'm an Asian American, Filipino

4   American, specifically.

5          THE INVESTIGATOR:  Your national origin?

6          THE WITNESS:  United States.

7          THE INVESTIGATOR:  And your sex is female,

8   correct?

9          THE WITNESS:  Female.

10          THE INVESTIGATOR:  Was your employment status

11  as of June of 2007 government employee or contractor?

12          THE WITNESS:  In 2007 I was the Deputy

13  Inspector General for Policy.  I was a government

14  employee.

15          THE INVESTIGATOR:  And you said your position

16  title.  What was your grade and series?

17          THE WITNESS:  SES.  I believe its 2 or 3.  I'm

18  not sure.

19          THE INVESTIGATOR:  And briefly describe your

20  duties in that position.

21          THE WITNESS:  I am the advisor to the Inspector

22  General and I function in the sort of CCO capacity, if

23  you would make a business analogy.  I make a lot of the

24  policy decisions, I maintain the day-to-day operations of

25  the organization.  I oversee the Public Affairs and

1   Congressional Affairs Divisions.  I was overseeing the

2   production of the quarterly report and providing advice

3   to the Inspector General on audits, investigations and

4   inspections.

5              THE INVESTIGATOR:  Okay.  When were you

6   assigned to your position?

7              THE WITNESS:  I originally became the deputy in

8   2005, I believe, and had been the deputy for a while and

9   had switched to a senior advisor position in December of

10  2006 and was senior advisor from December of 2006 until

11  June of 2007, when I was reinstated to a deputy position.

12             THE INVESTIGATOR:  You said, like, in December

13  of 2006 you became a senior advisor.  Was that for the

14  same organization?

15             THE WITNESS:  I remained with SIGIR the entire

16  time.  I was detailed to the State Department for a brief

17  tenure from December to January of 2006-2007, but the

18  entire time my employment was with SIGIR.

19             THE INVESTIGATOR:  Are you in the same position

20  now?

21             THE WITNESS:  I am currently the Deputy

22  Inspector General, yes.

23             THE INVESTIGATOR:  As of June 2007, with regard

24  to your first-level supervisor, to whom you reported,

25  what was that person's name?

83

 1                    THE WITNESS:  Stuart Bowen.

 2              THE INVESTIGATOR:  And his position title?

 3              THE WITNESS:  He is the Inspector General.

 4              THE INVESTIGATOR:  And who is your second-level

 5   supervisor?  To who was --

 6              THE WITNESS:  Is that the person he reports to?

 7              THE INVESTIGATOR:  Right.

 8              THE WITNESS:  He reports to the Secretary of

 9   State and the Secretary of Defense.

10              THE INVESTIGATOR:  As of June 2007, what was

11   your relationship to the Complainant during her

12   employment?

13              THE WITNESS:  I was her supervisor.

14              THE INVESTIGATOR:  Okay.  Her immediate

15   supervisor?

16              THE WITNESS:  Her immediate supervisor.

17              THE INVESTIGATOR:  Is there anything in

18   particular within the Complainant's testimony that you

19   wish to respond to at this time?

20              THE WITNESS:  Would you like me to go point by

21   point?

22              THE INVESTIGATOR:  Tell you what, I've got

23   other questions, so I'll go point by point.

24              THE WITNESS:  Okay.

25              THE INVESTIGATOR:  Respond to the Complainant's

1   allegation that on March 2nd, 2007 Kristine Belisle, the

2   -- let's see -- Complainant's former SIGIR deputy, at

3   your direction, challenged the Complainant's authority.

4           THE WITNESS:  If we're talking about the e-mail

5   that we've all looked at in the previous section, there

6   was an instance in which Kristine Belisle came to me, as

7   the Deputy Inspector General, it was late in the evening,

8   and informed me that the media had requested an interview

9   with the Inspector General and that she was unable to

10  reach Ms. Burgess and she felt that there was a time

11  sensitive need to respond to the media and since she

12  could not locate Ms. Burgess, she asked if this was

13  information that needed to be conveyed directly to the

14  Inspector General.

15          As Ms. Burgess's immediate supervisor and

16  understanding the Inspector General's desire to be

17  apprised of any urgent requests from the media, I advised

18  Ms. Belisle to write up what that query was, to send it

19  directly to the Inspector General and to ensure that Ms.

20  Burgess was copied and that I was copied so everybody

21  would be in the loop on the request, but I felt that

22  given the nature of the request that the Inspector

23  General would want to know about it and be able to decide

24  on his own if he would accept or decline the request.

25          THE INVESTIGATOR:  Okay.  Did the Complainant

1    approach you and discuss anything regarding that later?

2            THE WITNESS:  I don't recall specifically any

3    discussion about that issue.

4            THE INVESTIGATOR:  Respond to the Complainant's

5    allegation that on or about May 2007 you, without

6    consultation with the Complainant, took over an

7    assignment that the Inspector General had given to the

8    Complainant.

9            THE WITNESS:  I believe that was not May.  I

10   believe that July.  And looking at the files, that e-mail

11   chain in which the policy regarding the vetting of the

12   quarterly reports occurred in July.  Again, in July I was

13   her immediate supervisor and my recollection of the

14   incident was the Inspector General had requested

15   Ms. Burgess to prepare policy that would discuss the

16   release procedures for our quarterly reports.

17           She coordinated that with senior staff.  She

18   provided a draft to the Inspector General.  The Inspector

19   General advised me, at that point, that he was not

20   satisfied with the draft that was provided by Ms. Burgess

21   and asked that I discuss it with her.  I had one

22   conversation with her to determine where the task was at,

23   who she had talked with, what types of feedback she had

24   gotten and she provided that to me.  And then following

25   that, my recollection is the Inspector General spoke to

1    me directly about his desires on how that policy should

2    be issued.  He had very specific views on the timing of

3    the release of the quarterly reports.  At the direction

4    of the Inspector General, I then produced the final

5    policy that he required to be produced.  I felt that I

6    had coordinated adequately with Denise Burgess and as per

7    the Inspector General's instructions, I executed the

8    policy as directed.

9             THE INVESTIGATOR:  Okay.  Respond to the

10   Complainant's allegation that in July 2007 you targeted

11   the Complainant and her staff for termination when an

12   equivalent unit, the Congressional branch, I believe, had

13   four full-time staff members and was slated for no

14   reductions.

15            THE WITNESS:  At that exact time, there were

16   two reductions that were made, Congressional and Public

17   Affairs.  In the Public Affairs division, I reorganized

18   the Head of Public Affairs and one contract employee out

19   of the division and downgraded Congressional -- I mean,

20   downgraded Public Affairs to simply a director position.

21   It was not an entire division any longer.  It was just

22   going to be one person that will handle media.  At the

23   same time, I simultaneously notified a white female and a

24   white male and I'm sort of pained to have to say it in

25   those terms, but I know this is an EEO hearing, so I feel

1    that's relevant, but the point was there were two people

2    in Congressional Affairs who were also simultaneously

3    advised to find other positions because they would also

4    be reorganized out of a position.  And so at the same

5    time there was a net reduction; if you would include

6    contract employees and government employees, there was a

7    net reduction of two off of Congressional Affairs and two

8    off of Public Affairs.

9         Now, after -- I mean, if this is -- I looked at

10    the numbers last night to be able to -- when I take

11    personnel actions, being a minority female, myself, I'm

12    color blind.  I don't consider a person's race when I'm

13    making personnel decisions about reorganization.  So last

14    night I went back through and I looked at the

15    reorganization of the contractors and the reorganization

16    of the employees.

17         And I tallied up the race and gender of each

18    one of the people that was affected by the reorganization

19    and the numbers, which are factual and we can provide all

20    of the supporting records, I believe they are in the

21    record, are as follows: on the employee side, from

22    Congressional Affairs, a white female and a white male

23    had their positions eliminated.  In Congressional

24    Affairs, a black female's position was eliminated.  On

25    the contractor side, there were three contractors that

1  were cut.  One was a black female, that was

2  Patricia Redmon.  One was a white female and one was a

3  black male.  Simultaneously, I converted seven positions

4  to government employees and the differentiation between

5  the people who were cut off contract and the people who

6  were converted to government employees was made purely on

7  the basis of mission critical position.

8       If I did not believe that the position was

9  mission critical, it was eliminated.  If I did believe

10  that the position was mission critical, then the

11  individual in question, who was a contractor, was offered

12  a full-time government position.  The seven people who

13  were offered full-time government positions, the same

14  time that Patricia Redmon was asked to leave, included

15  four black females, one white female, one white male and

16  one black male.

17       Now, going back to these numbers last night, I

18  sent them to Andrea.  The only thing that appears to be

19  statistically significant from all of the reorganization

20  that was done at the same time period is the fact that

21  there was a definite skewing in the number of black

22  females that were offered full-time positions with the

23  organization, four of the seven that we retained were

24  black females.  But again, like I said, this entire

25  discussion is rather distasteful for me because being a

59

1  minority female myself, I don't make decisions based on

2  people's race.  I make decisions based on mission

3  critical needs.  I make decisions based on competence.  I

4  make decisions based on budget availability and what's

5  right for the organization.

6         THE INVESTIGATOR:  The two Congressional

7  employees that were removed from that branch --

8         THE WITNESS:  Yes.

9         THE INVESTIGATOR:  -- were they terminated or

10  were they given other positions?

11         THE WITNESS:  They were advised that they would

12  have the exact same time in service with the

13  organization.  They were advised to please go find other

14  positions and if they were not able to find other

15  positions, that their employment with SIGIR would

16  terminate on or about September 1st, which was the same

17  timeframe that was given to Denise Burgess.

18         THE INVESTIGATOR:  Were they able to find other

19  positions in SIGIR?

20         THE WITNESS:  They were able to find other

21  positions and I will note that when I had the

22  conversation with Denise Burgess, during that

23  conversation I did offer to provide what assistance I

24  could, if we could make phone calls, help her find

25  another position or write a letter of recommendation, we

1    would be happy to do that to help with the transition.

2            THE INVESTIGATOR:  Did you allow the

3    Complainant to look for another position within SIGIR?

4            THE WITNESS:  At the time there was no other

5    position that would have fit her skills and abilities, so

6    she was not considered for any other position within the

7    organization.

8            THE INVESTIGATOR:  Now, what you've described,

9    this reorganization -- well, the restructuring.  I don't

10   know if you used that term, reorganization.  What brought

11   it about?  Were you directed, something come down in

12   writing?

13           THE WITNESS:  The organization has a very

14   interesting history.  We have had 250 people leave our

15   organization in the four years since we were created.  We

16   are a temporary organization and we constantly undergo,

17   every three months, a strategic planning process in which

18   we reevaluate how we're meeting the mission with the

19   number of employees that we have.  We do not behave like

20   a normal long-term bureaucratic federal organization.  We

21   are constantly revising the organization to meet the

22   needs.  We are constantly reevaluating how we can perform

23   the mission with the leanest staff possible, which means

24   concentrating our budget on providing auditors,

25   inspectors and investigators and simultaneously keeping

1   the overhead staff, which would include Office of General

2   Counsel, Congressional Affairs, Public Affairs and the

3   quarterly report.  We try to keep that as lean as

4   possible and try to keep as many auditors and

5   investigators and inspectors in that mix.  And when I

6   talk about mix, that's what I'm talking about.  We have a

7   budget.  At the time, I believe it was 121 positions and

8   within those 121 positions, there had been a dramatic

9   increase in the amount of people in Congressional and

10  Public Affairs.  When I was deputy in 2006, earlier in

11  the year, we had traditionally had four people doing all

12  the work for Congressional and Public Affairs.

13        When I briefly left the position of Deputy

14  Inspector General in December of 2006 and the new deputy

15  came onboard, one of the things that she did was increase

16  the number of people in Congressional and Public Affairs

17  in a very dramatic fashion, so that by the time that I

18  returned to the position of Deputy Inspector General,

19  there were now eight people that were providing support

20  to Congressional and Public Affairs.  So the reality of

21  the reorganization was that the organization had

22  functioned perfectly fine with four people doing the job

23  in both of those divisions and it had increased to eight

24  people doing that job.  At the same time, the budget

25  submission from the agency was prepared and it was sent

1    in.  And I apologize if it gets in the weeds, but I think

2    it's important to understand the context.  SIGIR had been

3    running on a budget of about $25 million a year.  That

4    was very difficult to say because we've had such a varied

5    history and such a short history, but we were functioning

6    on approximately $25 million a year.  In January of 2006,

7    a request was made for -- I mean, I'm sorry.  January of

8    2007, a request was made for $53 million to OMB.

9         That request generated a very negative response

10   from OMB, who felt that that was an unjustified budget

11   and it resulted in several conversations that were had by

12   myself and by other staff members over the course of the

13   entire spring in which OMB was very concerned that

14   SIGIR's budget was dramatically increasing and we were

15   told, very directly, your public law requires that you do

16   audits, investigations, inspections and produce quarterly

17   reports.

18        There is no Congressional mandate for you to do

19   press and we are concerned to see that your in-house

20   support staff is growing and your budget is growing and

21   that's not acceptable.  And at the time, SIGIR's been

22   funded through supplementals, that's the other problem.

