Exhibit 3

1    a text message.

2              THE INVESTIGATOR:  Okay, okay.

3              MS. HUHRA:  Sorry about that.  It's a true

4    emergency.

5              THE INVESTIGATOR:  Okay, fine.

6              MS. BERNARDO:  Could be any one of us.

7    (Whereupon,

8                        DENISE BURGESS

9    was called for questioning, and after having been first

10   duly sworn, was examined and testified as follows:)

11                        EXAMINATION

12             BY THE INVESTIGATOR:  Okay.  Ms. Burgess, state

13   your full name.

14             THE WITNESS:  My name is Denise Naomi Burgess.

15             THE INVESTIGATOR:  N-a-o-m-i?

16             THE WITNESS:  Yes.  I rarely use it.  It's

17   like --

18             THE INVESTIGATOR: Identify your race.

19             THE WITNESS:  I am Black American.

20             THE INVESTIGATOR:  Identify your national

21   origin.

22             THE WITNESS:  I was born in the United States.

23             THE INVESTIGATOR:  And identify your sex.

24             THE WITNESS:  I'm female.

25             THE INVESTIGATOR:  Describe the protected EEO

1    activity for which you alleged that management reprised

2    against you.

3           THE WITNESS:  I sent an e-mail message with

4    very explicit and very clear language, using terms that I

5    took directly from the EEO policy at SIGIR, and I was

6    complaining about the termination, both the termination

7    of my assistant, Patricia Redmon, which I felt was

8    racially motivated and discriminatory, and I was also

9    complaining about -- I believe that part of that

10   termination was also racially discriminatory toward me.

11          I might also add that I copied on that e-mail

12   message the appropriate people who would be involved in

13   any kind of discussion regarding discrimination within

14   the office.  That would be the attorneys.  I also copied

15   the head of HR.  I also copied the Chief of Staff and the

16   outgoing Director General, the previous Director General

17   who was still there.

18          THE INVESTIGATOR:  Do you recall the date of

19   that e-mail?

20          THE WITNESS:  The 23rd of July.

21          THE INVESTIGATOR:  I'm looking in the

22   investigative file for that so I can state its page

23   number for the record.  I'm going to hand you a -- it's

24   Page 301 of the investigative file and ask you, Ms.

25   Burgess, is this the e-mail that you're mentioning?

1        THE WITNESS:  That is the e-mail.

2        THE INVESTIGATOR:  What's the date and time on

3   that?

4        THE WITNESS:  The date and time is July 23rd,

5   2007, 9:47 a.m.

6        THE INVESTIGATOR:  Okay.  Does everyone have

7   that, they need to take a look?  The record indicates at

8   the time the alleged violation, you occupied the position

9   of Assistant IG Public Affairs SES-4/AD/301/00.  Is this

10  correct?

11        THE WITNESS:  That is correct.

12        THE INVESTIGATOR:  Briefly describe your duties

13  in that position.

14        THE WITNESS:  As the director of the Public

15  Affairs Office, my duties were to prepare strategic plans

16  and terms of public affairs for SIGIR.  I had also

17  responsibility for the media and when I say -- do you

18  want me to describe strategic planning, sort of looking

19  at, for example, SIGIR is putting, was putting together a

20  Lessons Learned book that would be published at some

21  point and so part of strategic planning is looking at how

22  do we garner the type of attention that we want for this

23  book, what audiences do we want to address the book, what

24  audiences do we want to -- that sort of duties.  Media

25  responsibilities, media management, as well as working

1  with Stuart in terms of his media appearances, you know,

2  critiquing the appearance, critiquing what was said,

3  following up on various articles and interacting with the

4  media.

5        THE INVESTIGATOR:  Excuse me.

6        THE WITNESS:  Yes.

7        THE INVESTIGATOR:  So Stuart is Stuart Bowen?

8        THE WITNESS:  Stuart Bowen, I'm sorry.

9        THE INVESTIGATOR:  The --

10        THE WITNESS:  Who is the SIGIR.

11        MR. WELKER:  Ms. Burgess, you got to speak one

12  at a time or otherwise the record --

13        THE WITNESS:  Oh, I'm sorry.  I'm sorry.  I

14  apologize.

15        THE INVESTIGATOR:  Okay.  But you were -- I

16  asked for a brief description of your duties in that

17  position.

18        THE WITNESS:  Um-hum.

19        THE INVESTIGATOR:  You've given me quite a bit.

20  Is there anything else?

21        THE WITNESS:  As part of my duties -- no,

22  that's -- you know, I supervised, also, the people in the

23  Public Affairs section.  I also traveled with the Special

24  Inspector General, Stuart Bowen.  That's the bulk of my

25  duty.

1          THE INVESTIGATOR:  How many people did you

2   supervise?

3          THE WITNESS:  Anywhere between -- during the

4   time I was there, at one point, three, and then three,

5   directly.  We had four in the section, but one was in

6   Baghdad and she came back.  But I wasn't supervising her

7   when she was in Baghdad.

8          THE INVESTIGATOR:  What's the breakdown of

9   which of those -- how many of those people were contract

10  personnel, how many were federal government employees?

11         THE WITNESS:  I think -- I could be wrong, but

12  I think I was the only federal employee in my section,

13  but I could be wrong about that.

14         THE INVESTIGATOR:  When were you first assigned

15  to that position?

16         THE WITNESS:  I accepted the job and started

17  working in the job in January but because I had come from

18  the Department of Defense, we were able to put me into

19  the job with a minimal amount of paperwork and start

20  working and then my paperwork came completely through on

21  February 4th, I believe it was.

22         THE INVESTIGATOR:  Of 2007?

23         THE WITNESS:  Of 2007, yes.

24         THE INVESTIGATOR:  Okay.  You mentioned you

25  began working in January.  Do you recall what date in

16

1    January?

2              THE WITNESS:  I believe it was the first week.

3    It was right after New Year's.

4              THE INVESTIGATOR:  Was your employment

5    scheduled to end?  In other words, was it a temporary

6    period of work?

7              THE WITNESS:  No, not to my understanding it

8    wasn't.

9              THE INVESTIGATOR:  And what is the name of the

10   organization to which you were assigned?

11             THE WITNESS:  The Special Inspector General for

12   Iraq Reconstruction.

13             THE INVESTIGATOR:  And then your public affairs

14   branch or section?

15             THE WITNESS:  Right, my section was the Public

16   Affairs.  I was the Assistant Inspector General for

17   Public Affairs.

18             THE INVESTIGATOR:  And were you in that section

19   during the whole period of your employment with SIGIR?

20             THE WITNESS:  Yes, I was.

21             THE INVESTIGATOR:  Now, at the time of the

22   alleged discrimination -- we'll look -- I think 20,

23   July 23, 2007, about that time period, with regard to

24   your first-level supervisor to whom you reported, what

25   was that person's name?

17

1          THE WITNESS:  You know, I reported both to

2   Ginger and Stuart, but I would say, you know, on a daily

3   basis, at that point in time, I was reporting more to

4   Ginger.

5          THE INVESTIGATOR:  And Ms. Cruz, what was her

6   job position/title?

7          THE WITNESS:  She was the Deputy Inspector

8   General.

9          THE INVESTIGATOR:  And Mr. Bowen, what was his

10  job position/title?

11         THE WITNESS:  He was the Inspector General.

12         THE INVESTIGATOR:  Okay.

13         THE WITNESS:  The Special Inspector General, to

14  be exact.

15         THE INVESTIGATOR:  So you responded to -- your

16  first-line supervisor was -- who was your second-line

17  supervisor?  The name.

18         THE WITNESS:  Those were the two supervisors,

19  Ginger and Stuart.

20         THE INVESTIGATOR:  I imagine Ms. Cruz probably

21  reported to Mr. Bowen?

22         THE WITNESS:  Right.

23         THE INVESTIGATOR:  To whom did Mr. Bowen report

24  to?

25         THE WITNESS:  He reports to the Secretary of

1   State and to the Secretary of Defense, to both.

2            THE INVESTIGATOR:  Do you know, does he report

3   more to -- does one do his performance appraisal and one

4   not?

5            THE WITNESS:  I don't even know if he gets a

6   performance appraisal, but -- and organization charts and

7   various things, that's what you see about the Inspector

8   General -- those two individuals.  And he had regular

9   meetings with them.

10           THE INVESTIGATOR:  Who do you believe is

11  responsible for the alleged discrimination?

12           THE WITNESS:  Ginger Cruz and Stuart Bowen.

13           THE INVESTIGATOR:  With regard to Ms. Cruz,

14  identify her race.

15           THE WITNESS:  She's white.

16           THE INVESTIGATOR:  And identify her national

17  origin.

18           THE WITNESS:  She's from Guam.

19           THE INVESTIGATOR:  And is her sex female?

20           THE WITNESS:  Yes, she is.

21           THE INVESTIGATOR:  With regard to Mr. Bowen,

22  identify his race.

23           THE WITNESS:  He's white.

24           THE INVESTIGATOR:  And identify his national

25  origin.

