# Exhibit 13

# Termination Meeting Notes

Where:      SIGIR: Office of Deputy Inspector General

When:       Monday, July 23, 2007 at 3pm

Attending:  Ms. Ginger Cruz – Deputy Inspector General
            Mr. James Bowers – SIGIR General Counsel
            Ms. Denise Burgess – Assistant Inspector General for Public Affairs

Ms. Ginger Cruz called me into a meeting in which she informed me my employment at SIGIR would be terminated. I took extensive notes regarding the conversation and transcribe them below. Following the meeting I sent an e-mail to all appropriate staff, including the Special Inspector General, Mr. Stuart Bowen, requesting written notification of my termination with the reasons this decision was taken.

Ms. Cruz opened the meeting saying SIGIR was undergoing a reorganization because the senior staff at SIGIR was "too heavy along non-operational lines" and also claimed SIGIR was being forced by OMB to trim two million dollars from its current budget. She determined that there needed to be reductions in the Congressional and Public Affairs staffs. Since SIGIR does not issue press releases, she said other AIGs, herself and Mr. Bowen could handle all press inquiries, and thus the AIG for Public Affairs "was going away." She offered a one month transition period and positive recommendations.

I pointed out to Ms. Cruz that the Public Affairs sister section, Congressional Affairs had four full-time employees and the Public Affairs section had two and that both sections had equivalent workloads. I inquired as to how many people were being terminated from the Congressional Affairs section and Ms. Cruz replied "Congressional is in progress." I pressed further about cuts to that section and she replied "no one is being let go from that section at the moment." I asked why not, and she said because of the section's workload, specifically citing preparing testimony for hearings on the Hill and responding to Congressional inquiries. (I note none of these tasks represent new assignments nor has the testimony schedule increased in the past 3 months). She did not respond to my characterization that the two sections had comparable workloads.

I told Ms. Cruz the Public Affairs workload has not changed, so I was unsure why the Congressional Affairs section would remain untouched with four employees and the Public Affairs Section with only two employees would be completely eliminated. She then informed me they were creating a new position titled Director of Public Affairs, which would be paid at a lower level. She also informed me SIGIR had just hired an individual to fill that position.

-2-

I again expressed my concern at the lack of transparent, measurable criteria for determination of who would be terminated. Ms. Cruz said SIGIR was an organization with a special mission and as such, "must have the right mix of people." When I asked what exactly was the criteria for determining the "right mix of people" she replied that the criteria was "determined internally." I pressed her on this point and demanded specific criteria. She repeated that it was an "internal decision" and she was not "obligated to discuss those details with me." She said, "I don't need an AIG for Public Affairs." I challenged this statement by asking why SIGIR had needed an AIG for Public Affairs for its entire history and suddenly now, did not; I asked her what had changed in the portfolio. She asserted that SIGIR's Public Affairs work had changed over time. I again asked "in what way?" She responded that Public Affairs was "constantly evolving" but again could offer no specific examples. When I continued to press, she admitted there had been no change in the Public Affairs work, but there was now a change in "how we'll address Public Affairs work." I asked exactly what that meant and she replied "I don't need and SES doing this job."

I then said "so you're not contending there has been a great reduction in the Public Affairs workload either, correct?" She replied, "yes, that's correct." I then said "Ok, I still don't understand what has changed to require a change in the type of staffing needed in the section." I pointed out that it stands to reason that if the organization needed a different type of individual to do the Public Affairs work, there must be some change in the work driving the decision. At that point the lawyer entered into the conversation and said "*What* don't you understand?" I then made a statement that I presumed that neither Ms. Cruz nor Mr. Bowers had objections to my asking questions and that I was entitled to understand fully why I was targeted for termination and that I was taking very detailed and specific notes to ensure I had a full understanding of what they were saying. I reread my notes regarding workload and nature of work to both. Neither challenged the accuracy of my notes.

As it was clear to me that there was no objective criteria (measurable workload reduction, a change in the nature or type of work, etc) I decided to wrap up the conversation. I asked Ms. Cruz where we would go from here. I was instructed to forward all press inquiries to Mr. Bowen's staff assistant. I agreed that I would send out the remaining reports to the media. I asked about when exactly my administrative leave began and was told by Ms. Cruz on August 1st and that I would remain on the payroll until August 31st.

I concluded the meeting by saying I wanted to go on record to express my disappointment that my termination was for other than performance reasons, and I asked if I was correct in this statement. Both Mr. Bowers and Ms. Cruz said – at exactly the same time – "it's just reorganization." I said "ok" and left the room.

3/2

-8-

Neither the need for reorganization, nor an alleged budget deficit so severe it required immediate terminations, remain credible under scrutiny. Therefore, other reasons for the decision to "eliminate" the Public Affairs Section must be garnered from the statements, historical record of fact, and the testimony of individuals familiar with SIGIR's management practices. Those data-points lead to an unavoidable conclusion: that the termination decisions unjustly targeted minorities and were discriminatory; and that an environment of harassment and intimidation festered at SIGIR in order to eliminate SIGIR's senior female staff.

**REQUESTED ACTION**
The Office of the Special Inspector General for Iraq Reconstruction has failed to live up to standard best practices and its ethical responsibilities as a U.S. government agency. Worse, the Special Inspector General and his Deputy may have broken the law as regards the fair and equitable treatment of employees regardless of race or gender.

It is my hope that the EEO Commission will thoroughly investigate this complaint and determine the facts of the case. I also ask that a finding be rendered in the most expeditious manner possible.

I seek redress in the form of compensatory and punitive damages to be assessed against the Office of the Special Inspector General for Iraq Reconstruction. It is only through public accountability and substantive sanction, where fault is found, that ethical standards and the law will be respected.

I thank you for your attention to this matter.