# Exhibit 16

```
 1                      KRISTINE BELISLE
 2  was called for questioning, and after having been first
 3  duly sworn, was examined and testified as follows:)
 4                         EXAMINATION
 5          BY THE INVESTIGATOR:  Please be seated.  And
 6  please state your full name.
 7          THE WITNESS:  Kristine Rose Belisle.
 8          THE INVESTIGATOR:  And identify your race.
 9          THE WITNESS:  White, Caucasian.
10          THE INVESTIGATOR:  And identify your national
11  origin.
12          THE WITNESS:  American.
13          THE INVESTIGATOR:  Okay.  And your sex is
14  female, is that correct?
15          THE WITNESS:  Correct.
16          THE INVESTIGATOR:  As of calendar year 2007,
17  describe your employment status with SIGIR and by that, I
18  mean whether you were a federal government employee or a
19  contractor employee, and granted, it might have varied
20  during that year of 2007.  If you could kind of explain
21  what it was, when.
22          THE WITNESS:  Certainly.  I started the year
23  2007 as a federal government employee and departed, and
24  then in July of 2007 came back as a contract employee,
25  and then in August of 2007 I was converted to a federal
```

1  government employee.

2  THE INVESTIGATOR: Okay. And why, for that
3  short stint in July, why were you a contract employee?

4  THE WITNESS: Because I had departed SIGIR in
5  March and was contacted in July and asked to return to
6  help them out for a short period of time and then I -- so
7  I came back as a contractor; however, then I stayed, so I
8  reverted to a government employee.

9  THE INVESTIGATOR: When you returned in July,
10 was it the intent was for you to become a government
11 employee?

12 THE WITNESS: That was not my intent and the
13 conversation was very quick that I had with them in
14 preparation to come back and so we didn't really discuss
15 the long term. I was simply asked to come back and to
16 facilitate the process, to speed it up. It was to return
17 as a contract employee.

18 THE INVESTIGATOR: Okay. Early in your -- the
19 first part of the year, 2007 --

20 THE WITNESS: Um-hum.

21 THE INVESTIGATOR: -- what was your position
22 title?

23 THE WITNESS: I was a Deputy Assistant
24 Inspector General for Public Affairs.

25 THE INVESTIGATOR: And what was your grade and

1  series or what other identifier used for that position?

2  THE WITNESS:  Yeah, I have to be honest with
3  you.  I don't know.  I know that we do administrative
4  determined zero-zero and that there is a grade determined
5  for pay scale, but I don't -- I've never paid close
6  attention to it.  This is the only government job I've
7  held, so I didn't come in in a ranking.  I think it was
8  12 or 13, but I really don't know.

9  THE INVESTIGATOR:  When you again entered
10 employment as a government employee with SIGIR in August,
11 what was your duty title then?

12 THE WITNESS:  Director of Public Affairs.

13 THE INVESTIGATOR:  And do you recall -- grade,
14 series, position, anything like that?

15 THE WITNESS:  We didn't discuss grade.

16 THE INVESTIGATOR:  And are you in that current
17 -- in that position now?

18 THE WITNESS:  I am.

19 THE INVESTIGATOR:  And briefly describe your
20 duties back in the January 2007 timeframe.

21 THE WITNESS:  Well, for the month of January,
22 there was change at the end of January, but for the month
23 of January I was asked -- my previous boss quit and gave
24 24 hours notice.  I was asked by the Chief of Staff to
25 manage all of the duties of both Public Affairs and

1   Congressional Affairs because up until that moment they
2   actually were combined. When my boss quit, they were
3   split into two different departments.
4           Two individuals were hired, Denise Burgess and
5   Marthena Cowart, and came onboard -- we were in the
6   process of releasing our quarterly report. So I was
7   asked to assume all duties of both sections until the
8   report was released at the end of January and then to
9   transition the responsibilities to Denise and Marthena
10  and then act as Denise's deputy.
11          THE INVESTIGATOR: Okay. And what were your
12  duties when you came back onboard, July of 2007?
13          THE WITNESS: As Director of Public Affairs, I
14  managed the media relations, liaison with the press, act
15  as spokesperson, manage speaking engagements, do talking
16  points for any appearances the Inspector General or the
17  Deputy Inspector General may make and field public
18  inquiries.
19          THE INVESTIGATOR: What was the reason that you
20  left your employment with SIGIR early in the year of
21  2007?
22          THE WITNESS: I was Deputy Assistant Inspector
23  General for Public Affairs and had a number of run-ins
24  with Denise and the Chief of Staff came back to me and
25  told me that she had made the decision she didn't like

