# Exhibit 19

## Declaration under Penalty of Perjury

I, Stuart W. Bowen, Jr., in accordance with 28 U.S.C. Section 1746, make the following statement:

*EFFECTS OF NONDISCLOSURE:* Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.

*AUTHORITY:* The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.

*PURPOSE AND USES:* The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.

**Complainant's Name:** Denise N. Burgess

**Agency Number:** ARHQOSA07AUG03041

**Claims being Investigated:** Was the Complainant discriminated against based on her race (Black), sex (female), national origin (African-American), and retaliation (opposing unlawful discrimination) when:

1. On March 2, 2007, Kristine Belisle, the Complainant's former Special Inspector General for Iraq Reconstruction (SIGIR) Deputy, at the direction of Ginger Cruz, challenged the Complainant's authority?

2. On or about May 2007, Ms. Cruz, without consultation with the Complainant, took over an assignment that the Inspector General had given to the Complainant?

3. In July 2007, Ms. Cruz targeted the Complainant and her staff for termination when an equivalent unit had four full-time staff members and was slated for no reductions?

4. From June 2007 through July 2007, Ms. Cruz delayed hiring staff into the Complainant's section, forcing the Complainant to accomplish work previously done by two full-time individuals?

5. From June 2007 through July 2007, Ms. Cruz exclusively reviewed the Complainant's time and attendance records in hope of finding irregularities?

6. In July 2007, Ms. Cruz isolated the Complainant from the consultative process regarding media activities?

7. In July 2007, Ms. Cruz insisted on addressing one of the Complainant's staff members with an improper name?

8. On July 23, 2007, the Complainant received a memorandum from R.G. "Nick" Arntson, Chief of Staff for the SIGIR, informing her that effective September 1, 2007, her employment with the SIGIR agency would be terminated?

9. On July 23, 2007, Ms. Cruz retaliated against the Complainant for opposing employment practices that were racially discriminatory, by terminating her employment?

Q: State your full name.

R: *Stuart Waddington Bowen, Jr.*

Q: Identify your race, national origin, and sex.

R: *Caucasian, American, Male*

Q: What were your position title, grade, and series as of June 2007?

R: *Special Inspector General for Iraq Reconstruction; ES IV equivalent*

Q: Briefly describe your duties in that position.

R: *SIGIR is responsible for the oversight of the use, and potential misuse, of the all obligation, expenditure, and revenue associated with reconstruction and rehabilitation activities in Iraq. SIGIR provides independent and objective reviews of programs in Iraq reconstruction and provides audit and inspection reports to Congress. SIGIR produces comprehensive Quarterly Reports to Congress summarizing its audits, inspections, and investigations.*

*I manage a staff of approximately 130 personnel in Arlington, Virginia, and Baghdad, Iraq (and several other locations in the continental United States). I meet regularly with members of Congress to brief them on the progress of Iraq's reconstruction.*

Q: When were you assigned to the position you held as of June 2007? Are you in that same position now? If not, when did you leave that position?

R: *As provided in the Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005 (**P.L. 108–375**), I became and now serve as the Special Inspector General for Iraq Reconstruction. Previously, I was the Inspector General for the Coalition Provisional Authority (CPA), and that position was re-designated as the SIGIR by P.L. 108-375.*

Q: What is the name of the organization to which you were assigned when the claims at issue occurred?

R: *The Special Inspector General for Iraq Reconstruction*

Q: Provide the names and position titles of your first and second level supervisors (the persons to whom you reported) as of June 2007.

R: *As Inspector General, I serve under the general supervision of the Secretaries of State and Defense.*

Q: What was your organizational relationship to the Complainant during her employment within SIGIR?

R: *Complainant served as an Assistant Inspector General. I was her second line supervisor.*

Q: Who hired the Complainant for her position within SIGIR? Did you provide your approval so that the Complainant could be hired?

R: *I identified her for employment and provided approval for her to be hired.*

Q: The Complainant believes that you and Ginger Cruz are responsible for the alleged discrimination against her. Please respond.

R: *I deny that any SIGIR employee, including Ginger Cruz and myself, engaged in any acts of discrimination toward Ms. Burgess.*

Q: Respond to the Complainant's allegation that on March 2, 2007, Ms. Belisle, the Complainant's former SIGIR Deputy, at the direction of Ms. Cruz, challenged the Complainant's authority by performing media-related activity without first advising the Complainant.

R: *I have no direct knowledge of this. However, Ms. Belisle sent me an e-mail dated March 2, 2007, with regard to a media contact she had received in which she copied Ms. Burgess and Ms. Cruz. I believe that Ms. Belisle acted professionally and did not, by this action, challenge Ms. Burgess' authority.*

Q: Respond to the Complainant's allegation that on or about May 2007, Ms. Cruz, without consultation with the Complainant, and because of the Complainant's race, national origin, and sex, took over an assignment that you had given to the Complainant. Include in your response a description of that particular assignment.

