**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| DENISE BURGESS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No.   1:09-cv-763 |
| | ) | JCC/JFA |
| STUART W. BOWEN, | ) | |
| Special Inspector General for, | ) | |
| Iraq Reconstruction, | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Stuart W. Bowen, Jr., Special Inspector General for Iraq Reconstruction (hereinafter, "SIGIR"), by and through the undersigned United States Attorney, and pursuant to Fed. R. Civ. P. 56, respectfully renews his motion for summary judgment with respect to Plaintiff Denise Burgess's claims of discrimination and retaliation.  It would be an understatement to assert that discovery in this case has been extensive and robust.  Plaintiff has conducted over a dozen depositions, totaling over 70 hours in length (real time) and the parties have produced thousands of discovery documents.  Despite this, Plaintiff can point to no evidence of discrimination or retaliation that would allow her to overcome summary judgment.

**INTRODUCTION**

This is a Title VII action in which the Plaintiff, Ms. Denise Burgess ("Burgess"), alleges that she was removed from federal service and denied a transfer to a new position because of her race and color, and because she allegedly complained of race discrimination.  *See* Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16.  From approximately January 2007 until July 2007, Burgess served as SIGIR's Assistant Inspector General ("AIG") for Public Affairs in Arlington, Virginia.  On July 23,

1

2007, Ms. Ginger Cruz ("Cruz"), the Deputy Inspector General, with the approval from Mr. Stuart

Bowen, the Special Inspector General ("Bowen"), notified Burgess that her employment would

conclude effective September 1, 2007, because her position and function were being eliminated as a

result of organizational restructuring to reduce overhead and focus resources on core operations, which

included audits, inspections and investigations.  The drive to reduce costs and reallocate resources

resulted from the concerns expressed by the U.S. Office of Management and Budget ("OMB") about

SIGIR's significantly increased Fiscal Year ("FY") 2008 Budget request.  Specifically, representatives

from OMB instructed Cruz in no uncertain terms that SIGIR needed to reduce costs and focus on its

core audit and investigative mission. Govt. Exh. 18., Dickenson Deop, at 72:8-73:12.

The drive to reduce costs and reallocate resources resulted from the passage of a law at the end

of 2006[1] that gave SIGIR a new mandate to complete a "forensic audit," without any additional funds.

When SIGIR approached OMB with significantly increased budget requests, they were denied, and

representatives from OMB instructed SIGIR in no uncertain terms that "SIGIR needed to allocate more

resources toward forensic audits."  Government Exhibit ("Govt. Exh.") 1, Excerpts of Cruz Testimony

at Factfinding Conference ("Cruz Test."), p. 92, lines 9-10; 18, Dickenson Depo, at 30:9-22; 96:16-17.

OMB also expressed concern about SIGIR's significantly higher FY 2008 budget request compared to

its prior budgets, as well as concerns at OMB and within SIGIR that SIGIR was outspending its

appropriated funds.  Govt. Exh. 1, Cruz Test., p. 92, lines 6-17; *See* Govt. Exh. 18, Dickenson Depo, at

105:5-20.

Furthermore, it was SIGIR's understanding, at least through mid-July 2007, that it would need to

stretch out its FY 2008 budget – which OMB had approved at a $35 million level -- through December

---

[1]P.L. 109-440 passed on December 20, 2006.

2008[2], as opposed to September 2008, with $5 million of that amount being fenced off for a forensic audit requirement imposed by Congress.   At its then current staffing level, SIGIR projected that it would incur a $2 million shortfall with a $35 million budget and thus would have to cut costs to stay within that budget.  *See* Govt. Exh. 42, Email communications from Cruz to Young, *et al.*, regarding budget meeting with OMB.   As a result of these concerns, Inspector General Bowen instructed Cruz in June 2007 to present him with a plan that would yield savings for SIGIR in FY 2007 and would address the shortfalls for FY 2008.   Govt. Exh. 20, Bowen Depo, at 196:21-22, 197:1-6.   In response, Cruz developed a reorganization plan, which Special Inspector General Bowen approved, that in their opinion took appropriate measures to return SIGIR to the leaner agency it had once been, dedicating resources to core operational aspects, such as investigations and audits as opposed to administrative functions.   One of the cost-cutting measures Cruz recommended and Bowen approved (among several) was to downsize the SIGIR Public Affairs office's staff and function.

Unlike other divisions within SIGIR, Public Affairs does not play a congressionally mandated role, and in Cruz's opinion, it was over-staffed at the time.  As a result, Cruz and Bowen eliminated Burgess's supervisory position as Assistant Inspector General for Public Affairs, eliminated Burgess's contracted support staff, and replaced the entire Public Affairs division with a single, lower-graded Director of Public Affairs – a position with a lower base salary, and no managerial or supervisory role.

Burgess alleges that the decision to eliminate her position and to not offer her a transfer to a new position was based on her race (she is African-American) and/or color (she is black).   She further alleges that these decisions were made in retaliation for engaging in protected equal employment opportunity

---

[2]  Even after July 18, 2007, it was SIGIR's understanding that under the Anti-Deficiency Act, the budget in place during the summer of 2007 would have to be spent at a rate commensurate with the appropriation, which required that the $35 million appropriated in May 2007 would need to be budgeted to cover costs through December 2008, or until the Congress appropriated new money, which was not slated to happen until the Summer of 2008.  *See* Govt. Exh. 18, Dickenson Depo, at 212-213.

("EEO") activity (i.e., complaining that SIGIR eliminated a position held by one of Burgess's subordinates, a contractor for unlawful discriminatory reasons).

On September 18, 2009, SIGIR moved for summary judgment on Burgess's claims of discrimination and retaliation. Burgess opposed SIGIR's motion for summary judgment, asserting that the administrative record was insufficient to enable her to mount a defense to SIGIR's motion. By Order dated October 28, 2009, this Court denied SIGIR's motion for summary judgment without prejudice allowing Burgess's claims to proceed through discovery. Discovery in this matter has been exhaustive. After a lengthy and thorough process, involving the depositions of more than a dozen witnesses, including the head of the agency, Burgess has developed no new material evidence that support her claims. To the contrary, the evidence produced through the discovery process overwhelmingly supports SIGIR's position. These claims are now ripe for summary judgment under FED. R. CIV. P. 56(b).

## SUMMARY OF ARGUMENT

As explained in SIGIR's initial motion for summary judgment, SIGIR is entitled to summary judgment with respect to all of Burgess's claims (i.e., race/color discrimination in the decision to terminate her; race/color discrimination in the decision not to transfer her to a new position; retaliation in deciding to terminate her; and retaliation in deciding not to transfer her to a new position).

First, with respect to Burgess's race and color discrimination claims, she fails to make out a *prima facie* case because she has failed to produce evidence that demonstrates her position as Assistant Inspector General for Public Affairs, an SES-equivalent position, remained open to similarly qualified applicants or that a person outside her protected class replaced her as Assistant Inspector General. She cannot provide such evidence because that position was abolished and has never been resurrected. Even if Burgess could establish a *prima facie* case, her discrimination claims nonetheless fail because SIGIR

has articulated (and, indeed, supported with substantial evidence in the summary judgment record) legitimate, non-discriminatory reasons for its decisions.  Discovery has yielded no evidence that would even remotely allow Burgess to demonstrate that these reasons are pretext.

It is beyond dispute that during the relevant time period, OMB instructed SIGIR to hold down costs and focus on its core audit and investigative mission.  It is further beyond dispute that as a result of that directive and corresponding budget constraints during the months preceding Burgess's termination, SIGIR engaged in various budget exercises and developed various budget scenarios which endeavored to reduce SIGIR's operating expenses. Those scenarios specifically looked to SIGIR's organizational structure, and contemplated organizational changes in order to keep costs down.  It is irrefutable that changes within SIGIR's staff did occur as a result – the elimination of Burgess's position was just one of them.

While the fiscal crunch affected other sections of SIGIR, Burgess's Public Affairs office felt the brunt of the impact because, unlike other sections, SIGIR has no congressional mandate to perform public affairs functions.  The reorganization, therefore, eliminated Burgess's SES-equivalent position and replaced it with a lower-graded GS-15- equivalent position.  The reorganization also eliminated Burgess's support staff, making the Public Affairs office a single-person shop.  The Public Affairs office today remains in this pared-down state, with one person handling all duties.  The reductions in Public Affairs were only part of a larger on-going reorganization. Other actions taken included eliminating contract staff and, in certain cases, converting the contract positions to full-time government positions (which would save costs).

The SIGIR leadership did not offer Burgess a new role as the sole public affairs employee within the reorganized SIGIR because: (1) as an SES-equivalent employee, she occupied a supervisory position that in management's perception was not needed in a reduced public affairs office to be staffed by one, lower-level hands-on employee; (2) she repeatedly expressed that she needed more staff in order to perform the public affairs mission- a staffing level the SIGIR believed it could not afford; and (3) she

argued passionately for resource parity between the Public Affairs office and the Congressional Affairs office – a position not endorsed by the SIGIR management or by SIGIR's congressional mandate. Notably, upon her hiring, Burgess was duly notified that she could be terminated earlier than the not-to-exceed date of her appointment (thirteen months from the date of her appointment) for reasons such as lack of funds, and lack of work.  She acknowledged this by her signature on the "Memo for Time Limited 3161 Appointees" dated February 4, 2007.

