IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

DENISE BURGESS,                )
                               )
        Plaintiff,             )
                               )
            v.                 )
                               )    1:09cv763 (JCC)
STUART W. BOWEN, JR.,          )
Special Inspector General      )
for Iraq Reconstruction,       )
                               )
        Defendant.             )

## M E M O R A N D U M   O P I N I O N

This case is before the Court on a Motion for Summary
Judgment filed by defendant Stuart W. Bowen, Special Inspector
General for Iraq ("Defendant," "Bowen," or the "Government")
pursuant to Federal Rule of Civil Procedure 56.  For the
following reasons, this Court will grant Defendant's Motion.

### I. Background

After exhausting her administrative remedies (G. Ex.
14 (Final Agency Decision of the Department of the Army))[1],
plaintiff Denise Burgess ("Plaintiff" or "Burgess") filed a
Complaint in this action on July 10, 2009 alleging four
violations of Title VII of the Civil Rights Act of 1964, as
amended, 42 U.S.C. § 2000e *et seq*. ("Title VII").  [Dkt. 1.]

---

[1] Government Exhibits will be abbreviated as "G. Ex."  Plaintiff's Exhibits
will be abbreviated as "P. Ex."

She alleges: (1) Discriminatory Termination based on Race or Color (Count One); (2) Discriminatory Denial of a Transfer based on Race or Color (Count Two); (3) Retaliatory Termination (Count Three); and (4) Retaliatory Denial of Transfer (Count Four). [Dkt. 1.] Burgess's claims arise out of her termination from the Office of the Special Inspector General for Iraq Reconstruction ("SIGIR"), and the Defendant's decision not to offer her an alternative position. The Government contends that Plaintiff's termination was part of a reduction in staff and reorganization due to budget constraints. The Government does not contend that Burgess was fired for poor performance. (P. Ex. 27 (D.'s Resp. to Pl.'s Request for Admission No. 1) (stating that "Ms. Burgess was not terminated for unsatisfactory job performance."); P. Ex. 26 (Def.'s Resp. Pl.'s Interrog. No. 2) ("[N]o deficiencies in Ms. Burgess's conduct or job performance were the basis for or in any way related to the termination of her supervisory position"); P. Ex. 23 (Cruz Dep.) at 248; P. Ex. 13 (Bowen Dep.) at 65.)[2] Burgess believes that her termination was a result of racial discrimination, and/or retaliation for her complaints regarding racial discrimination. The significant facts are as follows.

A. SIGIR Budget Constraints

---

[2] The abbreviation "Dep." is used for deposition testimony, while the abbreviation "Test." will be used for administrative discovery testimony. The abbreviation "Decl." will be used for testimony offered in a sworn declaration.

SIGIR, first created by Congress in 2003 as the Office of the Inspector General of the Coalition Provisional Authority, fulfills a mandate to oversee all U.S.-funded Iraq reconstruction programs and projects. Pub. L. 108-106, § 3001, as amended. At all times relevant to the Complaint, Defendant Bowen, a Caucasian male, was the Special Inspector General for Iraq Reconstruction. (*See* Compl ¶ 2; G. Ex. 3 (Bowen Decl.) at 2.) Bowen recruited Burgess, an African-American female, to join SIGIR in January 2007. (P. Ex. 13 (Bowen Dep.) at 25; P. Ex. 4 (Burgess Appointment Memorandum).)

On January 16, 2007, Bowen and Ambassador Robin Raphel ("Raphel"), the then-Deputy Inspector General, appointed Plaintiff Burgess to serve as SIGIR's Assistant Inspector General for Public Affairs ("AIG-PA"). (G. Ex. 3 (Bowen Decl.) at 3; G. Ex. 2 (Burgess Dep.) at 32:12-25; G. Ex. 29 (Burgess's Appointment Memo, Jan. 16, 2007).) As the AIG-PA, Burgess reported directly to the Deputy Inspector General (initially, Raphel, and then, after June 11, Ginger Cruz ("Cruz")). Burgess's second-level supervisor was the Special Inspector General, Bowen. (G. Ex. 2 (Burgess Test.) at 16-17.) In her role as the AIG-PA, Burgess prepared strategic plans for SIGIR and handled media issues and media appearances for Bowen. (P. Ex. 21 (Burgess Test.) at 13; P. Ex. 32 (AIG-PA Position Description).)

From 2005 until December 2006, Cruz, an Asian American female, served as the Deputy Inspector General for Iraq Reconstruction. (G. Ex. 1 (Cruz Test.) at 82:7-10.) After briefly leaving SIGIR for a position with the State Department, Cruz returned to SIGIR (G. Ex. 1 at 82:9-11; P. Ex. 10 (Arntson Dep.) at 92; P. Ex. 13 (Bowen Dep.) at 34; P. Ex. 9 (Acken Dep.) at 100) and assumed the duties of Deputy Inspector General for Policy in June of 2007, which included the supervision of Burgess. (G. Ex. 1 at 82:161; G. Ex. 2 (Burgess Test.) at 16-17; Compl. ¶¶ 22, 25.)

Shortly after Burgess was hired, at Burgess's request, Patricia Redmon ("Redmon"), an African-American female, was hired as a contract employee to serve as Burgess's administrative assistant. (*See* G. Ex. 40 (Burgess Dep.) 248:7-8, 250:6-11; P. Ex. 39 (Redmon Dep.) at 21-23.) Redmon was supervised by and reported directly to Burgess. (G. Ex. 15 (Redmon Test.) at 174-5; *see* G. Ex. 40 (Burgess Dep.) at 248:7-8, 250:6-11.)

Until January 2007, SIGIR had been operating on a budget of approximately $25 million a year. (G. Ex. 1 (Cruz Test.) at 92:3-8; G. Ex. 37 (February 19, 2008 Budget Request).) On December 7, 2006, however, SIGIR had submitted to the Office of Management and Budget ("OMB") a request for $53 million to operate through September 2008 that was denied by OMB. (G. Ex.