23   SIGIR doesn't have a normal base budget.  It has never

24   had a base budget put in as part of every other federal

25   agency since the beginning of the organization.  So the

1 supplemental budget that we were supposed to live on, as

2 an organization, was supposed to last through the end of

3 September of 2008 and we received notification from OMB

4 that OMB expected us to live on that same budget.  They

5 were not going to put in, OMB was not going to put in and

6 additional request and we would be required to live on

7 that money through December of 2008.

8       So that meant, from a budgetary standpoint

9 within the organization, I was then required to take the

10 same amount of money that had been budgeted for a fiscal

11 year and spend it over five quarters instead of four

12 quarters.  So you hit a very difficult decision point.

13 Your money's not going to change.  Certainly,

14 Congressional Affairs was having discussions with

15 Congress about the need for more money, but as a good

16 fiscal manager and as a person who works in an audit

17 organization, you cannot manage an organization on

18 wishful thinking that hopefully Congress will pass a

19 budget that you may or may not get.

20       OMB rules are very specific.  Once you're

21 appropriated money, you are told how long that money's

22 going to last for and you have to provide a spend plan

23 that reflects that you will live within your means

24 because you can't spend money that the Congress had not

25 authorized and that's Congress's discretion.  They may,

1    they may not, but you have to live within the budget.  So

2    we were under significant budget pressures in the spring

3    of 2007, so when I took over as deputy, the first thing

4    that the Inspector General asked me to do was to take a

5    very hard look at the entire organization, to figure out

6    what changes that we needed to make as an organization to

7    live within the budget that we were given, which at the

8    time was $35 million.

9        Instead of living on that through September of

10   '08, we were being required by OMB to live on that

11   through December of 2008.  And part of the requirement

12   was that we try as hard as possible not to reduce the

13   amount of auditors or investigators or inspectors because

14   that's what the Congress expects us to do, that's our

15   mission.

16       And so the first thing I did was I looked very

17   hard at all of the positions that we had internal to the

18   organization and it became apparent to me and I had

19   several discussions with the Inspector General, who

20   concurred, there were two areas that were really outsize

21   of the budget.  One of them was the great number of

22   contractors that we had and people familiar with

23   government budgeting understand that a contract employee

24   costs roughly twice to three times what a government

25   employee costs.  In the case of Patricia Redmon, she was

1   costing the government, she was costing SIGIR $115,000 a

2   year.  Now, that's not how much she made, that's how much

3   the organization had to pay to the contracting company in

4   order to have the services of someone who was,

5   essentially, an assistant to Public Affairs.  So that

6   went into the calculation.  The other part of the

7   calculation that I made at the time was the fact that the

8   organization had functioned perfectly fine with four

9   people doing Congressional and Public Affairs.

10          So when I saw the number of four go up to eight

11  people doing Congressional and Public Affairs, I

12  immediately considered could we ration it back to the

13  number four, which was something that we had proven that

14  we could function at previous to all the changes in hires

15  that had been made.  So there were two things that were

16  simultaneously going.

17          One of them was in-sourcing and at the time we

18  were getting direction from the Department of the Army.

19  I believe there's a memorandum that has been sent out

20  which has since codified this, which required all

21  Department of Army agencies to consider in-sourcing as

22  appropriate because it is more cost-effective to hire

23  government employees than it is to have contract

24  employees.  So we were doing that because we thought it

25  was going to be very good cost savings measure and I'm

1  quite proud of the fact that we brought those cost

2  savings down.  We were spending about $250,000 a month on

3  contractors through this one contract vehicle and after

4  the reorganization, in which seven people were converted

5  to government positions and three people were cut off the

6  rolls because they didn't have mission critical

7  positions, as a result, our average burn rate went down

8  somewhere $50-60,000 a month, so there was significant

9  cost savings per month, significant cost savings to the

10  agency.

11          The other consideration that I made was

12  Congressional affairs and public affairs are not equal in

13  the law.  Our law, Public Law 108-106 requires, very

14  specifically in the law, that we do audits, we do

15  investigations, we provide quarterly reports to Congress

16  and we report to eight Congressional committees.

17          That requires us to have a Congressional staff

18  that interacts with eight committees; four on the Senate

19  side, four on the House side.  There is a legal

20  requirement for us to do Congressional affairs.  There is

21  no legal requirement for us to do public affairs.  In the

22  entire four-year history of SIGIR, we've never issued a

23  press release and we've never had a press conference.

24  Our press is strictly reactive and the primary purpose of

25  our press department is to ensure that copies of the

1   quarterly report, the audits and the inspections are

2   provided to the media and we are responsive to questions,

3   but we do not do any sort of proactive media.  So the

4   idea that somehow Congressional Affairs and Public

5   Affairs are equal divisions is perhaps an impression that

6   Denise may have had and I understand that, but it is not

7   the impression that either the Inspector General nor I

8   had of how the organization needed to function.

9        He has been very clear about the need to be

10   very responsive to the Congress, but not to expend a lot

11   of effort on, as they would say, administrative or

12   support functions when we need to make sure that we're

13   very focused on audits, inspections, investigations and

14   quarterly reports.  So that also went into the thinking

15   at the time and so in June I began to draft potentials

16   for the reorganization and the reason that we did not

17   involve anyone on the senior staff is because the

18   reorganization involved cutting positions off of senior

19   staff.

20        In fact, it involved cutting the Assistant

21   Inspector General of Public Affairs, removing that as an

22   SES position, and simultaneously with that, it was really

23   transforming Public Affairs from an entire division which

24   had a supervisor and three staff underneath it into a

25   support function; one person who would do the heavy

1    lifting, who would interact with the media, who would

2    provide copies of the reports, who would make

3    appointments and basically be a staffer to the Inspector

4    General for those issues.  But I felt that it was

5    appropriate and I made the recommendation to the

6    Inspector General that an entire division with

7    secretaries and assistants was not needed for that

8    position, given the mission and given the way the

9    Inspector General felt he wanted the organization run.  I

10   also simultaneously felt that in terms of Congressional

11   Affairs, we didn't need an entire division, either.

12        We really needed two people who would do the

13   interaction and the reason it was two people instead of

14   one in Public Affairs is because we have eight

15   committees, we get a substantial number of questions for

16   the record and at the time, when the Congress converted,

17   when it was a Republican Congress, not that it's

18   partisan, but when it was a Republican Congress we did a

19   total of, I believe, three or four testimonies in the

20   space of two years.  Once the Congress became a

21   Democratic Congress, we were requested to testify 25

22   times.  We also -- the number of questions for the record

23   dramatically increased, so the workload from our

24   Congressional side did dramatically escalate.  The

25   workload on the media side has remained consistent

1    throughout the life of SIGIR.  We get the same number of

2    media calls, we get the same number of requests and we

3    handle them appropriately.  So that was what went into my

4    thinking as we were doing this.  Again, it has had

5    absolutely no racial, no gender, no -- I mean, there was

6    no bias to it.

7         It was really a question of good management and

8    I realize that sometimes it's unfortunate because people

9    are reorganized out of a job and we try as much as

10   possible, I personally try as much as possible, to make

11   that process as, you know, not painful as I can and I

12   realize it's a very difficult thing to do and I'm sorry

13   that it had to happen to Denise.  We tried to do

14   everything that we could.  We provided 30 days of

15   administrative leave to help her have enough time to look

16   for a job.

17        I made sure that she was given all of the

18   normal courtesies.  That certificate which she was given

19   when she left which said she did an outstanding job is a

20   certificate that SIGIR provides to every single one of

21   our employees and contractors who leaves.  We've had 250

22   people who have come through, worked for us and decided

23   to move on and so we understand that, as a temporary

24   organization, that there is a very large turnover of

25   employees, which is allowed under 3161.  When we hire

1    people, they are given a letter and clearly in the letter

2    it says this is a temporary appointment for 13 months,

3    which can be terminated any time before that 13 months

4    because precisely, we are a temporary organization.  Part

5    of the benefit of a temporary organization is people do

6    not have to compete for the job.

7            Denise did not have to compete for that job.

8    She did not have to go up against other candidates for

9    that job.  I mean, that's the benefit of 3161.  The

10   Inspector General selected her, she was hired.  So that's

11   the benefit and unfortunately, there's a down side to

12   that and that is that there is no expectation on behalf

13   of any member that works with SIGIR that they are

14   guaranteed full employment.  It is simply not a permanent

15   position, it's a temporary position.

16           THE INVESTIGATOR:  Did you -- seeing that you

17   had Ms. Belisle come in and work in Public Affairs, did

18   you offer that or if not, why, to the Complainant to fill

19   that position?

20           THE WITNESS:  I did not offer that position to

21   Denise Burgess and the reason I did not is because Denise

22   had clearly explained to me over the course of the

23   previous two months that she was unable to carry out the

24   duties of Public Affairs without four people in the

25   division and I would actually refer you to her complaint

1    letter to the EEO in which, on Page 2, third paragraph

2    down, she said, "I told Ms. Cruz that it would be

3    extremely difficult for me to manage the workload without

4    an assistant."  That comports with what she told her

5    personally.  Additionally --

6              THE INVESTIGATOR:  Let me just say for the

7    record it's on Page 7 and I think I have it elsewhere in

8    the investigative file, but also on Page 7.

9              THE WITNESS:  Okay.  And then on Page 4, third

10   bullet down from the top, she indicated that "delaying

11   hiring staff into my section, forcing me to accomplish

12   the work previously done by two full-time individuals."

13   I mean, those are two statements in her letter which

14   confirm my understanding from her at the time and that

15   understanding from her was that she could not accomplish

16   the duties of Public Affairs unless there was an entire

17   division of four people.

18             And there were several things that went into

19   that.  She needed an assistant to answer the phone, she

20   would often her assistants to get back to media contacts

21   instead of her doing that callback.  She did not have a

22   conversant knowledge of the audits, inspections and

23   quarterly report and so very often -- I believe many of

24   those were submitted to the record -- very often she

25   would rely on me to provide that information to reporters

1  because she was not able to do so and so, as a manager,

2  what went into my thinking, if I'm going to take a

3  division of four people and I need to downsize it to one

4  person to provide the support that the agency needs, it

5  would need to be a person whose skills were not

6  managerial because there would be no one to manage.

7       I would need someone who was able to do the

8  heavy lifting, who was not above making the phone calls,

9  who was not above doing, sort of, you know, the day-to-

10 day scheduling, management and callbacks and those types

11 of things and someone who had a conversant knowledge in

12 the audits, inspections and the quarterly report.  And so

13 part of the reason that I reached out to Kris Belisle and

14 asked her if she would be willing to come back is because

15 she had a current knowledge.

16      She had worked for SIGIR all the way up until

17 that spring, was completely aware of the unique nature of

18 SIGIR, was able to discuss the audits, inspections and

19 investigations, and she conveyed to me that she would be

20 able to take care of all of the duties which were not

21 managerial, just the day-to-day duties of performing the

22 functions of public affairs.  And so, in my mind, from a

23 budgetary standpoint, if you take Denise's salary, you

24 take Patricia Redmon's salary, and you take the two

25 people that she was asking me to hire in order for that

1  to function as a department, you come up with a total

2  budget of $464,000.  If I was to convert that division,

3  change it to a 15 position, I believe it was like a 15

4  Step 1, and make it a Director of Public Affairs, which

5  is not management, not a directorate, just simply one

6  person who would handle the callbacks and be able to do

7  the minimal amount needed to perform the function, I

8  would be spending $124,000 and so for me, the annual

9  difference between $464,000 and $124,000 was significant

10  but it also meant that Denise, in some ways, was over-

11  qualified for the job.  She was a manager and I didn't

12  need a manager.  I just needed somebody to make the phone

13  calls and make sure that the responses were provided as

14  appropriate.

15      THE INVESTIGATOR:  Now, the duties you

16  described for the new position that Ms. Belisle filled,

17  do those -- those duties, are they descriptive of a GS-15

18  level position?

19      THE WITNESS:  Yes, they are.

20      THE INVESTIGATOR:  Okay.  No supervision, I

21  guess, just a person to work on their own?

22      THE WITNESS:  She is supervised by me.  The

23  Director of Public Affairs is a support position.  There

24  are no subordinates, so she has no management

25  responsibilities, but being the Deputy Inspector General,

1    everybody within the organization reports through me to

2    the Inspector General.

3              THE INVESTIGATOR:  In the testimony we heard, I

4    think at one time another person -- I could be incorrect

5    with the name -- a Mr. Mays, maybe the intent was to hire

6    him for Public Affairs, as one of the individuals.  Why

7    was he not hired?

8              THE WITNESS:  He was not hired because at the

9    time we were going through the process of reorganization

10   and I delayed any hirings because it would not make sense

11   to hire someone on if we were simply going to remove that

12   position from the table 30, so any decision on hiring

13   individuals into the organization was delayed.  And part

14   of the reason for the disconnect between sort of why did

15   we go out and look for him, I was not the deputy at the

16   time.