29

1          THE WITNESS:  He was born in the United States.

2          THE INVESTIGATOR:  And is his sex male?

3          THE WITNESS:  He is a male.

4          THE INVESTIGATOR:  Explain why you believe

5  Ms. Cruz is responsible for the alleged discrimination.

6          THE WITNESS:  There were a number of incidences

7  leading up to Patricia's termination and ultimately, my

8  termination.

9          THE INVESTIGATOR:  Patricia Redmon?

10          THE WITNESS:  Patricia Redmon, I'm sorry.

11  Patricia Redmon's termination and my termination, that

12  for me, became increasingly troublesome and to begin,

13  there was an incident at staff meeting where Ginger made

14  comments regarding people filing discrimination cases

15  which caused me great concern.  It raised flags for me

16  because it came out of the blue.

17          It seemed to be almost like a probe and the

18  comment specifically was that people who file EEO

19  complaints are weak links in the chain and looking for

20  excuses for their own personal failure.  I'm a black

21  woman.  EEO discrimination cases have often been

22  associated with Black Americans and so of course, for me,

23  it raised a flag and I thought why are you saying this to

24  me, what does this mean?  But it was just a flag.

25  Subsequent events --

```
 1              THE INVESTIGATOR:  Let me --

 2              THE WITNESS:  Yes.

 3              THE INVESTIGATOR:  Before we leave that, when

 4   did that occur?  Do you recall the date?

 5              THE WITNESS:  It occurred not too long after

 6   Ginger had arrived and I'm sorry, I don't have a date for

 7   you.  Dates -- it's been so long.  It was --

 8              THE INVESTIGATOR:  Do you recall the month,

 9   maybe?

10              THE WITNESS:  It was in the spring, I can say

11   that much.

12              THE INVESTIGATOR:  So you arrived in --

13              THE WITNESS:  It was just after she arrived,

14   yeah.

15              THE INVESTIGATOR:  You arrived in the

16   organization prior to Ms. Cruz's arrival?

17              THE WITNESS:  Yes.  Prior to her return.  She

18   had worked for SIGIR before.

19              THE INVESTIGATOR:  You were going to talk about

20   other instances.

21              THE WITNESS:  Oh.  And so again, a flag was

22   raised and those comments, for me, you know, just sort of

23   threw me and I thought what is going on here?  But, you

24   know, let's wait and see, let's work it out.  The next

25   incident that -- and I'm not sure if I've got these all
```

1   in the right chronology, but another incident that took

2   place was -- well, in particular, the way Patricia

3   Redmon, my assistant, who is Black American, was

4   addressed.  Patricia's name is Patricia.  It's not Pat,

5   it's not anything other than Patricia.  And I understand

6   there is a normal tendency for everybody to use the

7   diminutive of someone's name, you know, hey, Bill.

8          But if that person corrects you and says my

9   name is William, then you show them the respect of

10  addressing them by the name which they have asked you to

11  address them.  This occurred not once, not twice, not

12  three times, four times.  For me and for all Black

13  Americans -- and I think that's a show of disrespect to

14  anyone, but for Black Americans, it's a particular sign.

15         THE INVESTIGATOR:  Did you overhear the

16  incident when she was referred to as Pat rather than

17  Patricia?

18         THE WITNESS:  She referred to her as Pat to me

19  and I corrected her.  She referred to Patricia as Pat and

20  Patricia said I'm sorry, I go by the name Patricia and

21  Ginger was very annoyed and after Ginger -- this was

22  reported to me.  You can talk to Patricia about this

23  particular instance and the colleague sitting in the

24  room, you know, basically told her oh, don't -- you know,

25  you're going to get fired.  Well, I'm sorry, if demanding

1    that you be called by your own name gets you fired, to

2    me, that's just completely unacceptable.  It has such

3    racial overtones.

4              THE INVESTIGATOR:  The colleague that made the

5    statement you're going to get fired, to whom were they

6    talking?

7              THE WITNESS:  To Patricia.  That troubled me

8    greatly, I must say, again.  And that was more than a

9    flag at that point, but I was pretty determined to, you

10   know, put my head down, do my job, you know, and get

11   along, just make it work.  You know, I don't have to be

12   your best friend for us to work together and for you to

13   do a good job and me to do a good job and the two of us

14   together to complete the mission.

15             Another instance that came about, again,

16   undercutting my authority, undercutting my authority to

17   the people that I work with which, again, is just so

18   classically -- I hate to use the word because it's just a

19   terrible word and it's a terrible accusation, but it's so

20   classically racist to undercut someone's authority.  I

21   have been in management many, many times and when I have

22   an individual who works with the media, that's the person

23   who interacts with the media.  If they come to me, I send

24   them to the person that works with the media.  I don't

25   undercut them.  And if I have to, if I have to be

1  involved in some way, I bring that person in, as well.

2  There was a particular incident when -- and I have notes

3  at home, I'll have to dig them out, but there was a

4  particular incident where Stuart was at the beach and a

5  reporter was calling on deadline and I spoke with her and

6  she called Ginger and Ginger basically never contacted me

7  and told me that she'd spoken with the reporter, never

8  closed the loop with me, never told me the reporter had

9  spoken to Stuart and basically, just completely undercut

10 my authority.  What was the subsequent result of that?

11 The subsequent result of that is that this reporter, who

12 worked for the Washington Post, essentially no longer

13 felt that she needed to deal with me, why should she?

14         THE INVESTIGATOR:   You mentioned Stuart Bowen

15 as at the beach?

16         THE WITNESS:  Yeah, he was on vacation and one

17 of our reports, they wanted to discuss one of our reports

18 that was being issued and they wanted some comments from

19 him.

20         THE INVESTIGATOR:  And when did that happen?

21         THE WITNESS:  It was in the summer.  I'm sorry,

22 I -- as I said, I can go dig my notes out, but it was

23 definitely in the summer because he was at the beach with

24 his family.

25         THE INVESTIGATOR:  How close was it to

```
 1  July 23rd, would you say?

 2          THE WITNESS:  Well, it would have to be fairly

 3  close because it was in the summer.  It was beach

 4  weather, so it would've been, you know, June or July.

 5          THE INVESTIGATOR:  Okay.

 6          THE WITNESS:  I'm sorry.  I wish I was better

 7  at dates for you, but it's also -- you know, it's been a

 8  year, so --

 9          THE INVESTIGATOR:  Okay.  So again, I asked why

10  do you believe Ms. Cruz --

11          THE WITNESS:  Um-hum.

12          THE INVESTIGATOR:  -- is responsible for the

13  alleged discrimination?

14          THE WITNESS:  Um-hum.

15          THE INVESTIGATOR:  Continue.

16          THE WITNESS:  There was also an incident where

17  my authority was undercut with my colleagues.  And again,

18  these are classic tactics.  Mr. Bowen had asked me to --

19  we release a report every quarter.  There's generally

20  high media interest and the procedures for releasing a

21  report, you know, gets released on the website, et

22  cetera, was -- had gotten muddied up and so Mr. Bowen

23  asked me to try and come up with a set of recommendations

24  as to how we would release the next report.  The

25  assignment was given to me, specifically.  I went ahead
```

25

1  and consulted with my colleagues, other AIGs, about, you

2  know, where would problems be created for you, what would

3  be your best set of rules.  I came up with a draft set of

4  recommendations as to how we would proceed, sent them

5  around to everyone for comment.  We had a meeting and we

6  realized there were some -- there were still some sticky

7  wickets.

8        There were still, you know, certain sections

9  that couldn't work within those constraints and we came

10  up with some other problems with why certain rules

11  wouldn't work.  So I redrafted, taking in everybody's

12  considerations, redrafted them, came up with a new set

13  and sent them out for comment and said, you know, please

14  get back to me by X date and I think X date was a Monday.

15        I had off, I think it was a Thursday and a

16  Friday and I came back to the office and Ginger had taken

17  the old set and just issued them as the rules.  And you

18  know, my colleagues came to me and said what happened?  I

19  thought you were handling this.  More than once I've been

20  cut out of the media loop.  The one example I gave you

21  was one example.  I believe I still have an e-mail where

22  one of my colleagues actually says, you know, why weren't

23  you brought in on this?

24        THE INVESTIGATOR:  Did you talk to Ms. Cruz

25  about that incident?

1          THE WITNESS:  I did not, because I was trying

2    very hard at that point to not be confrontational.  I'm

3    not a confrontational person.  I was just trying to get

4    along and do my job.

5          THE INVESTIGATOR:  Okay.  Are there other

6    instances where Ms. Cruz allegedly discriminated against

7    you?

8          THE WITNESS:  Those were what come to my -- oh,

9    and then, of course, when we had -- Kris Belisle.  Kris

10   and I had many discussions regarding the fact that

11   interviews with Stuart needed to come through me first

12   and I explained to her that the reason that was, was

13   because we need to consider whether or not he should do

14   the interview.

15          And I'm, you know, happy to consult, but in the

16   end, it has to go through me first so that I can say

17   yeah, he should do it or this is why it's a bad idea not

18   to do it and to be able to present it to him, having

19   already done whatever necessary research might need to be

20   done; it's a reporter we don't know or a story we don't

21   know, et cetera.  We've been over this turf many times.