1  me, that my personality was not one that she wished to
2  work with and so I -- and that she was reducing my duties
3  and I was allowed to be her secretary if I wanted to
4  stay, which I declined.
5      I was overqualified for that and wouldn't have
6  found it challenging.  And so at that point, I -- they
7  offered -- well, there was a back-and-forth and in the
8  end, I said I disagree with the way that I was being
9  treated, that she was allowed to make that decision over
10 a matter of days based on two run-ins.
11     THE INVESTIGATOR:  I need to ask for
12 clarification.
13     THE WITNESS:  Sure.
14     THE INVESTIGATOR:  Who made this -- you're
15 saying she and I'm wondering if we're talking the Deputy
16 of SIGIR or --
17     THE WITNESS:  I was told that Denise was
18 allowed to make the decision that she no longer wished
19 for me to work with her in her department.  And also I
20 was to be her secretary.
21     THE INVESTIGATOR:  You would've been
22 Ms. Burgess's secretary?
23     THE WITNESS:  Correct.
24     THE INVESTIGATOR:  Okay.
25     THE WITNESS:  I declined that position, but

1  then there was further back-and-forth about what was
2  taking place and the way that I was treated and so I did,
3  at that point, tell the Chief of Staff -- I was told I
4  could either resign or be let go and I just told him I
5  refuse to resign because I disagreed with the process and
6  how I was being treated. And so then I was given a
7  letter stating that there is a reorganization and my
8  position was reorg'd out.
9        THE INVESTIGATOR: You refused to resign and
10 the reason that you left was your position was
11 reorganized?
12        THE WITNESS: The letter that I received,
13 that's what it stated, but I was told by the Chief of
14 Staff I was essentially being let go because Denise did
15 not like me.
16        THE INVESTIGATOR: Who wrote this or created
17 this letter of reorganization?
18        THE WITNESS: I think it was signed by the
19 Chief of Staff. I haven't looked at it recently.
20        THE INVESTIGATOR: That would be Mr. Arnston?
21        THE WITNESS: Yes.
22        MS. BERNARDO: I don't know if it's in the
23 record, but I have a copy of it here.
24        THE INVESTIGATOR: Um-hum.
25        MS. BERNARDO: Right here.

```
 1              MR. BARATZ:  Mr. Welker, can we get copies of
 2   that --
 3              MS. BERNARDO:  Yeah.
 4              MR. BARATZ:  -- to put in the record?
 5              THE INVESTIGATOR:  Okay.  Just one second,
 6   here.  Quickly looking just to make sure I don't already
 7   have -- no, I don't think I do.  Yeah.
 8              MR. BARATZ:  I'm virtually positive that you
 9   don't have the document.
10              THE INVESTIGATOR:  Okay.  And for the record,
11   this is a letter dated March 26, 2007, assigned to
12   Kristine Belisle, signed by Janice Nisbet.  It deals with
13   -- mentions reorganization of her position.
14              MS. HALBROOKS:  Want -- to make copies?
15              MR. BARATZ:  No, that's okay.  I'll wait for
16   the copy.  Thank you.
17              THE INVESTIGATOR:  What was the reason that you
18   returned to employment with SIGIR?
19              THE WITNESS:  At the time, I was consulting.  I
20   had a couple of clients for which I was doing
21   communications consulting for and when Ginger asked me to
22   come back and help them and return as a contractor, I was
23   happy to do so.  I had positive relations with everyone
24   at SIGIR with the exception of Denise and so it was my
25   understanding she was not going to be there.  I said I
```