R: *I have no knowledge of this.*

Q: Respond to the Complainant's allegation that in July 2007, Ms. Cruz targeted the Complainant and her staff for termination, because of the Complainant's race, national origin, sex, and in retaliation, when an equivalent unit had four full-time staff members and was slated for no reductions.

R: *In the spring and summer of 2007, SIGIR was under financial pressure, particularly from the Office of Management and Budget (OMB), due to potential budget shortfalls and thus reductions in staffing levels became necessary. It was also understood at that point in time that SIGIR could be closing its doors within a year to 18 months. Nick Arntson, then Chief of Staff, informed me that SIGIR could suffer an Anti-Deficiency Act violation if it did not reduce staffing numbers and costs. I tasked Ms. Cruz with the duty to realign our staffing, with particular emphasis on reducing the number of positions in non-core functions and in cutting contractor costs. During this time frame, we reduced staff in Media and Congressional Affairs. We also reduced our footprint in Iraq. The termination of Complainant was in conjunction with this reorganization and was not related to the Complainant's race, national origin, sex, nor was it in retaliation for any complaint.*

Q: Respond to the Complainant's allegation that from June 2007, through July 2007, Ms. Cruz delayed hiring staff into the Complainant's section, forcing the Complainant to accomplish work previously done by two full-time individuals, and I do not believe that this was done because of the Complainant's race, national origin, sex, and in retaliation.

R: *I have no direct knowledge of this. Given that SIGIR was under budget constraints and engaging in a reorganization, it seems appropriate to refrain from hiring staff for this time period. I do not believe that the work-load for public affairs was unreasonable for one person to accomplish, and one person has succeeded in accomplishing this workload for over a year now. Ms. Cruz's action was not taken because of the Complainant's race, national origin, sex, or in retaliation.*

Q: Respond to the Complainant's allegation that because of her race, national origin, sex, and in retaliation, from June 2007, through July 2007, Ms. Cruz exclusively reviewed the Complainant's time and attendance records in hope of finding irregularities.

R: *I have no direct knowledge of this. However, as the Complainant's supervisor, Ms. Cruz was required to approve her time and attendance. I do not believe that such time and attendance review was related to the Complainant's race, national origin, sex, or in retaliation.*

Q: Did the Complainant inform you that Ms. Cruz had reviewed her records for that purpose? If so, when did she inform you, how did she inform you, and what action did you take in response?

R: *I have no recollection of any such conversations.*

Q: Respond to the Complainant's allegation that in July 2007, Ms. Cruz isolated the Complainant from the consultative process regarding media activities, because of her race, national origin, sex, and in retaliation.

R: *I have no knowledge of this.*

Q: Respond to the Complainant's allegation that in July 2007, Ms. Cruz insisted on addressing one of the Complainant's staff members with an improper name by referring to Patricia Redmon as "Pat." Include in your response whether you knew of that incident.

R: *I have no knowledge of this.*

Q: Why did Ms. Cruz use that name? Had Ms. Cruz or anyone else used that name before when addressing Ms. Redmon?

R: *I have no knowledge of this.*

Q: Did Ms. Redmon, or anyone else, object to being addressed as "Pat?" If so, who, when, and in what manner did she or he object? Describe what action management took when it became aware of the objection to the use of the name at issue.

R: *I have no knowledge of this.*

Q: Respond to the Complainant's allegation that on July 23, 2007, she received a memorandum from R.G. "Nick" Arntson, Chief of Staff for the SIGIR, informing her that effective September 1, 2007, her employment with the SIGIR agency would be terminated, and that this was done to her because of her race, national origin, sex, and in retaliation for having complained of Ms. Redmon's termination.

R: *The letter speaks for itself. The termination was based on a necessary reorganization and not because of Complainant's race, national origin, sex, nor in retaliation for having complained of Ms. Redmon's contract being terminated.*

Q: Respond to the Complainant's allegation that on July 23, 2007, Ms. Cruz retaliated against the Complainant, for complaining of Ms. Redmon's termination, by terminating the Complainant's employment.

R: *As discussed above, the termination of the Complainant was part of a reorganization of non-core function positions at SIGIR. The termination was not in retaliation for anything.*

Q: Were you aware of the Complainant having complained about Ms. Redmon's termination? If so, when did she complain, and when and how did you learn of it?

R: *I do not recall. To the best of my recollection, I became aware of her complaint regarding Ms. Redmon during the pendency of this proceeding.*

Q: What was the reason(s) for the Complainant's termination?

R: *As discussed above, in the spring and summer of 2007, SIGIR was under financial pressure, particularly from OMB, to reduce staffing levels. I tasked Ms. Cruz to realign our staffing with a particular eye toward reducing the number of positions in non-core functions and in cutting contractor costs. During this time frame, we reduced staff in Media Affairs and Congressional Affairs. The termination of Complainant was in no way because of the Complainant's race, national origin, sex, or in retaliation.*

Q: Was Kristine Belisle's previous complaint against the Complainant a factor in the Complainant's termination?