Second, Burgess's retaliation claims fare no better.  Initially, she cannot make out a *prima facie* retaliation case because she fails to demonstrate that her stated concerns to management before her removal constituted Title VII-protected activity.  Moreover, even assuming *arguendo* that Burgess's expressed displeasure with the termination of her assistant (a contractor) constituted protected Title VII activity, there is no evidence that would enable Burgess to show a causal nexus between her complaint and any employment decision.  Even if Burgess could establish a *prima facie* retaliation case, she would still be unable to rebut as pretext SIGIR's legitimate, non-retaliatory reasons for its employment decisions.  For these reasons, summary judgment on all Burgess's claims is now warranted.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**1**.  The Office of the Special Inspector General for Iraq Reconstruction (SIGIR), first created by the Congress in 2003 as the Office of the Inspector General of the Coalition Provisional Authority, fulfills a mandate to oversee all U.S.-funded Iraq reconstruction programs and projects. Pub. L. 108-106, § 3001, as amended. The Congress created SIGIR as a temporary federal law enforcement and oversight agency to prevent, detect, and investigate waste, fraud, and abuse.  According to the law, SIGIR is required to conduct independent and objective audits and investigations of all appropriated funds supporting Iraq reconstruction. *Id.*, § 3001(f)(1). To that end, SIGIR's enabling legislation directs the Special Inspector

General to appoint both an Assistant Inspector General for Auditing and an Assistant Inspector General for Investigations. Id., § 3001(d).  In addition to these requirements, SIGIR is required by law to submit to the appropriate committees of Congress quarterly reports of its activities and the activities involved in Iraq reconstruction. *Id.*, § 3001(i).

**2**.  At all times relevant to the Complaint, Stuart W. Bowen, Jr., a Caucasian male ("Bowen") was the Special Inspector General for Iraq Reconstruction.  *See* Compl., para. 2; Govt. Exh. 3, Bowen Declaration ("Bowen Decl."), p. 2.

**3.**  From 2005 until December 2006, Ginger Cruz, an Asian American female, served as the Deputy Inspector General for Iraq Reconstruction.  Govt. Exh. 1, Cruz Test., p. 82, lines 7-10.  Cruz returned to SIGIR in December 2006 as a senior adviser.  Govt. Exh 1, Cruz Test., p. 82, lines 9-11; Compl., paras. 22, 25.  She then briefly assumed the role of Deputy Inspector General for Policy in June 2007.  Govt. Exh. 1, Cruz Test., pp. 82, 161; Compl., paras. 22, 25.  After a detail at the State Department, on June 22, 2007, Bowen announced that Cruz was assuming duties as Deputy Inspector General for Policy.  Govt. Exh. 1, Cruz Test., pp. 82, 161; Compl., paras. 22, 25.

**4.**  After assuming duties as Deputy Inspector General for Iraq Reconstruction, Raphel played a key role in doubling the number of personnel in SIGIR's Congressional and Public Affairs Offices from four to eight.  Govt. Exh. 1, Cruz Test., p. 91, lines 10-20.

**5.**  From June 2006 until November 2008, Erica Young (African-American, female) functioned as the Senior Budget Officer at SIGIR.  Govt. Exh. 16, Young Depo, 13:11-17.  In that capacity, Young was responsible for creating budget estimates and executing the SIGIR budget once SIGIR received its appropriated funds.  *Id.* at 15: 14-19.  In November 2008, Young was promoted by Cruz to the position of Director of Resource Management and Budget.  *Id.* at 14:8-12.

6.     On December 2007, Bowen recruited Burgess, and on January 16, 2007, he and Ambassador Robin Raphel, the Deputy Inspector General immediately prior to Cruz, appointed Burgess to serve as SIGIR's Assistant Inspector General for Public Affairs.  Govt. Exh. 3, Bowen Decl., p. 3; Govt. Exh. 2, Burgess Test., p. 32, lines 12-25; Govt. Exh. 29, Burgess's Appointment Memo, Jan., 16, 2007. Burgess's position was rated SES-4/AD/301/00, an Administratively Determined position that was the equivalent of an SES-4.  Govt. Exh. 2, Burgess Test., p. 13, lines 8-11.  Burgess was hired into a temporary position for a term not to exceed thirteen months, pursuant to 5 U.S.C. §3161.  Govt. Exh. 10, Declaration of Janet Nisbet ("Nisbet Decl.").  SIGIR's offer letter to Burgess stated that her appointment could be terminated earlier.  *Id.*  The "Memo for Time Limited 3161 Appointees" that Burgess, like all new SIGIR employees read and signed when she began her SIGIR employment informed her that she could be terminated earlier than the not-to-exceed date of her appointment "for reasons such as lack of funds, lack of work, etc."  *Id*. at att. 4.  All new SIGIR employees are given such a memo during in-processing.  *See* Govt. Exh. 10, Nisbet Decl.

7.   Shortly after Burgess was hired, at Burgess's request, Patricia Redmon was hired as a contract employee through BCPI contracting services to serve as Burgess's administrative assistant.  *See* Govt. Exh. 40, Burgess Depo, pp. 248:7-8; 250:6-11. Redmon was supervised by and reported directly to Burgess. Compl., at 2;  Govt. Exh. 15, Redmon Test., p. 174-5; *see* Govt. Exh. 40, Burgess Depo, pp. 248:7-8; 250:6-11.

8.   As the Assistant Inspector General for Public Affairs, Burgess reported directly to the Deputy Inspector General Cruz, and Burgess's second-level supervisor was Special Inspector General Bowen. Govt. Exh. 2, Burgess Test., pp. 16-17.

9.   Until January 2007, SIGIR had been operating on a budget of approximately $25 million a year.

Govt. Exh. 1, Cruz Test., p. 92, lines 3-8; Govt. Exh. 37.  On December 7, 2006, however, SIGIR had submitted to OMB a request for $53 million to operate through September 2008.  Govt. Exh. 17; Govt. Exh. 1, Cruz Test., p. 92, lines 3-8; Govt. Exh. 21, Cruz notes, July 9, 2007.  The December 7, 2007 budget request was denied by OMB.  On January 8, 2007, SIGIR Chief of Staff Nick Arnston send an appeal memo signed by Robin Raphel to OMB Budget Examiner Howard Dickenson. Govt. Exh. 30, Email from Arnston to Dickenson, attached Appeal FY08 Budget Request, January 8, 2007.  The appeal included a new budget request this time for even more money - $90 million dollars.  *Id.*

10.    In or about early June 2007, OMB, through OMB Budget Examiner Howard Dickenson, expressed concern with SIGIR's substantially increased budget request, which had more than doubled from previous years' budget requests.  Govt. Exh. 18, Dickenson Depo, at 32:11-33:7; Govt. Exh. 1, Cruz Test., p. 92, lines 3-17.  OMB instructed SIGIR (and more specifically, Cruz who was instructed to take over budget duties from Arnston) to reduce SIGIR's proposed budget, and to operate on a $35 million budget through <u>December</u> 2008 (rather than September 2008, as SIGIR proposed in its previous $53 million budget request, and $90 million budget request that shortly followed).  Govt . Exh. 18, Dickenson Depo, at 210:9-210:14; Govt. Exh. 19, June 11, 2007, Email from Young to Dickenson regarding budget; Govt. Exh. 1, Cruz Test., p. 94, lines 1-11.  OMB furthermore instructed SIGIR, and Cruz specifically, that prior to any approval of a budget, SIGIR would have to demonstrate that substantial cuts were made in costs. Govt . Exh. 18, Dickenson Depo, at 219:22-220:7 ("I do recall as an OMB examiner I did take the position to SIGIR that we weren't going to tell them where to cut, but I do recall I said something along the lines of, if we're going to strike a deal because you guys are so bad off [on your budget], we have to see you actually make real cuts.").  Throughout calendar year 2007, SIGIR engaged in multiple communications

with Howard Dickenson of OMB where he emphasized the need for budget cuts[3].  *See*, Govt. Exh. 3; *see also*, Govt. Exh. 18, Dickenson Depo, at 114:15-115:14; 115:20-116:14; 63:14-63:19; 198:1-198:6; 24 Throughout that time SIGIR also engaged in various budget drills in order to project various budget and organizational scenarios. Govt. Exh. 26; Govt. Exh. 31;Govt. Exh. 32; Govt. Exh. 35; Govt. Exh 36:, Govt; Govt. Exh 38.  Those drills contemplated, among other issues, the reorganization and often referenced potential employee reductions.  *See id.*

    **11.**  Faced with these significant budget constraints, and concerns that SIGIR was expending more of its budget on overhead and non-essential bureaucratic positions, rather than mission-essential audits, investigations and inspections functions and positions, Bowen asked Cruz to scrutinize the entire organization to determine what budget cuts could be made.  Govt. Exh. 1, Cruz Test., p. 94, lines 3-8; Govt. Exh. 3 at p. 4; Govt. Exh. 20, Bowen Depo, at 105:18-106:8; 115:1-116:21; 196:21-197:1-6. Throughout calendar year 2007 SIGIR would continue to evaluate its organizational structure in view of its budget constraints. *See* Govt. Exh. 39, SIGIR Weekly Activity Reports ("WARS") from January 2007 through July 2007.

    **12.**  On or about June 20, 2007, Cruz developed the first plans to streamline and reorganize SIGIR so that it could meet the new mission within the budget constraints. Govt. Exh. 1, Cruz Test., pp. 121, 160;

---

[3]Govt. Exh. 18, Dickenson Depo, at 114:13-115:14 (Q. Sure. So I don't misstate it, I'll have the court reporter read it. THE REPORTER:  "Question: Did you ever instruct any employee at SIGIR to reduce the number of employees that SIGIR had on its payroll?" THE WITNESS:  The quick answer to that is no, but there's always a "but" to that. SIGIR in one of my discussions with them when we had identified what I had believed to be a funding gap, that they were not going to be able to get through the end of the fiscal year absent some injection of new money, which as an OMB examiner I communicated to them that we're not going to give to them, SIGIR did tell me, if you make us live within these means we're going to have to lay people off.  I do recall my response to them was, if you don't have enough money, it's SIGIR's responsibility to identify how to live within your budget. But I did not specifically -- you know, I acknowledged that that might mean laying people off, but that would be something for SIGIR to decide.)