17 (Fiscal Year 2008 budget Request); G. Ex. 1 (Cruz Test.)
92:3-8; G. Ex. 21 (Cruz Notes) at July 9, 2007.) In or about
early June 2007, OMB, through's OMB Budget Examiner Howard
Dickenson ("Dickenson"), expressed concern with SIGIR's
substantially increased budget request, which had more than
doubled from previous years' budget requests. (G. Ex. 18
(Dickenson Dep.) at 32:11-33:7; G. Ex. 1 at 92:3-17.) OMB
instructed SIGIR and, more specifically, Cruz, who was
instructed to take over budget duties from SIGIR Chief of Staff
Nick Arntson ("Arntson"), to reduce SIGIR's proposed budget, and
to operate on a $35 million budget through December 2008. (G.
Ex. 18 (Dickenson Dep.) at 210:9-210:14; G. Ex. 19 (Email from
Young to Dickenson regarding budget, June 11, 2007); G. Ex. 1
(Cruz Test.) at 94:1-11.) In fact, while SIGIR's total
expenditures, personnel expenditures, and number of employees
increased from 2007 to 2008, they stayed well below the $35
million budget requested. (P. Ex. 23 (Cruz Dep.) at 160, 162,
209-10 (SIGIR expenditures were $28.3 million in FY07 and $29
million in FY08; Cruz acknowledges that "from 2004 through 2008,
payroll did increase."); Ex. 42 (Young Dep.) at 83-88; *see also*
P. Exs. 2, 8.)

During this period, SIGIR engaged in multiple
communications with Dickenson of the OMB wherein he emphasized
the need for budget cuts. (G. Ex. 3 (Bowen Decl.); G. Ex. 18

(Dickenson Dep.) at 114:15-115:14, 115:20-116:14, 63:14-63:19, 198:1-198:6.)  Dickenson made clear to SIGIR that no additional funding was coming and that cuts might be necessary:

> Question:  Did you ever instruct any employee at SIGIR to reduce the number of employees that SIGIR had on its payroll?"
> THE WITNESS:  The quick answer to that is no, but there's always a "but" to that.  SIGIR in one of my discussions with them when we had identified what I had believed to be a funding gap, that they were not going to be able to get through the end of the fiscal year absent some injection of new money, which as an OMB examiner I communicated to them that we're not going to give to them, SIGIR did tell me, if you make us live within these means we're going to have to lay people off. I do recall my response to them was, if you don't have enough money, it's SIGIR's responsibility to identify how to live within your budget.

(G. Ex. 18 at 114:13-115:14.)  SIGIR also engaged in various budget drills in order to project various budget and organizational scenarios.  (*See* G. Ex. 26, 31-32, 35-36, 38.) Those drills contemplated, among other issues, reorganization of SIGIR, and often referenced potential employee reductions.  (*See* G. Exs. 26, 31, 32, 35, 36, 38.)

     During this period, Erica Young, ("Young"), an African-American female, functioned as the Senior Budget Officer at SIGIR.  (G. Ex. 16 (Young Dep.) 13:11-17.)  In that capacity, Young was responsible for creating budget estimates and executing the SIGIR budget once SIGIR received its appropriated funds.  (G. Ex. 16 at 15:14-19.)  In November 2008, Young was

promoted by Cruz to the position of Director of Resource
Management and Budget.  (G. Ex. 16. at 14:8-12.)  Nonetheless,
it was Cruz's responsibility to develop plans to meet SIGIR's
budget goals.  (G. Ex. 1 (Cruz Test.) at 93, 121, 160; G. Ex. 5
(Cruz notes) at 376-379.)

      B.   SIGIR Reorganization

In response to the budget restrictions, Defendant
Bowen instructed Cruz to present him with a plan that would
yield savings for SIGIR in fiscal year ("FY") 2007 and would
address the shortfalls for the 2008 FY.  (G. Ex. 20 (Bowen Dep.)
at 196:21-197:6.)  On or about June 20, 2007, Cruz developed the
first plans to streamline and reorganize SIGIR so that it could
operate within the budget constraints.  (G. Ex. 1 (Cruz Test.)
at 121, 160; G. Ex. 5 (Cruz Notes) at 376-379.)  During June and
July 2007, Cruz, in consultation with Bowen, developed plans to,
among other things, downsize the Public Affairs office,
specifically by eliminating Burgess's AIG-PA position.
(G. Ex. 1 (Cruz Test.) at 86-87, 97-103, 167:2-6; G. Ex. 41.
(Email from Cruz to Janice Nisbet regarding "Draft org chart,"
with attachment of "SIGIR Org Chart 20JUN07 DRAFT.ppt").)  As
part of this reorganization, and by no later than July 3, 2007,
Cruz decided to create a new Director of Public Affairs position
for which she re-hired Kristine Belisle ("Belisle"), a former
Public Affairs employee.  (G. Ex. 41.)

Cruz's decision was memorialized days later in her notes, dated July 16, 2007, which state: "Public Affairs X2 . . . Dissolve AIGPA [Assistant Inspector General for Public Affairs position] . . . + Kris Belisle . . ."  (G. Ex. 21 (Cruz Notes, July 16, 2007 Entry) at 229-32.)  Again, on July 17, 2007, Cruz wrote, "Belisle – immediate . . . Denise – reorganize . . . Patricia Redmon/Barbara Lewis – reduce BCPI."  (G. Ex. 21 (Cruz Notes, July 17, 2007 Entry) at 233, 240 (emphasis added).)  On or about the second week of July 2007, Cruz contacted Belisle via telephone, who was familiar with the SIGIR Public Affairs office and its mission because of her previous employment in the office, with the intention of hiring her back to SIGIR.  (G. Ex. 6 (Belisle Test.) at 220; G. Ex. 22 (Belisle Dep.) at 110:15-22.)