17             There was a distinct difference between the

18   organization that was conceived by Robin Raphael, who was

19   Deputy from December through June, and my view of how the

20   organization would continue to function from June

21   forward.  So at the time that Robin Raphael was there,

22   Robin Raphael, I believe, felt that it was important to

23   increase the number of people and that was when those

24   offers were made and those individuals were brought on.

25   When I came on, there was a different understanding of

1  how the organization was going to function and so as part

2  of a greater reorganization, I mean, this is just one

3  part of it.  The deputies' positions were also

4  reorganized.  There were several people who left the

5  organization at the time.  But it was a fairly major

6  reorganization.

7         THE INVESTIGATOR:  Now, from the testimony that

8  we've heard, you let go Ms. Redmon and not the same day,

9  but a few days afterwards, the Complainant was told of

10  her termination.  How do you account for the not

11  occurring at the same time but so close in time?

12         THE WITNESS:  The termination of Ms. Redmon was

13  not done by me.  That's a contractual issue and the COTR

14  handles the notification to the person who manages the

15  contract.

16         THE INVESTIGATOR:  The COTR, contracting --

17         THE WITNESS:  Contracting Officer Technical

18  Representative.  And the timing was -- there was no issue

19  on the timing.  I had issued instructions to the

20  Contracting Officer Technical Representative that I had

21  done an evaluation of the positions, I considered three

22  positions to be nonessential, I considered seven

23  positions to be essential and I requested that the three

24  nonessential positions be rolled off and that the seven

25  essential positions be permanized (phonetic sp.) as

1   government employees and I believe we have provided an e-

2   mail today, to Geoff Loehsl, who was the contracting

3   manager at the time, which basically lays out the

4   conversion of contractors that I'm discussing.  So

5   Patricia Redmon's -- and it wasn't termination.  She

6   wasn't a government employee.  Contract employees are

7   brought on and then they're rolled off.  They don't have

8   the same expectations even as a 3161.  But it was not

9   specific to Ms. Redmon.  It was actually part of a very

10  comprehensive downsizing of the contract in order to get

11  the contract funds in line with our budget.

12          THE INVESTIGATOR:  In earlier testimony, the

13  Complainant said that when you met with her regarding her

14  termination, you used the term or the sentence that she

15  was being let go because you needed the right mix of

16  people.

17          THE WITNESS:  Um-hum.

18          THE INVESTIGATOR:  Did you use that terminology

19  and if so, what did you mean by it?

20          THE WITNESS:  I did.  I used the term right mix

21  of people because I was talking about the substantive mix

22  of individuals which includes more auditors, inspectors

23  and investigators and less people in nonessential

24  positions, support positions, such as Public Affairs,

25  Congressional Affairs, special assistance.  I mean, those

1  things which are not considered essential to our mission.

2  And I -- I mean, I used that term several times as I was

3  discussing with people the purpose of the reorganization.

4  We needed to make sure that if we had a limited amount of

5  money that the mix of people included a higher percentage

6  of individuals who were specifically targeted towards our

7  mission under Public Law 108-106 and that's not just my

8  recollection.  If you look at the e-mail that I sent to

9  Geoff Loehsl, who was the contracting officer, I again

10  used that term and I used -- I believe if you read the

11  entire sentence, I said the right mix of substantive

12  skills.  What I meant when I said the right mix of people

13  was we needed the right mix of substantive skills.

14          We needed -- you know, when you have to -- you

15  got a hundred positions and you have to cut it to 75, you

16  want to make sure that those 75 people that you end up

17  with are absolutely the people that you need to meet your

18  mission and all the people that have to be considered

19  nonessential -- and it's a difficult decision to make, I

20  mean because at some point you're telling that 25 percent

21  that they're not going to have their job any longer and I

22  understand, having been a manager for 15 years, that this

23  is a difficult thing to do and you try and be as

24  thoughtful and accommodating as you can, but

25  unfortunately, that's the reality of running an

1  organization with a limited budget and needing to meet

2  the mission.  If I have a limited number of positions,

3  I'm not going to use those positions for assistance.  I'm

4  not going to use those positions for a large public

5  affairs staff when I have no Congressional mandate to do

6  public affairs.  I'm going to make sure that when

7  Congress says to me are you auditing the Iraq

8  Reconstruction Program, I'm going to make sure that I

9  have numbers that say I've got 45 auditors on the ground,

10  doing their job, as I was mandated to do by Congress.

11              THE INVESTIGATOR:  You mentioned there was an

12  e-mail with a Mr. Loehsl?

13              THE WITNESS:  Yes.

14              THE INVESTIGATOR:  How do you spell his name?

15              THE WITNESS:  L-o-e-h-s-l, I believe.

16  G-e-o-f-f, Geoff Loehsl.

17              MR. BARATZ:  That was one of the three e-mails

18  that --

19              THE WITNESS:  Yes.

20              THE INVESTIGATOR:  Oh, okay.

21              MR. BARATZ:  -- SIGIR gave us to that.

22              THE INVESTIGATOR:  I was going to ask about

23  that, so --

24              THE WITNESS:  It's that on the top, I believe

25  or -- no.

1          MS. BERNARDO:  No, it's that one --

2          THE INVESTIGATOR:  Oh, okay.

3          MR. BARATZ:  It's dated August 26, 2007.

4          THE INVESTIGATOR:  Right, okay.  Respond to the

5    Complainant's allegation that from June 2007 through July

6    2007 you exclusively reviewed the Complainant's time and

7    attendance records in hope of finding irregularities.

8          THE WITNESS:  When I became the Deputy for

9    Policy, I sent out an e-mail to all of the individuals

10   who directly reported to me and that would include

11   Denise Burgess, Scott Michaud and Marthena Cowart, and I

12   requested that all of them send their timesheets to me

13   since I was now going to be their supervisor and as a

14   good supervisor, I make sure that I review them as

15   appropriate.

16          I mean, I never sign a timesheet that I haven't

17   reviewed to make sure it's accurate.  It was not targeted

18   at any one specific individual.  It's simply good

19   management to make sure that the timesheets which I'm

20   responsible for signing are accurate.  At no point did I

21   have any issues with Denise Burgess's timesheet nor did I

22   single her out.  Everyone that reported to me gave me

23   their timesheets.

24          THE INVESTIGATOR:  Do you recall finding any

25   irregularities with the Complainant's timesheets?

1           THE WITNESS:  I don't.

2           THE INVESTIGATOR:  Respond to the Complainant's

3    allegation that in July 2007 you isolated the Complainant

4    from the consultative process regarding media activities.

5           THE WITNESS:  I did not isolate the Complainant

6    from consultation on media activities.  As a matter of

7    fact, I believe the record will show, through multiple

8    e-mails, that whenever there were cases in which media

9    issues were brought to my attention, I made sure to

10   either direct the person who brought it to my attention

11   or did to myself, to put Denise into the loop.  It's a

12   small organization and a lot of times people would just

13   go directly to the Inspector General or they might come

14   directly to me.

15          There's an interesting case here also, since my

16   background is public affairs.  So the Inspector General

17   also relied upon me to provide him with public affairs

18   advise concurrent with the advice that he was getting

19   from Denise Burgess.  I'm a former Deputy Assistant

20   Secretary of Public Affairs for the Department of Housing

21   and Urban Development.  I'm a former member of the Radio

22   and Television News Directors Association.  I was a

23   television news director for many years for NBC, so the

24   Inspector General valued my input into matters of media

25   issues, but I was very cognizant of the fact that

1  Denise Burgess was heading the Public Affairs Department

2  and I think the record is pretty clear in showing that

3  any time media issues were brought to my attention and

4  they were excluding Denise, that I made effort to include

5  Denise in the loop to make sure that she knew about

6  those.  I believe there are also several instances in

7  which Denise would get direct inquiries from the media

8  that was asking her for information and I would

9  coordinate with Denise and help her respond to the media

10  inquiries.

11          (Off the record.)

12          (On the record.)

13          THE INVESTIGATOR:  Go back on the record.  It

14  is 1:50.  We were off the record for a minute or two just

15  to stop and sort of coordinating with other witnesses

16  that were arriving.  We'll continue with our questioning

17  of Ms. Cruz.  Respond to the Complainant's allegation

18  that in July 2007 insisted on addressing one of the

19  Complainant's staff members with an improper name,

20  specifically calling Patricia Redmon Pat.

21          THE WITNESS:  I do recall making the mistake of

22  calling Patricia Redmon Pat.  I was not aware that she

23  wanted to be called Patricia and I had known several Pats

24  throughout my life who, you know, it was sort of natural

25  for me to call someone named Patricia Pat.  When it was

1  brought to my attention by Pat, I apologized to her and

2  said that I would try to remember that in the future, but

3  it sort of gets ingrained.  Patty Royal (phonetic sp.)

4  was a good friend of mine.  I had several other friends

5  who were named Pat and so it's hard to retrain yourself

6  when you've used that name to call people.  Pat Bowers I

7  talked to all the time, so I did apologize.

8           I meant no offense by it and then when Denise

9  -- I think I made the mistake a couple of times and when

10  Denise brought to my attention that her name was not Pat,

11  it was Patricia, I felt embarrassed.  I mean, it was not

12  something that I meant to do and I believe that my

13  reaction to Denise was embarrassment.  I mean, I was

14  trying very hard to remember that, but we work 14 hour

15  days and we work really hard, but sometimes I do make

16  mistakes and I didn't mean anything by it.

17           THE INVESTIGATOR:  Respond to the Complainant's

18  allegation that on July 23rd, 2007, you retaliated

19  against the Complainant for opposing employment practices

20  that were racially discriminatory by terminating her

21  employment.

22           THE WITNESS:  The termination of Denise Burgess

23  was not related at all to any sort of retaliation.  The

24  plans for the reorganization had been ongoing since June

25  and so just by sheer timing, it had nothing to do with

1   that e-mail and as a matter of fact -- I mean, that was

2   sort of the shocking thing.  I had no idea that there was

3   any sort of an EEO issue going on until the day that I

4   was notified by General Counsel that we had received an

5   EEO complaint from Denise Burgess and I was shocked and I

6   said well, what's the complaint and somebody told me

7   well, they said that she's lodging the complaint that you

8   fired her because she's African American and she's female

9   and my immediate response was that's absurd.

10          I'm a minority female.  The last thing I would

11  do is terminate somebody because they were a minority

12  female.  I mean, I founded the United Minorities Council

13  Asian Alliance when I was in college.  I founded the Penn

14  Filipino Association.  I mean, I've been known for my

15  activism in the minority community for years.

16  Secretary Norminetto (phonetic sp.) is one of the first

17  people that I brought on the college speaking circuit

18  because I was such a big fan of minority rights.

19          So I was frankly utterly shocked and utterly

20  taken aback and you know, in retrospect, as I look back,

21  did I understand that there were code words in there that

22  somehow indicated that this was a racial issue?  It

23  wasn't apparent to me because I was not aware of that and

24  as a matter of fact, the e-mail that was sent on Patricia

25  Redmon that she alleges is this huge thing, never did she

114

1   use the word, you know, you're terminating her because

2   she's African American.  That would've been an indicator

3   to me oh, gee, maybe I need to go talk to General

4   Counsel.  There was nothing in there that I considered to

5   be racial or sex-based, so I completely -- I mean, my

6   understanding of that e-mail, when I received the e-mail

7   saying that I don't think it's fair that you're going to

8   terminate Patricia was that I thought that Denise was

9   trying to protect her friend.

10          We had had several conversations in the

11  preceding weeks in which Denise Burgess told me that

12  Patricia Redmon had been her friend for many years, over

13  10 years, and that she thought the world of her and that

14  a lot of the places that she had worked, Patricia had

15  also worked and she was a great person and great friend

16  and she really needed her around.

17          And so when I got the e-mail from Denise

18  saying, you know, I don't think it's fair that you're

19  terminating Patricia, my initial reaction was that she

20  was trying to save Patricia's job because it was her

21  friend and I didn't want to discuss it any further with

22  Denise for two reasons.  Number One, the decision on how

23  to terminate people off of a contract is not a group

24  decision.  The Inspector General had given me strict

25  instructions to in-source positions and remove

1   nonessential positions off contract.  So you know, I

2   asked her for input, but it was not her decision to make.

3   It was the Inspector General's call and it was my

4   decision.  And second of all, I didn't think it was

5   appropriate for her to want to save a friend who was

6   costing the agency $115,000 and providing services as her

7   assistant.

8            Public Affairs -- having an assistant in the

9   Public Affairs division, it cost the agency $115,000.  I

10  could hire a GS-13 auditor for $115,000, so I couldn't

11  justify to OMB why I had a larger Public Affairs division

12  and was having to cut auditor positions.  So all of that

13  sort of went into my thinking as I was looking at how to

14  proceed, how to move forward.  But, I mean, that was how

15  I viewed the whole situation.

16           The other thing that I will point out is

17  throughout this whole process of preparing the

18  notification to Denise about the reorganization, I did

19  involve the General Counsel's office.  The General

20  Counsel sat there with me through the notification of

21  Denise Burgess and General Counsel was copied on the e-

22  mails that Denise Burgess sent, as well.  And I discussed

23  it with General Counsel and I said to General Counsel do

24  you have any concerns and both Justin Martel and Pat

25  Bowers told me we do not have any concerns, we don't see

1  anything here that's an issue.  You've done what's

2  appropriate.  Go ahead and proceed.  So at no point did

3  -- I mean, maybe I was blind to it because I'm not used

4  to these things because I've never launched nor been the

5  subject of an EEO complaint in the entire 25 years of my

6  professional career, so maybe it's my fault for not

7  seeing it.