22   I receive an e-mail from Stuart, who was out in Baghdad

23   at this point, coming back to me and saying -- and he

24   basically forwarded to me an e-mail Kris sent to him.

25          THE INVESTIGATOR:  Kris?

1          THE WITNESS:  Belisle.

2          THE INVESTIGATOR:  Okay.

3          THE WITNESS:  Who essentially said I was

4  talking to a reporter and they wanted you, Stuart Bowen,

5  to comment on General Kicklighter being nominated to be

6  the Inspector General in the Pentagon and that's a

7  perfect example as to why this needed to come to me

8  first.  Okay, it's inappropriate for one IG to be

9  commenting on his colleague and whether the colleague

10  should be in the job or not be in the job, particularly

11  given the fact that many of the programs that our

12  operation are investigating were contracted out by DoD.

13  It's just too messy, too muddy.  You don't get into that.

14  It's just not appropriate.  Kris's e-mail said I was

15  talking to Ginger and she thought that I should talk to

16  you.  No, you should talk to me.  And as I said again,

17  Ms. Belisle and I have been over this turf many times.

18          THE INVESTIGATOR:  And when about did this

19  happen, what month?

20          THE WITNESS:  Trying to think.  The e-mail

21  would have the date on it.

22          THE INVESTIGATOR:  Now, I'm thinking it's

23  pretty early in 2007.  Ms. Belisle left employment.

24          THE WITNESS:  Right.  And he was in Baghdad, so

25  probably -- it was probably within the first three

1    months.  It was before I went to Paris because I was

2    arranging the Paris trip --

3               THE INVESTIGATOR:  Um-hum.

4               THE WITNESS:  -- and I was in the office that

5    Saturday, excuse me, when I saw this e-mail and I, of

6    course, wrote back to Stuart and said there is no way you

7    should be making comments to the press on another

8    proposed IG and furthermore, you don't know what's in

9    this guy's background.  It just is a bad move.

10              THE INVESTIGATOR:  Okay.  Do you have some

11   information?

12              MR. WELKER:  The e-mail that Ms. Burgess was

13   just referring to is in the record.  I didn't know if you

14   wanted to --

15              THE INVESTIGATOR:  Okay.  Could you, perhaps,

16   give the date?

17              MR. WELKER:  The date of the e-mail is

18   March 2nd, 2007.  It's from --

19              MS. BERNARDO:  How do you have them numbered?

20              MR. WELKER:  Tab 10.

21              MS. BERNARDO:  Okay.

22              THE WITNESS:  There is a consistent pattern

23   here.  It was a pattern that I --

24              MR. WELKER:  So the original e-mail from

25   Kristine Belisle to Stuart Bowen with a copy to

1  Ginger Cruz and Denise Burgess is dated on March 2nd,

2  2007, at the bottom of the page.  And then Ms. Burgess

3  follows up by forwarding the message at the top of the

4  page with the Saturday, March 3rd, 2007 e-mail to

5  Stuart Bowen.

6              THE INVESTIGATOR:  Before you begin, allow me a

7  minute to --

8              THE WITNESS:  Sure.

9              THE INVESTIGATOR:  Okay.  For the record, in

10  the investigative file, it's on Page 254 and also appears

11  to be 255 and 56.  Okay, please continue.

12              THE WITNESS:  At that point, to me, there was a

13  very consistent pattern of discriminatory behavior,

14  frankly.  However, it was behavior that I was doing my

15  best to tolerate because I wanted to keep my job, I liked

16  my job, I was good at my job.  For me, the final straw

17  came when Patricia was terminated.

18              Patricia was terminated -- if you want my read

19  of this, Patricia was terminated.  I felt her termination

20  was racially motivated.  Patricia is, as you will see, is

21  a well-spoken, well-educated black woman who clearly

22  didn't know her place because she demanded to be called

23  by her right name.  When Patricia was terminated, when we

24  had the meeting, I raised the issue that I felt that I

25  was being targeted, that Patricia was being targeted,

1  that our section, which consisted of only two African

2  American women, were being targeted.  And I used that

3  exact language.  I was terminated that Monday after I

4  sent an e-mail.  Over the weekend, I though about it and

5  I said you know, it's one thing to just put up with

6  people's racism; it's another thing when people start

7  losing their jobs over this.

8          So I decided I would send the e-mail and you

9  know, Mr. Welker, that was not, as I said to you, was not

10  an easy decision for me.  I am not confrontational.  It's

11  just not in my nature to be confrontational.  And this

12  is, as I'm sure you're well aware because you work in

13  this business and you see it every day, it's very painful

14  and it's very ugly.  And you know, I would do almost

15  anything not to be sitting here, but that was just --

16  that was one step too far.  And then the comments in my

17  termination meeting were just appalling.

18          The right mix of people.  I was told that part

19  of the reason I was being terminated is that SIGIR

20  required the right mix of people.  However, that could

21  not be defined in any manner and I asked for specific

22  criteria used to determine who the right mix of people

23  would be and I was never given any criteria.  I was told

24  it was an internal deliberation and I made very clear

25  that I was not interested, at all, in the deliberative

1   specifics.  What I wanted was criteria.  Was the criteria

2   you have to have a master's degree, was the criteria that

3   you have to have had X number of years working with the

4   press, what was the criteria that SIGIR uses to determine

5   who the right mix of people would be?  And frankly, if

6   you can't answer that question, what it tells me is that

7   there's a reason you can't answer that question and the

8   reason is because the right mix of people has to do with

9   race.  And certainly, no one is going to admit to that.

10          THE INVESTIGATOR:  By hearing that statement --

11          THE WITNESS:  Um-hum.

12          THE INVESTIGATOR:  -- was there anything else

13   associated which caused you to believe that she meant a

14   racial thing by that?

15          THE WITNESS:  Everything leading up to it.

16   That was icing on the cake, frankly.  I mean, it was just

17   stunning to me and I was not going to make any

18   assumptions.  That was what my very first question was,

19   what is the criteria that you are using to determine who

20   the right people are.

21          THE INVESTIGATOR:  Are there other instances of

22   alleged discrimination by Ms. Cruz?

23          THE WITNESS:  Nothing's popping to my brain at

24   the moment.

25          THE INVESTIGATOR:  I'll move on to my next

1    question and maybe some other items will come.  With

2    regard to Mr. Bowen, why do you believe that he's

3    responsible for the alleged discrimination?

4             THE WITNESS:  Because Mr. Bowen is the head of

5    the organization and he had to sanction this.  And as the

6    head of the organization and as the person who sanctioned

7    it, he, too, is culpable.

8             THE INVESTIGATOR:  Did he do anything on his

9    own, separate from what you've already related, in

10   addition to what you're alleging Ms. Cruz did?

11            THE WITNESS:  No.

12            THE INVESTIGATOR:  Who hired you for the

13   position that you held?

14            THE WITNESS:  Ambassador Raphael and

15   Stuart Bowen.

16            THE INVESTIGATOR:  Mr. Bowen.  Did he interview

17   you prior to hiring you?

18            THE WITNESS:  Yes, he did.

19            THE INVESTIGATOR:  Was it a face-to-face

20   interview?

21            THE WITNESS:  Yes, it was.

22            THE INVESTIGATOR:  Explain why the person who

23   would hire you, Mr. Bowen in this case, would later

24   harass and terminate you because of your race, national

25   origin or sex?  Seeing that he knew of those aspects of

1    you.

2            THE WITNESS:  Can you repeat the question?  I

3    didn't hear it.

4            THE INVESTIGATOR:  Yeah.  Explain why the

5    person who hired you, Stuart Bowen --

6            THE WITNESS:  Um-hum.

7            THE INVESTIGATOR:  -- would later harass and

8    terminate you because of your race, national origin or

9    sex.

10           THE WITNESS:  You know, I have to be honest

11   with you.  I, for me, I couldn't understand why Stuart

12   would allow this.  This is a man who told me I was doing

13   a great job, that he liked working with me and who had,

14   within weeks of my dismissal, assured me that I would be

15   with SIGIR, and I quote, "for the duration," meaning for

16   as long as SIGIR was in existence.

17           THE INVESTIGATOR:  Is there any documentary

18   evidence such as an e-mail that supports his stating that

19   to you?

20           THE WITNESS:  Not that supports stating that to

21   me, but there's certainly plenty of documentary evidence

22   as to my work performance.  I was given a Certain of

23   Appreciation when I left, on my last day, and that

24   certificate clearly, clearly says that I did an

25   outstanding job, if I'm not mistaken, the work

1  outstanding is in there.  In addition, mere weeks before

2  I was dismissed, I received an $8,500 bonus for

3  outstanding work along with a letter of commendation from

4  Mr. Bowen, Stuart Bowen, himself, commending me on my

5  performance.

6           THE INVESTIGATOR:  What management members had

7  knowledge of your previous protected EEO activity?  I

8  believe it was complaining about Ms. Redmon's

9  termination.

10          THE WITNESS:  Before Monday?

11          THE INVESTIGATOR:  Well --

12          THE WITNESS:  Or --

13          THE INVESTIGATOR:  -- you filed a complaint and

14  I think it's -- you made a complaint, I think it's in an

15  e-mail, about your dissatisfaction with -- feeling of

16  unfairness, equality of Ms. Redmon's termination and you

17  might have stated it verbally, too.  I don't -- I'm not

18  sure.  What management officials were aware of your

19  complaining in one way or another?