1  thought I was just going back to help out for a short
2  period of time.  I was happy to do so.  I had all of the
3  media contacts, I knew everyone.  I knew that they were
4  in a pinch in terms of the report was about to come out
5  at the end of July and I knew that I'd be able to easily
6  facilitate the process of releasing it.
7          THE INVESTIGATOR:  Do you have any information
8  regarding the Complainant's termination?
9          THE WITNESS:  No.
10         THE INVESTIGATOR:  When you were invited to
11 come back for employment, did -- who did you speak with?
12         THE WITNESS:  I spoke with Ginger Cruz.
13         THE INVESTIGATOR:  Did she tell you anything
14 about the Complainant's termination.
15         THE WITNESS:  She did not.  I asked if she
16 would be there because I would not have worked with her
17 again and so I know that she wasn't going to be there,
18 but that's all that I knew.
19         THE INVESTIGATOR:  Did you treat the
20 Complainant differently in any manner during her
21 employment with SIGIR because of her race, national
22 origin, sex or because of any EEO complaints she might
23 have made?
24         THE WITNESS:  No.
25         THE INVESTIGATOR:  Are you aware of anyone else

1  having treated the Complainant differently for those same
2  reasons?
3           THE WITNESS: No, absolutely not.
4           THE INVESTIGATOR: My last question for you
5  before I invite others to ask you questions, do you have
6  anything to add, anything you care to state?
7           THE WITNESS: Only that I had reviewed some of
8  the information for today and I understand that it's
9  being stated that there is concern about this March 2nd
10 event where I passed an e-mail to the Inspector General
11 and that I was being insubordinate to Denise and I'd only
12 like to state that I did everything in my power to make
13 her transition into SIGIR as easy as possible.
14          I was running around crazy trying to do
15 everything for her to make it a smooth transition, for
16 everything to go successfully. I, in no way, shape or
17 form was ever insubordinate to her and on the event of
18 March 2nd, I got a call from a reporter who wanted a very
19 quick interview with the Inspector General. He was
20 leaving the country, Denise was not available. I called,
21 she did not answer. I waited two hours, it was not -- my
22 call was not returned and so I sent an e-mail to the
23 Inspector General that cc'd Denise simply so that they
24 would know that this request had come in.
25          THE INVESTIGATOR: Okay. Mr. Baratz, questions

1  you may have?

2       MR. BARATZ:  Have you heard anything from
3  anyone about the hearing today?

4       THE WITNESS:  No.  I mean, I was here this
5  morning, so just -- was told that it would continue to
6  proceed and I could not sit in until now.  That was it.

7       MR. BARATZ:  When did Ginger first, Ms. Cruz,
8  first contact you about returning to SIGIR?

9       THE WITNESS:  I think it was the second week of
10 July.  I was in Minnesota, which is where I'm from, so I
11 was with family.  She called me and I told her that I was
12 in Minnesota and not available to have a longer
13 conversation, but she asked about my schedule and my
14 availability, what I was doing in my career, and I told
15 her I'd be back to D.C. that following week.

16      I think that's correct, return to the third
17 week, if I'm correct, somewhere around the 15th.  When I
18 returned, we went to lunch.  It was a Friday and I don't
19 know the exact date off the top of my head.  I think it
20 might've been the 20th, perhaps, which -- because I had a
21 wedding shower the next day and I think it was on the
22 21st, but it was a Friday and she asked me at that time
23 to come back.

24      MR. BARATZ:  What did she say to you?

25      THE WITNESS:  That they -- there was going to

1  be a change in the Public Affairs staffing and they

2  needed help releasing the report.

3           MR. BARATZ:  So when you came onboard, you had

4  to jump in right away on this huge report?

5           THE WITNESS:  Correct.

6           MR. BARATZ:  And when is that report released?

7           THE WITNESS:  It depends on if it's an annual

8  or a semi-annual, but that one was released on July 30th.

9           MR. BARATZ:  Did she -- did Ms. Cruz explain to

10 you at all why you were jumping in a week, two weeks

11 before that major report had to be released?

12          THE WITNESS:  No.  I mean, I knew that -- I

13 assumed then that Denise would be leaving and not

14 releasing the report and so that's why I was needed

15 because I had released the reports in the past.

16          MR. BARATZ:  And what was your understanding as

17 to why Ms. Burgess would be leaving?