R: *No.*

Q: Why did Ms. Belisle quit her employment with SIGIR in the early portion of calendar year 2007?

R: *I am aware that, at the Complainant's direction, Ms. Belisle received a letter from the SIGIR human resource officer informing her that her employment with SIGIR was terminated due to a reorganization.*

Q: Why did Ms. Belisle return to employment with SIGIR after she had previously quit?

R: *I do not know why Ms. Belisle chose to return to SIGIR. However, I do know that she is one of about ten SIGIR employees that have returned to work at SIGIR after a hiatus.*

Q: Was the Complainant's termination a factor in Ms. Belisle's return to employment with SIGIR?

R: *I do not know why Ms. Belisle chose to return to work for SIGIR. I do know that the new position of Director, Public Affairs, was created as part of the reorganization, that Ms Cruz offered her a position and that Ms. Belisle chose to accept that position.*

Q: What was the reason(s) for the termination of Barbara Lewis and Patricia Redmon?

R: *They both were contractors and not government employees. Given budget constraints, SIGIR reduced the number of contractor employees. Generally, contractor employees were considerably more costly for the agency than direct hire employees*

Q: Why was it that after the Complainant had been hired for only about seven months, it was determined that her section and position were no longer needed? What changed within that seven-month period to make her termination necessary?

R: *The budget situation changed within that time period. As discussed, above, in the spring and summer of 2007, SIGIR was under tremendous pressure, particularly from OMB, to reduce staffing levels. The then Principal Deputy Inspector General Robin Raphel, whom I had tasked to develop a budget and work with OMB, had submitted a budget to OMB of over $50 million. This was rejected by OMB and caused increased scrutiny of SIGIR's spending, particularly in areas of non-core functions, like Public and Congressional Affairs. I tasked Ms. Cruz with realigning our staffing overall with particular eye toward reducing the number of positions in non-core functions and in cutting contractor costs. During this time frame, we reduced staff in Media Affairs and Congressional Affairs. We also reduced our footprint in Iraq. Once it was determined that Public Affairs would not have a staff, there was no longer a need for Complainant's skill sets. The termination of Complainant was in no way because of the Complainant's race, national origin, sex, or in retaliation.*

Q: Did the Complainant ever report to you or to any other of her supervisors that she believed she was being harassed on her job? If so, to whom did the Complainant report, when did the Complainant tell that person, how did she tell that person, what did the Complainant say, and what was management's response?

R: *No. I have no knowledge as to whether she reported harassment to anyone else.*

Q: Was anyone else involved in the harassment that the Complainant alleges? If so, who and in what manner?

R: *I have no knowledge of this.*

Q: Did you treat the Complainant differently in any manner during her employment with SIGIR because of her race, national origin, sex, or any previous protected EEO activity in which she participated?

R: *No.*

Q: Are you aware of anyone having treated the Complainant differently because of her race, national origin, sex, or previous EEO participation?

R: *No.*

Q: Describe your role in any restructuring of the Agency that occurred prior to the termination of Ms. Redmon and the Complainant?

R: *I tasked Ms. Cruz with realigning SIGIR's staffing to respond to our budgetary pressures. We had several conversations during the course of this realignment. However, Ms. Cruz was completely responsible for managing this task. She had, and continues to have, my full authority and support for her actions in this regard.*

Page 7 of 8 Pages
Declarant's Initials

Q: Identify with whom you discussed reorganization of the Agency, when any such discussions occurred, and what was the substance of those discussions? To be clear, "discussions" include any in-person discussions, telephone calls, emails, and/or any other communications.

R: *Ms. Cruz and I had several discussions over this time period. I also had discussions with Nick Arntson, my Chief of Staff. I do not recall the specific dates and times of these discussions. To the best of my recollection, the substance of the discussions with Ms. Cruz involved the nature of the budget problems facing SIGIR and my authorization for her to take necessary actions to address these budgetary problems through a reorganization of non-core functions that would reduce costs, including contractor costs. To the best of my recollection, my discussions with Mr. Arntson involved the budgetary problems facing SIGIR as well as certain administrative matters like the notification of termination to Complainant and the hiring of Ms. Belisle.*

Q: Describe by category and location all documents, electronically stored information, and tangible things that the Agency has in its possession, custody, or control that relates to a reorganization of the Agency in any way, created before the agency terminated the Complainant.

R: *I am aware of no personal records or e-mails addressing the reorganization. Documents that support the reorganization were provided to counsel to provide to the EEO Investigator. It is my understanding that such documents were provided to the Investigator. In addition, Ms. Cruz's notes about the reorganization have also been provided to the Investigator. There are no other files specifically discussing the reorganization. Possible documents include organizational charts, table 30, notes and emails between SIGIR and OMB, memoranda, and e-mails.*

Q: Do you have anything to add?

R: *No.*

## END OF STATEMENT

I, Stuart W. Bowen, Jr., declare (*certify, verify or state*) under penalty of perjury, that the foregoing is true and correct.

_____          9-12-08
(Declarant's Signature)                                    (Date)