Govt. Exh. 5, excerpts from Cruz's notes ("Cruz notes"), pp. 376-379.[4]

**13.** During June and July 2007, Cruz, in consultation with Bowen, developed plans to, among other things, downsize the Public Affairs office, which consisted of an SES-4-equivalent Assistant Inspector General (Burgess) and two staff members. Govt. Exh. 1, Cruz Test., pp. 86, 97-103; Govt. Exh. 20, Bowen Depo, at 110:4-110:20; Govt. Exh. 41, Email from Cruz to Nisbet, regarding "Draft org chart," with attachment of "SIGIR Org Chart 20JUN07 DRAFT.ppt."[5] (Chart reflecting that as of the very latest, July 3, 2007, Cruz had already decided to create a new Director of Public Affairs position in which she would hire Kris Belisle.) According to Cruz, the Director of Public Affairs needed to be "someone who was able to do the heavy lifting, who was not above making the phone calls, who was not above doing . . . the day-to-day scheduling, management and callbacks . . . ." Gov. Exh. 1, Cruz Test., at p. 102, lines 7-10. The newly-created GS-15-equivalent Director of Public Affairs would have no staff and would be responsible for the day-to-day public affairs functions of SIGIR.

**14.** In early July 2007, approximately two weeks prior to terminating Burgess's employment, Bowen and Cruz decided to eliminate the Assistant Inspector General for Public Affairs position. Govt. Exh. 1, Cruz Test., p. 167, lines 2-6; *see also* Govt. Exh. 41.

---

[4] This draft SIGIR organization chart attached to the email, transmitted by Cruz on July 3, 2007, reflects the placement of Kristine Belisle as the Director of Public Affairs. This illustrates that Cruz, as early as July 3, 2007 had made the decision to eliminate the AIG for Public Affairs position to create a new Director of Public Affairs position with Kristine Belisle as Director. The Court must note that although the chart itself reflects a May "2006," it was dated so in error. Defendants represent that it should have been correctly dated June 20, 2007, the date upon which it was created.

[5] Burgess herself was aware of both the budget issues and the reorganization at the time they were occurring. In July 2007, she sent e-mail messages regarding her efforts to hire new staff. Govt. Exhs. 8-9. In those e-mail messages, she mentioned that she selected someone for a vacant position, "but didn't move forward due to the reorganization." Govt. Exh. 9. She also mentioned that SIGIR was holding off on hiring new personnel "until they [SIGIR] have some assurance [they] will have sufficient funds." Govt. Exh. 9.

15.   Cruz's decision is also memorialized days later in her notes, dated July 16, 2007 which states:

" …. Public Affairs X2 .... dissolve AIGPA [Assistant Inspector General for Public Affairs position] … +

Kris Belisle...."  Govt. Exh. 21, Cruz Notes, July 16, 2007 Entry, pp. 229-32.  Again, on July 17, 2007,

Cruz writes, "Belisle – immediate  … Denise –reorganize … Patricia Redmon/Barbara Lewis – reduce

BCPI".  Govt. Exh. 21, Cruz Notes, July 17, 2007 Entry, pp. 233, 240.  Clearly and importantly, by this

date, SIGIR had decided to: hire Belisle; eliminate Burgess's position as a part of the reorganization; and

reduce the BCPI contract costs by ending the contracts of Redmon and Lewis.  In fact, on or about this

second week of July, 2007, Cruz contacted Ms. Kristine Belisle (via telephone), who previously had

worked in the SIGIR Public Affairs office and was familiar with the organization and its mission. Govt.

Exh. 6, Belisle Test., p. 220; Govt. Exh. 22, Belisle Depo, at 110:15-22.  Cruz told Belisle that there "may

be the opportunity for [Belisle] to do some more work."  Govt. Exh. 6, Belisle Test. p. 220, lines 9-10; p.

223, lines 3-11.  Cruz also told Belisle to contact her once Belisle returned to the Washington, DC area

because Cruz wanted to have lunch with her.  Govt. Exh. 22 at 117:9-11.

16.     The reduction in the staff of Public Affairs was just one component of the larger

reorganizational effort.  One example is that personnel in the Audits division were reappointed from Iraq to

the United States in efforts to cut on travel expenses.  *See* Exh. 24, Email exchange from Nisbet and Bell,

June 13, 2007 (describing reorganizations in Audits division.)  Another major initiative undertaken by

SIGIR to reduce overhead was to reduce the total number of support contractors (which are more costly to

the organization than government employees), and to convert the essential contract positions to full-time

government employee positions.  Govt. Exh. 10, Nisbet Decl.  In addition to the contractor position

eliminated in the Public Affairs section, at least four other contract positions were also eliminated (two

African-American males, and two white females).  Conversely, seven contractor positions, deemed to be

12

essential following Cruz's review, were converted to full-time government positions in the period from July through November 2007.  *See* Nisbet Decl.  Notably, of these individuals offered jobs with SIGIR at Cruz and Bowen's direction, five were African-American.  *See* Govt. Exh. 10, Nisbet Decl.; *see also* Govt. Exh. 33, Arnston Depo, at 217-222.  Notably, of these individuals offered positions with SIGIR at Cruz and Bowen's direction, five were African-American.  *See* Nisbet Decl, p. 2.

**17.**   On July 19, 2007, again, *after* the decision was made internally to eliminate the position of AIG for Public Affairs as well, Cruz informed Burgess that Burgess's assistant, BCPI contractor, Patricia Redmon, would be let go.  Govt. Exh. 7, EEO Compl., p. 7; Govt. Exh. 8, Jul. 23 email.  In Burgess's August 13, 2007 EEO Complaint, she stated that during the meeting Cruz informed her:

> that my assistant Ms. Patricia Redmon would be terminated in two weeks.  At that time I specifically raised my concern that the decision was unfair.  I questioned the equality of the decision to terminate Ms. Redmon since the Public Affairs sister section, Congressional Affairs, was overstaffed.

Govt. Exh. 7, EEO Compl., p. 2.  Burgess further wrote in her EEO Complaint that upon being informed that Redmon would be let go, "I told Ms. Cruz it would be extremely difficult for me to manage the workload with out (sic) an assistant.  She said I could expect help from her, the Inspector General and other AIGs."  Govt. Exh. 7, p. 2.

**18.**   On Friday, July 20, 2007, Cruz and Belisle met for lunch, Govt. Exh. 6, Belisle Test., p. 220, lines 16-18, and Cruz told Belisle that the SIGIR Public Affairs office was undergoing staffing changes.  Govt. Exh. 6, Belisle Test., p. 220, line 25 and p. 221, lines 1-2.  During the lunch, Cruz asked Belisle of her availability, and if she would be interested in returning to SIGIR to do work at the Public Affairs Office.  *Id.*, p. 224, lines 22-24.; Govt. Exh. 22, Belisle Depo, at 118:13-15; 119:1-9; 17-19.  Cruz also asked Belisle to send SIGIR her resume.  Govt. Exh. 22, Belisle Depo, at 129: 1-5.

**19.**   On Saturday, July 21, 2007, Belisle sent her resume to Cruz via e-mail.  Govt. Exh. 6, Belisle

Test. p. 225, lines 1-7; Govt. Exh. 22, Belisle Depo, at 128: 17-20.  On Monday, July 23, 2007, Belisle

learned that she would start work at SIGIR on Tuesday, July 24, 2007.  Govt. Exh. 6, Belisle Test. p. 226,

lines 15-18; Govt. Exh. 1, Cruz Test., p. 172, lines 5-6.

     **20.**   On Monday, July 23, 2007, at 9:47 A.M., Burgess sent an e-mail message, which she

forwarded from her home computer, to Cruz which stated:

> I believe we need to revisit the decision to terminate Patricia [Redmon].  As I told you on
> Thursday when you informed me of this decision, I have serious concerns about the
> fairness and equality of this action.  I believe we need to have a robust discussion that
> includes the appropriate management staff, whom I have copied on this message.  If we are
> unable to do so today, we should plan to do so in a conference call as soon as you are
> available given your travel schedule.

Govt. Exh. 8, Jul. 23 email.  While the email appears to have been intended for Cruz and other SIGIR

leadership, Burgess mistakenly put the email addresses of all the other intended recipients, except for that

of Cruz's, in the "subject" line of the email, rather than in the "to:" line of the email.  As a result, of all the

intended recipients only Cruz, did not received the email from Burgess.  The others were made aware of

the email through various means throughout the day.  Importantly, Bowen never received the email, and in

fact, the first time Bowen ever saw this email was in preparation for his recent deposition in this district

court matter.  *See* Govt. Exh. 20, Bowen Depo, at 267:18-269:12.

     **21.**   On Monday, July 23, 2007, at approximately 3:00 p.m., Cruz notified Burgess of the

reorganization of the SIGIR Public Affairs office, and that Cruz and Bowen had decided in light of budget

constraints to eliminate Burgess's position and conclude her employment with SIGIR, effective September

1, 2007.  Compl., paras. 34, 40, 43; Govt. Exh. 11, Burgess Notes, pp. 311-13; Govt. Exh. 28 Cruz Depo,

at 379:17-22; 407:16-19.  Cruz informed Burgess that she was to remain in a paid administrative leave

status until September 1, 2007, because the SIGIR leadership believed it would be inappropriate to have

the person in charge of all external relations for the organization continue to speak for the organization

after learning of her pending termination.  Govt. Exh. 1, Cruz Test., pp. 152-53; Compl., paras. 1, 38, 40;

Govt. Exh. 12, Notification of Personnel Action, Aug. 27, 2007.

**22.**  Burgess took detailed notes during the meeting in which Cruz informed Burgess that her

employment would be terminated.  After the meeting, Burgess provided a detailed, typed version of her

recollection of the meeting.  These typed notes do not indicate that Burgess or Cruz ever mentioned race,

color, or retaliation for complaining of race or color discrimination during the course of the meeting.  Govt.

Exh. 11, Burgess Notes, pp. 311-313.  In fact, Burgess admits that she did not state to Cruz at the meeting

that she felt that the action being taken by Cruz was discriminatory or based on race discrimination.  Govt.

Exh. 40, Burgess Depo, at 331:19-25.  Likewise, after her termination she not raise with Stuart Bowen,

who had recruited and hired her just months earlier, the prospect that her termination was based on race or

color discrimination.  *Id.* at 316.  Likewise, at no time prior to her termination, in spite of being located

just a few doors down, did she complain to Bowen that she was being targeted or harassed.  *Id.* at 207.