### C.  Termination of Burgess and Redmon

On July 19, 2007, after the decision was made within SIGIR to eliminate Burgess's AIG-PA position, Cruz informed Burgess that Burgess's assistant, Redmon, would be let go.  (G. Ex. 7 (Equal Employment Opportunity Commission ("EEOC") Compl.) at 7; G. Ex. 8 (Email from Burgess to Cruz, July 23, 2007).)  In Burgess's August 13, 2007 EEOC Complaint, she stated that Cruz informed her during the July 19 meeting "that my assistant Ms. Patricia Redmon would be terminated in two weeks.  At that time I specifically raised my concern that the decision was unfair.

I questioned the equality of the decision to terminate Ms. Redmon since the Public Affairs sister section, Congressional Affairs, was overstaffed." (G. Ex. 7 at 2.)  Burgess further wrote in her EEOC Complaint that, upon being informed that Redmon would be let go, "I told Ms. Cruz it would be extremely difficult for me to manage the workload with out [sic] an assistant. She said I could expect help from her, the Inspector General and other AIGs." (G. Ex. 7 at 2.)  Two days later, on Saturday, July 21, 2007, Belisle, sent her resume to Cruz via e-mail at Cruz's request.  (G. Ex. 6 (Belisle Test.) at 225:1-7; G. Ex. 22 (Belisle Dep.) at 128:17-20.)

On Monday, July 23, 2007 at 9:04 AM, Burgess sent Cruz an e-mail questioning the "fairness and equality" of the decision to terminate Redmon and requesting a meeting to discuss the matter.  (P. Ex. 17 (Email from Burgess to Cruz, July 23, 2007).)  The e-mail stated:

> I have an appointment at the PCIE [President's Council on Integrity and Efficiency] this morning . . . However, I believe we need to revisit the decision to terminate Patricia.  As I told you on Thursday when you informed me of this decision, I have serious concerns about the fairness and equality of this action.  I believe we need to have a robust discussion that includes the appropriate management staff, whom I have copied on this message.  If we are unable to do so today, we should plan to do so in a conference call as soon as you are available given your travel schedule.

(P. Ex. 17.)[3] Burgess states that she intended to send the e-mail to SIGIR's senior staff, but she inadvertently placed their addresses in the subject line, so they did not receive her complaint directly.[4] (P. Ex. 17; P. Ex. 21 (Burgess Test.) at 12, 34, 36.) Cruz then called Chief of Staff Arntson and asked Arntson to set up a meeting between her and counsel. (P. Ex. 23 (Cruz Dep.) at 399-400; Ex. 33 (Arntson Decl.) at 6; Ex. 10 (Arntson Dep.) at 135-40, 177-79 ("It was almost immediately after she received Denise's e-mail, we arranged that meeting.").) Cruz explained that she sought the advice of counsel in response to Burgess's e-mail:

> [T]he fact that Denise Burgess had that morning also sent an email and she seemed to be copying quite a lot of her correspondence to the General Counsel's office made me feel that it is was important for transparency, to ensure that everything that was done was fully understood by the agency and by the General Counsel's office.

(P. Ex. 24 (Cruz Test.) at 156.) Deputy General Counsel J. Patrick Bowers ("Bowers") was informed of the meeting regarding Burgess's termination on July 23, 2007. (P. Ex. 14 (Bowers Dep.) at 65-66 ("Q. So let's talk about July 23rd. How is it that you came to attend this meeting? A. I was asked by Ms. Cruz to be there and witness it. Q. When? A. I believe that

---

[3] Burgess has claimed that the words "fairness and equality" came from either the SIGIR EEO Policy or the EEOC website. (*See* P. Ex. 20 at 283.)
[4] SIGIR concedes, however, that each intended recipient other than Bowen received the e-mail shortly after it was sent. (Def.'s Br. at 14.)

morning. Not before.").)  Cruz wanted counsel present to take
notes and to prepare a memorandum for the record, and she
reconfirmed Bowers' availability shortly before the meeting.
(P. Ex. 23 at 407.)

At approximately 3:00 p.m. on July 23, 2007, Cruz and
Bowers met with Burgess and notified her that Cruz and Bowen had
decided to eliminate Burgess's position and conclude her
employment with SIGIR "in light of budget constraints,"
effective September 1, 2007.  (G. Ex. 11 (Burgess Notes) at 311-
13; G. Ex. 28 (Cruz Dep.) at 379:17-22, 407:16-19; P. Ex. 33
(Arntson Decl.) at 6.)  Cruz did not offer Burgess any other
position at SIGIR, including the (soon to be created) Director
of Public Affairs position or a Senior Advisor position.  (P.
Ex. 10 (Arntson Dep.) at 171.)  Cruz informed Burgess that she
was to remain on paid administrative leave until September 1,
2007, because the SIGIR leadership believed it would be
inappropriate to have the person in charge of all external
relations for the organization continue to speak for the
organization after learning of her pending termination.  (G. Ex.
1 (Cruz Test.) at 152-53; G. Ex. 12 (Notification of Personnel
Action, Aug. 27, 2007); P. Ex. 20 (Burgess Dep.) at 308, 316.)
Burgess now contends in a Declaration signed on June 21, 2010,
contemporaneously with her Opposition to Defendant's Summary
Judgment Motion, that she "would have chosen to stay on at SIGIR

in the Director of Public Affairs position or any other position
in lieu of termination" and that she "would have applied for
either the Public Affairs Director or a Senior Advisor position
if provided the opportunity." (Burgess Decl. ¶¶ 3-4.) During
her termination meeting, Burgess requested a letter documenting
the reasons for her termination. At Cruz's direction, Arntson
drafted the letter, stating that Burgess was terminated "due to
the reorganization of the Office of Public Affairs." (P. Ex. 18
(Burgess Termination Letter); Ex. 10 (Arntson Dep.) at 149-50.)