8         But additionally, you know, I was communicating

9  the entire time with Nick Arnston, who was the Chief of

10 Staff; with Janice Nisbet, who is a very competent

11 personnel director; and with the Office of General

12 Counsel, and at no point did anybody on my staff indicate

13 to me that there were any issues with regard to EEO, so I

14 was not aware of the issue at all.

15        THE INVESTIGATOR:  What was the reason for the

16 termination of Barbara Lewis?

17        THE WITNESS:  Barbara Lewis was also one of the

18 contractors.  Those are three of the positions that were

19 not considered essential.  She, as you can see from that

20 e-mail, I discussed very specifically Barbara Lewis in

21 that e-mail.  Barbara Lewis is a very smart woman and she

22 provided a lot of expertise in the area of the Department

23 of Treasury and she was brought on by Ambassador Raphael

24 to assist with one of the programs that we have and as I

25 was doing the evaluation of the skills that we needed,

1    SIGIR does not audit the Department of Treasury programs

2    and so her area of expertise was not specifically tied to

3    the types of issues that SIGIR reports on.  We report on

4    essential services, we report on the expenditure of Iraq

5    reconstruction funds.  We do not have purview over the

6    Department of Treasury's interactions with the government

7    of Iraq and that was her field of expertise.

8            She was initially brought on as a part-time

9    employee to help us a little bit with Treasury issues.

10   It quickly escalated into full-time work because she was

11   working 40, 50 hours.  She was costing the agency

12   $275,000 a year and when the Inspector General says to me

13   you have somebody who's costing the agency $275,000 a

14   year, what skills and abilities are they bringing to the

15   table?

16           And I said great skill and ability but it's not

17   the right mix.  We don't need an expert on Treasury

18   affairs because that's not within our jurisdiction and so

19   I indicated to the contracting officer that that was one

20   of the positions that we could do without because that

21   type of expertise was not needed.

22           THE INVESTIGATOR:  What section or branch had

23   she been in?

24           THE WITNESS:  She was in the Quarterly Report

25   Division.

1          THE INVESTIGATOR:  Okay.  My last question for

2  you.  Do you have anything to add?

3          THE WITNESS:  There are a couple of issues I

4  believe -- I just want to make sure I have addressed them

5  all.  I want to be very clear for the record that the

6  discussion in which Denise Burgess and I talked about

7  people who file complaints.  I was very specifically

8  referring to people who file anonymous complaints.

9          At the time, I don't think it's any secret,

10  there was a full-blown anonymous attack that as going

11  against my character and the character of the Inspector

12  General and it was launched by disgruntled former

13  employees and my comments to her were directly related to

14  my displeasure with disgruntled former employees using

15  anonymous media contacts to slander and libel me in

16  public.

17          And I was discussing this with Denise because

18  she was the one who was getting the calls from the media

19  because the media, at the time, was actively covering

20  these slanderous, anonymous complaints against me.  I

21  will note for the record that following over two years of

22  very thorough investigation by the President's Council on

23  Integrity and Efficiency and by the Department of

24  Justice, that every single one of those complaints was

25  dismissed, no findings were found either criminally or

1   administratively.  There was absolutely no wrongdoing,

2   which was my contention from the very beginning.  But my

3   comment to her, at the time, which I believe was before

4   the meeting, it was just sort of the conversation that I

5   was having with her, was a reflection of my displeasure

6   at those people who would file anonymous complaints and

7   besmirch and damage my reputation, which has taken a

8   significant hit, in that whole process.

9        And for the record, again, I don't like talking

10  about race and sex and all of that other stuff, but the

11  people who launched the anonymous complaint against me

12  were almost exclusively white males, so I was clearly not

13  talking about the weakness of people who were minorities

14  or females.  The people who were the source of my

15  incredible discomfort at the time, who had filed the

16  complaint against me, were, in fact, white males, but I

17  don't consider that a part of how I evaluate things.

18       Again, being a minority female, I've put up

19  with quite a lot throughout my life of issues of

20  potential racial discrimination and I've managed it and I

21  think I've proceeded in a professional fashion and

22  handled several instances in which that occurred, but

23  having gone through that my entire life, I can tell you

24  the furthest thing from my mind would be to ever do that

25  to anyone else and that's been done to me my whole life

1  and that not something that I would ever do to anyone

2  else.  I think the other points that I would make I've

3  pretty much made, I think.  I just want to make sure that

4  everything that was not clear in the record was

5  explained.  I believe I've covered everything.  Oh, one

6  other point, I'm sorry, the final point.  When you were

7  talking about minority on senior staff, I'm minority, I'm

8  on senior staff, so I think when they were counting how

9  many females on senior staff and how many minorities on

10  senior staff, I'm a female minority, I'm on senior staff,

11  so in terms of numbers.

12         THE INVESTIGATOR:  Now, what's considered

13  senior staff?

14         THE WITNESS:  Senior staff would be all AIGs,

15  Deputy AIGs, and the Inspector General and myself.

16         THE INVESTIGATOR:  Would the Complainant have

17  fit in there?

18         THE WITNESS:  Denise would fit as senior staff,

19  yes.

20         THE INVESTIGATOR:  Okay.  Anything else?

21         THE WITNESS:  That's it.

22         THE INVESTIGATOR:  Okay.  Mr. Baratz, any

23  questions or --

24         MR. BARATZ:  Could we take three minutes just

25  to talk so we can cut down on the number of questions?

121

1    We may have very little.  I just want to make sure we

2    don't unnecessarily ask questions that we don't need

3    to --

4              THE INVESTIGATOR:  Okay, we'll go off the

5    record.

6              (Off the record.)

7              (On the record.)

8              THE INVESTIGATOR:  We're back on the record.

9    It's 2:13.  We were off the record for about 10 minutes,

10   taking a break.  Mr. Baratz, any questions you may have

11   of Ms. Cruz?

12             MR. BARATZ:  Ms. Cruz, would you mind telling

13   us when you specifically decided, in your reorganization

14   plans, to eliminate the Public Affairs IG position or to

15   terminate Ms. Burgess?

16             THE WITNESS:  On or about the 22nd of June I

17   began to put together plans for alternate structures for

18   the organization which included eliminating a directorate

19   for Public Affairs and just making it one staff person.

20             MR. BARATZ:  And when you said you put together

21   plans, what documents were you generating at that time?

22             THE WITNESS:  At that time, I was making notes

23   in a notebook, I was discussing with the Inspector

24   General those notes and was refining them based on the

25   discussions with the Inspector General.

1      MR. BARATZ:  And those notes, were you asked to

2   provide them as part of this process?

3      THE WITNESS:  I was not specifically asked to

4   provide those notes, no.

5      MR. BARATZ:  Do you have any other documents

6   other than the notes?

7      THE WITNESS:  The notes are the only

8   documentation that I believe exists that would confirm

9   the thought process that was ongoing at the time.

10      MR. BARATZ:  And your notes, I see you have in

11   front of you a notebook.

12      THE WITNESS:  Um-hum.

13      MR. BARATZ:  Are those the type of notes that

14   we're talking --

15      THE WITNESS:  These are exactly the type of

16   notes.

17      MR. BARATZ:  And how would you describe those

18   notes?

19      THE WITNESS:  These are official notes that I

20   take which chronicles the different meetings that I

21   attend, the brainstorms that occur within the

22   organization.  They capture ideas, they capture concepts,

23   they capture strategies.  They're also just follow-up

24   taskers that I go back and put onto index cards.

25      MR. BARATZ:  And the notebooks -- so they're

1  bound notebooks and you're just flipping the pages in

2  chronological order?

3       THE WITNESS:  Yes, I am.

4       MR. BARATZ:  And -- I was just asking if that

5  was your method of note taking.  How far back do your

6  notebooks go?

7       THE WITNESS:  From the first day I started with

8  the organization.

9       MR. BARATZ:  When was that?

10       THE WITNESS:  It was on June 26, 2004.

11       MR. BARATZ:  And that was your first stint with

12  the organization before you got reassigned to State?

13       THE WITNESS:  No, I started with SIGIR on

14  June 24th, 2004.

15       MR. BARATZ:  Do you have the notebooks from

16  then?

17       THE WITNESS:  Yes, I do.

18       MR. BARATZ:  How long have you been using this

19  notebook practice?

20       THE WITNESS:  Every single day since -- I mean,

21  just professionally?  I've been doing this for at least

22  20 years.

23       MR. BARATZ:  And you have all those notebooks?

24       THE WITNESS:  I do not have the notebooks from

25  previous jobs.

1        MR. BARATZ:  Do you have the notebooks from

2   June 2004 when you started with SIGIR?

3        THE WITNESS:  Yes, I do.

4        MR. BARATZ:  All the way through?

5        THE WITNESS:  Yes, I do.

6        MR. BARATZ:  And that includes notebooks at

7   State?

8        THE WITNESS:  I never worked for the Department

9   of State.

10       MR. BARATZ:  I'm sorry.  Maybe I misunderstood

11  your prior testimony.  I thought you were assigned out

12  for the State --

13       THE WITNESS:  I was detailed to the State

14  Department.

15       MR. BARATZ:  Excuse me.  When you were detailed

16  with the State Department did you have -- did you take

17  notes at that time?

18       THE WITNESS:  Yes, I did.

19       MR. BARATZ:  And you have those notebooks?

20       THE WITNESS:  Yes, I do.

21       MR. BARATZ:  Do you know why those notes

22  weren't turned over as part of this proceeding?

23       THE WITNESS:  They weren't relevant.  They were

24  asked -- I was asked for all e-mails or official

25  information.  Those notes were merely a record of my

1  thoughts at the time and my thoughts at the time were not

2  official in the sense that there was no official plan

3  that was presented, so there was never an intention to

4  withhold them.  I just didn't think that they were

5  germane.

6           MS. BERNARDO:  Let me interrupt for a second.

7  At the time we gathered the evidence or the information

8  as requested by Mr. Welker, for whatever reason they

9  weren't really deemed responsive.  We discovered other

10 items that were clearly more responsive like -- you know,

11 published charts and such.  As I mentioned earlier in the

12 meeting, I have some copies of some pages of those notes

13 that really reflect more the OMB conversations which I

14 need to redact and I told you I didn't really feel I

15 could redact them until I really saw what surfaced here

16 in terms of information, but there's clearly some

17 personal information on there, personal information as to

18 other employees that are really not relevant to this

19 event and I would be happy to produce the pages that I

20 have.

21          MR. BARATZ:  I would say that we would ask for

22 those and any and every document that relates to

23 reorganization.  And just so I'm clear --

24          MS. BERNARDO:  I think we gave them other than

25 these notes.

1          MR. BARATZ:  Well, so let's just clarify this.

2   So there are no official documents on reorganization as

3   you use that term?

4          THE WITNESS:  The official document of

5   reorganization is the Table 30.

6          MR. BARATZ:  And what is the Table 30?

7          THE WITNESS:  The Table 30 is the official

8   record of the positions that are assigned in the

9   organization to each of the directorates and it assigns

10  the grade level and it assigns the title of the

11  positions.

12         MR. BARATZ:  And do you know if the Table 30

13  was produced as part of this record?

14         THE WITNESS:  I believe it was.  Janice Nisbet

15  did provide the Table 30.

16         MR. BARATZ:  Can we identify --

17         THE WITNESS:  Or I believe excerpts of the

18  Table 30.  Part of the problem with the Table 30 is it

19  contains Privacy Act information on all of our employees.

20  It includes names and Social Security numbers and since

21  that is not a part of this record -- I don't know what

22  they produced, but --

23         MS. BERNARDO:  I honestly -- I can honestly

24  tell you that we tried to answer the request as best we

25  saw fit at the time and we're happy to produce new Table

1    30s.  Oh, here.  This is -- we did provide Table 30s.

2    What we did is we provided it for Congressional and

3    Public Affairs.

4              THE INVESTIGATOR:  For the record, it begins --

5              THE WITNESS:  It's Item 13.

6              THE INVESTIGATOR:  -- at Page 129 of the

7    investigative file.

8              MR. BARATZ:  So the Table 30 is the one

9    official document on the reorganization?

10             THE WITNESS:  Yes.

11             MR. BARATZ:  Are there any other official

12   documents that discuss the deliberative process you were

13   going through on reorganization?

14             THE WITNESS:  No.

15             MR. BARATZ:  And what do you mean by official,

16   because I want to make sure we clearly understand.