20          THE WITNESS:  No other management officials.  I

21  complained verbally on Thursday when I was informed of

22  the decision, by Ms. Cruz, and I complained verbally to

23  her, directly, and the following Monday, I sent an e-mail

24  message in which I copied the appropriate management

25  officials.

```
 1              THE INVESTIGATOR:  Again, for the record,

 2   that's Page 301 of the investigative file.  And as I look

 3   at that, I see it was sent to -- well, actually this one

 4   from you to you, but also -- let's see.  I think cc is

 5   Mr. Bowen; Ms. Raphael; Mr. Acken; Mr. --

 6              THE WITNESS:  He is also --

 7              THE INVESTIGATOR:  -- Martel; Mr. Bower, James

 8   Bowers; Nick Arnston; Janice Nisbet.

 9              THE WITNESS:  Correct.

10              THE INVESTIGATOR:  Those individuals, they

11   received this e-mail message.  Had you spoken with them

12   prior to that or --

13              THE WITNESS:  No.

14              THE INVESTIGATOR:  So that was their first

15   indication that you were dissatisfied with Ms. Redmon's

16   termination?

17              THE WITNESS:  Yes.

18              THE INVESTIGATOR:  What adverse employment

19   actions are you alleging occurred because of management's

20   knowledge of your complaint?

21              THE WITNESS:  I was terminated.

22              THE INVESTIGATOR:  Anything in addition to

23   that?

24              THE WITNESS:  Well, not in terms of employment,

25   no, but my reputation has been, for lack of a better
```

1  word, trashed.  But I'm not sure that fits into that

2  question.

3         THE INVESTIGATOR:  What evidence do you offer

4  in support of your claim that management reprised against

5  you because of that complaint?

6         THE WITNESS:  I offer the e-mail as evidence.

7  I had a discussion with Ginger on Thursday regarding

8  Patricia's termination.  I made clear my complete

9  disagreement with it.  I made clear that I felt that I

10  was being targeted, that Patricia was being targeted and

11  that our section, consisting of only two African American

12  women, was being targeted.

13         I then wrote an e-mail in which I asked to have

14  the appropriate management people who would need to be at

15  a table to talk about discriminatory action.  I sent the

16  e-mail; within hours, I was terminated.  When I had my

17  discussion with Ginger on Thursday, one of the questions

18  I asked was how am I supposed to do this without

19  somebody, an assistant?

20         If I'm off with Mr. Bowen at an interview,

21  who's answering the phone?  How is this going to work?

22  And her answer to me was we're all going to help you.

23  Mr. Bowen, the AIGs, don't worry, we'll take care of it.

24  You'll have enough help to get things done.  So clearly,

25  there was no thought at that point that I wasn't going to

1  be there on Monday and on Monday, I come into the office,

2  having sent this e-mail, and within hours, I'm

3  terminated.

4          THE INVESTIGATOR:  Describe what occurred --

5  and it's regarding the one claim -- that on March 2nd,

6  2007, when Ms. Belisle, your former Special Inspector

7  General for Iraq Reconstruction Special Inspector General

8  for Iraq Reconstruction deputy, at the direction of

9  Ms. Cruz, allegedly challenged your authority.

10          THE WITNESS:  I think that was -- is that the

11  date of the e-mail?

12          MR. WELKER:  Mr. Welker, you referred earlier

13  to Page 254 of the record.

14          THE INVESTIGATOR:  Right.

15          MS. BERNARDO:  This is your Exhibit 10, right?

16          MR. WELKER:  Yes, which is Exhibit 10.

17          THE INVESTIGATOR:  Oh, okay.

18          MS. BERNARDO:  Thanks.

19          THE INVESTIGATOR:  Okay.  So that is what you

20  previously discussed.

21          THE WITNESS:  Um-hum.

22          THE INVESTIGATOR:  It's documented in that --

23          THE WITNESS:  Yes, sir.

24          THE INVESTIGATOR:  -- e-mail.  That was the

25  challenge to your authority by the direction of Ms. Cruz,

28

1    okay.

2                MR. WELKER:  Give a verbal answer, Ms. Burgess.

3                THE WITNESS:  Yes.  I'm sorry.

4                THE INVESTIGATOR:  Explain why you believe that

5    that discrimination was because of your race.

6                THE WITNESS:  Which?

7                THE INVESTIGATOR:  This -- the challenging of

8    your authority by Ms. Cruz allegedly directing

9    Ms. Belisle to take action and bypassing you, I believe.

10   Why do you think that was done because of your race?

11               THE WITNESS:  At the time, I did not look at

12   that and say oh, my goodness, this is racially motivated,

13   but as instance upon instance kept mounting, it became

14   clear to me that undercutting my authority was a way to

15   diminish me.

16               THE INVESTIGATOR:  Okay.  Would you give the

17   same response -- I was going to ask you --

18               THE WITNESS:  Um-hum.

19               THE INVESTIGATOR:  -- with regard to why was it

20   discrimination because of national origin or your sex.

21   Would you give substantially the same response or --

22               THE WITNESS:  Yes.

23               THE INVESTIGATOR:  -- anything different?

24   Okay.

25               THE WITNESS:  You know, when I say diminish me,

1  diminish me because I'm a black person who clearly

2  doesn't know her place.

3         THE INVESTIGATOR:  Describe what occurred on or

4  about May 2007 when Ms. Cruz, without consultation with

5  you, allegedly took over an assignment that the Inspector

6  General had given to you.

7         THE WITNESS:  That was the assignment where I

8  was putting together the new regulations on how we would

9  send out the quarterly report.

10         THE INVESTIGATOR:  Again, explain why you

11  believe that that discrimination occurred because of your

12  race, national origin or sex.

13         THE WITNESS:  Again, this is behavior that was

14  only exhibited toward me.  I was the only minority in

15  senior staff and this is -- you know, having been black

16  all my life, you know, this is classic, classic behavior.

17         THE INVESTIGATOR:  Describe what occurred on

18  July 2007 when Ms. Cruz allegedly targeted you and your

19  staff for termination when equivalent unit had four full-

20  time staff members and was slated for no reductions.

21         THE WITNESS:  Ginger came to my office to tell

22  me that she had bad news and that she decided she was

23  going to terminate Patricia Redmon, my assistant.  When I

24  came aboard SIGIR, Congressional Affairs and Public

25  Affairs were one office.  That office was split because

1  there was an anticipation that there would be a lot more

2  Congressional testimony, which there was.  I was hired as

3  the AIG for Public Affairs; Marthena Cowart was hired as

4  the AIG for Congressional Affairs.  The two sections were

5  meant to be staffed equally and the workload was more or

6  less equal.  Not equal in terms of day to day because, of

7  course, the Congressional side goes with the

8  Congressional cycle.

9          Obviously, not a whole lot of stuff when, you

10  know, the real heavy period is.  You're writing testimony

11  and you know, when -- but pretty much, you know, in my

12  opinion, the workloads were fairly equal.  When Ginger

13  came to tell me that she was dismissing my assistant, my

14  first question, because we needed budget cuts and as a

15  result, Patricia was being -- my first question was well,

16  who's being let go on the sister side because clearly,

17  that office, with the equivalent workload of my office,

18  has many more staff.

19          In fact, that office had two SES.  So I didn't

20  understand what kind of logic there was to eliminating

21  somebody who's at a staff level position rather than

22  eliminating somebody at an SES position if your

23  motivation is to save money.  It just didn't make logical

24  sense.  See, and I -- you know, answering the question of

25  why do you think things are racially motivated, often

1   times you look at the full range of why something

2   might've happened and sometimes it's just through a

3   process of elimination that you come to realize that

4   there's nothing left.  Now, I'm not saying that's in this

5   case, but that certainly sprung to my mind there.  It's

6   like this is completely illogical, so what's the real

7   reason behind this?  Because clearly, what you're telling

8   me isn't.

9             MR. WELKER:  Mr. Welker, may we take a break in

10  the near future?  I don't want to interrupt your line of

11  questioning, but --

12             (Off the record.)

13             (On the record.)

14             THE INVESTIGATOR:  The time is 11:26.  We were

15  off the record for eleven minutes as we took a needed

16  break, and we'll continue with the questioning of the

17  Complainant.  You mentioned -- you kind of made a

18  comparison with your public affairs with the

19  Congressional section and is it correct, did you have,

20  counting yourself, two individuals in the public affairs

21  section?

22             THE WITNESS:  At that time, yes.

23             THE INVESTIGATOR:  That time being July?

24             THE WITNESS:  Yes.

25             THE INVESTIGATOR:  Okay.

1              THE WITNESS:  We actually, on the books, had

2      three, but one person in the section was in the hospital.

3              THE INVESTIGATOR:  Oh.  Yourself --

4              THE WITNESS:  And then we had --

5              THE INVESTIGATOR:  The two people at the time,

6      yourself and Ms. Redmon?