18          THE WITNESS:  I didn't have an understanding.

19 I didn't ask.

20          MR. BARATZ:  Did you find out afterwards?  Did

21 you discuss it with anyone after --

22          THE WITNESS:  I was -- yeah, the department was

23 downsized.

24          MR. BARATZ:  The department was downsized how?

25          THE WITNESS:  In that the contract staff was

1  let go, some people were shuffled around. I knew

2  Marthena Cowart was -- that there was a reorganization,

3  that Marthena Cowart moved on, Denise moved on.

4          MR. BARATZ: And who told you about the

5  reorganization?

6          THE WITNESS: You know, to be honest with you,

7  I don't know. I mean, it was -- I mean, multiple people

8  were leaving, so it was talked about in the office by

9  multiple people.

10         MR. BARATZ: And that reorganization occurs,

11 are you -- come in that week before that major report,

12 how hard did you have to work when you got back here?

13         THE WITNESS: I think I worked a good 10 or 12

14 day each day to make sure that I was up to being on the

15 content of the material and could answer the questions

16 quickly. That's usually the most taxing part of it.

17         MR. BARATZ: That phone call in Minnesota, when

18 did you think that was?

19         THE WITNESS: The second week of July.

20         MR. BARATZ: And Ms. Cruz called you?

21         THE WITNESS: Correct.

22         MR. BARATZ: And what did she say?

23         THE WITNESS: She asked about my schedule and

24 my availability. She understood that I was in Minnesota

25 working and she wanted to know how long I would be in

1  Minnesota and just was asking what I was up to. She knew
2  I was consulting.
3      MR. BARATZ: Did she mention, at that time, the
4  possibility of rejoining SIGIR or was this just sort of a
5  find out how you were doing, where you are and what your
6  schedule is?
7      THE WITNESS: I think it was find out how I was
8  doing and catch up and she mentioned that there may be
9  opportunity, but she didn't say with SIGIR, even. She
10 just said there may be opportunity for me to do some more
11 work.
12     MR. BARATZ: Did you understand that to be as
13 part of your consulting practice? What did you
14 understand that to mean?
15     THE WITNESS: I assumed that it was because I
16 had no intention of not consulting at that time. I had
17 been working to build up consulting clients, so I had no
18 intention I was changing that.
19     MR. BARATZ: And the reason you were in the
20 D.C. area on that Friday was because of the wedding
21 shower?
22     THE WITNESS: Well, I live here, so I was
23 finished with my time in Minnesota. I was scheduled to
24 come back at that time, anyways. But I did specifically
25 schedule my time in Minnesota to end because it was one

1  of my closest friends. I needed to be here for that
2  occasion.
3         MR. BARATZ: Where did you have lunch?
4         THE WITNESS: Ted's.
5         MR. BARATZ: Where -- is that --
6         THE WITNESS: Ted's is Ted's Montana Grill, I
7  think it's called, in Crystal City. It's across the
8  street from the SIGIR office.
9         MR. BARATZ: And how long did that lunch last?
10        THE WITNESS: It wasn't a long lunch. I think
11 it was probably about an hour, maybe it was an hour and a
12 half. I mean, it was an average lunch time.
13        MR. BARATZ: Did you bring your resume with
14 you?
15        THE WITNESS: No.
16        MR. BARATZ: Did you understand that the lunch
17 was going to be discussing a new position with SIGIR?
18        THE WITNESS: No, I did not have that much
19 detail going into the lunch.
20        MR. BARATZ: And what was exactly said at the
21 lunch?
22        THE WITNESS: That she needed somebody to come
23 in and help release the report and was I available and
24 would I be interested.
25        MR. BARATZ: And you responded --

1          THE WITNESS:  That I would be interested.  I
2  sent her my resume the next day.
3          MR. BARATZ:  So you sent it to her on the
4  weekend?
5          THE WITNESS:  Yes, I sent it Saturday.
6          MR. BARATZ:  Via e-mail?
7          THE WITNESS:  Correct.
8          MR. BARATZ:  Was that your personal e-mail?
9          THE WITNESS:  It was.
10         MR. BARATZ:  Do you keep your e-mail?  Do you
11 still have that?
12         THE WITNESS:  I do.  I do have it.
13         MR. BARATZ:  The responsibilities for your job
14 now --
15         THE WITNESS:  Um-hum.
16         MR. BARATZ:  Well, let me strike that.  You
17 were familiar, because you were here, of what
18 Ms. Burgess's responsibilities were when she was the
19 Assistant Inspector General for Public Affairs, right?
20         THE WITNESS:  If those responsibilities would
21 have changed once I was not working directly with her or
22 after my departure, then I would not be -- I mean, I can
23 tell you as I knew them from my previous boss and I
24 assumed Denise assumed the same responsibilities.  If
25 they changed, I would not have been familiar with them.