Burgess kept a notebook of several hundred pages of handwritten notes of, among other things, her

activities at SIGIR.  Not once did she memorialize the fact that she felt she was being targeted based on

race discrimination, or any other basis.  *See* Govt. Exh. 40, Burgess Depo, at 270:16-217:9.

## SUMMARY JUDGMENT STANDARD

SIGIR hereby incorporates by reference the legal standards for summary judgment as articulated in

SIGIR's initial motion for summary judgment, Dkt. No. 12, at section "Summary Judgment Standard," p.

12.

## DISCUSSION

## I.   BURGESS'S DISPARATE TREATMENT CLAIMS (COUNTS I AND II) FAIL

In Counts I and II of her Complaint, Burgess alleges that SIGIR removed her from her position and

denied her a transfer within the organization because of her race and color.  Burgess, however, cannot establish a *prima facie* case of disparate treatment with respect to these claims.  Further, even if Burgess could establish a *prima facie* case, she can point to no evidence in the summary judgment record to sufficiently rebut SIGIR's legitimate, non-discriminatory reasons for its employment decisions as pretext.

The general burdens of proof and persuasion to be applied in evaluating the employment decisions presented in this case are well-established.  First, through either direct evidence of such discrimination or through circumstantial evidence via the analytical framework found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Burgess must establish that she was the victim of intentional, unlawful discrimination.  Burgess can present no direct evidence of discrimination in the exhaustive evidence of record, and thus the *McDonnell Douglas* analysis governs her claims.  But Burgess fares no better under this framework.  Burgess must first establish a *prima facie* case of unlawful discrimination.  *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981).  That is, she must come forward with "a set of facts which would enable the fact-finder to conclude, in the absence of any further explanation, that it is more likely than not that the adverse employment action was the product of discrimination."  *Ennis v. Nat'l Assoc. of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995).

If Burgess establishes a *prima facie* discrimination case, the burden of production – not proof or persuasion – shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  *McDonnell Douglas*, 411 U.S. at 802.  If the defendant meets its burden of production, Burgess must then prove, by a preponderance of the evidence, that the defendant's articulated reasons are pretextual.  *Id.*  "Despite the burden-shifting framework, the ultimate burden of proof *remains with the plaintiff*."  *Id.* (emphasis added).  Even after full and complete discovery in this matter, Burgess

16

can point to no pretext evidence.

### A.   BURGESS CANNOT ESTABLISH A *PRIMA FACIE* DISCRIMINATION CASE

#### 1.   Count I -- Termination

To establish a *prima facie* case of disparate treatment in the context of a termination, Burgess must show: (1) that she is a member of a protected class; (2) that she was qualified for and satisfactorily performed her job; (3) that her employer terminated her employment; and (4) her job remained open to similarly qualified applicants after her dismissal or that a person outside her protected class replaced her. *See Williams v. Cerberonics*, 871 F.2d 452, 455-456 (4th Cir. 1989) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  Burgess has failed to establish a *prima facie* case to support her disparate treatment termination claim because she cannot establish the fourth element of a *prima facie* case, i.e., that her job, once eliminated, remained open to similarly qualified individuals or that she was replaced with a similarly situated applicant from outside her protected class.  Burgess, therefore, cannot set forth a *prima facie* case to support her disparate treatment allegations.

Because Burgess's position was eliminated, she cannot demonstrate facts that show "*her position was filled by an applicant outside . . .* [her] protected class." (emphasis added)  Compl., para. 52.  The administrative record – and Burgess's own statements – indicate that SIGIR eliminated her SES-4-equivalent Assistant Inspector General position and created a lower level GS-15-equivalent Director of Public Affairs position.  In contrast to Burgess's position as Assistant Inspector General, the newly-created GS-15-equivalent Director of Public Affairs had a lower base salary, no staff (or staff assistant) and was personally responsible for the day-to-day public affairs functions of SIGIR.  Govt. Exh 23; Govt. Exh. 25 (confirming that Burgess's base salary as Assistant Inspector General Public Affairs was $144,400.00 per annum, while the lower level Director of Public Affairs base salary was $125,078.00 per annum); Govt.

17

Exh. 1, Cruz Test., pp. 102-103; Govt. Exh. 4, Arnston Decl., p. 8; Govt. Exh. 10, Nisbet Decl.; *see also*

Govt. Exh. 1, Cruz Test., pp. 86, 103; Govt. Exh. 27, Nisbet[6] Depo, at 181:8-182:19 (citing the various

distinctions between the AIG for Public Affairs position and the Director position, and specifically

explaining that the Director position was a "rank and file position"[,] … that "didn't have the annual leave

benefit"[,] … "didn't develop policies"[,] …"has less connection to the IG"[,] … "operating at a lesser

role"[,] … "the duties would be more routine"[,] … "and would have no staff to support them ….").

Belisle's testimony regarding her day-to-day functions as the Director of Public Affairs further

corroborates the fact that Burgess's position was eliminated, and a new lower-level position was created.

*See* Govt. Exh., 22, Belisle Depo, at 159:18-160:22; 161:19-20; 162:13-15; 163:18-20; 175:6-15

(testifying that in her GS-15-equivalent Director of Public Affairs position, among other duties, she

answered her own phone; did all the interview transcriptions; set up all the Inspector General's press

appointments; fielded all press and public inquiries; and acted as the liaison between SIGIR and the press

– "I really did everything myself.  So yes, if the occasion arose where I would've really needed someone's

help on something, I certainly would've – you know, I was – had very good relations with the rest of the

staff [,] … [b]ut primarily I did everything myself"). *Compare*, Govt. Exh. 40, Burgess Depo, at 250:18-

251:11 (Burgess testifying that as Assistant Inspector General for Public affairs, her duties did not include

answering the phones; transcribing; records keeping, etc., because they were the duties of her assistant,

Redmon).  Cruz also confirms that she personally assumed many of Burgess's duties, such as developing

public affairs policy and planning.  Govt. Exh. 1, Cruz Test., pp. 110-111; Govt. Exh. 4, Arnston Decl, p. 8.

Additionally, other staff sections assumed responsibility for managing SIGIR's website, which had been a

public affairs function.  Govt. Exh. 4, Arnston Decl, p. 8.  Therefore, the new Director of Public Affairs

---

[6] Janice Nisbet, was during all relevant times Chief of Staffing and Operations at SIGIR.

position paid less, carried no supervisory responsibility, and required more work performing actual public affairs staff level functions than the supervisory Assistant Inspector General for Public Affairs position Burgess had held.

There is simply no evidence of record that Burgess's position as Assistant Inspector General for Public Affairs remained open to similarly qualified applicants or that a person outside her class replaced her. Rather, the summary judgment evidence makes abundantly clear that SIGIR eliminated Burgess's SES-4-equivalent position and downgraded it to the GS-15-equivalent level Director of Public Affairs position. In fact, Burgess's SES-level, managerial, senior staff position, Assistant Inspector General for Public Affairs – is *gone*. Govt. Exh. 27, Nisbet Depo, at 128: 16-19 ("There is no directorate anymore. [Director of Public Affairs] is a position that sits within the executive office basically along with the executive assistant to the IG, in other words.") Thus, Burgess cannot show that a person outside her protected class replaced her or that her job remained open. She, therefore, cannot establish a *prima facie* case of discrimination with respect to her termination claim (i.e., Count I of her complaint).

### 2.   Count II – Denial of Transfer

Burgess likewise cannot establish a *prima facie* discrimination case regarding her claim that she was "denied the opportunity to transfer to another position within SIGIR when she was terminated." Compl., p. 11, para., 57. To establish a *prima facie* case with respect to this claim, Burgess must show that she: 1) is a member of a protected class; 2) she applied for the position in question; 3) she was qualified for the position sought; and 4) that she was rejected for the position in favor of someone outside the protected category in circumstances giving rise to an inference of unlawful discrimination. *Williams v. Henderson*, 129 F. App'x 806, 813 (4th Cir. 2005) (citing *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 760 (4th Cir. 1998)). Burgess has not alleged – and indeed, cannot point to any evidence to show –

that she applied for a transfer to any vacant position within SIGIR, or even that she requested another position.

Even assuming, as Burgess will likely argue, that SIGIR's practice was to transfer its employees without requiring them to apply for a vacant position (which SIGIR *does not* concede), or that Burgess was not given the opportunity to apply for the new position, Burgess still fails to show that she would have applied for the new lower-level position of Director of Public Affairs had she known it was open and that she need apply for it.  *See Williams v. Giant Food, Inc.*, 370 F.2d 423-33 (4th Cir. 2004) (holding that the plaintiff-employee "cannot be treated as if she had applied for [vacant positions] unless she can show that she would have applied had she known about them").  The undisputed evidence of record demonstrates that Burgess complained about her assistant's termination because, generally, she felt she could not accomplish the agency's public affairs duties without staff support.  Burgess explicitly stated to Cruz that Redmon was an "integral part of the [Public Affairs] unit and that she was needed,"  and "that [Burgess] needed to have someone in the section who was there … when [Burgess] was out of the office" to answer the phone. Govt. Exh. 40, Burgess Depo, at 258:3-7; 258:18-19.  In view of this, it stands to reason that Burgess would not have requested or applied for a lower-paying, non-managerial position in a one-person Public Affairs shop that would require her to perform the public affairs duties by herself.  *See also*, *id*. at 227:22-25 (Burgess confirming in her district court depo‚sition her belief that "[t]he mission of the [office of Public Affairs] could be accomplished better if there were a backup who was in the office and particularly so that someone at all times was in the office.")  Notably, Burgess can point to no evidence in the record that would tend to establish otherwise.

She therefore cannot establish a *prima facie* discrimination case with respect to her claim that she was denied a transfer.  *See Johnson v. Wheeling-Pittsburgh Steel Corp.*, 279 F. App'x 200 (4th Cir. 2008)

(finding that plaintiff-employee could not establish *prima facie* case with respect to his claim that he was denied a job within the company, where plaintiff did not apply for the job).  Thus, the Court should grant summary judgment with respect to Count II of Burgess's complaint.