      D.   <u>Director of Public Affairs Position</u>

     On the day that Burgess was terminated, Cruz tasked
Arntson with drafting a position description for a Director of
Public Affairs position. (P. Ex. 33 (Arntson Decl.) at 4;
Ex. 10 (Arntson Dep.) at 409.) As described above, Cruz had
already drafted an organizational chart with a new Director of
Public Affairs position to be filled by Belisle on, at the
latest, July 3, 2007, almost three weeks prior to Burgess's
termination. (G. Ex. 41 (Email from Cruz to Janice Nisbet
regarding "Draft org chart," with attachment of "SIGIR Org Chart
20JUN07 DRAFT.ppt").) The newly created Director of Public
Affairs was to "serve as the principal staff advisor in the
conduct of liaison with national and international news media,
other collective and individual stakeholders, and public
audiences for" SIGIR. (*Compare* P. Ex. 32 (AIG-PA Position

Description) with P. Ex. 34 (Director of Public Affairs Position Description).)  The main distinction between the job descriptions is that the new Director of Public Affairs would have little autonomy and almost no policy or decision making authority.  (P. Ex. 34 (Director of Public Affairs Position Description).)  As Burgess wrote in her EEOC Complaint, upon being informed that Redmon (her administrative assistant) had been let go, "[She] told Ms. Cruz it would be extremely difficult for [her] to manage the workload [of the AIG-PA position] without [sic] an assistant."  (G. Ex. 7 (Burgess EEOC Compl.) at 2.)  This comports with the testimony of Janice Nisbet ("Nisbet"), the Chief of Staffing and Operations at SIGIR, who described the position of AIG-PA during her deposition as follows:

> The AIG for Public Affairs [was] considered a senior
> staff member, an [Senior Executive Service]
> equivalent.  There is a certain statute with regard to
> that.  There [are] only something like nine senior
> staff folks within the entire organization . . . .
> They would [] be supervising . . . they might advise
> on development of policy, procedures.  They would
> provide direct guidance to the AIG . . . .

(G. Ex. 27 (Nesbit Dep.) at 181-182.)  In contrast, she described the Director position as:

> a rank and file position. . . [T]hey didn't develop
> policies.  They were only asked to advise the IG
> [Inspector General] when they were directed to do so
> . . . They were operating at a lesser role.  And in
> particular, the duties would be more routine.  Contact

the media, set up press events, that type of thing.
Not advise the IG . . . .

(G. Ex. 27 at 181-182.)  This is also in line with Cruz's

testimony.  According to Cruz, the new Director of Public

Affairs needed to be "someone who was able to do the heavy

lifting, who was not above making the phone calls, who was not

above doing . . . the day-to-day scheduling, management and

callbacks . . ."  (G. Ex. 1 (Cruz Test.) at 102:7-10.)  Nisbet

also explained that the AIG position came with a higher salary

and annual leave than the Director position.  (G. Ex. 27 at 181-

182.)

E.    Scope of the SIGIR Reorganization

Setting aside the Public Affairs staff, as part of the

SIGIR reorganization effort, personnel in the Audits division

were reappointed from Iraq to the United States in an effort to

cut on travel expenses.  (*See* G. Ex. 24 (Email exchange from

Nisbet and Bell, June 13, 2007) (describing reorganizations in

Audits division).)  SIGIR also attempted to decrease overhead by

reducing the total number of support contractors and by

converting the essential contract positions to full-time

government employee positions, which are more affordable to the

Government.  (G. Ex. 10 (Nisbet Decl.).)  In addition to the

elimination of Redmon's contractor position in the Public

Affairs section, at least four other contractor positions were

also eliminated (two African-American males and two white females).  (G. Ex. 10 (Nesbit Decl.) at 3.)  Further, seven contractor positions, deemed to be essential following Cruz's review, were converted to full-time government positions during the period from July through November 2007. (G. Ex. 10 at 2.) Of the individuals offered jobs with SIGIR at Cruz and Bowen's direction, five were African-American.  (G. Ex. 10 at 2; *see also* G. Ex. 33 (Arntson Dep.) at 217-222.)  Overall, the personnel expenditure of the Public and Congressional Affairs divisions was reduced from $950,000 to $413,000 through the reorganization.  (P. Ex. 23 (Cruz Dep.) at 253:22-254:17.)  A total of eight employees were ultimately affected; however, not all of them were asked to leave the organization as promptly as Burgess was required to leave.  (P. Ex. 23 at 254-277.)

In response to her termination, Plaintiff brought her Complaint on July 10, 2009.  Defendant filed this Motion for Summary Judgment on June 4, 2010.  [Dkt 43.]  In accordance with the agreed upon briefing schedule, Plaintiff opposed Defendant's Motion on June 21, 2010 [Dkt. 47] and Defendant filed a Reply on June 25, 2010.  [Dkt. 48.]  Argument was heard on July 2, 2010. Defendant's Motion for Summary Judgment is now before the Court.

## II.  Standard of Review

Summary judgment is appropriate if the record shows "there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c); *see also Anderson*, 477 U.S. at 247-48;
*Evans v. Techs. Applications & Serv., Co.*, 80 F.3d 954, 958-59
(4th Cir. 1996). The party seeking summary judgment has the
initial burden to show the absence of a genuine issue of
material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325
(1986). A genuine issue of material fact exists "if the
evidence is such that a reasonable jury could return a verdict
for the non-moving party." *Anderson*, 477 U.S. at 248. To
defeat a properly supported motion for summary judgment, the
non-moving party "must set forth specific facts showing that
there is a genuine issue for trial." *Id.* (quotation omitted).
The very existence of a scintilla of evidence or of
unsubstantiated conclusory allegations, however, is insufficient
to avoid summary judgment. *Id.* at 248-52. The facts shall be
viewed, and all reasonable inferences drawn, in the light most
favorable to the non-moving party. *Id.* at 255; *see also*
*Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

### III. Analysis

A.  Discrimination under Title VII

Counts One and Two of Plaintiff's Complaint allege
that she was removed from her role at SIGIR based on her race.
To establish her case, Plaintiff must show, through either
direct evidence of such discrimination or through circumstantial

evidence via the analytical framework found in *McDonnell Douglas Corp v. Green*, 411 U.S. 762 (1973), that she was the victim of intentional, unlawful discrimination.  The parties agree that analysis under *McDonnell Douglas* is appropriate, as there is no direct evidence of discrimination in the record.  (*See* Mem. at 16; Opp. at 16-17.)