17             THE WITNESS:  Table 30 is an official document

18   that's provided to the Department of the Army which

19   determines the staffing levels of the organization.  I

20   think the other thing that would fall in the category of

21   official, which was also provided, was the organizational

22   charts which also reflect the change in the organization

23   and those were provided, as well.

24             MR. BARATZ:  In preparing for your testimony,

25   did you look back at your notes?

1       THE WITNESS:  I did.

2       MR. BARATZ:  And when did you do that?

3       THE WITNESS:  Over the last two weeks.

4       MR. BARATZ:  And what have you looked at

5  specifically that you recall?

6       THE WITNESS:  I specifically looked at the

7  notes from the time period of May through August of 2007

8  to refresh my memory as to the general times and the

9  deliberations that were ongoing at the time, most of

10  which were verbal and were between me and the Inspector

11  General.

12       MR. BARATZ:  And you took notes of those verbal

13  conversations between you and the Inspector General?

14       THE WITNESS:  I took high level notes, yes.

15       MR. BARATZ:  And so there were no e-mails

16  between the two of you or any other documents or

17  correspondence authorizing you --

18       THE WITNESS:  The Inspector General advised me

19  to perform the reorganization in the most expedient

20  manner possible and to report to him directly in person.

21  I do not report to the Inspector General via e-mail.  I

22  think that's a very impersonal way to report to the

23  Inspector General.  He prefers to sit down and have me

24  explain the process and what to expect and so I do that

25  in person and at the point that it becomes an official

1    act of the organization, that they get rolled into the

2    Table 30, it gets rolled into the organizational chart,

3    HR gets notified and the Chief of Staff gets notified and

4    they officially produce the pieces.  But at no time was

5    there any requirement in law nor in policy nor by the

6    Inspector General, who is my supervisor, for anything

7    other than a deliberation and verbal reports on progress.

8         THE INVESTIGATOR:  Excuse me a second.  Is the

9    noise here, does that bother you any on the --

10        COURT REPORTER:  No.  I mean, I can hear it,

11   but it's fine.

12        THE INVESTIGATOR:  Okay.  Does it bother anyone

13   in here?

14        MS. BERNARDO:  Not yet.

15        THE WITNESS:  Not too much.

16        COURT REPORTER:  It's okay.

17        THE INVESTIGATOR:  Okay, we'll let it go for

18   the time being.  Okay, please continue.

19        MR. BARATZ:  Approximately how often did you

20   meet with Mr. Bowen to discuss the reorganization?

21        THE WITNESS:  I meet with Mr. Bowen several

22   times a day.  I can't disengage how many times we were

23   talking about the reorganization, how many times we're

24   talking about a bevy of other issues that occurs in the

25   organization, but I meet with him on a consistent basis

1  and speak with him several times a day every day.

2        MR. BARATZ:  From your just recent reviewing of

3  your notes --

4        THE WITNESS:  Um-hum.

5        MR. BARATZ:  -- do you have any recollection,

6  sitting here today, how many times you saw reorg come up?

7        THE WITNESS:  I mean, we discussed it at least

8  half a dozen times.

9        MR. BARATZ:  Do you have the notes with you

10 now?

11       THE WITNESS:  I believe Andrea has excerpts of

12 the notebooks that reflect my recollection of what was

13 happening at the time.

14       MS. BERNARDO:  Um-hum.  That's what I just

15 mentioned.

16       MR. BARATZ:  So those notes cover everything

17 relating to reorganization, because I thought earlier and

18 it may have been on or off the record, you mentioned that

19 those notes related to discussions with OMB.

20       THE WITNESS:  That was included in there, as

21 well.  I mean, it's a journal of every single thing that

22 I'm doing so every time OMB calls there'll be a note.

23 OMB called and you know, a few shorthand notes that would

24 trigger in my mind some sort of a recollection of what

25 happened and then if there's a discussion with someone in

1    Baghdad, you know, a discussion with Ambassador Crocker

2    regarding something else.  So it's sort of an ongoing

3    flow of various discussions and at the time, I believe

4    Andrea was asking me well, you know, how often or what

5    was the nature of your discussion with OMB since I have

6    so many discussions with OMB and I can't recall off the

7    top of my head, I went back through the notes to sort of

8    refresh my memory and there were several instances

9    between, I guess, June, beginning of June and August,

10   around that timeframe, where there were multiple phone

11   calls with OMB that I had noted in my notebook and put

12   some feedback to.

13          MR. BARATZ:  When did you give your lawyer the

14   notes, the copy of the notes?

15          THE WITNESS:  I pulled them out as we were sort

16   of going back to recall what happened on particular days

17   within the last two weeks when we were preparing for this

18   hearing.

19          MR. BARATZ:  And did you hand over to your

20   lawyer a copy of all the notes from May all the way

21   through the relevant --

22          THE WITNESS:  I gave her the notebook which

23   included the dates in question.

24          MR. BARATZ:  How many notebooks was it?

25          THE WITNESS:  It was one.

132

1        MR. BARATZ:   So one notebook covered the period

2    from May all the way through what time period did you

3    say?

4        THE WITNESS:   One notebook covers, usually,

5    about six months.  A notebook is about 300 pages.  They

6    all look like this.  This is Notebook Number 12.  There's

7    a number on it, there's page numbers on it and beginning

8    -- this begins on April 22 of 2008.  Today is August and

9    I am currently on Page 292.

10       MR. BARATZ:   You said that official documents

11   about a reorganization are not generated until HR and the

12   Chief of Staff are notified?

13       THE WITNESS:   Right.

14       MR. BARATZ:   How are the Chief of Staff and HR

15   notified?

16       THE WITNESS:   I notify them verbally.

17       MR. BARATZ:   Did you make a notation of that in

18   your notebook?

19       THE WITNESS:   I don't know if I did.

20       MR. BARATZ:   What did you say to them in that

21   conversation?  I'm sorry, that was a little sloppy.  When

22   did you have the conversation?

23       THE WITNESS:   Throughout the process of the

24   reorganization, I had conversations with HR about the

25   need to reflect in the Table 30 the changes that I was

1  making in the organization that would shift positions,

2  reduce positions in the Congressional and Public Affairs

3  department and various changes as a result of those

4  conversations over the course of the next two months,

5  various changes were made to the Table 30.

6            MR. BARATZ:  Let's take the first meeting.

7  When was the first meeting?

8            THE WITNESS:  I don't recall.

9            MR. BARATZ:  Would your notes reflect the first

10  meeting?

11            THE WITNESS:  It was not a meeting, it was a

12  conversation.

13            MR. BARATZ:  When was the first conversation?

14            THE WITNESS:  I don't recall exactly.

15            MR. BARATZ:  Would your notes reflect the first

16  conversation?

17            THE WITNESS:  The notes do not reflect

18  conversations, the notes only reflect meetings.  There's

19  a certain level at which the notes don't -- I don't mark

20  lunch, I don't mark conversations that I have with every

21  person within the organization.  If there is a scheduled

22  meeting for an hour in the conference room with a group

23  of people, I will make it out.  But if I have 12 things

24  to do, to run around and let General Counsel know

25  something, let HR know something, let Public Affairs know

1  something and let the contracting officer know something,

2  I don't mark that in the notebook.  I simply go and ask

3  them to take the appropriate action and they take the

4  appropriate action.

5           MS. BERNARDO:  Excuse me.  I'm happy to have

6  her refer to the pages that I have here if that would be

7  of assistance or if that would be your preference.

8           MR. BARATZ:  That's fine.  Why don't we make

9  copies of that?

10          MS. BERNARDO:  Well, actually -- all right,

11  then as I said, I'm very concerned about redacting

12  because there is privacy information on them and that's

13  my -- as I said, my hesitation with having redacting them

14  prior to this meeting was that I didn't know what would

15  be, you know, elicited here.

16          MR. BARATZ:  My understanding of the EEO rules

17  is that there is no privacy information, that all

18  information is supposed to be revealed and barring that,

19  we certainly could've reached an agreement to protect the

20  confidentiality of that information.  What I'm willing to

21  enter into now --

22          MS. BERNARDO:  I mean, it's not just about this

23  event.  There are other things in there and I think that

24  they're, in that regard, not relevant to this case.  The

25  privacy information that is -- you're obligated to

1  protect here is in connection with this case.

2          THE WITNESS:  The other thing that I would

3  point out for the record is there could be 6(e)

4  information in there, if there is information on an

5  investigation which is ongoing, I will take notes in my

6  notebook and some of that could be protected by a 6(e)

7  grand jury.  So, I mean, it is a collection of notes that

8  I take on a variety of issues, so those things which are

9  agency protected since we are an Inspector General I

10  don't believe are relevant and cannot be shared in the

11  EEO forum because I need to protect those notes, so I'm

12  happy to share the notes that are relevant to this.  I'm

13  just saying if I have notes about an investigative

14  target, I cannot have that published in something that

15  does not have protection because if it gets FOIA'd, the

16  information on that individual who is the target of the

17  investigation then becomes public, so I have to protect

18  that.

19          MR. BARATZ:  Right.

20          MS. BERNARDO:  I'm happy to have her read this

21  to refresh her recollection.

22          MR. BARATZ:  Well, but not without a copy to

23  us.

24          MS. BERNARDO:  Okay.

25          MR. LEE:  And Mr. Welker, may I speak on

126

1    this --

2           THE INVESTIGATOR:  Okay.

3           MR. LEE:  We believe they should have been

4    produced.  They were relevant, they were requested by

5    you.  There's some collection of documents on the other

6    side of the table.  They don't appear to be complete.

7    They seem to -- first, it was explained it was only about

8    OMB.  We don't know that they're all about the

9    reorganization.  We would request this record be kept

10   open until this is resolved, we get to see the notes,

11   study the notes and have an opportunity to at least

12   digest what they say, see what they say about this

13   critical witness's conversation and memory.

14          MS. BERNARDO:  That would be fine with me.

15          MR. LEE:  That's the request I'm making, but I

16   don't accept their view of relevance.  We need to make

17   sure we got everything because I have no earthly idea as

18   to why they weren't produced before.

19          MS. HALBROOKS:  And as long as he was able to

20   speak on that, if I may, as well?

21          THE INVESTIGATOR:  All right.

22          MS. HALBROOKS:  I assure you there was no

23   attempt at deception and I would also -- we're happy to

24   leave it open and get you the material and fall under a

25   confidentiality agreement, however you want to do it.  We

1  can let you look at the books once we've looked at them,

2  ourselves, et cetera.  But I might suggest that since

3  we're here and she's on the record and Mr. Welker's here

4  that it might help, I think that the content may be over-

5  exaggerated and that it might help for her to go through

6  each one and say what she thought was valuable off that

7  page not in lieu of later producing them, but just while

8  we're here.  That was just --

9           MR. LEE:  I have a preference to do it once,

10  not twice.

11           THE INVESTIGATOR:  And again, what we're

12  talking about are just Ms. Cruz's personal notes and I

13  think --

14           THE WITNESS:  Um-hum, my personal notes.

15           THE INVESTIGATOR:  Well, not personal.  Yeah,

16  but --

17           THE WITNESS:  Well, they are my personal notes.

18           THE INVESTIGATOR:  -- ones you personally took.

19           THE WITNESS:  I mean, you know, I -- sometimes

20  if Mom calls and I don't have enough time to get out

21  another piece of paper, it'll say call Mom, so I mean,

22  that's in there, too.

23           THE INVESTIGATOR:  And we have all the pages of

24  relevance already copied.  I think you have them?

25           MR. LEE:  No.

1          MS. HALBROOKS:  Not for distribution?

2          MR. BARATZ:  No.

3          THE INVESTIGATOR:  Well, yeah.  But I saw,

4 Ms. Halbrooks, you had -- or Bernardo.  You had some

5 documents here.

6          MS. BERNARDO:  Correct.

7          THE INVESTIGATOR:  It looks like you've made --

8          MS. BERNARDO:  Correct.

9          THE INVESTIGATOR:  -- copies.

10         MS. BERNARDO:  Correct.

11         MR. BARATZ:  But the difficulty with those

12 documents, they're saying is that they're not in redacted

13 form and so while Ms. Cruz could look at them and

14 possibly refresh her recollection and it's material she

15 looked at to prepare for her testimony for over two

16 weeks, we haven't had any copies and there appears to be

17 no copy that they could easily produce in the

18 investigative record or --

19         MS. BERNARDO:  I'm happy to provide them

20 tomorrow.  It's no problem.

21         THE INVESTIGATOR:  Okay.  That's what I was

22 trying to --

23         MS. HALBROOKS:  If you want to take a half hour

24 break, perhaps we could do it today with some White Out.

25 You know, I mean we're not trying to --

1          MS. HUHRA:  Well, I think we should keep going

2    and turn back to that issue.

3          THE INVESTIGATOR:  Okay.  We'll try to get

4    copies of those for me and the Complainant's

5    representatives at the end of the day.

6          MR. BARATZ:  And just so we're clear on this

7    topic, other than the Table 30 and the notes that you

8    took in your notebook --

9          THE WITNESS:  Um-hum.

10          MR. BARATZ:  -- are there any other documents

11    whatsoever that you generated, received, reviewed that

12    relate to reorganization at SIGIR?