7              THE WITNESS:  Myself and Patricia Redmon.

8              THE INVESTIGATOR:  Yeah, let me -- make sure --

9              THE WITNESS:  Oh, I'm sorry.

10             THE INVESTIGATOR:  -- I'm done talking.

11             THE WITNESS:  I'm talking with you rather than,

12     yeah, one at a time.

13             THE INVESTIGATOR:  Now, the Congressional

14     section, how many people were in that section?

15             THE WITNESS:  Congressional section had four

16     people.

17             THE INVESTIGATOR:  What were the races of those

18     people?

19             THE WITNESS:  The two SES were white, the

20     deputy was white and the staff assistant was black.

21             THE INVESTIGATOR:  And what were the sexes of

22     those people?

23             THE WITNESS:  There was a male and a female SES

24     and the deputy was a male.

25             THE INVESTIGATOR:  And that leaves another

33

1    person.

2            THE WITNESS:  Oh, I'm sorry.  The staff

3    assistant was a female.

4            THE INVESTIGATOR:  Do you know -- are you able

5    to tell the national origins of those four people?

6            THE WITNESS:  I'm pretty certain they were all

7    born in the United States.

8            THE INVESTIGATOR:  Describe what occurred from

9    June 2007 through July 2007 when Ms. Cruz allegedly

10   delayed hiring staff into your section, forcing you to

11   accomplish work previously done by two full-time

12   individuals.

13           THE WITNESS:  We had selected someone for the

14   deputy position.  We had been interviewing for some time

15   and Ginger decided to put that on hold.

16           THE INVESTIGATOR:  This would've been a deputy

17   to you?

18           THE WITNESS:  Yes.

19           THE INVESTIGATOR:  And did she tell you why it

20   was being put on hold?

21           THE WITNESS:  Because she had been away from

22   SIGIR for a while, but she'd been there before, and

23   wanted to just sort of familiarize herself where

24   everybody and everything was.

25           THE INVESTIGATOR:  This is the person who's

34

1  going to be hired?

2           THE WITNESS:  Um-hum.

3           THE INVESTIGATOR:  Is that Ms. Belisle?

4           THE WITNESS:  No, that was David Mays.

5           THE INVESTIGATOR:  Okay.  M-a-y-s?

6           THE WITNESS:  Y-s, I believe.

7           THE INVESTIGATOR:  Was Mr. Mays ever hired?

8           THE WITNESS:  No, he was not.

9           THE INVESTIGATOR:  Do you know why he was not

10  hired?

11          THE WITNESS:  No, I don't.

12          THE INVESTIGATOR:  Could the reason for the

13  agency having delayed hiring staff in your section have

14  been because of the impending reorganization that would

15  abolish your section?

16          THE WITNESS:  No, because there was no official

17  reorganization.  Reorganization was used as a loose term

18  at that point.  There had been no management meetings

19  about any kind of formal reorganization.  There were no

20  discussions with the management team about a

21  reorganization, a formal reorganization.  No.

22          THE INVESTIGATOR:  And I'd ask -- I said that

23  would abolish your section.  Was your section abolished

24  or did it still exist even after your departure?

25          THE WITNESS:  I was told my -- when I was

45

1  terminated, I was told my section was being abolished,

2  but SIGIR had already hired someone to take my position.

3          THE INVESTIGATOR:  And who was that?

4          THE WITNESS:  That was Kris Belisle.

5          THE INVESTIGATOR:  When was Ms. Belisle hired?

6          THE WITNESS:  I don't know.

7          THE INVESTIGATOR:  Describe what occurred from

8  June 2007 through July 2007 when allegedly Ms. Cruz

9  exclusively reviewed your time and attendance records in

10  hope of finding irregularities.

11         THE WITNESS:  I was told by three people in the

12  office that my time and attendance was being reviewed to

13  see if some -- you know, as a gotcha, to see if there

14  would be irregularities, overtime claimed where it hadn't

15  been worked, et cetera.

16         THE INVESTIGATOR:  Who were these three people?

17         THE WITNESS:  Nick Arnston, Robin Raphael.  I'm

18  trying to remember who the third person was.  I know

19  there were three people who came to me.  I can't recall

20  who the third person was.

21         THE INVESTIGATOR:  Robin Raphael, what was her

22  position and title?

23         THE WITNESS:  Deputy Inspector General.

24         THE INVESTIGATOR:  Correct me if I'm wrong.

25  Didn't Ms. Cruz replace her?

1    THE WITNESS:   Yes.   But Robin had submitted her

2   resignation for a particular date and Ginger had been

3   made the new Deputy Inspector General and Robin was still

4   in the office.

5          THE INVESTIGATOR:   Okay.

6          THE WITNESS:   I don't have all the exact dates,

7   sorry.

8          THE INVESTIGATOR:   Do you know how long

9   Ms. Raphael worked after Ms. Cruz had been hired?

10          THE WITNESS:   After she had been made Deputy

11   Inspector General?

12          THE INVESTIGATOR:   Right.

13          THE WITNESS:   I don't know.

14          THE INVESTIGATOR:   How did these individuals

15   have knowledge that Ms. Cruz was looking at your time and

16   attendance records?

17          THE WITNESS:   I don't know.

18          THE INVESTIGATOR:   Do you have any other

19   evidence that Ms. Cruz did that?

20          THE WITNESS:   No, sir.

21          THE INVESTIGATOR:   Did Ms. Cruz find any

22   irregularities and if so, what occurred as a result?

23          THE WITNESS:   Not to my knowledge.

24          THE INVESTIGATOR:   Did Ms. Cruz ever discuss

25   with you that she had looked at your records?

```
 1              THE WITNESS:  Not to my knowledge.

 2              THE INVESTIGATOR:  Did anyone from the agency

 3   give you any indication of a restructure coming along

 4   prior to Ms. Redmon's termination?

 5              THE WITNESS:  No.

 6              THE INVESTIGATOR:  There was no discussion of

 7   any type this was a possible --

 8              THE WITNESS:  The only discussion of any kind

 9   of restructuring had more to do with the people out in

10   Baghdad because SIGIR's footprint was being made smaller

11   because of the number of seats.

12              THE INVESTIGATOR:  Describe what occurred in

13   July 2007 when Ms. Cruz allegedly isolated you from the

14   consultative process regarding media activities.

15              THE WITNESS:  Well, there was the first

16   instance where -- when Stuart was at the beach and the

17   Washington Post reporter was looking for information.

18   There was another incident, the one where -- a second

19   where I got an e-mail from -- I didn't even know.  I got

20   an e-mail from someone else in the office who copied me

21   on the e-mail string and said shouldn't you be involved

22   in this?  I'll have to go and dig it out because I'm

23   pretty sure I have most of the e-mails.

24              THE INVESTIGATOR:  Could that action of

25   isolating you from the consultative process, could it
```

1    have occurred because of an impending reorganization

2    where your section would no longer be there, so maybe

3    they're already funneling work to someone else?

4              THE WITNESS:  No.

5              THE INVESTIGATOR:  Earlier on, you discussed

6    when Ms. Cruz insisted on addressing Ms. Redmon with the

7    name Pat rather than Patricia -- and I'm not sure if you

8    mentioned it, but what was Ms. Redmon's response that you

9    observed or heard about to being called Pat?

10             THE WITNESS:  The first time?

11             THE INVESTIGATOR:  The total.

12             THE WITNESS:  Patricia's response is my name is

13   Patricia.  I don't go by Pat.

14             THE INVESTIGATOR:  Did she state that to

15   Ms. Cruz?

16             THE WITNESS:  Yes.  I did, as well.

17             THE INVESTIGATOR:  And did you observe any

18   other reactions by Ms. Redmon?

19             THE WITNESS:  No.

20             THE INVESTIGATOR:  What was Ms. Cruz's response

21   when Ms. Redmon told her that?

22             THE WITNESS:  I don't know what Ginger's

23   response was when she -- I can speak to what her response

24   was when I corrected her.

25             THE INVESTIGATOR:  And what was that response?

1          THE WITNESS:  And the response was annoyance,

2   pursed lips, like, you know -- I'm sorry.  I don't know

3   how you describe that.

4          THE INVESTIGATOR:  For the record, you're

5   showing a face of that you believe to be annoyance, I

6   suppose.

7          THE WITNESS:  Yes.

8          THE INVESTIGATOR:  Pursing your lips.

9          THE WITNESS:  Yes.

10          THE INVESTIGATOR:  Okay.  Nothing was said,

11   though, is that correct?

12          THE WITNESS:  Oh, right.

13          THE INVESTIGATOR:  She said oh, right?  Did she

14   say anything else?

15          THE WITNESS:  No.

16          THE INVESTIGATOR:  Describe what occurred on

17   July 23rd, 2007 when you received a memorandum from Mr.

18   Arnston informing you that effective September 1, 2007,

19   your employment with the SIGIR agency would be

20   terminated.  If there's anything else relating to that

21   that you can tell us.

22          THE WITNESS:  Mr. Arnston wrote the memo.  He

23   wrote it because I had -- I believe I did it in e-mail --

24   asked -- excuse me.  Either Ginger or the lawyers or

25   Stuart, I'd have to again go back and dig it out, for in

 1  writing that my job was being terminated and why.