1     MR. BARATZ: And how do those responsibilities
2 compare with your responsibilities now?
3     THE WITNESS: I don't know that I can say. I
4 mean, I know that it would've been expected of her to
5 manage the press; I manage the press. I know that -- I
6 assume it would've been expected of her, as it was of my
7 previous boss, to give comment to the press and act as a
8 spokesperson, which I do. And also to cover speaking
9 engagements and general communications for the agency.
10     MR. BARATZ: At your lunch on the 20th with
11 Ms. Cruz, did you know when Ms. Cruz wanted you to start
12 back at SIGIR?
13     THE WITNESS: I did not. I mean, I ended up
14 starting that Tuesday, I believe, which I did not expect.
15     MR. BARATZ: And how did that occur? You sent
16 your resume on Saturday. What happens next?
17     THE WITNESS: They called me Monday and said
18 can you come in tomorrow.
19     MR. BARATZ: When -- what time did they call
20 you on Monday?
21     THE WITNESS: I don't know. It was sometime in
22 the afternoon.
23     MR. BARATZ: When you had -- you said that
24 there was tension in your professional relationship with
25 Ms. Burgess.

```
 1              THE WITNESS:  Correct.
 2              MR. BARATZ:  Who did you discuss those issues
 3    with at SIGIR?
 4              THE WITNESS:  Nick Arnston.
 5              MR. BARATZ:  Anyone else?
 6              THE WITNESS:  No.  I mean, not specifically
 7    that I can recall.  I mean, I had -- multiple
 8    conversations with Nick Arnston.  Oh, actually I
 9    discussed it briefly with Jim Burn, who is no longer with
10    the organization, and I most likely discussed it with
11    Dina Nevarez although I don't recall specifically, but I
12    would imagine that she's someone I would've discussed it
13    with.
14              MR. BARATZ:  Any conversations with Ms. Cruz?
15              THE WITNESS:  No.
16              MR. BARATZ:  How long have you known Ms. Cruz?
17              THE WITNESS:  Since I joined the organization,
18    September of 2005.
19              MR. BARATZ:  And no interactions with her
20    before that?
21              THE WITNESS:  Before 2005 in September, no.
22              MR. BARATZ:  How did you get a position with
23    SIGIR?
24              THE WITNESS:  I knew Jim Burn, who had been the
25    General Counsel at the time.  He knew that I worked in
```

1  communications. The Assistant Inspector General at that
2  time, Jim Mitchell, was looking for a deputy for Public
3  Affairs and Jim Burn suggested that I send in my resume,
4  that I would be a good fit. I interviewed with
5  Jim Mitchell and was offered the position.
6            MR. BARATZ: When you started to meet with --
7  when you met Ms. Cruz in 2005, what -- can you describe
8  for us the types of interactions that you had with
9  Ms. Cruz?
10           THE WITNESS: Sure, I had interaction with her
11 on a fairly regular basis because I was in Public Affairs
12 as Jim Mitchell's deputy. I interacted with the IG and
13 the Deputy Inspector General, Ginger Cruz, really on an
14 almost daily basis because we field that many press calls
15 and the relationship with them is very casual.
16           They want to hear about every interview
17 request, they want to hear about the conversations with
18 the media so that they have a good finger on the pulse of
19 what's going on. So it was daily that I was probably in
20 their office updating them on things that were going on,
21 but I also staffed both of them for their speaking
22 engagements, Ms. Cruz more so. Jim Mitchell staffed the
23 Inspector General more and I staffed Ginger more. So
24 staffed for speaking engagements and then just other
25 miscellaneous projects as they may have arisen.