**B.** **BURGESS CANNOT REBUT AS PRETEXT THE LEGITIMATE, NONDISCRIMINATORY REASONS FOR ELIMINATING HER POSITION AND DECIDING NOT TO OFFER A NEW POSITION**

Even if Burgess could establish a *prima facie* disparate treatment case, SIGIR is entitled to summary judgment because Burgess cannot rebut SIGIR's legitimate, non-discriminatory reasons for terminating her employment, and for declining to offer her a new position.  SIGIR has proferred (and supported with more than substantial evidence) its legitimate, non-discriminatory reasons for its decisions, which Burgess cannot rebut as pretext.

**1.** **Count I -- Termination**

SIGIR has justified its reasons for eliminating Burgess's SES-equivalent, Assistant Inspector General position.  Burgess's termination was conducted in conjunction with several measures (including other staff reductions) to reduce SIGIR's budget expenditures after OMB cautioned SIGIR regarding its budget request.  Until January 2007, SIGIR had been operating on a budget of approximately $25 million a year.  In January 2007, SIGIR's budget request to OMB ballooned to $53 million. Govt. Exh. 1, Cruz Test., p. 92, lines 3-8.  And OMB made clear to SIGIR, that the $53 million budget request was too high and out of proportion with the reasonable budgetary needs that SIGIR had at the time.  Govt. Exh. 18, Dickenson Depo, at 32:22-33:7.  As a result of the increased budget request, SIGIR faced pressure from OMB to cut costs.  Govt . Exh. 18, Dickenson Depo, at 219:22-220:7; Govt. Exh. 1, Cruz Test., p. 92, lines 3-17, and p. 94, lines 2-11, Cruz Notes.  Indeed, at one point, SIGIR was made to understand that the supplemental appropriation that was supposed to fund the organization through September 2008 would

have to be stretched to last through December 2008; Govt. Exh 1, Cruz Test., p. 93, lines 1-7; p. 94, lines 9-11.  Thus, when Cruz resumed duties as Deputy Inspector General in June 2007, Bowen asked Cruz to reorganize SIGIR so that it operated more efficiently and within the constraints OMB had placed upon SIGIR's budget.  Govt. Exh. 1, p. 94, lines 3-8; Govt. Exh. 20, Bowen Depo, at 115:22-116:5.

While reviewing SIGIR's organization, Cruz noted that her immediate predecessor had increased the number of personnel in SIGIR's Congressional and Public Affairs offices from four to eight. Govt. Exh. 1, p. 91, lines 10-24.  Cruz, at Bowen's direction, scrutinized both of these sections and Bowen and Cruz then decided to reduce their staffing.  Regarding the Public Affairs Office, Cruz felt that because she had a public affairs background, she would only need one person "to do the heavy lifting, who was not above making the phone calls, who was not above doing . . . the day-to-day scheduling, management and callbacks . . . ."  Govt. Exh. 1, Cruz Test., p. 102, lines 7-10.  Cruz's vision of a pared-down Public Affairs Office thus differed greatly from Burgess's repeated statements that she needed several support staff members to accomplish her mission as the Assistant Inspector General for Public Affairs.

Additionally, Cruz did not feel that SIGIR could reduce the Congressional Affairs office to one person (as she had reduced the Public Affairs Office to one person) because SIGIR was congressionally mandated to provide quarterly reports to Congress and reports to no fewer than eight congressional committees.  Govt. Exh. 1, Cruz Test., p. 96, lines 11-16; *see also* Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2002, Pub. L. No. 108-375, § 1203, 118 Stat. 1811, 2078-2081 (2004). No Congressional mandate existed for SIGIR to interact with the media or perform public affairs functions. Govt. Exh. 1, Cruz Test., p. 92, lines18-20.  Therefore, as documented by Cruz's contemporaneous notes, in early July 2007, Cruz, in consultation with Bowen, decided to eliminate the SES-4-equivalent Assistant Inspector General for Public Affairs position and create the GS-15-level Director of Public Affairs position.

Govt. Exh. 1, Cruz Test., p. 167, lines 2-6; Govt. Exh. 21; *See Anderson v. Westinghouse Savannah River Co.*, 272, 406 F.3d 248 (4th Cir. 2005) ("The court does not sit as a 'super-personnel department weighing the prudence of employment decisions' made by the defendants") (quoting *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)).

There is no rebutting the evidence in the summary judgment record which establishes that throughout the months preceding and through the date of Burgess's termination (FY 2008, CY 2007), reorganization at SIGIR did, in fact, occur as a result of pressure from OMB regarding its budget. SIGIR's budget pressures are substantiated not only by the testimony of Cruz and Bowen, but they are independently corroborated by OMB Budget Examiner Howard Dickenson, and SIGIR's Senior Staff. Govt. Exh. 18; Govt. Exh. 33, Arnston Depo, at 321:19-20 ("We were being asked to reduce. We were bumping up over our budget"); Govt. Exh. 16, Young Depo, at 20:13-16 ("[OMB] said we're going to give you 35 million and oh, by the way, that 35 million is going to have to last you from October through 31 December of '08.); Govt., Exh., 34, Weinberg Depo, at 84:5-11 ("Howard [Dickenson]was fairly direct about keeping our expenses down or our spending down. So I think that in the course of conversations with him where he was trying to make sure we didn't spend more money than we should, that he would have implied, if not said, that head count is an issue.").

Burgess cannot rebut that as a result, SIGIR, looked to make cuts by downsizing staff. Throughout May, June and July of 2007, SIGIR went through a number of budget execution drills and scenarios reflecting possible staffing changes and organizational reductions in order to bring down costs, which were presented to OMB for budget approval. *See* Govt. Exh 16, at 18:13-22:13; Govt. Exhs. 26; 31; 34; 37; 44; 45; 46. Importantly, as detailed in SIGIR's Weekly Activity Reports ("WARS")[7], and as

---

[7] The WARS are reports provided by all the divisions within SIGIR of the preceding week's activities. Burgess, along with the other directorates contributed to the WARS on a weekly basis. The WARS were sent to all SIGIR staff, or were otherwise made available to all SIGIR staff so that they may be informed of

Burgess as a recipient and contributor to the WARS, should have been reasonably aware at the time, the budget and staff reorganization was an ongoing topic of discussion amongst the Special Inspector General, Chief of Staff, and Deputy Inspector General throughout the months immediately preceding her termination. *See* Govt. Exh. 39, January 6, 2007 SIGIR WAR at p. 1286 ("Received verbal notification from OMB that SIGIR's budget request from $53M in FY08 will be funded at $35M including the mandated forensic audit. Preparing an appeal for DIG signature."); January 12, 2007 SIGIR WAR at p. 1293 ("Appeal to OMB's decision to fund SIGIR's FY07 Supplemental at $35M (including the mandated forensic audit) was prepared, signed by DIG and sent forward"); June 9, 2007 SIGIR WAR at p. 1310 ("Provided guidance to Budget Officer for FY08 Execution Plan. Reviewed Plan. Briefed IG and DIG. Plan has been forwarded to OMB."); June 23, 2007 SIGAR WAR, at p. 1127 ("Met with IG and DIG re reorganization and new roles and responsibilities."); June 30, 2007 SIGIR WAR at p. 1140; July 7, 2007 SIGIR WAR, at p. 1150 ("Reviewed budget, contracting and personnel status with M&A Chiefs … [p]rovided budget and contracting personnel information for FY07 and projections for FY08 to IG … [d]iscussed various proposals to reduce FY08 execution budget with IG."); July 9, 2007 SIGIR WAR at p. 1162 ("Brief IG and DIG-P regarding staffing options and associated budget impacts … [m]et with BCPI budget manager to discuss revised requirements."); July 16, 2007 SIGIR WAR at p. 1174 ("Staffed recommendation to DIG-P concerning reorganization … [p]rovided recommendations to IG and DIG-P on budget."); July 23, 2007 SIGIR WAR at p. 1185 ("Worked with General Counsel and DIG on various staffing and reorganization issues."); *See also* Govt. Exh. 40, Burgess Depo, at 228:25-229:5. Moreover, Burgess was a time-limited, temporary employee. SIGIR is a temporary organization, and its employees are subject to the provisions of 5 U.S.C. § 3161, which governs the employment and compensation of

---

all the matters, activities, accomplishments, etc., by various divisions within SIGIR. *See* Govt. Exh. 40, Burgess Depo, at 228:25-229:5.

employees of temporary organizations established by law or executive order.  That statute places certain restrictions on its employees; for instance, they are appointed for a limited term only (according to § 3161, appointments may be only for a maximum period of three years, and may be extended for up to two years). 5 U.S.C. § 3161; *see also* 5 C.F.R. § 213.3199.[8]  Burgess acknowledged this and other restrictions when SIGIR hired her.  On February 4, 2007, she signed a "Memo for Time Limited 3161 Appointees," which provided (in pertinent part) that "[a] time limited employee does not have the protection of reduction-in-force procedures.  Upon advance notice from [the] appointing officer, you may be terminated earlier than the established 'not to exceed date' for reasons such as lack of funds, lack of work, etc."  Govt. Exh. 10, Nisbet Decl., att. 4.  Burgess expressly acknowledged this when SIGIR hired her.  *Id.*  Thus, Burgess was made aware at the outset of her employment that her term could be ended early because of budget reasons.

Burgess has no evidence that SIGIR's budgetary reasons for terminating her employment were pretextual, or that the true reason for removing her from her position was her race and color.  Indeed, the Court is respectfully reminded that Stuart Bowen, the approving official in Burgess's termination, is also the same individual who recruited Burgess to the Assistant Inspector General for Public Affairs position in the first instance.  Govt. Exh. 2, Burgess Test., pp. 32-33.  *See Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) (holding that "[w]hen the hirer and firer are the same individual, there is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer, and the early resolution of this question need not be derailed by strict fealty to proof schemes" (specifically, the scheme of proof set out by *McDonnell Douglas*)).  The record in this regard is clear.  Not only did Stuart Bowen hire Burgess, he went out and recruited her.  *See* Govt. Exh. 2, Burgess Test., pp. 32-33.; Govt. Exh. 20, Bowen Depo, at 69:1-70:20.  In fact, no one else interviewed for the AIG for Public Affairs position.