Under the *McDonnell Douglas* burden-shifting scheme, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 (1993); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981).  While the burden is "not onerous," *Burdine,* 450 U.S. at 253, it is also not empty or perfunctory.  *Ennis v. Nat'l Assoc. of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 58 (4th Cir. 1995).  A plaintiff can establish a *prima facie* case by "proving a set of facts which would enable the fact-finder to conclude, in the absence of any further explanation, that it is more likely than not that the adverse employment action was the product of discrimination." *Ennis,* 53 F.3d at 58 (citing *Burdine,* 450 U.S. at 254).

If the plaintiff succeeds in proving the *prima facie* case, the burden of production – not proof or persuasion – shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action

which, "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *McDonnell Douglas*, 411 U.S. at 802 (holding that "despite the burden-shifting framework, the ultimate burden of proof remains with the plaintiff"); *Ennis*, 53 F.3d at 58. If the defendant meets this burden of production, the presumption created by the *prima facie* case "drops out of the picture," and the plaintiff must show, by a preponderance of evidence, that the defendant's articulated reasons are mere pretext. *McDonnell Douglas,* 411 U.S. at 802*.* "The plaintiff then has 'the full and fair opportunity to demonstrate,' through presentation of his own case and through cross-examination of the defendant's witnesses, 'that the proffered reason was not the true reason for the employment decision,' and that race was." *Hicks,* 509 U.S. at 507-508 (holding that a *prima facie* case in addition to disbelief of employer's asserted justification for employment action is not necessarily sufficient to establish violation; summary judgment is appropriate unless plaintiff presents adequate evidence that employer unlawfully discriminated) (citing *Burdine*, 450 U.S. at 255). "In Title VII cases, the 'prima facie case,' a mechanism peculiar to the pretext framework, is never by itself sufficient to permit a plaintiff to escape an adverse summary judgment ruling except in the rare

instance when an 'employer is silent in the face of the
presumption' it raises." *Burdine,* 450 U.S. at 254.

> 1.  *Count One: Discriminatory Termination based on Race or Color*

To establish a *prima facie* case for a discriminatory
termination claim, a plaintiff must show:

> (1) that she is a member of a protected class; (2)
> that she was qualified for her job and her job
> performance was satisfactory; (3) that, in spite of
> her qualifications and performance, she was fired; and
> (4) that the position remained open to similarly
> qualified applicants after her dismissal.

*Williams v. Cerberonics,* 871 F.2d 452, 455-456 (4th Cir. 1989)
(citing *McDonnell Douglas*, 411 U.S. at 802.)  Defendant argues
that summary judgment is appropriate here because Plaintiff
cannot establish the forth prong of her *prima facie* case, as her
position as AIG-PA was eliminated and thus could not have
"remained open to similarly qualified applicants." (Mem. at
17.)  Plaintiff argues that the position was "merely renamed"
and a less qualified white employee, Belisle, was hired.
(Opp. at 17-18.)

Plaintiff's argument that the "position remained open"
hinges on the definition of the position. (*See* Opp. at 18.)
Plaintiff argues that she "was in charge of SIGIR's public
affairs function" as the AIG-PA and that the new Director of
Public Affairs fulfilled entirely the same function. (Opp. at
18.)  In support of this, Plaintiff points to the official job

descriptions of the positions.  (P. Ex. 32 and 34.)  Plaintiff
also cites to the similar salaries and the testimony of SIGIR's
then Chief of Staff that it was Bowen and Cruz's original intent
to simply offer Belisle the same salary that Burgess had earned.
(P. Ex. 10 (Arnston Dep.) at 185, 187-188; P. Ex. 11 (Belisle
Dep.) at 145.)[5]

        Defendant argues that Burgess's SES-level, managerial,
senior staff position as AIG-PA was eliminated.  (Mem. at 19
(citing G. Ex. 27 (Nisbet Dep.) at 128:16-19) ("There is no
directorate anymore.  [Director of Public Affairs] is a position
that sits within the executive office basically along with the
executive assistant to the IG [Inspector General], in other
words").)  Defendant further argues that the job descriptions
reveal that the new Director position had much less
responsibility than the old AIG-PA position and came with a
lower base salary (the same $20,000.00 difference in base salary
asserted by the Plaintiff).  Defendant also points to the
testimony of Nisbet, the Chief of Staffing and Operations at
SIGIR, recounted *supra* at 14, describing the differences in role
and responsibility between the position of AIG-PA (one of only
nine "senior staff member" in SIGIR - a "supervis[or]" who

---

[5] Plaintiff analogizes this case to *Murray v. Gilmore,* 406 F.3d 708 (D.C. Cir.
2005), in which a plaintiff was fired and a non-protected class member was
hired into a "functionally equivalent position."  In the *Murray* case,
however, the responsibilities of the new position were identical to the old.
*See id.* at 710.