13          THE WITNESS:  Not to my recollection, no.

14          MR. BARATZ:  You cited earlier in your

15    testimony the cost of Ms. Redmon, for example, to SIGIR.

16    What information did you draw on to get that -- those

17    numbers?

18          THE WITNESS:  Her contractual costs, which were

19    outlined in the BCPI contract.

20          MR. BARATZ:  So Ms. Redmon was specifically

21    mentioned in the BCPI contract?

22          THE WITNESS:  Ms. Redmon's employment with

23    SIGIR was through a company called BCPI --

24          MR. BARATZ:  Um-hum.

25          THE WITNESS:  -- and so she was paid at a

1    certain rate on the BCPI contract for her services to

2    SIGIR.

3            MR. BARATZ:  And you had mentioned also that

4    having employees of SIGIR is less expensive than going

5    through the contract services?

6            THE WITNESS:  Um-hum, it is.

7            MR. BARATZ:  So why have all these employees

8    through the contractor?

9            THE WITNESS:  Because over the course of five

10   years SIGIR has faced closure five different times and so

11   as SIGIR faces closure, our ability to offer full-time

12   employment to individuals has been remarkably restricted.

13   So for -- and it's a very complicated procedure that we

14   have managed to refine over this period of four years.

15   When it comes to auditors and investigators, it's fairly

16   easy to find retirees who don't mind the fact that

17   they're going to get a 13-month temporary appointment

18   that may end short of the 13 months and so they're

19   willing to come on as government employees.

20           But when you're looking for more generic skill

21   sets such as secretaries, assistants, you know, writers,

22   editors, positions that don't require us to go to

23   retirees or people with a lot of expertise, it's

24   difficult to find people that want to work for an

25   organization when they cannot be given any sort of

1   assurance that they will have a job three months from

2   now, much less 13 months from now.  And so as a result,

3   SIGIR has relied heavily on two other forms of hiring.

4   One of them is the detailee process in which we borrow

5   employees from other federal agencies and reimburse them,

6   and the other is the contractual process and so a lot of

7   our administrative staff over the course of our history

8   have been contract staff because we're not able to

9   attract and retain government employees.  People are not

10  going to give up a permanent job in the government, come

11  and work for SIGIR for 13 months or less and so we've

12  relied on contractor employees for quite a period of

13  time.

14          We have tried very hard every time the Congress

15  extends us to shift that back and to convert as many

16  positions as we can to government employees and we were

17  able to quite successfully, with the passage of the

18  latest legislation which extended SIGIR for up to five

19  years, now we're able to at least explain to people who

20  want to come to work for SIGIR that the organization will

21  be around for longer than 12 months.  But over the last

22  five years, I've never been able to have our HR people

23  tell the folks who applied for jobs that there was any

24  expectation that SIGIR was going to be around for more

25  than 12 months, that it's a temporary organization and

1    has a very dynamic sort of a life span.

2         MR. BARATZ:  You mentioned earlier you drew a

3    distinction between meetings and conversations.

4         THE WITNESS:  Um-hum.

5         MR. BARATZ:  I believe you testified that

6    conversations were on the phone and you don't typically

7    take notes.

8         THE WITNESS:  Um-hum.

9         MR. BARATZ:  Meetings are in-person or

10   scheduled and you do --

11        THE WITNESS:  Not --

12        MR. BARATZ:  -- typically take --

13        THE WITNESS:  I'm sorry.

14   MR. BARATZ:  And you do typically take notes.

15        THE WITNESS:  It's not very cut and dried.  I

16   mean, there are some phone conversations where if I need

17   very specifically to recall the details of a phone

18   conversation, I will take notes of the phone conversation

19   so I can convey it accurately to the Inspector General.

20   If it's a conversation external to the organization such

21   as a conversation with OMB, I will very likely take

22   notes.  If it's a conversation with my HR director, I

23   will very likely not take notes because I'm just

24   providing instructions on her and I expect that the

25   record will be reflected when she actually accomplishes

1  the task that she was directed to do.

2            MR. BARATZ:  Did you have any meetings with

3  your HR director about the reorganization?

4            THE WITNESS:  I spoke with my HR director about

5  the reorganization throughout the course of the process.

6            (Off the record.)

7            (On the record.)

8            THE INVESTIGATOR:  On the record.  It's 2:37.

9  We were off the record for a couple minutes for technical

10 difficulties and Mr. Baratz.

11           MR. BARATZ:  The last question was whether you

12 had any meetings with your HR director.  Who's your HR

13 director?

14           THE WITNESS:  Janice Nisbet.

15           MR. BARATZ:  Did you have any face-to-face

16 meetings with her about the reorganization?

17           THE WITNESS:  I did.

18           MR. BARATZ:  When were those meetings?

19           THE WITNESS:  I wouldn't classify it as

20 meetings.  I had conversations with her over the period

21 of time between June and August of 2007 to both obtain

22 information from her on the current footprint within the

23 Table 30 and after decisions were made on HR changes to

24 provide her feedback on changes that would need to be

25 made to the Table 30.

1          MR. BARATZ:  Did you consult with her on what

2    decisions would be made on the Table 30?

3          THE WITNESS:  She is a subordinate employee and

4    she is not involved in policy.  She executes the policy

5    that is at the discretion of the Inspector General, so in

6    terms of consulting, I certainly received feedback on her

7    views of where the organization currently was on the

8    Table 30, but she was not part of the deliberative policy

9    process.

10         MR. BARATZ:  Who was part of the deliberative

11   policy process?

12         THE WITNESS:  Myself and the Inspector General.

13         MR. BARATZ:  And the Chief of Staff, who was

14   the Chief of Staff at the time?

15         THE WITNESS:  Nick Arnston.

16         MR. BARATZ:  Was he part of the process?

17         THE WITNESS:  No, he was not.

18         MR. BARATZ:  You said that the Chief of Staff

19   needed to be notified of HR decisions.

20         THE WITNESS:  He executed the decision once the

21   decision was made by the Inspector General.

22         MR. BARATZ:  And how did you notify the Chief

23   of Staff of an HR decision?

24         THE WITNESS:  Verbally.

25         MR. BARATZ:  Was that over the phone?

1              THE WITNESS:  No, in person.

2              MR. BARATZ:  When?

3              THE WITNESS:  In that timeframe in which the

4    decision was made to execute the reorganization plan.  I

5    can't remember the exact day.

6              MR. BARATZ:  Were you concerned at all about

7    your instructions not being followed or being

8    misunderstood?

9              THE WITNESS:  No.

10             MR. BARATZ:  Why is that?

11             THE WITNESS:  We had made the notification, we

12   had informed General Counsel.  General Counsel was there

13   during the notification of Ms. Burgess, at which point

14   the Chief of Staff was requested to prepare the letter,

15   was notified that Ms. Burgess's position had been

16   eliminated, was given the terms of what we would be

17   doing.  He drafted the responses that needed to occur

18   from the agency and those were vetted back to ensure that

19   his recollection was accurate.  The draft of the letter

20   for Ms. Burgess was run back through me.  I reviewed it,

21   it was accurate, it was run through General Counsel.

22   They reviewed it, felt it was accurate and then it was

23   issued.

24             MR. BARATZ:  That's the letter that resulted

25   from the July 23 meeting with Ms. Burgess?

```
 1                  THE WITNESS:  Yes.

 2            MR. BARATZ:  And did you take notes during the

 3   July 23 meeting?

 4                  THE WITNESS:  I believe I had about two or

 5   three lines of notes.

 6            MR. BARATZ:  And what do they say?

 7                  THE WITNESS:  I believe it was 3:20 p.m. was in

 8   the left side.  It said Denise Burgess.  It said not

 9   performance issues and then there was one other line and

10   that was it.

11            MS. BERNARDO:  That's fine.

12            MR. BARATZ:  That's a specific note we'd make a

13   request for.

14            MS. BERNARDO:  Oh, that's fine.

15                  THE WITNESS:  I mean, not to rat out General

16   Counsel's office, but at the time we were going through

17   sort of a General Counsel changeover at the time.  You

18   know, that one piece of note taking, I believe I provided

19   that one sheet because that was that particular day of

20   notes to the Office of General Counsel.

21            MR. BARATZ:  Um-hum.

22                  THE WITNESS:  Internally, no excuse, but we've

23   had a changeover in General Counsel, so there are some

24   records that perhaps, you know, have not -- I mean, the

25   agreement on settlement amount and things like that, I
```

1   believe were made with the former General Counsel who no

2   longer works here.  The recordkeeping may not have been

3   as good as it should have been but the intent was never

4   not to provide that.

5         MR. BARATZ:  Did you keep the note in your

6   notebook?

7         THE WITNESS:  Yes.

8         MR. BARATZ:  So you made a copy, one copy, and

9   you gave it to General Counsel?

10         THE WITNESS:  Um-hum.

11         MR. BARATZ:  Now, you explained that for

12   Ms. Burgess's termination you weren't concerned about

13   your instructions with dealing with the HR decision being

14   confused at all.  You also told us that about 10 people

15   were involved in this reorganization.

16         THE WITNESS:  Right.

17         MR. BARATZ:  How did you issue instructions for

18   all 10 of those people?

19         THE WITNESS:  The instructions for all of the

20   individuals varied on the situations in which the people

21   were handled.  In the case of the contractors, the

22   instructions were given, I believe, both verbally and

23   then followed up with in an e-mail to make sure that the

24   people who were rolled off contract were rolled off and

25   the people who were permanized were permanized.

1          MR. BARATZ:  And let me just stop you there.

2          THE WITNESS:  Um-hum.

3          MR. BARATZ:  So you issued the instruction to

4    the contractor?

5          THE WITNESS:  I issued the instruction to the

6    SIGIR individual who was the Contracting Officer

7    Technical Representative.  That individual then notified

8    the contractor, who I believe was Ben Campbell, who then

9    -- who was at the head of that contract vehicle whose job

10   it was then to notify the individual.  So at no point, I

11   don't believe, was anyone from SIGIR supposed to notify

12   Patricia Redmon.  That's not the way that the contracting

13   goes.  I would notify the Contracting Officer Technical

14   Representative, who would then notify whoever held that

15   contract vehicle with the following people who were

16   rolled off and that we were going to be offering

17   government jobs to the following people.

18         MR. BARATZ:  Did you have any conversations

19   with Mr. Campbell about --

20         THE WITNESS:  I did not have any conversations

21   with Mr. Campbell.

22         MR. BARATZ:  And did you tell Ms. Burgess --

23   excuse me.  Did you tell Ms. Burgess about Ms. Redmon

24   being let go prior to Ms. Redmon knowing?

25         THE WITNESS:  I believe I shared it the day

1  before the instructions were given.  I mean, I believe I

2  felt that it was necessary to let Denise know before I

3  actually notified the Contracting Officer Technical

4  Representative, but it was roughly the same time because

5  part of my concern at the time was the fact that Denise

6  had told me that she was friends with Patricia and what I

7  didn't want to happen was for me to convey that to

8  someone who would then tell her friend versus the

9  appropriate way that the agency was required to notify,

10  which is by notifying the Contracting Officer Technical

11  Representative.

12          MR. BARATZ:  And so does Thursday, July 19th,

13  2007, does that sound about right when you had this

14  conversation with Ms. Burgess?

15          THE WITNESS:  It sounds about right.

16          MR. BARATZ:  And what do you recall the

17  substance of that conversation to be?

18          THE WITNESS:  I believe it was a very short

19  conversation because I didn't want to get into the

20  details and it was a pretty straightforward notification

21  that we were going to be rolling Patricia off because

22  there were some decisions that were made with regard to

23  our contract employees.

24          MR. BARATZ:  Do you remember, to the best of

25  your recollection, what you said?

 1                THE WITNESS:  I don't recall specifically.

 2                MR. BARATZ:  Do you remember what Ms. Burgess

 3   said to you?

 4                THE WITNESS:  I don't.  I mean, I can recall

 5   that it was a short conversation.  I can recall, at the

 6   time, that I was involved in several conversations.  I

 7   mean, at that point, I also knew that I would be asking

 8   Ms. Burgess to leave, as well, so I was trying to be very

 9   -- you know, it's hard when you release several people to

10   not discuss the release of one person because then it

11   causes rumors in the organization, so whenever you're

12   talking about a reorganization and you're releasing

13   multiple people at the same time, you have to be very

14   diplomatic.  I don't want to lie to someone.

15                For example, the reason that she, in her claim,

16   erroneously states that no changes were made to

17   Congressional Affairs was because she asked me very

18   specifically, during our conversation, about her being

19   reorganized, are any changes being made in Congressional

20   Affairs.  At the time I said I don't wish to discuss any

21   changes that are being made in Congressional Affairs and

22   I was very specific about the words that I used because

23   it was not Ms. Burgess's right to know that I was making

24   any changes in Congressional Affairs.  And as a manger

25   with 15 years of experience, I didn't want to tell Denise

1  that I had the intention of letting Marthena go, as well,

2  and then have Denise be the one who walked into

3  Marthena's office and say hey, Ginger's going to let you

4  go.  I mean, I wanted to be the one who told Marthena she

5  only had a month, she needed to find another job.