 2          THE INVESTIGATOR:  So you had already been told

 3  your position would be terminated?

 4          THE WITNESS:  Yes, I --

 5          THE INVESTIGATOR:  And this was a written --

 6          THE WITNESS:  Yes.  And I specifically asked

 7  for the reasons that my termination be written in.

 8          MR. WELKER:  Mr. Welker, for the record, should

 9  we read that memo's page number?

10          THE INVESTIGATOR:  That would be a good idea.

11  I have here Page 310 of the investigative file, the

12  letter from Mr. Arnston sent to Ms. Burgess dated

13  July 23rd.  Tell me, Ms. Burgess, is that --

14          THE WITNESS:  Yes.

15          THE INVESTIGATOR:  -- the letter you have in

16  mind?

17          THE WITNESS:  Yes.

18          THE INVESTIGATOR:  Okay.  Go ahead and read

19  that, if you would.

20          THE WITNESS:  I will.  "Dear Ms. Burgess, Due

21  to the reorganization of the Office of Public Affairs,

22  your term of employment with the Office of the Special

23  Inspector General for Iraq Reconstruction will conclude

24  on September 1st, 2007, as discussed with you by the

25  Deputy Inspector General for Policy, Ms. Ginger Cruz.

1  Your last work day with SIGIR is Friday, July 27th, 2007.

2  You have been approved for administrative leave for a

3  period of 28 July to 1 September 2007.  Please contact

4  Rebecca Baughman (phonetic sp.) to schedule and complete

5  on Friday the 27th of July 2007, the required out-

6  processing requirements.  Information on the continuation

7  of benefits will be mailed to your home address reflected

8  above.

9          You should be proud of the fine manner in which

10  you performed your duties and knowing that you have

11  positively impacted the future of Iraq and its people.  I

12  wish you every success in all your future endeavors and

13  thank you for you service to this organization, to the

14  people of Iraq and to the United States of America."

15          THE INVESTIGATOR:  Okay, thank you.  In the

16  investigative file, Page 311 through 313, are pages of a

17  document entitled Termination Meeting Notes dated

18  July 23rd, 2007 at 3:00 p.m.  Is this something that you

19  created?

20          THE WITNESS:  Yes, sir.

21          THE INVESTIGATOR:  And tell me, when -- what

22  was the meeting that's a note of?

23          THE WITNESS:  This is a note that transcribed

24  the notes that I took in the meeting where I was

25  terminated.

1          THE INVESTIGATOR:  And who terminated you in

2    that meeting?

3          THE WITNESS:  Ginger Cruz.

4          THE INVESTIGATOR:  Now, were your notes done

5    after you received the Mr. Arnston letter?

6          THE WITNESS:  No, this was before.  This was

7    the day of the termination of this -- I think I got it

8    the next day, maybe.

9          THE INVESTIGATOR:  Prior to that meeting with

10   Ms. Cruz, for which you wrote the notes, had you ever

11   been told that you would be terminated?

12         THE WITNESS:  No.  Quite the opposite.

13         THE INVESTIGATOR:  You stated in your staff you

14   had Ms. Redmon and then one individual was in the

15   hospital?

16         THE WITNESS:  Yes.

17         THE INVESTIGATOR:  That individual in the

18   hospital, did they ever return to employment in Public

19   Affairs?

20         THE WITNESS:  I don't know.  Not while I was

21   there.

22         THE INVESTIGATOR:  What employees who were --

23   had job duties comparable to yours received better

24   treatment from the agency than you did?

25         THE WITNESS:  Marthena Cowart.

1          THE INVESTIGATOR:  Anyone else?

2          THE WITNESS:  Kristine Belisle.

3          THE INVESTIGATOR:  Any others?

4          THE WITNESS:  And I'm naming specific

5   instances.

6          THE INVESTIGATOR:  For these two individuals, I

7   think they were branch heads, as you were.

8          THE WITNESS:  One was.  Kristine Belisle was

9   the Deputy in Public Affairs.

10          THE INVESTIGATOR:  Okay.  Ms. Cowart, was she

11   the IG of Congressional?

12          THE WITNESS:  Congressional, exactly.

13          THE INVESTIGATOR:  And Ms. Cowart, let's see.

14   What was her pay grade?

15          THE WITNESS:  SES.

16          THE INVESTIGATOR:  And Ms. Belisle, what was

17   hers?

18          THE WITNESS:  Don't know.

19          THE INVESTIGATOR:  And what was Ms. Cowart's

20   race?

21          THE WITNESS:  White.

22          THE INVESTIGATOR:  Ms. Belisle's race?

23          THE WITNESS:  White.

24          THE INVESTIGATOR:  And what was Ms. Cowart's

25   national origin?

1    THE WITNESS:  American.  She was born here.

2    THE INVESTIGATOR:  And Ms. Belisle was

3    American?

4    THE WITNESS:  I believe she was born here.  I

5    believe she was American.

6    THE INVESTIGATOR:  Were they both government

7    employees, federal government civilian employees?

8    THE WITNESS:  Definitely Marthena and I believe

9    Kris.  I don't know.

10    THE INVESTIGATOR:  In what manner did the

11    agency treat them better than it treated you?

12    THE WITNESS:  In those two specific incidences,

13    you have employees whose performance was -- I don't know

14    how to put this kindly -- the SIGIR was not happy with

15    Marthena's performance and in Kris Belisle's case, both

16    myself and Marthena Cowart were not happy with her

17    performance and in both cases neither were terminated.

18    Marthena was moved aside and someone else hired, but she

19    didn't lose her job despite performance issues.

20    And Kris Belisle was allowed to stay until her

21    contract or I'm not sure exactly what her status was, but

22    until such time as her contract -- and again, I didn't

23    see paperwork on any of this.  This is what I was told.

24    But she definitely stayed in the office for some time

25    after it was clear that her services were not going to be

1   used by myself nor Marthena Cowart.

2          THE INVESTIGATOR:  Once again, who stayed in

3   the office?

4          THE WITNESS:  Both Kris Belisle and

5   Marthena Cowart.  And in my case, there weren't any

6   performance issues.  And if I might also add, I was the

7   sole individual asked to carry the burden of a

8   reorganization who was a full-time employee at SIGIR,

9   directly employed by SIGIR.  I was the only individual

10  asked to carry any kind of burden through this

11  reorganization.

12         THE INVESTIGATOR:  Not to put words in your

13  mouth, but are you saying it was your section that got

14  cut back or it was just you that felt the brunt of this

15  reorganization, you personally?

16         THE WITNESS:  Of the people who were on SIGIR's

17  direct payroll, yes.  Me.

18         THE INVESTIGATOR:  One of the bases you're

19  alleging is harassment because of your race, national

20  origin and sex.  Did you speak to anyone or report

21  harassment prior to your termination?

22         THE WITNESS:  In the office?

23         THE INVESTIGATOR:  Right.

24         THE WITNESS:  No.  Not on the management team,

25  no.

1        THE INVESTIGATOR:  And why did you not do that?

2        THE WITNESS:  Because I had hoped that I could

3   just tolerate it.  I wanted my job.

4        THE INVESTIGATOR:  From the investigative file,

5   what I've seen, the agency has claimed that it terminated

6   your employment not because of discrimination but due to

7   reorganization in the Office of Public Affairs.  What's

8   your response to that allegation?

9        THE WITNESS:  My response is that it's a

10  phantom reorganization and that if you had reorganization

11  plans, there's no evidence.  In addition, I might also

12  add that I was given assurances, verbally by both Ginger

13  and by Stuart Bowen that my job was not in jeopardy.

14        THE INVESTIGATOR:  I recall that you testified

15  that Mr. Bowen had given you those assurances that you'd

16  be safe but I don't recall from Ms. Cruz.  Can you tell

17  me --

18        THE WITNESS:  Yes.

19        THE INVESTIGATOR:  -- about that again?

20        THE WITNESS:  On that Thursday, when she told

21  me about Patricia and I -- thank you -- when she told me

22  about Patricia and I asked about, you know, how was I

23  going to be able to accomplish all of my duties as the

24  sole person in Public Affairs, at which point her reply

25  was that I would be getting extra help from other people.

1          THE INVESTIGATOR:  The record shows that

2   Ms. Belisle had made a complaint against you earlier in

3   your employment with the agency.  Do you believe anything

4   associated with that complaint was a factor in the

5   agency's treatment of you?

6          THE WITNESS:  No.

7          THE INVESTIGATOR:  And my final question for

8   you.

9          THE WITNESS:  Yes, sir.

10          THE INVESTIGATOR:  Do you have anything to add?

11   Not asking you to repeat anything.

12          THE WITNESS:  Just that it was a difficult and

13   painful process and I'm sorry we all have to be here.

14          THE INVESTIGATOR:  Okay.  Ms. Bernardo, do you

15   have any questions of the Complainant?

16          MS. BERNARDO:  I do have just a few.  And I'm

17   going to -- I'd like to start at the beginning, so

18   instead of going backwards, we'll have to refresh you

19   with some of the earlier things you said.  You mentioned

20   your duties as -- I think -- and you mixed the words

21   director, but you were the AIG for Public Affairs?