---

[8]In practice all SIGIR employees are appointed to terms of less than two years, normally thirteen months as was the case with Ms. Burgess.  Govt. Exh. 10, Nisbet Decl.

Govt. Exh. 20, Bowen Depo, at 69:1-70:20.  The notion that Bowen would go through these efforts to bring her aboard only to terminate her based on race or color is counterintuitive.  Accordingly, the Court should draw a powerful inference that discrimination did not motivate him or those who he directed to carry out his management decisions.

Furthermore, Burgess herself expressly acknowledged that SIGIR was in a reorganization and in the midst of budget concerns shortly before she was informed that her position was abolished.  In July 2007, she sent e-mail messages regarding her efforts to hire new staff.  Govt. Exh. 9.  In those e-mail messages, she mentioned that she had selected someone for a vacant position, "but didn't move forward due to the reorganization."  Govt. Exh. 9; Govt. Exh. 10, Nisbet Decl., att. 5.  She also mentioned that SIGIR was holding off on hiring new personnel "until they [SIGIR] have some assurance [they] will have sufficient funds."  Govt. Exh. 9; Govt. Exh. 10, Nisbet Decl., att. 5.  Thus, the evidence shows that Burgess explicitly and contemporaneously recognized the very reorganization that she now claims to be a fabricated pretext.[9]

Finally, in what appears to be both an attempt to demonstrate that the decision to terminate her employment and failure to offer reassignment were pretextual, Burgess alleges in her District Court Complaint that: (1) Cruz usurped Burgess's authority and responsibilities, Compl., para., 25; (2) Cruz reviewed Burgess's time and attendance records for irregularities, Compl., para. 26; (3) "Ms. Cruz . . . isolated Ms. Burgess from the consultative process regarding media activities (examples of such isolation include Cruz directly coordinating with a reporter and, without consulting Burgess, issuing new recommendations on how to release the SIGIR's quarterly reports)," Compl., paras. 26, 27, 28; (4) Cruz

---

[9] Burgess, in her recent district court deposition, equivocates by stating that she stated in the email that reorganization was the reason for holding off on the hiring because that is what she was told by Cruz.  *See* Govt. Exh. 40, Burgess Depo, at 223:18-25.

allegedly complained to Burgess "that people who file EEO complaints are 'weak links in the chain and looking for excuses for their own personal failure.' Burgess interpreted this to be a reference to African Americans." Compl., para. 24; (5) Cruz failed to hire additional public affairs staff, "forcing Ms. Burgess to accomplish alone work previously done by two full-time individuals, and an assistant." Compl., para. 29; and (6) Cruz terminated the employment of Patricia Redmon, the contractor who was Burgess's assistant. Compl., para. 2.

Even assuming the above allegations are true, they do not demonstrate that SIGIR's proffered budgetary reasons for eliminating Burgess's position were pretextual. As an initial matter, there is nothing inappropriate or unusual about a supervisor reviewing a subordinate's attendance records. Burgess does not allege that Cruz trumped up disciplinary charges against her based on the scrutiny of Burgess's attendance records, that Cruz treated any employee more favorably, or that Burgess ever faced any adverse action as a result of the scrutiny of her attendance records. Indeed, when pressed for evidence that these alleged acts were motivated by race discrimination, Burgess offered no more than her own speculation that it must be race discrimination because it just came to her based on "process of elimination." Govt. Exh. 40, Burgess Depo. at 342:20-342:7.

In short, this purported evidence of pretext does not yield even a hint of discrimination; rather, these allegations constitute a mere laundry list of perceived slights, having nothing to do with unlawful discrimination. Moreover, it is worth noting that Burgess's allegations that Cruz refused to hire additional public affairs personnel, and that Cruz terminated Burgess's assistant, directly support SIGIR's reasons for terminating Burgess's employment, i.e., that SIGIR was facing a significant budget shortfall, and sought to reduce its public affairs staff.

2.   **Count II – Denial of Transfer**

27

Similarly, Burgess cannot rebut as pretext SIGIR's articulated, legitimate non-discriminatory reasons for SIGIR's decision not to offer her a transfer to another position within the agency once her position as Assistant Inspector General for Public Affairs was abolished.

Cruz explained that she believed that the new Public Affairs position should be filled by *one* person "to do the heavy lifting, who was not above making the phone calls, who was not above doing . . . the day-to-day scheduling, management and callbacks . . . ." Govt. Exh. 1, Cruz Test., p. 102, lines 7-10. Burgess was not the person for the job. In fact, before Burgess's termination, she had "clearly explained to [Cruz] over the course of previous two months that she [Burgess] was unable to carry out the duties of Public Affairs without fewer than four people [...]." Govt. Exh. 1, Cruz Test., p. 100, lines 20-25; *see also*, Govt. Exh. 1, pp. 101-102. Cruz testified further regarding her decision that Burgess

> needed an assistant to answer the phone, she would often [use] her assistants to get back to media contacts instead of her doing that callback. She did not have a conversant knowledge of the audits, inspections and quarterly report and so very often … she would rely on me to provide that information to reporters because she was not able to do so and so, as a manager, what went into my thinking, if I'm going to take a division of four people and I need to downsize it to one person to provide the support that the agency needs, it would need to be a person whose skills were not managerial, because there would be no one there to manage.

Govt. Exh. 1, Cruz Test., pp. 101-102. The fact that Cruz, upon contacting Belisle to offer her an opportunity to return to SIGIR, explicitly mentioned that she needed Belisle to come back to help with the quarterly report also tends to confirm that Cruz genuinely perceived that the new Director of Public Affairs position should be filled by a lower level, hands-on employee who would provide the day-to-day support sought by Cruz. *See* Govt. Exh. 6, Belisle test., at p. 224, line 20-24.

Hence, it is clear that even if Burgess had been eligible for the lower-graded public affairs position, she would not have received it for the reasons described above. There is nothing in the administrative record that would allow Burgess to rebut these reasons, or to show that they are pretext for race or color

discrimination.

There is simply no evidence in the expansive summary judgment record that would allow a reasonable jury to conclude that the SIGIR leadership removed Burgess because of her race or color. Burgess, therefore, is left only with her bald accusations and subjective perceptions, which do not suffice to overcome the undisputed evidence of record, which overwhelmingly demonstrate that nondiscriminatory reasons were the basis for Burgess's termination and SIGIR's decision not to offer her a new position. *See Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1995) (holding that a "plaintiff's beliefs, just like conclusory allegations, speculation and conjecture are simply insufficient to defeat a properly supported motion for summary judgment"); *see also Williams v. Cerberonics*, 871 F.2d 452, 456 (4th Cir. 1989) (holding that "a plaintiff's own assertions of discrimination, in and of themselves, are insufficient to counter substantial evidence of legitimate, non-discriminatory reasons for an adverse employment action"). Therefore, the Court should grant summary judgment in favor of SIGIR on Burgess's discrimination claims, and dismiss Counts I and II of her Complaint.

## II.    BURGESS'S RETALIATION CLAIMS (COUNTS III AND IV) FAIL AS WELL

In Counts III and IV of her Complaint, Burgess alleges that SIGIR removed her and declined to offer her a new job within SIGIR in retaliation for complaining of unlawful discrimination.  As the robust summary judgment record demonstrates, SIGIR is entitled to summary judgment on this claim as well, for much the same reasons that it is entitled to summary judgment on her discrimination claims.  Namely, Burgess cannot establish a *prima facie* retaliation claim; nor can she rebut SIGIR's legitimate reasons for removing her.

As far as the burdens of proof and persuasion that apply, "[r]etaliation claims function in parallel" with the analysis used in disparate treatment cases.  *Lamb v. Boeing*, 213 Fed. Appx. 175, 179 (4th Cir.

29

2007).  Thus, to survive summary judgment, Ms. Burgess must establish a *prima facie* retaliation case.  To

do so, Burgess must show that: (1) she engaged in prior protected activity; (2) she suffered a materially

adverse employment action;[10] and (3) the adverse action was taken because of the protected activity.  *See*

*Gibson v. Old Town Trolley Tours*, 160 F.3d 177, 180 (4th Cir. 1998); *McNarin v. Sullivan*, 929 F.2d 974,

980 (4th Cir 1991) (to establish a *prima facie* case, plaintiff must show that there is a causal nexus between

the protected activity and the adverse action).  If Burgess establishes a *prima facie* case, the burden shifts to

SIGIR to proffer a legitimate, non-retaliatory reason for its removal decision, which Ms. Burgess must then

rebut.  Burgess can produce no evidence to establish a *prima facie* case, or to rebut SIGIR's legitimate,

nonretaliatory reasons.

### A.     BURGESS CANNOT ESTABLISH A *PRIMA FACIE* RETALIATION CASE

Burgess fails to establish a *prima faci*e case of retaliation because she cannot prove the first and

third elements.  Specifically, Burgess cannot demonstrate that she engaged in protected activity *prior* to her

termination, and she cannot show that SIGIR took the adverse action because of the protected activity.

Furthermore, legitimate, nonretaliatory reasons that she cannot rebut as pretext, foreclose Burgess's

retaliation claims.

### 1.  Burgess Engaged in *No* Protected Activity *Prior* to Termination

"Protected activities fall into two distinct categories: participation or opposition."  *Laughlin v.*

---

[10]  In *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405 (2006), the Supreme Court held that a private sector employee who alleges retaliation under 42 U.S.C. § 2000e-3(a) need not show that he experienced an adverse personnel action to state a claim for retaliation under Title VII.  SIGIR's position is that the holding in *Burlington Northern* applies to government employees only to the extent that the plaintiff alleges a "personnel action." 42 U.S.C. § 2000e-16(a).  *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008) (noting that "there is disagreement about whether the Supreme Court's decision regarding the scope of the adverse action requirement in [*Burlington*] applies to federal employees").  Because the employment action at issue here – removal from federal service – is clearly a "personnel action," the issue of the applicability of *Burlington Northern* to the Federal Government need not be reached here.

*Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998) (citing to 42 U.S.C.A. § 2000e-

3(a)(1994)).  An employer shall not take adverse action against an employee who opposes discriminatory

workplace practices or who participates in Title VII proceedings or investigations.  *Id*.  Because Burgess

does not claim to have undertaken any participation activities prior to her termination, she must establish

that she engaged in opposition activities.[11]  Opposition activities do not involve the formal discrimination

complaint adjudicatory process.  *Id*.  They include using "informal grievance procedures as well as staging

informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory

activities."  *Id*. (citing to *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981)).  The Fourth

Circuit has recognized that an employee's opposition activity is only protected if the employee was

opposed to actual unlawful activity or, if there was no actual violation, if the employee *reasonably* believed

that the employment practice he is opposing is unlawful.  *See Jordan v. Alternative Res. Corp.*, 458 F.3d

332, 338-39 (4th Cir. 2006).  Specifically, the inquiry is whether: (1) the plaintiff subjectively (in good

faith) believed that the defendant engaged in an unlawful action; and (2) whether this belief was objectively

reasonable in light of the facts.  *See Peters v. Jenney*, 327 F.3d 307, 321 (4th Cir. 2003).  Burgess can

establish neither.

In her Complaint, Burgess specifically alleges that she engaged in "protesting discrimination" on

July 19, 2007, by protesting the termination of her assistant, Patricia Redmon. Compl., para. 31.  Burgess

alleges further in her Complaint, that several days later, on Monday, July 23, 2007, she again "expressed

her dissatisfaction with Ms. Redmon's termination by complaining [to the SIGIR attorneys, the SIGIR

human resources chiefs, and the outgoing Deputy Inspector General] . . . that she believed the termination

of her assistant . . . was racially discriminatory." Compl., paras. 32-34.  Burgess claims that "mere hours

---

[11] Participatory activities include "(1) making a charge; (2) testifying; (3) assisting; or (4) participating in
any manner in an investigation, proceeding, or hearing under Title VII."  *Id*.

after she made her latter complaint," Ms. Cruz and Mr. Bowen told her that her employment was terminated.  Compl., para. 34.  However, close scrutiny of the record, including Burgess's own testimony, demonstrates that prior to her termination Burgess never complained to Cruz, or Bowen, of race or color discrimination. Therefore, the conduct alleged in her Complaint does not constitute oppositional activity protected by Title VII.  Furthermore, she never documented or otherwise recorded a belief she was the target of racial discrimination.  In any event, Burgess did not have an objectively reasonable belief that SIGIR had engaged in race discrimination.  *See Peters v. Jenney*, 327 F.3d 307, 321 (4th Cir. 2003).  Thus, Burgess's retaliation claims fail as a matter of law.

Burgess's EEO complaint, which she lodged *after* her termination, confirms that at the time Burgess complained to Cruz and the rest of SIGIR senior management about Redmon's termination, Burgess's complaint was that she would be left without the necessary staff support to manage the Public Affairs workload and that Congressional Affairs had a large staff, *not* race discrimination.  In fact, Burgess's own formal EEO complaint states that when Cruz informed her of Redmon's termination, Burgess merely states "that the decision was unfair." Govt. Exh. 7, EEO Compl., p. 2.  But Burgess further clarified that specifically, she "questioned the equality of the decision to terminate Ms. Redmon since the Public Affairs sister section, Congressional Affairs, was overstaffed."  *Id.*  Burgess "told Ms. Cruz that I (sic) it would be extremely difficult for me to manage the workload with out (sic) an assistant."  *Id.* Burgess, also confirms that parity with the Congressional Affairs section was her concern during her testimony in the underlying fact finding conference where she explains:

> 'When Ginger came to tell me that she was dismissing my assistant, my first question, because we needed budget cuts and as a result, Patricia was being -- my first question was well, who's being let go on the sister side because clearly, that office, with the equivalent workload of my office, has many more staff.'

Govt Exh. 2, Burgess Test., pp. 39-40; Govt Exh. 40 at 255: 2-7.

In fact, again in her recent District Court deposition Burgess explained that her complaint to Cruz and SIGIR management was with respect to equality in treatment regarding the relative staff size and workload of the Public Affairs section to the Congressional Affairs counterpart:

> Q.    You mentioned earlier at the top of the page that you felt that your workload was equal to that of Congressional Affairs, correct?
> A.    Yes.
> Q.    And you also felt that it would not be fair if you got cuts, and correct me if I'm not characterizing, that if you got cuts but your sister component didn't, correct?
> A.    Yes.
> Q.    No, I appreciate that you're being as accurate as possible.  That's very helpful.  And you're saying here that your first question to her was how is Congressional Affairs being treated in this budget cut, correct?
> A.    Yes.

Govt Exh. 40, at 258:23-259:6.

> Q.    Sure.  No, it makes sense because I think you were -- perfect.  And then your first question was, and then is that what's on line 16, "who's being let go on the sister [Congressional Affairs] side"?
> A.    Yes.

Govt Exh. 40, at 256: 2-5.  And again, when asked why her *first* response was to inquire about Congressional affairs, Burgess does not cite race discrimination as the concern:

> Q.    And why was that the first thing that you asked her?
> A.    Because the Congressional Affairs office was -- had almost -- had doubled the staff that Public Affairs had at that time.

Govt Exh. 40, at 256:18-257:3.  Again, she explains that her concern was lack of staff support, *not* race or color discrimination:

> Q.    What did you tell her?
> A.    I told her that Patricia answered the phone and that that in particular was a great concern to me, who would answer the telephone, that we needed to have someone in the section who was there when, you know, I was out of the office.
> Q.    What else did you tell her about Patricia Redmon?  I'm sorry, I didn't -- what else did you tell her about the value of Patricia Redmon?

> A.    That Patricia was an integral part of the unit and the work.
> Q.    What do you mean by --
> A.    And that she was needed.
> Q.    I'm sorry, and she was needed.  I'm sorry, I'll let you repeat that.
> You told her that Patricia was --
> A.    An integral part of the unit and that she was needed.
> Q.    And when you say integral, you mean you can't do without her,
> correct?
> A.    I mean she's busy all day.

Govt Exh. 40, at 258:1-22.  Burgess was specifically concerned about management of the telephone traffic

without Redmon:

> Q.    So if she's not there one day, you would feel her absence, correct?
> A.    Well, there wouldn't be anyone to answer the phone, so then I
> would feel very torn about leaving my desk, because the phone might ring,
> and there would be no one there to answer it.  And that's just -- in Public
> Affairs, you just can't have that.  It's like not answering an e-mail.

Govt Exh. 40, at 252:23-253:5.

> Q.    Anything else you discussed in that meeting?
> A.    I asked her, you know, why she was targeting us.
> Q.    Explain -- what -- well, let me ask you, specifically what did you
> say in that regard?
> A.    I told her that I thought that she was targeting our section, and I
> didn't understand why she was targeting our section, particularly given the
> fact that the Congressional Affairs section had two senior-level people, a
> mid-level person and a staff assistant.

Govt Exh. 40, at 259: 7-17.  Again, Burgess admits that she *never* complained about race discrimination.

> Q.    Did you at that point tell her that you felt like you were being
> targeted based on your race?
> A.    I didn't say based on my race, no, but I did say I felt I was being
> targeted.

Govt Exh. 40, at 259:18-21.  Indeed, when pressed again to explain what she expressed to Cruz regarding

Redmon's termination, Burgess is clear that she complained about the lack of administrative support,

because she was "concerned *more than anything* about the phone." (emphasis added)  Govt Exh. 40, at

267:4.  There was simply no allegation of unlawful discrimination:

> Q.      So prior to your termination -- well, strike that.  We'll get back to
> that.   How did the meeting with Ginger on July 19th about Patricia
> Redmon's termination end?
> A.      To the best of my recollection, it ended with my continuing to voice
> my unhappiness and concern, and Ginger did tell me, you know, don't
> worry.   There -- you will have lots of help, because I was very concerned
> more than anything about the phone.
> Q.      About the phone?
> A.      Yeah, who was going to answer the phone.   That's a big deal in
> public relations.  It's your interface with the public.  And she --

Govt Exh. 40,  at 266:21-267:8.  Cruz's recollection of Burgess's complaints also substantiates Burgess's

concern with Public Affairs staffing relative to Congressional Affairs, and Burgess's workload

management in Public Affairs.  *See* Govt Exh. 28, Cruz Depo, at 390: 22-391:4 ("I generally recall that

Ms. Burgess was asking about what sort of changes would occur in congressional affairs, and I remember

her being extremely adamant about not being able to do her job without an assistant.").  Thus, while it is

clear that Burgess complained to Cruz on July 19, 2007, about the unfairness of the decision to terminate

Redmon, it is equally clear that she *never* made any allegation of unlawful racially based discrimination to

Cruz or Bowen.

    Similarly, closer scrutiny of Burgess's July 23, 2007, communications with Cruz and other

members of the SIGIR leadership also bolsters the fact that Burgess did not raise the issue of race or color

when she complained of Redmon's termination. Burgess sent an e-mail message on July 23, 2007, to Cruz

and several senior personnel in which Burgess stated:

> I believe we need to revisit the decision to terminate Patricia.  As I told you on Thursday
> when you informed me of this decision, I have serious concerns about the fairness and
> equality of this action.  I believe we need to have a robust discussion that includes the
> appropriate management staff, whom I have copied on this message.

Govt. Exh. 8, Jul. 23 email.  Notably, Ms. Burgess' electronic mail message, like her verbal complaint the

week before, is void of any allegations of race or color-based discrimination, appearing only to reiterate her concern regarding the "fairness" and "equality" of the staff reduction relative to staffing in Congressional Affairs, which Burgess had already expressed previously.  *Id.*  Burgess fails to demonstrate that she voiced to Cruz and/or SIGIR a claim of race or color discrimination, or that she necessarily even believed that Redmon's termination was based on race or color discrimination.  Thus, she cannot establish the first element of her *prima facie* case of retaliation, and summary judgment in favor of Defendant should be entered on this claim.