"might advise on development of policy, procedures" and who would "provide direct guidance to the IG") and the Director position ("a rank and file position" that "didn't develop policies," "operating at a lesser role" with "more routine" and who did not advise the IG. . . .) (G. Ex. 27 at 181-182.) Nisbet also explained that the AIG position came with a higher salary and annual leave than the Director position. (G. Ex. 27 at 181-182.) Belisle testified that in her GS-15-equivalent Director of Public Affairs position, among other duties, she answered her own phone, did all interview transcriptions, set up the Inspector General's press appointments, fielded all press and public inquiries, and acted as the liaison between SIGIR and the press. (G. Ex. 22 (Belisle Dep.) at 159:18-160:22; 161:19-20; 162:13-15; 163:18-20; 175:6-15.) Burgess testified that as AIG-PA her duties did not include answering the phones, transcribing, records keeping, etc., and that such tasks were the duties of her assistant, Redmon. (Govt. Ex. 40 (Burgess Dep.) at 250:18-251:11.) Cruz testified that she personally assumed many of Burgess's duties, such as developing public affairs policy and planning. (G. Ex. 1 (Cruz Test.) at 110-111; G. Ex. 4 (Arntson Decl.) at 8.)

This Court finds that the AIG-PA position was eliminated and rejects Plaintiff's argument that it was merely "renamed" as the Director of Public Affairs. The core

managerial and policy responsibilities of the AIG-PA position were eliminated, the salary structure was different, and other employees of SIGIR assumed the primary duties that the AIG-PA had previously preformed.  As Plaintiff has not shown that the same position "remained open," she has not established a *prima facie* case of discrimination.

Even assuming *arguendo* that Plaintiff has established a *prima facie* case for discriminatory termination, under the *McDonnell Douglas* analysis, Defendant here has proffered a legitimate, non-discriminatory reasons for its decision. Defendant's argument is premised on its measures (including reorganization and staff reductions) to reduce SIGIR's budget expenditures after OMB cautioned SIGIR regarding its budget request.  Until January 2007, SIGIR had been operating on a budget of approximately $25 million a year.  In January 2007, SIGIR's budget request to OMB ballooned to $53 million.  (G. Ex. 1 (Cruz Test.) at 92:3-8.)  OMB rejected this request as out of proportion with the reasonable budgetary needs that SIGIR had at the time.  (G. Ex. 18 (Dickenson Dep.) at 32:22-33:7.)  As a result of OMB's decision, SIGIR faced pressure from OMB to trim its budget.  (G. Ex. 18 at 219:22-220:7; G. Ex. 1 at 92:3-17, 94:2.)  When Cruz assumed the position of Deputy Inspector General in June 2007, Bowen asked Cruz to reorganize SIGIR so that it operated more efficiently and within the constraints OMB

had placed upon SIGIR's budget. (G. Ex. 1 at 94:3-8; G. Ex. 20 (Bowen Dep.) at 115:22-116:5.) Throughout May, June and July of 2007, SIGIR went through a number of budget execution drills and scenarios reflecting possible staffing changes and organizational reductions in order to bring down costs, which were presented to OMB for budget approval. (G. Ex. 16 (Young Dep.) at 18:13-22:13; *see also* G. Ex. 26; 31; 34; 37; 44; 45; 46.) This reorganization and budgeting was detailed in SIGIR's Weekly Activity Reports ("WARS"), and Burgess (a recipient and contributor to the WARS) should have been reasonably aware at the time that the budget and staff reorganization was an ongoing topic of discussion amongst the Special Inspector General, Chief of Staff, and Deputy Inspector General throughout the months immediately preceding her termination. (*See* G. Ex. 39 (June 9, 2007 SIGIR WAR at 1310) ("Provided guidance to Budget Officer for FY08 Execution Plan. Reviewed Plan. Briefed IG and DIG. Plan has been forwarded to OMB."); June 23, 2007 SIGIR WAR at 1127 ("Met with IG and DIG re: reorganization and new roles and responsibilities."); June 30, 2007 SIGIR WAR at 1140; July 7, 2007 SIGIR WAR at 1150 ("Reviewed budget, contracting and personnel status with M&A Chiefs . . . [p]rovided budget and contracting personnel information for FY07 and projections for FY08 to IG . . . .[d]iscussed various proposals to reduce FY08 execution budget with IG."); July 16, 2007 SIGIR WAR at 1174

("Staffed recommendation to DIG-P concerning reorganization
. . . [p]rovided recommendations to IG and DIG-P on budget.");
July 23, 2007 SIGIR WAR at 1185 ("Worked with General Counsel
and DIG on various staffing and reorganization issues.")); *see
also* G. Ex. 40 (Burgess Dep.) at 228:25-229:5.)

As part of this effort to comply with OMB's directive,
Cruz reviewed SIGIR's organizational structure and noted that
her immediate predecessor had increased the number of personnel
in SIGIR's Congressional and Public Affairs offices from four to
eight. (G. Ex. 1 (Cruz Test.) at 91:10-24.) Regarding the
Public Affairs Office, Cruz felt that, because she had a public
affairs background, she would only need one person "to do the
heavy lifting, who was not above making the phone calls, who was
not above doing . . . the day-to-day scheduling, management and
callbacks . . ." (G. Ex. 1 at 102:7-10.) Cruz did not feel
that SIGIR could similarly reduce the Congressional Affairs
office to one person (as she had reduced the Public Affairs
Office to one person) because SIGIR was congressionally mandated
to provide quarterly reports to Congress, as well as reports to
eight congressional committees. (G. Ex. 1 at 96:11-16; *see also*
Ronald W. Reagan National Defense Authorization Act for Fiscal
Year 2002, Pub. L. No. 108-375, § 1203, 118 Stat. 1811, 2078-
2081 (2004).) No similar Congressional mandate existed for
SIGIR to interact with the media or perform public affairs

functions. (G. Ex. 1 at 92:18-20.) Therefore, as documented by Cruz's contemporaneous notes, in early July 2007, Cruz, in consultation with Bowen, decided to eliminate the SES-4-equivalent AIG-PA position and create the GS-15-level Director of Public Affairs position. (G. Ex. 1 at 167: G. Ex. 21 (Cruz Notes) at 2-6; *see* G. Ex. 41; *Anderson v. Westinghouse Savannah River Co.*, 272, 406 F.3d 248 (4th Cir. 2005) ("The court does not sit as a 'super-personnel department weighing the prudence of employment decisions' made by the defendants") (quoting *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)).