6          So, you know, I have the confidentiality, I

7  have -- you know, it's a very difficult position to be in

8  and I tried to treat all of the employees and all of the

9  contractors that we have in the organization with dignity

10  and respect and part of that dignity and respect is not

11  discussing other terminations with the individual with

12  whom I'm discussing one termination.

13          So there were a lot of moving parts at the

14  time, there were a lot of contractors rolling off, a lot

15  being permanized, several government officials being

16  asked to leave and I was trying to be as diplomatic as

17  possible.

18          MR. BARATZ:  You didn't tell Ms. Burgess at

19  that Thursday meeting that she, too, was going to be

20  terminated as part of the reorganization --

21          THE WITNESS:  I did not tell her.

22          MR. BARATZ:  Why not?

23          THE WITNESS:  Because I had not cleared it with

24  General Counsel yet and I wanted to make sure that when I

25  discussed General Counsel the manner in which I was going

1  to inform Ms. Burgess about her reorganization.  In the

2  case of the contractors, it's a different issue.

3  Contractors were being rolled off; that's not an issue of

4  terminating someone's employment.  Rolling contractors on

5  and off is something that constantly occurs and is a

6  natural part of contract employees.  The actual

7  termination of Ms. Burgess, I wanted to make sure was

8  discussed with the Office of General Counsel before it

9  occurred and I did have a discussion with Pat Bowers and

10  I did ask him to sit in.

11         I ran through how I was going to do it, the

12  reasons for doing it, to make sure that I was doing was

13  appropriate and asked Mr. Bowers for his input, which he

14  provided, and then I asked him to sit in on the meeting.

15  I scheduled the meeting with Denise and tried to do this

16  in the most appropriate fashion that I felt possible.

17         MR. BARATZ:  Why contact the General Counsel?

18         THE WITNESS:  To make sure that all the

19  processes were appropriately reviewed.  We want to make

20  sure that we're following the law.  We want to make sure

21  that we're not, you know, violating any policies and we

22  want to make sure that we are doing what we're doing in

23  the most appropriate manner possible.

24         MR. BARATZ:  Did you confer with the General

25  Counsel about Marthena's termination?

1          MS. BERNARDO:  At this point, you're getting

2    into attorney/client privileges.

3          MR. BARATZ:  I would disagree.  This is just on

4    the subject.  I'm not asking what the nature of the legal

5    advice is, whatsoever.  I'm asking if there was a

6    meeting.  Did you meet with the General Counsel, as well,

7    on Marthena's --

8          THE WITNESS:  There wasn't a meeting, per se.

9    The General Counsel was aware that we were doing a

10   reorganization.  They were aware of the scope of the

11   reorganization and the individuals involved.

12         MR. BARATZ:  Did the General Counsel attend the

13   meeting with Marthena when you let her go?

14         THE WITNESS:  No, they did not.

15         MR. BARATZ:  Why did the General Counsel attend

16   the meeting with Ms. Burgess?

17         THE WITNESS:  Because the nature in which Ms.

18   Burgess was fired was slightly different from the nature

19   in which Marthena Cowart was fired.  The benefits

20   provided to the two was exactly the same.  However, the

21   termination of Denise Burgess was performed in such a

22   manner that we could not have the person who does all of

23   the external relations for the organization be notified

24   that they're being terminated and have them continue to

25   hold a position of trust and speak for the organization.

1    Obviously, that person is going to have bad feelings

2    toward the agency and it is not good management practice

3    to notify someone that they have been terminated and then

4    to let them continue to be the agency's spokesperson with

5    the media.  So in the case of Denise Burgess we felt the

6    most appropriate thing to do was to give her

7    administrative leave and to have her continue to be paid,

8    but to seek employment outside the agency but removed

9    from the position of being able to speak for the agency

10   because it's just not good management practice to

11   terminate someone and have them continue to speak for the

12   agency.

13             MR. BARATZ:  Marthena was in Congressional

14   Affairs, right?

15             THE WITNESS:  She was in Congressional Affairs.

16             MR. BARATZ:  And your relationship with the

17   Congress is very important, right?

18             THE WITNESS:  Yes, it is.

19             MR. BARATZ:  And yet she was allowed to stay on

20   with the organization after being notified that she, too,

21   was going to be terminated.

22             THE WITNESS:  In terms of financial --

23             MR. BARATZ:  Is that right?

24             THE WITNESS:  She was allowed to stay, yes.

25             MR. BARATZ:  When did you speak with the

1    General Counsel about Ms. Burgess's termination?

2            THE WITNESS:  My recollection is it was the

3    Friday before when I sent the e-mail requesting her to

4    attend a meeting.

5            MR. BARATZ:  The Friday before what?

6            THE WITNESS:  Before the Monday in which she

7    was notified.

8            MR. BARATZ:  So that would be July 20th?

9            THE WITNESS:  I believe.  23rd, 22, 21, 20.

10   Um-hum.

11           MR. BARATZ:  And did you -- I'm sorry?

12           MS. BERNARDO:  Wasn't the 23rd a Monday?

13           MR. BARATZ:  Yes.

14           MS. HUHRA:  The 23rd's a Monday.  Friday would

15   be --

16           MR. BARATZ:  Did you take notes of that

17   discussion with the General Counsel?

18           THE WITNESS:  I did not.

19           MR. BARATZ:  When did you request the meeting?

20           THE WITNESS:  I was in the office with the

21   Inspector General.  I was briefing him on the final

22   decision to make the notification.  He concurred and said

23   -- I don't remember if it was his idea or my idea, but we

24   wanted to make sure that the General Counsel was notified

25   and so in the Inspector General's office, we called the

1  General Counsel, who at the time was Pat Bowers, asked

2  him to join us in the Inspector General's office, briefed

3  him on what we had planned to do, asked for him to review

4  it and let us know if there were any issues or if there

5  was anything that we needed to make sure that we did to

6  do this appropriately.  He did that and then on Monday I

7  requested that he join me for the meeting with Ms.

8  Burgess when I was making notification.

9          MR. BARATZ:  Why did you ask that the General

10  Counsel join you for the meeting?

11          THE WITNESS:  I felt that it would be prudent

12  to do and appropriate to do, and the fact that Denise

13  Burgess had that morning also sent an e-mail and she

14  seemed to be copying quite a lot of her correspondence to

15  the General Counsel's office made me feel that it was

16  important for transparency, to ensure that everything

17  that was done was fully understood by the agency and by

18  the General Counsel's office, I felt it was prudent to

19  have the General Counsel there.

20          MR. BARATZ:  So Friday, July 20th, you have a

21  meeting with the Inspector General, the General Counsel

22  and yourself.

23          THE WITNESS:  Um-hum.

24          MR. BARATZ:  Anyone else present?

25          THE WITNESS:  No.

1          MR. BARATZ:   And at that meeting you are

2   discussing the termination of Ms. Burgess --

3          THE WITNESS:   Yes.

4          MR. BARATZ:   -- and how to notify her?

5          THE WITNESS:   Right.

6          MR. BARATZ:   How did you set up that meeting?

7   Did you send an e-mail?

8          THE WITNESS:   No.

9          MR. BARATZ:   Just phone calls?

10         THE WITNESS:   Yes.

11         MR. BARATZ:   When did you first inform the

12  Inspector General that it was your recommendation to

13  terminate Ms. Burgess?

14         THE WITNESS:   I first began discussing with the

15  Inspector General the reorganization of the entire

16  organization in mid-June.

17         MR. BARATZ:   But when did you first inform him

18  that it was going to be your recommendation to terminate

19  Ms. Burgess?

20         THE WITNESS:   It was roughly two weeks before

21  the final termination action was taken.

22         MR. BARATZ:   Did you take notes of that

23  meeting?

24         THE WITNESS:   No.

25         MR. BARATZ:   So two weeks before you have a

1  discussion with the Inspector General?

2          THE WITNESS:  Yes.

3          MR. BARATZ:  Anyone else?

4          THE WITNESS:  No.

5          MR. BARATZ:  When did you meet?

6          THE WITNESS:  The Inspector General and I meet

7  multiple times a day, so I can't specifically recall when

8  that conversation was held.  I do know it was about two

9  weeks prior to the decision.

10          MR. BARATZ:  Do you recall if it was in the

11  morning or afternoon?

12          THE WITNESS:  I don't recall.

13          MR. BARATZ:  Do you recall how long of a

14  meeting it was?

15          THE WITNESS:  It wasn't a meeting on one

16  specific topic.  I think it was in the course of

17  discussing a wide range of issues that it was discussed

18  with the Inspector General.

19          MR. BARATZ:  How much time did it take in that

20  meeting to discuss Ms. Burgess's position?

21          THE WITNESS:  There was a lot of discussion

22  going on at the time about reorganization and it didn't

23  include just Ms. Burgess.  It included Marthena Cowart,

24  it included Paul Janizac (phonetic sp.), it included the

25  contractors, it included a wide range of individuals and

1    so there were ongoing discussions for several weeks at

2    that point.

3            MR. BARATZ:  In that meeting two weeks before,

4    about approximately how much time did you and the

5    Inspector General spend discussing the reorganization?

6            THE WITNESS:  We spent several hours over the

7    course of two weeks discussing various aspects of the

8    reorganization.

9            MR. BARATZ:  That's several hours over the

10   course of two weeks.  What about in this one particular

11   meeting where you first informed him?

12           THE WITNESS:  That was not a discreet meeting.

13   I did not call a discreet meeting at a discreet time to

14   simply discuss the termination of one employee.  Most of

15   the conversations --

16           MR. BARATZ:  I'm sorry --

17           THE WITNESS:  -- included all of the

18   terminations.

19           MR. BARATZ:  I thought maybe you misunderstood

20   my question.  I was speaking about the entire

21   reorganization.

22           THE WITNESS:  The entire reorganization, there

23   were multiple meetings over the course of several weeks

24   in which it was discussed.

25           MR. BARATZ:  Well, I tried to ask you this

1  before.  When did you first meet about reorganization?

2  What exactly is the timeline?

3        THE WITNESS:  The first notes that I have --

4  and I'm going to have to refer to the notes which we're

5  going to provide you -- do you have those notes?

6        MS. BERNARDO:  Um-hum.

7        THE WITNESS:  I mean, because this was a long

8  time ago and we do a lot of different things and I can't

9  recall specifically, but --

10        MR. BARATZ:  That's why usually documents are

11  helpful on reorganization, personnel decisions.

12        MS. HALBROOKS:  You're welcome to come work

13  with us for a while and see how fast we --

14        MS. BERNARDO:  There's the drawing --

15        THE WITNESS:  That one.

16        MS. BERNARDO:  And this one I think I'd be

17  happy --

18        THE WITNESS:  Thank you.

19        MS. BERNARDO:  -- to release right now, since

20  that doesn't --

21        THE WITNESS:  June 20th of '07.

22        MR. BARATZ:  What happened on June 20th, 2007?

23        THE WITNESS:  On June 20th of '07 I came up

24  with the first concepts of how to -- different ways in

25  which the organization could reorganize and streamline

1   and so shortly after June 20th, I don't know if I

2   discussed it with him that day, I don't know if I

3   discussed it with him the day before, the day after, but

4   roughly about June 20th was when I began to put some

5   concepts together for how the organization could function

6   more efficiently with a different footprint.

7            MR. BARATZ:  What precipitated that?

8            THE WITNESS:  The impending announcement of my

9   assumption of the deputy position, which was announced by

10  the Inspector General on the 22nd of June.

11           MR. BARATZ:  Did you have meetings before

12  June 22nd?

13           THE WITNESS:  On the reorganization, no.

14           MR. BARATZ:  Did you have meetings with the

15  Inspector General prior to June 22nd that would discuss

16  your duties?

17           THE WITNESS:  Meetings or conversations?

18           MR. BARATZ:  Well, let's start with meetings.

19           THE WITNESS:  I don't recall a specific

20  scheduled meeting with the Inspector General to discuss

21  that, no.

22           MR. BARATZ:  And what's the difference in your

23  mind between meetings and conversations?

24           THE WITNESS:  A meeting is something official

25  which has a timeframe of either half an hour or an hour,

1    sometimes more.  It's on his calendar, it's put in

2    Outlook, it's usually conducted either in a conference

3    room or in his office and it usually includes people

4    other than the Inspector General and myself.  The

5    deliberative process, the deliberative consultative

6    process that I have with the Inspector General includes

7    multiple conversations per day that are not meetings,

8    it's just an ongoing conversation.  As he has questions,

9    he will either call me into his office, he will use the

10   phone, he will send an e-mail and the topics could range

11   from an audit to a quarterly report to a question about a

12   news clip.

13        MR. BARATZ:  The deliberative process on

14   reorganization, which category did that fall into based

15   on what you just described?