22          THE WITNESS:  Yes.

23          MS. BERNARDO:  And you listed a number of

24   duties, but the one thing you didn't talk about was press

25   contacts.  Was it also your responsibility to have

1  contact with the press?

2           THE WITNESS:  That's media relations, yes.

3           MS. BERNARDO:  Okay.  You just didn't mention

4  it.  That's all I wanted to clarify.  So what does it

5  mean to have press contacts?  Did you actually call

6  people, the media, or return their calls?

7           THE WITNESS:  Yes.

8           MS. BERNARDO:  Okay.  I'm sorry about that.  I

9  kind of jumped over you, too.  Press contacts is you

10  personally received the calls from the media and then

11  make the calls back?

12           THE WITNESS:  Yes.

13           MS. BERNARDO:  Okay.  I also was wondering, you

14  talked about it was your understanding your job wasn't

15  supposed to end.  I provided the 3161 rule and I have a

16  letter that's your hire letter that talks about the 3161

17  Authority and it does give a date of termination and it

18  tells you you could be terminated any day.  Are you

19  familiar with that letter?

20           THE WITNESS:  Yes.

21           MS. BERNARDO:  You are.  So in your letter, it

22  said you have -- you know, your initial appointment's for

23  13 months, but it may end sooner.

24           THE WITNESS:  Um-hum.

25           MS. BERNARDO:  So the inference is that it

59

1    could end sooner, right?

2            THE WITNESS:  That's what's on the piece of

3    paper, yes.

4            MS. BERNARDO:  Okay.  You made the comment

5    about Ginger saying that -- and it's different in your

6    letter than it is in your statement -- people who file

7    these complaints are always the weak ones.  I don't

8    think, in your letter, you said discrimination complaints

9    and you identified it associated with being before --

10           THE WITNESS:  EEO, not discrimination.

11           MS. BERNARDO:  EEO.  I don't think you said

12   that in your letter, when you quoted Ginger.  You said

13   these -- people who file these complaints.  Wasn't that

14   the time that the "anonymous" complaint surfaced?  It had

15   apparently been sent to the media with a number of

16   complaints by a number of former employees whose

17   complaints were being sort of circulated in the media and

18   you were having to make media contacts and wasn't she

19   really referring to the anonymous complaint and not EEO

20   complaints, which --

21           THE WITNESS:  No, because I didn't know about

22   that investigation at that point in time.

23           MS. BERNARDO:  Okay.  So were you having the

24   conversation with her directly or was she just mentioning

25   it offhandedly prior to a staff meeting?

1    THE WITNESS:  She was sitting next to me at the

2 staff meeting and she was talking to me.

3    MS. BERNARDO:  Okay.  With regard to addressing

4 Patricia Redmon by Pat, I got to tell you, there was a

5 Pat Bowers on staff and I got to tell you, I mix up

6 people's names all the time, so I'm a little surprised if

7 you've already got someone named Pat and you have someone

8 named Patricia, wouldn't it be reasonable to guess that

9 sometimes people just fumble over their words and make a

10 mistake?

11    THE WITNESS:  I don't think I'd mix up a white

12 elderly man and a black 50-year old woman, no.

13    MS. BERNARDO:  Okay.  Because I -- you know,

14 for instance, I don't know if you were in the room, but

15 Mr. Welker pronounced my name correctly, Andray-a

16 (phonetic sp.), when we walked into the room and I said

17 thank you, you said it correctly.  Then when we got on

18 the record, he said Andree-a (phonetic sp.).  Did you see

19 that as a gender bias or any kind of racial or ethnic

20 bias toward me?

21    THE WITNESS:  I didn't hear it.

22    MS. BERNARDO:  Okay.  I didn't take it that

23 way, sir.  You mentioned you're not a confrontational

24 person.

25    THE WITNESS:  Um-hum.

1          MS. BERNARDO:  However, do you think

2   Kris Belisle would agree with that?

3          THE WITNESS:  I don't know what Kris Belisle

4   would say.

5          MS. BERNARDO:  Aren't there some times when you

6   may have had some conversations with Kris Belisle that

7   some people might interpret as confrontational?

8          THE WITNESS:  I don't speak for other people.

9          MS. BERNARDO:  Okay.  Did you not take her to a

10  bar and reprimand her in a bar?

11         THE WITNESS:  No, I did not.

12         MS. BERNARDO:  You did not go to a bar with her

13  and talked to her?

14         THE WITNESS:  We went to a bar --

15         MS. BERNARDO:  Um-hum.

16         THE WITNESS:  -- but I don't agree with the

17  characterization of the meeting.

18         MS. BERNARDO:  Okay, what was -- what happened

19  in the meeting?

20         THE WITNESS:  The meeting was for Kris and I to

21  sit down and talk outside of the office --

22         MS. BERNARDO:  Um-hum.

23         THE WITNESS:  -- to try and -- and I thought

24  getting outside of the office might make her feel more

25  comfortable, make her feel more willing to sort of open

1  up so that we could -- and my purpose in having that

2  meeting was to, as I said, to rewind, let's start again.

3          MS. BERNARDO:  Um-hum.

4          THE WITNESS:  Let's get this professional

5  relationship --

6          MS. BERNARDO:  Um-hum.

7          THE WITNESS:  -- working together working well.

8          MS. BERNARDO:  Um-hum.  Were you finger

9  pointing while you were talking to her?

10          MR. WELKER:  Mr. Welker, may I ask -- I thought

11  that the rules were it had to be related to the claims

12  when the other attorney was asking questions.

13          THE INVESTIGATOR:  Yeah.  Try to --

14          MS. BERNARDO:  Fine.

15          THE INVESTIGATOR:  -- address your questions

16  to --

17          MS. BERNARDO:  That's fine.

18          THE INVESTIGATOR:  -- obtaining information

19  about these claims.

20          MS. BERNARDO:  She said she wasn't

21  confrontational and I was just trying to follow up on a

22  few questions.  I want to look at the e-mail that you --

23  where you think that -- or you assert that Kris Belisle

24  defied you.  I'm blanking on the term, but challenged

25  your authority, and I believe -- which number is it?  I

1    know it's of record.  I thought it was 310 or 311.

2              THE INVESTIGATOR:  I was thinking it might be

3    255 of this file, anyway.  About the Paris schedule?

4              THE WITNESS:  Yes.

5              MS. BERNARDO:  Yes, yes.  When I look at that,

6    I have to say I reach the opposite conclusion.  It seems

7    to me that it was written at the end of the day.  The

8    timing on it is the end of the day and that you were in

9    the office at the time.

10             THE WITNESS:  Um-hum.

11             MS. BERNARDO:  Is that correct?

12             THE WITNESS:  I don't know if I was in the

13   office --

14             MS. BERNARDO:  All right.

15             THE WITNESS:  -- at the time.

16             MS. BERNARDO:  Okay.  I'm not fighting it, so

17   it's a little embarrassing for me to go through it even

18   though I have it in my mind quite successfully.  It's

19   late in the day, though, right?

20             THE WITNESS:  What is --

21             MS. BERNARDO:  When Kris Belisle sent that e-

22   mail, it's late in the day, isn't that correct?

23             THE WITNESS:  At 7:22 p.m.

24             MS. BERNARDO:  So it would be reasonable to

25   guess that you may not have been there, okay.  And she

1    cc'd you on the e-mail, didn't she?

2              THE WITNESS:  She did.

3              MS. BERNARDO:  And she cc'd Ginger Cruz on the

4    e-mail, right?

5              THE WITNESS:  She did.

6              MS. BERNARDO:  Isn't that sort of standard

7    office protocol to include your supervisor on an e-mail

8    when you are in a situation?  She was the Deputy IG where

9    she might've had to communicate directly with the IG?

10             THE WITNESS:  No.

11             MS. BERNARDO:  Oh, it's not.

12             THE WITNESS:  Standard operating procedure as

13   regards to the press, I've been over this with Stuart and

14   I've been over this with Kris, and we both have been over

15   it, as well, with -- standard operating procedure was

16   that press, all the requests or any kind of press

17   interaction with Stuart, went through me first.

18             MS. BERNARDO:  And she copied you on it, so you

19   did get the notice?

20             THE WITNESS:  And that and I believe there's an

21   e-mail in there that clearly explains that it was up to

22   me to decide whether it would go to Stuart or not.

23             MS. BERNARDO:  And your response, I note you

24   just responded to Stuart.  You didn't include Ginger or

25   Kris on the response.

1           THE WITNESS:  I think I responded to Kris

2    directly.

3           MS. BERNARDO:  I don't see there on that e-mail

4    you responded to Stuart directly.

5           THE WITNESS:  I also responded to --

6           MS. BERNARDO:  Separately.

7           THE WITNESS:  -- Kris directly.

8           MS. BERNARDO:  Okay.  What was the --

9           MR. WELKER:  Sorry.

10          THE INVESTIGATOR:  Yeah, it's on Page 254 in

11   the investigative file is your response you mentioned.

12          MR. WELKER:  And I'd like the record --

13          THE WITNESS:  Can I look at it?  I'm sorry.  It

14   would help me.