Further, Burgess fails to establish that her purported belief that Redmon was terminated because of race or color was objectively reasonable.  Under Fourth Circuit law, oppositional activities are not protected unless they are proportionate and reasonable under the circumstances.  *See Laughlin*, 149 F.3d at 259 (4th Cir. 1998) (courts must balance the purpose of protecting opposition to discrimination against Congress's "manifest desire not to tie the hands of employers in the objective selection and control of personnel.")  That is, the employee must have a reasonable belief that a violation is actually occurring based on the circumstances that the employee observes and reasonably believes.  *Id.*  Here, the record evidence illustrates that SIGIR had a legitimate and genuine interest in taking what it believed were appropriate measures to execute staff reorganizations, and to promote better resource management and efficiency in the context of its budget constraints, which in part resulted in a pared-down Public Affairs Office.  Accordingly, Cruz explained to Burgess that Redmon was being let go due to budget cuts at SIGIR.  *See* Govt. Exh. 11; *see also* Govt. Exh. 28.  While Burgess now maintains that she did not believe that to be the true reason for Redmon's termination, that belief would have been objectively *unreasonable* for various reasons.

First, as previously discussed, the record evidence illustrates that Burgess was contemporaneously

aware and expressly acknowledged that SIGIR was reorganizing, in the midst of budget concerns shortly before she was informed of Redmon's as well as her own termination. Govt. Exh. 9; Govt. Exh. 10, Nisbet Decl., att 5. Both the genuineness of the budget issues and reorganization, as well as Burgess's awareness, is further confirmed by, among other things, discussions at staff meetings where Burgess was present, and SIGIR's WARS throughout the months leading up to both Redmon's and Burgess terminations.  As mentioned, the WARS, to which Burgess herself contributed during her tenure at SIGIR as a member of the senior staff, explicitly discussed the various budget constraints faced by SIGIR.  The Chief of Staff, the Inspector General and the Deputy Inspector General discussed and contemplated staff reorganization and staff realignment, and more generally, staff resource management issues and concerns.  *See Supra* at p. 22-23; *see also* Govt. Exh. 40, Burgess Depo, at 228:25-229:5 (Q.  Do you receive the weekly activity reports for SIGIR as the head of Public Affairs?  A.  The weekly activity reports, if I remember correctly, were published on the -- on our internal Internet and may have been sent out globally to everybody.  But yeah, we saw them.).

Second, although Burgess contends that there were a series of instances prior to Redmon's termination where Cruz attempted to undermine her authority and diminish Burgess because of her race, s*ee* Factfinding at p. 39, as discussed previously, these allegations are nothing more than a laundry list of perceived slights.  The summary judgment record is void of any evidence, aside from Burgess's own subjective, self-serving speculation that these instances were examples of race discrimination simply because they "didn't really make any logical sense" to her.  Govt. Exh. 40, Burgess Depo, at 204:23.

The unreasonableness of Burgess's purported belief that Redmon's termination was a discriminatory action protected by Title VII is further illustrated by the perceptions of her fellow staff who reached the same conclusion as Cruz – that Burgess's complaints regarding Redmon's termination had

nothing to do with race discrimination.  Govt. Exh. 43, Martell Depo, 120:10-19 ( "To be honest with you,

when I first read it, when I first saw all of this, I thought that she was simply complaining about the lack of

support she was receiving. I didn't have any inclination whatsoever to believe that she was making any

kind of an allegation that Ms. Redmond was no longer at SIGIR as  a result of an improper EEO issue.

That seriously never entered my mind when I first read that."); Govt. Exh. 27, Nisbet Depo, 51:5-7

(testifying that had she read the July 23, 2007, email she would have thought that "maybe there is a

workload matter, maybe she [Burgess] wants to have the termination date changed");  Govt. Exh. 33,

Arnston Depo, 304:3-17 (" It [race discrimination] did not cross my mind, no, that that's what the issue

was….. [A]s I saw it, this was really more of a process question, why am I not involved in this decision,

why are you doing this and why don't we get other people who are also involved in the management of the

staff involved in making a decision on it.  So I did not see it as a potential EEO issue, no.").  Thus, no

reasonable person could objectively believe in light of the record evidence that Burgess's informal

complaints regarding Redmon's termination were meant to oppose race discrimination.

### 2.    There is No Causal Connection Between Burgess's Complaints and her Termination

Finally, even assuming that Burgess's complaints about Redmon's termination constituted

protected activity, Burgess cannot establish the third element of a *prima facie* retaliation claim – that

SIGIR terminated her employment because of those complaints.  Burgess's complaints on July 19, 2007,

and July 23, 2007, about Redmon's termination occurred *after* SIGIR's internal decision to eliminate

Burgess's position and downsize the Public Affairs Office.  Therefore, Burgess cannot establish any causal

connection between the complaints and the decision to terminate her.

Burgess has indicated that she complained about Redmon's termination on July 19, 2007, and on

July 23, 2007.  *See* Compl., paras. 31, 32, 33, 34.  SIGIR terminated Burgess's employment on July 23,

2007, hours after Ms. Burgess sent her second complaint via electronic mail.  *See* Compl., para. 34.  Yet, the administrative record clearly indicates that SIGIR's restructuring plans began in June 2007, at least one month *before* Burgess complained of Redmon's termination.  Govt. Exh. 1, Cruz Test., p. 112, lines 23-24.  On June 22, 2007, Ms. Cruz began developing plans to restructure the SIGIR.  *Id.* p. 121, lines 16-19; p. 160, line 23, p. 161, line 6; Compl., paras. 22, 25.  During June and early July 2007, Cruz, in consultation with Bowen, decided to downsize the Public Affairs office.  *Id.*, p. 86, lines 17-22; p. 97, lines 3-25; p. 98, lines 1-11; p. 103, lines 1-19.  On or about July 9, 2007, approximately two weeks prior to terminating Burgess's employment, Bowen and Cruz decided to eliminate the Assistant Inspector General for Public Affairs position. Govt. Exh. 1, Cruz Test., p. 167, lines 2-6; Govt. Exh. 20, Bowen Depo, at 110:4-110:20; Govt. Exh. 41.  During the second week of July 2007, Cruz called Kristine Belisle to tell Belisle that there may be some public affairs work available for her.  Govt. Exh. 6, Belisle Test., p. 220, lines 9-10; p. 223, lines 3-11.  All of these decisions and preparations took place *before* Cruz notified Burgess of the termination decision, and well before Burgess complained about Redmon's termination.

Burgess, therefore, can point to no evidence that would show the decision to eliminate her position occurred after she complained about Ms. Redmon's termination.  Indeed, the record shows that the decision to abolish her position was made before she ever complained about the Redmon termination.  Thus, Burgess cannot demonstrate that her complaints prompted SIGIR to terminate her employment.  Because Burgess cannot show that she engaged in protected activity prior to her termination, and because Burgess cannot show that SIGIR terminated her employment because of the complaints she made about Redmon's termination, Burgess cannot establish a *prima facie* retaliation case.  As a result, the Court should grant SIGIR summary judgment on Burgess's retaliation claims.

**B.**     **B<span>URGESS CANNOT</span> R<span>EBUT</span> SIGIR'<span>S</span> L<span>EGITIMATE,</span> N<span>ON-</span>R<span>ETALIATORY</span> R<span>EASONS</span>**

Even if Burgess could establish a *prima facie* retaliation case, the legitimate, non-retaliatory reasons SIGIR has offered for removing Burgess and for declining to offer her another job compel granting summary judgment on the retaliation claim.  These reasons have been described in great detail in the Statement of Undisputed Material Facts, and in Section I.B., above, and need not be repeated here. Burgess can offer no evidence that is sufficient to rebut these reasons; therefore, SIGIR is entitled to summary judgment with respect to Burgess's retaliation claims.

## CONCLUSION

The record evidence makes clear there are no facts that would give rise to an inference of discrimination; nor is there any evidence that would allow Burgess to rebut SIGIR's legitimate, non-discriminatory reasons. With respect to the retaliation claims, Burgess cannot show that she engaged in protected activity before her termination, or that any complaints she made prompted SIGIR to fire her; nor can she rebut SIGIR's legitimate, non-retaliatory reasons.  Thus, the Court should grant summary in favor of SIGIR on all of Burgess's claims.

Respectfully Submitted,

NEIL H. MacBRIDE
UNITED STATES ATTORNEY

Of Counsel:                      By:      _____/s_____

                                         YIRIS E. CORNWALL
                                         Assistant United States Attorney
                                         Justin W. Williams United States
                                         Attorney's Building
                                         2100 Jamieson Avenue
                                         Alexandria, Virginia   22314
Luis A. Reyes                            Telephone: (703) 299-3766
General Counsel                          Facsimile: (703) 299-3983
Special Inspector General                yiris.cornwall@usdoj.gov
for Iraq Reconstruction                  *Counsel for the Defendant*
400 Army Navy Drive
Arlington, Virginia 22202


                                         KEVIN J. MIKOLASHEK
                                         Assistant United States Attorney
                                         2100 Jamieson Avenue
                                         Alexandria, Virginia   22314
                                         Telephone: (703) 299-3809
                                         Facsimile: (703) 299-3983
                                         kevin.mikolashek@usdoj.gov
                                         *Counsel for the Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 4, I will electronically file the foregoing with the Clerk of

Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Catherine Cockerham
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington D.C. 20036-1795

                                 /s/
                          _____
                          YIRIS E. CORNWALL
                          Assistant United States Attorney
                          United States Attorney's Office
                          Justin W. Williams United States
                          Attorney's Building
                          2100 Jamieson Avenue
                          Alexandria, Virginia 22314
                          Telephone: (703) 299-3809
                          Facsimile: (703) 299-3983
                          kevin.mikolashek@usdoj.gov
                          *Counsel for the Defendant*

Copy furnished:

Luis A. Reyes
General Counsel
Special Inspector General for Iraq Reconstruction
400 Army Navy Drive
Arlington, Virginia 22202