As Defendant has met his burden of production in offering a legitimate non-discriminatory reason for Burgess's termination, the presumption created by Plaintiff's *prima facie* case "drops out of the picture," and the Plaintiff must now show, "'that the proffered reason was not the true reason for the employment decision,' and that race was." *Hicks,* 509 U.S. at 507-508 (citing *Burdine*, 450 U.S. at 255.) To do so, Plaintiff asserts that the entire "reorganization" was pretext. In other words, "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination [or retaliation]," which entitles a "plaintiff to survive a motion for summary judgment." *Burdine,* 450 U.S. at 253; *see also Sears Roebuck & Co.*, 243 F.3d at 852.

The bulk of Plaintiff's argument is made as part of its argument for a *prima facie* case and is stated above. Namely, that while the personnel expenditure of the Public Affairs and Congressional affairs divisions was reduced from $950,000.00 to $413,000.00 through the reorganization (P. Ex. 23 (Cruz Dep.) at 253:22-254:17), and eight employees were affected, only Burgess was asked to leave immediately. (P. Ex. 23 at 254-277.) Plaintiff also makes the conclusory statement that "there is virtually no documentary evidence of the purported reorganization" (Opp. at 32) but does not directly address the facts put forward by Defendant, particularly the WAR Reports and the testimony of Bowen, Cruz, and OMB Budget Examiner Dickenson.

Plaintiff last attempts to argue that Defendant's "reorganization" rationale is inconsistent, and suggests that such "an inference can be drawn that the reasons are pretext for discrimination." (Opp. at 32 (citing *Sears Roebuck & Co.,* 243 F.3d at 852-53); *Merritt v. Old Dominion Freight Line, Inc.,* 601 F.3d 289, 298 (4th Cir. 2010) (finding that when defendant's reason gradually took shape during the litigation, the inconsistencies could lead a fact-finder to believe it was a *post-hoc* rationale). Plaintiff argues that Burgess's termination was not part of a larger reorganization, and that the evidence put on by the Government is mere pretext.

To ultimately establish a case of race discrimination, however, Plaintiff must show there is a genuine issue of material fact regarding a connection between her race and her adverse employment action. "In other words, she would [ultimately] have to show that she was [terminated] *because of* her race, not that she was a member of the black race *and* was [terminated]." *Autry v. North Carolina Dept. of Human Resources*, 820 F.2d 1384, 1386 (4th Cir. 1987) (emphasis in original); *see also Burdine,* 450 U.S. at 248. Additionally, "when the hirer and firer are the same individual, there is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer, and the early resolution of this question need not be derailed by strict fealty to proof schemes" (specifically, the scheme of proof set out by *McDonnell Douglas*). *Proud v.* Stone, 945 F.2d 796, 798 (4th Cir. 1991). Stuart Bowen, the Defendant here, is also the same individual who recruited Burgess to the AIG-PA position in the first instance. (G. Ex. 2 (Burgess Test.) at 32-33; G. Ex. 20 (Bowen Dep.) at 69:1-70:20.)

Here, Plaintiff has not "set forth specific facts showing that there is a genuine issue for trial." *See Anderson*, 477 U.S. at 248. Despite prolonged and lengthy discovery requiring the filing of over-length briefs and thousands of pages of exhibits, Plaintiff has not come forward with evidence

that these acts were motivated by race discrimination.
Plaintiff's own notes, taken during her termination meeting do
not make any reference to even the suspicion of a racially
motivated firing. (*See* G. Ex. 11 (Burgess Notes).) As
Defendant contends in its brief, "when pressed for evidence that
these alleged acts were motivated by race discrimination,
Burgess offered no more than her own speculation that it must be
race discrimination based on "process of elimination." (G. Ex.
40 (Burgess Dep.) at 342:20-342:7.) Accordingly, even assuming
*arguendo* that Plaintiff established a *prima facie* case of race
discrimination, which she did not, Plaintiff fails to show facts
sufficient to defeat a motion for summary judgment. This Court
will grant Defendant's Motion for Summary Judgment as to Count
One.

> 2. *Count Two: Discriminatory Denial of a*
> *Transfer based on Race or Color*

To establish a *prima facie* case for a discriminatory
denial of transfer claim, a plaintiff must show:

> (1) she is a member of a protected group; (2) she
> applied for the position in question; (3) she was
> qualified for the position; and (4) she was rejected
> for the position in favor of someone not a member of
> the protected group under circumstances giving rise to
> an inference of unlawful discrimination.

*Lowery v. Circuit City Stores, Inc.,* 158 F.3d 742, 760 (4th Cir.
1998); *Williams v. Henderson,* 129 F. Appx. 806, 813 (4th Cir.
2005). "If the employer fails to make its employee[] aware of

vacancies, the application requirement may be relaxed and the employee treated as if she had actually applied for a specific position;" however, a plaintiff-employee "cannot be treated as if she had applied for [a vacant position] unless she can show that she would have applied had she known about them." *Williams v. Giant Food, Inc.,* 370 F.2d 423, 431, 433 (4th Cir. 2004). While Burgess cannot show that she applied for the position, Burgess's Declaration attached to her Opposition states unequivocally, that she "would have chosen to stay on at SIGIR in the Director of Public Affairs position or any other position in lieu of termination." (June 21, 2010 Decl. of Denise Burgess ¶ 4.) This declaration is un-rebutted. The second prong of the *Lowery* test is thus established, as is Plaintiff's *prima facie* case.