16        THE WITNESS:  The discussion of the

17   reorganization was part of the general discussion about

18   management of the organization.  You can't really -- it's

19   like disentangling, you know, how much of your day do you

20   spend walking.  I mean, you walk at certain points

21   throughout the day.  You can't say I specifically spent

22   12 minutes walking today and 15 minutes sitting down

23   because it's interspersed.

24        MR. BARATZ:  So there were no scheduled

25   meetings?

1        THE WITNESS:  There were no scheduled meetings

2   with the IG, but none of my meetings with the IG are

3   scheduled, per se.

4        MR. BARATZ:  Were there any scheduled meetings

5   with anyone within the organization other than the one

6   you described with the General Counsel, Inspector

7   General, about reorganization?

8        THE WITNESS:  No.

9        MR. BARATZ:  So the one meeting that you had

10  about reorganization, which was on Friday, July 20th,

11  2007, which had you, the Inspector General and the

12  General Counsel was about notifying Ms. Burgess about her

13  termination?

14        THE WITNESS:  Yes.

15        MR. BARATZ:  The drawing that you --

16        MR. LEE:  Show it to Mr. Welker.

17        THE INVESTIGATOR:  And for the record, Ms. Cruz

18  has provided a copy from her notes from a meeting.  Looks

19  like it's dated June of 2007, Page 178, in her

20  handwriting are documented on the page.

21        MR. BARATZ:  When was the first time you

22  proposed to the Inspector General to terminate

23  Ms. Burgess?

24        THE WITNESS:  The specific termination of

25  Ms. Burgess, I believe I broached the subject about two

1    weeks prior to the actual termination.

2              MR. BARATZ:  And what did you say and what did

3    he say?

4              THE WITNESS:  I believe I briefed to him the

5    need to reorganize the division.  I felt that it would be

6    more efficient if we had one person doing it and we could

7    have a significant cost savings and I believed that OMB

8    would be a lot more willing to cooperate with us and

9    submit a budget request for the follow-on year if we

10    demonstrated that we were downsizing our administrative

11    and support staff in order to focus on audits and

12    inspections.  He concurred with that concept and I had

13    mentioned that that meant that I would need to terminate

14    Denise Burgess and he said -- and he was, you know,

15    wanted to make sure that I had a good reason for it.

16              And so his comment to me at the time was how is

17    the division going to operate with one person and so I

18    explained my view that if we had one person who was not a

19    manager, who was a line person who could handle media

20    requests, that we could continue to perform the function

21    adequately and meet our mission but with a smaller number

22    of people.  And he said if that's your decision and you

23    feel that that's the most appropriate way for the

24    organization to function effectively and you think it's

25    necessary, then I concur with it.  So he reviewed the

1   decision as presented by me and he concurred with it.

2          MR. BARATZ:  What was the basis for believing

3   that eliminating Public Affairs would make OMB more

4   favorable to your budget requests?

5          THE WITNESS:  It wasn't just Public Affairs.

6   At the time it was Public Affairs, Congressional Affairs

7   and the administrative staff that -- where the changes

8   were made, and the contracting.  I mean, there were four

9   different changes that were made and there was -- I

10  believe they were submitted for the record, a series of

11  e-mails that went back and forth in which OMB asked us

12  very specifically to provide backup information on how we

13  arrived at our numbers and there was a split between the

14  number of what we call core personnel, which are people

15  who do audits, inspections, investigations and write the

16  quarterly report, and support personnel, which are those

17  people who perform Congressional affairs, public affairs

18  or any extraneous non-mission, non-core mission areas.

19         MR. BARATZ:  What was the total amount of money

20  that this reorganization saved you?

21         THE WITNESS:  At the end of the day, it was --

22  the target was $2 million and at the end of the day we

23  came under budget and we did achieve the $2 million worth

24  of savings.

25         MR. BARATZ:  And --

1          THE INVESTIGATOR:  Let me make a comment here.

2    Your questioning's not out of line, but it's so very

3    detailed.  I'm just going to ask if you can condense it

4    somewhat knowing that we have to allow the other side to

5    ask questions and also have witnesses waiting outside.

6          MR. BARATZ:  And in this chart that you drew on

7    June 20 of 2007 --

8          THE WITNESS:  Um-hum.

9          MR. BARATZ:  -- it appears that Public Affairs

10   is still a separate department in at least those -- your

11   initial take and your initial thoughts, is that right?

12         THE WITNESS:  Um-hum.  It was one of the

13   options that was looked at, yes.  And that also has three

14   deputies, which is not what we ended up with.  What this

15   shows of the deliberative process is not a neat, clean

16   one.  I mean, at the time there were several options that

17   were looked at, there were several issues.

18         I think all this demonstrates is that on June

19   20th I began a process in which I evaluated several

20   different models in order to determine which would be the

21   most appropriate model.  I reviewed the existing Table 30

22   as provided by Janice Nisbet.  I reviewed a lot of the

23   documents that I had in my files, the old Table 30s, the

24   old organizational charts, and did a significant amount

25   analysis on my own to determine what recommendation I

1  would eventually make to the Inspector General.

2           MR. BARATZ:  At what point in your deliberative

3  process did you decide to eliminate Public Affairs?

4           THE WITNESS:  The final decision I made to the

5  Inspector General, roughly two weeks before I actually

6  executed the termination.

7           MR. BARATZ:  Did you have a file where you kept

8  all of the Table 30s and all of your analysis?

9           THE WITNESS:  I had a file at the time as I

10 worked through it, but once I was done and the decision

11 had been made, the file -- I mean, they were printouts.

12 I scribbled on the printouts once I was done.  Those were

13 all shredded.

14          MR. BARATZ:  Did you send Ms. Burgess an e-mail

15 on Friday, July 20th asking for a meeting on Monday?

16          THE WITNESS:  I did.

17          MR. BARATZ:  Has that e-mail been produced?

18          THE WITNESS:  I believe it was.  If it was

19 around.  I don't know that I kept it, but I did send the

20 e-mail on Friday asking her to see me on Monday because

21 on Friday I went into the Inspector General's office, we

22 called in the General Counsel, I briefed both the

23 Inspector General and the General Counsel on my desire to

24 inform Ms. Burgess on Monday that we were reorganizing

25 and her position would be eliminated.

1          MR. BARATZ:  That's after Ms. Burgess

2    complained to you about Ms. Redmon's termination on

3    Thursday, right?

4          THE WITNESS:  That was coincidental.

5          MR. BARATZ:  But that's correct, right?  This

6    whole timing, right, Thursday Ms. Burgess complains to

7    you about Ms. Redmon's termination, right?

8          THE WITNESS:  I believe that's the timing of

9    the e-mail, yes.

10         MR. BARATZ:  And not the e-mail, the oral

11   conversation you had?

12         THE WITNESS:  I believe that's what she said

13   and I won't dispute it.

14         MR. BARATZ:  And then on Friday you have a

15   meeting with the Inspector General and with the General

16   Counsel about Ms. Burgess's termination and how to notify

17   her?

18         THE WITNESS:  Right.

19         MR. BARATZ:  And then you're now saying that

20   you sent an e-mail on Friday about a meeting for Monday

21   but there's no e-mail in the record as of now.

22         THE WITNESS:  There should be an e-mail in the

23   record.  I think it's just a matter of us finding it, but

24   I don't -- I didn't keep a copy of it.

25         MS. BERNARDO:  Let me address that.  I have

1    never seen an e-mail -- seeing Ms. Burgess's response,

2    the inference being that there was a request for a

3    meeting.  I never -- it never came up.  We got -- to the

4    extent we had to produce --

5              THE INVESTIGATOR:  I don't see it in the

6    record.

7              MS. BERNARDO:  Yeah.

8              MR. BARATZ:  Just so that the record is clear

9    and I believe it's Page 301, there's no reference

10   whatsoever to some type of follow-up meeting.  It's

11   Ms. Burgess asking for a meeting and asking for a meeting

12   to discuss the serious concerns about the fairness and

13   equality of Ms. Redmon's termination.  That's the Monday

14   morning meeting now.

15             THE WITNESS:  I scheduled a meeting on Monday

16   to discuss with her her termination.

17             MR. BARATZ:  When did you schedule that

18   meeting?

19             THE WITNESS:  I scheduled it on Friday.  I

20   don't recall if it was via e-mail or via phone.  It

21   might've been via phone.

22             MR. BARATZ:  What was the -- what did you state

23   the purpose of the meeting to be?

24             THE WITNESS:  I did not state the purpose of

25   the meeting.  I said that I needed to have a meeting with

1    her and was she available that day to meet and I don't

2    recall exactly -- I don't know if she then notified me

3    that she might have a scheduling conflict and the time

4    might not be appropriate and I said that was fine,

5    whenever she could meet with me, we needed to meet on

6    Monday.  And part of the reason that I needed to meet on

7    Monday was because I was leaving for Baghdad that evening

8    and I needed to accomplish this in person.

9          MR. BARATZ:  And why you and why not the

10    Inspector General?

11          THE WITNESS:  Because I was her supervisor.

12          MR. BARATZ:  Thank you, Mr. Welker.

13          THE INVESTIGATOR:  Okay.

14          MR. BARATZ:  I have no further questions.

15          THE INVESTIGATOR:  All right.  Ms. Bernardo, if

16    you have any questions, you may ask them.

17          MS. BERNARDO:  Is there anything you want to

18    add?

19          THE WITNESS:  One thing that I will note is

20    that Kris Belisle had already been offered the job by the

21    time that I received the e-mail from Denise Burgess

22    regarding Patricia Redmon.

23          MS. BERNARDO:  Okay.

24          THE WITNESS:  And there's an e-mail on the file

25    from Kris Belisle on Friday confirming that she was

1  sending me her resume.

2         THE INVESTIGATOR:  I'll give you a chance if --

3  did you have any additional questions?

4         MS. BERNARDO:  No.

5         THE INVESTIGATOR:  Mr. Baratz.

6         MR. BARATZ:  When was Ms. Belisle hired?

7         THE WITNESS:  I had discussions with her that

8  week beginning, I believe it was Monday or Tuesday, where

9  I got in contact with her.  We had a phone conversation.

10  I indicated to her that we had a position for a Director

11  of Public Affairs, would she come back and work.  She

12  indicated to me that she would not work with SIGIR if

13  Denise Burgess were still employed in the Public Affairs

14  division because there had been a finding in the

15  organization that Denise had conducted herself in an

16  unprofessional manner and had harassed Kris Belisle.

17         And Kris Belisle reminded me of that and I was

18  aware of that because I had read the file in which

19  Ambassador Robin Raphael had counseled Denise Burgess for

20  her unprofessional conduct with Kris Belisle.  So I was

21  aware that there was a personality conflict between the

22  two of them and Kris informed me that the only conditions

23  under which she would come back to work for SIGIR or if

24  she was not working with Denise Burgess and I agreed and

25  I said that she would not be working with Denise Burgess.

1  And I asked her to forward her resume and she forwarded

2  her resume and I forwarded that to Nick Arnston, who was

3  the Chief of Staff and asked Nick Arnston to begin

4  processing the paperwork to bring Kris Belisle on.  And

5  my understanding is, I think Kris's first day was

6  Tuesday.

7        THE INVESTIGATOR:  I got to -- clarification.

8  You're saying Monday, Tuesday.  Is it the Monday that

9  you --

10        THE WITNESS:  The Monday that I notified --

11        THE INVESTIGATOR:  The Complainant that she --

12        MS. BERNARDO:  The 23rd of July, I believe.

13        THE INVESTIGATOR:  Okay.

14        THE WITNESS:  Yes.

15        MR. BARATZ:  And how did she come on?  Was she

16  a SIGIR employee or through the contractor?

17        THE WITNESS:  We wanted to bring her on as a

18  SIGIR employee, but because I needed someone literally

19  the day that I notified Denise that she would no longer

20  be employed as the head of Public Affairs, I needed

21  somebody who could immediately work and so the only way

22  to do that was to bring her on as a contractor, which we

23  occasionally do.  She was brought on as a contractor for

24  a brief period of time, as the paperwork was being

25  processed to return her to federal employment and so I

1   believe she was on contract for a period of about a month

2   and then she was converted to government employment.

3        MR. BARATZ:  And why did you need someone

4   immediately?

5        THE WITNESS:  Because my intention was to ask

6   Denise Burgess to spend that month on administrative

7   leave.  Again, I did not want her to have external

8   relations on behalf of the agency with the media after

9   being notified that she would be reorganized out of a job

10  and so I needed to somebody immediately able to answer

11  calls from the media.

12       MR. BARATZ:  I have no further questions.

13  Thank you, Mr. Welker.

14       THE INVESTIGATOR:  Ms. Bernardo, any additional

15  questions?

16       MS. BERNARDO:  No.

17       THE INVESTIGATOR:  Okay.  Ms. Burgess, if you

18  care to, interested in your rebuttal comments to Ms.

19  Cruz's testimony?

20       MS. BURGESS:  I don't have anything.

21  (Off the record.)

22  (On the record.)

23       THE INVESTIGATOR:  We are on the record.  It's

24  3:17.  We've been off the record maybe about 10 minutes

25  as we exchanged witnesses.  We have a new witness,