15          MR. WELKER:  Sure.  And then we'll read into

16   record all of the names that were copied on that response

17   to Kris at the top of the e-mail.

18          THE INVESTIGATOR:  Go ahead.

19          MR. WELKER:  That's okay, Mr. Welker.  You

20   identified the -- I wouldn't want the record to be

21   confused.

22          THE INVESTIGATOR:  Well, I'm a little confused.

23   Which of the -- which of these -- yeah.

24          THE WITNESS:  Okay.  Yeah, this is hard because

25   it was printed off of my computer.  The e-mail is from

1  me, Denise Burgess.  It's sent Saturday, March 3rd, 2007

2  at 8:59 a.m.  It is to Kristine Belisle and Stuart Bowen.

3  It is carbon copied to Ginger Cruz, Robin Raphael,

4  Nick Arnston, who was the Chief of Staff at the time.

5         THE INVESTIGATOR:  What's the subject again?

6         THE WITNESS:  The subject is regarding Business

7  Week opinion on Kicklighter.  Should I read it?

8         MR. WELKER:  What's the first sentence?

9         THE WITNESS:  "As discussed previously -- Kris,

10  as discussed previously, please refer all SIGIR" -- in

11  capital letters -- "media inquiries directly to me."

12         MS. BERNARDO:  Do you know who the EEO officer

13  was at SIGIR?

14         THE WITNESS:  No.

15         MS. BERNARDO:  So did you ever complain to the

16  EEO officer about any kind of discrimination issues?

17         THE WITNESS:  I tried to find the EEO officer

18  on that Monday and no one knew who the EEO officer was.

19         MS. BERNARDO:  Okay.  Who did you ask?

20         THE WITNESS:  I asked Linda Fields.  I believe

21  I asked Janet, but I'm not sure.  But I know --

22         MS. BERNARDO:  Janet?

23         THE WITNESS:  Nisbet.

24         MS. BERNARDO:  Okay.  You know, in your

25  complaint you say May 2007 --

1          THE WITNESS:  Um-hum.

2          MS. BERNARDO:  -- that Ms. Cruz took over an

3   assignment?

4          THE WITNESS:  Um-hum.

5          MS. BERNARDO:  But I do believe your e-mail,

6   sending out this audit list is actually dated in July,

7   July 11.  Isn't that correct?

8          THE WITNESS:  I'd have to look at it.  I'm

9   sorry.

10          MS. BERNARDO:  Okay, I'll have to -- and I

11  apologize, but I will have to find it.  Yeah, it would be

12  your Tab H and I don't know what page number it is,

13  otherwise.  In fact, in April of 2005 -- I'm sorry,

14  there's something else in here.

15          MR. WELKER:  Are you referring to the July 2nd,

16  2007 e-mail from Ms. Burgess to Stuart Bowen and others

17  regarding publications guidelines?

18          MS. BERNARDO:  I think I'm referring to the

19  July 3rd, but that's the same timeframe.  I have a

20  July 3rd e-mail.  I have other e-mails.  We have

21  different tabs.  It's all quite interesting.

22          THE INVESTIGATOR:  For the record, these begin

23  at Page 289.

24          MS. BERNARDO:  Okay.  I have -- on April 9, I

25  have an e-mail from Taryn Edmonds putting out a public

1    affairs weekly report, but I don't think that's the item.

2              THE WITNESS:  Yes, there's the July 3rd.  We

3    don't have this one.

4              MR. WELKER:  Okay.

5              MS. BERNARDO:  I'd be happy to -- I mean, we

6    can hold this, you can share it, look at it.  It's just

7    -- I just wanted to correct the timeframe.  You're saying

8    you're using that as -- to support the Ginger Cruz took

9    over your assignment and it's -- in your complaint, you

10   said it was May but it's really this, in July, right?

11             THE WITNESS:  Yes.

12             MS. BERNARDO:  Okay.  And then how did you say

13   she took over the assignment again?

14             THE WITNESS:  Because I had sent out this

15   e-mail.

16             MS. BERNARDO:  Uh-huh.

17             THE WITNESS:  We'd already gone through it one

18   draft.  I gathered comments from everybody, folded them

19   in, talked to everybody --

20             MS. BERNARDO:  Um-hum.

21             THE WITNESS:  -- figured out well, let's get a

22   second set of drafts and get a second set of comments and

23   see if we can't come up with something everybody can

24   agree to.  And I sent the e-mail out to everyone, so all

25   of my colleagues are thinking about the ways they're

1    going to respond to me and then they get an e-mail from

2    Ginger saying this is done.

3         MS. BERNARDO:  Okay.

4         THE WITNESS:  So I don't even exist.

5         MS. BERNARDO:  Wasn't she the DIG at the time?

6         THE WITNESS:  I believe she was.

7         MS. BERNARDO:  Okay.  That would make her your

8    supervisor, right?

9         THE WITNESS:  Um-hum?

10        THE INVESTIGATOR:  DIG?  That's Deputy

11   Inspector General?

12        MS. BERNARDO:  Inspector General, yes.  Did you

13   realize or did you understand that Patricia Redmon was a

14   contractor?

15        THE WITNESS:  Yes.

16        MS. BERNARDO:  Do you know how much she cost

17   the agency?

18        THE WITNESS:  No.

19        MS. BERNARDO:  I'd like to refer you to those

20   two e-mails that I had submitted earlier in the -- not

21   that one but -- oh, I'm sorry.  The two e-mails that were

22   from you that I believe you reviewed.

23        MR. WELKER:  I think you sent three e-mails.

24   Are you talking about two of the three?

25        MS. BERNARDO:  There's two of the three, yes.

70

1        MR. WELKER:  And which?

2        MS. BERNARDO:  The ones dated -- well, I'm

3    sorry.  The top dates, they both have my name on,

4    Thursday, May 8 and Thursday, May 8, but it's -- they're

5    these two e-mails that are below from Denise Burgess,

6    both of them to Janice Nisbet.  And let's see, which one

7    predates the other in time?  Okay, the first one,

8    Wednesday, July 11 at 9:03 a.m.  "Hi, Janice.  Selected

9    David Mays, but don't move forward due to the

10   reorganization.  I spoke with Ginger and she's on board

11   with offering David the position."

12        And then it appears that on the same day, a few

13   hours later, about -- little less than an hour later,

14   actually, it appears again from Denise Burgess to

15   Janice Nisbet.  "It's a budget issue.  They're holding

16   new hires until they have some assurance we will have

17   sufficient funds in time to make offers.  They anticipate

18   news next week sometime."

19        THE INVESTIGATOR:  I have to correct.  I think

20   that's two days later.

21        MS. BERNARDO:  July -- oh, I apologize.  You're

22   absolutely right.  So two days later, July 13.  So the

23   inference I would get is that you had an understanding

24   there was a reorganization going on at this time and that

25   there were budget issue at this time.

1          THE WITNESS:  What I understood at that time

2    was there was no formal reorganization going on at that

3    time.  The terms reorganization's used in very loose

4    terms.  There were no management meetings whatsoever

5    where we all sat down and talked about reorganizing the

6    office.

7          We were not asked, as heads of our sections, to

8    submit any kind of documentation about how we might or

9    should save money in our sections.  That's -- I was a fed

10   for 16 years.  That's standard.  And in terms of the

11   that's the budget, this is the issue, apparently, where

12   -- and I'm not going to try and explain the whole thing

13   -- if SIGIR were going to be drawn down, would there be

14   sufficient money for the drawdown, having to do with

15   fiscal cycle, et cetera.  I mean, I could spend a lot of

16   time explaining that.

17         MS. BERNARDO:  Okay.  You mentioned there were

18   no management meetings.  Have you ever been involved in a

19   reorganization before?

20         THE WITNESS:  Yes, I have.

21         MS. BERNARDO:  And have you ever participated

22   in management meetings?

23         THE WITNESS:  Yes, I have.

24         MS. BERNARDO:  Did you believe SIGIR was

25   obligated to do that under the 3161 Hiring Authority?

1       THE WITNESS:  I don't know if they were

2  obligated to do that.

3       MS. BERNARDO:  Let's go to the issue of your

4  time and attendance being reviewed for irregularities.

5  You said that Nick Arnston and Robin Raphael told you

6  that?

7       THE WITNESS:  Um-hum.

8       MS. BERNARDO:  About what time in this

9  timeframe did they tell you that?

10      THE WITNESS:  Probably in -- I don't know, May.

11      MS. BERNARDO:  In May?  Because in --

12      THE WITNESS:  I don't know.  Okay.

13      MS. BERNARDO:  Excuse me.  In your complaint,

14  you refer to her looking at your time and attendance in

15  June, in the June and July timeframe and I believe

16  somewhere in that timeframe she became your supervisor

17  and therefore would've been the person responsible for

18  signing your time and attendance.

19      THE WITNESS:  Um-hum.

20      MS. BERNARDO:  Isn't that correct?

21      THE WITNESS:  I believe she did take over the

22  duties of signing my time and attendance.

23      MS. BERNARDO:  Okay.  So her reviewing it would

24  be part of her job, isn't that correct?

25      THE WITNESS:  I don't know what Ginger's job