Under the *McDonnell Douglas* analysis, Defendant must now come forward with a legitimate non-discriminatory reason for denying Plaintiff the ability to transfer into the new Director of Public Affairs position. Defendant asserts that Burgess "was not the person for the job." (Mem. at 28.) As Cruz explained that she believed that the new Public Affairs position should be filled by one person "to do the heavy lifting, who was not above making the phone calls, who was not above doing . . . the day-to-day scheduling, management and callbacks . . ." (G. Ex. 1 (Cruz Test.) at 102:7-10.) In fact, before Burgess's

termination, she had "clearly explained to [Cruz] over the course of previous two months that she [Burgess] was unable to carry out the duties of Public Affairs without fewer than four people." (G. Ex. 1 (Cruz Test.) at 100:20-25, 101-102.) Cruz also testified that Burgess:

> needed an assistant to answer the phone, she would often [use] her assistants to get back to media contacts instead of her doing that callback. She did not have a conversant knowledge of the audits, inspections and quarterly report and so very often . . . she would rely on me to provide that information to reporters because she was not able to do so and so, as a manager, what went into my thinking, if I'm going to take a division of four people and I need to downsize it to one person to provide the support that the agency needs, it would need to be a person whose skills were not managerial, because there would be no one there to manage.

(G. Ex. 1 at 101-102.) Cruz genuinely perceived that the new Director of Public Affairs position should be filled by a lower level, hands-on employee who would provide the day-to-day support sought by Cruz. (G. Ex. 6 (Belisle Test.) at 224:20-24.) Cruz's July 3, 2007 email establishes that Cruz felt that Belisle was the appropriate individual to handle already slotted into the position prior to Burgess's termination and thus Belisle never even formally applied for the Director of Public Affairs. (G. Ex. 41 (July 3, 2007 Email and attachment); P. Ex. 11 (Belisle Dep.) at 116-17, 127-31, 133-34, 140-41.)

Burgess reiterates her arguments that the reorganization was mere pretext here that she was denied the

opportunity to apply because of her race.  In addition, Burgess argues that "if the Director position was indeed lower level then it necessarily consisted of duties that were part of the AIG-PA position, a position which SIGIR concedes Burgess performed ably."  (Opp. at 35.)  Plaintiff also disputes the Government's contention that as Burgess complained she could not perform the purportedly higher-level AIG-PA position without support it had an reflection on her ability or willingness to perform the supposedly lower-level Director position without support.  (Opp. at 35.)  What Plaintiff does not do is present any evidence of a connection between her race and the denial of her ability to transfer to the new position.

It is not enough for Plaintiff to believe that race was the basis for her termination and SIGIR's decision not to offer her a new position; there must be a sufficient record of proof for a reasonable jury to agree.  *See Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1995) (holding that a "plaintiff's beliefs, just like conclusory allegations, speculation and conjecture are simply insufficient to defeat a properly supported motion for summary judgment"); *see also Williams*, 871 F.2d at 456 (holding that "a plaintiff's own assertions of discrimination, in and of themselves, are insufficient to counter substantial evidence of legitimate, non-discriminatory reasons for an adverse employment action").

Ultimately, viewing the copious factual record and drawing all reasonable inferences in favor of Plaintiff, Burgess has not presented sufficient evidence to allow a reasonable jury to conclude that the SIGIR leadership denied Burgess because of her race.

B.    Retaliation under Title VII

The Plaintiff also alleges that her termination (Count Three) and denial of transfer (Count Four) were due to Defendant's unlawful retaliation against her for protesting the termination of Redmon.  (Compl. at ¶¶ 62-69.)  Many of the arguments laid out in the parties' briefing are repetitive as the burdens of proof and persuasion in "[r]etaliation claims function in parallel with the analysis used in disparate treatment cases." *Lamb v. Boeing,* 213 Fed. Appx. 175, 179 (4th Cir. 2007).  To establish a *prima facie* case of retaliation under Title VII, "a plaintiff is required to prove (1) that she engaged in a protected activity; (2) that an adverse employment action was taken against her; and (3) that there was a causal connection between the first two elements." *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 656 (4th Cir. 1998) (citing *Hopkins v. Baltimore Gas & Electric Co.,* 77 F.3d 745, 754 (4th Cir. 1998), *cert. denied,* 519 U.S. 818 (1996)).  If Plaintiff can establish a *prima facie* case, the burden then shifts to Defendant to proffer a legitimate, non-

retaliatory reason for its removal decision, which Plaintiff
must then rebut.  *Id.*

Assuming *arguendo* that Burgess was participating in a
protected activity, there is no evidence to support a finding
that there was a causal connection between her activity and the
adverse actions.  The allegedly "protected activities" here are
a verbal complaint made by Burgess to Cruz on July 19, 2007 and
an email complaint sent from Burgess to Cruz on July 23, 2007.
Both of this communications were with respect to the termination
of Redmon.  Cruz and Bowen have both testified that the decision to
eliminate the AIG-PA position, terminate Burgess's employment, and
hire another individual to assume SIGIR's public affairs duties
was made before Burgess's July 19, 2007 protest of Redmon's
termination.  (G. Ex. 20A (Bowen Dep.) at 144-148; G. Ex. 1
(Cruz Test.) at 167.)  Not only is the testimony of Cruz and
Bowen unrebutted, but it is also corroborated.  First, such
testimony is corroborated by the testimony of Arntson, who said
that he had discussed the reorganization and whether Burgess
should be terminated from SIGIR as early as late June or early
July 2007.  (P. Ex. 10 (Arntson Dep.) at 338-341.)  Second, such
testimony is corroborated by Cruz's July 3, 2007 email to
SIGIR's human resources director, two weeks before Burgess's
first complaint, attaching a draft revised organization chart
that included Kristine Belisle as the "Public Affairs Director."

(G. Ex. 41 (July 3, 2007 Email).)  As such, Burgess has not come forward with facts sufficient to show that there is a "genuine issue for trial," because the decision to eliminate her position was made well before Burgess engaged in any purported protected activity.

## IV.  Conclusion

For the reasons stated above, the Court will grant Defendant's Motion for Summary Judgment.  An appropriate Order will issue.

_____
/s/
James C. Cacheris
UNITED STATES DISTRICT COURT JUDGE

August 2, 2010
Alexandria, Virginia